Exhibit 3

2016-0175060-CV
**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

## General Civil Case Filing Information Form (Non-Domestic)

**16109795**

Reuben M. Green - 51
DEC 13, 2016 04:24 PM

*Rebecca Keaton*

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

| | | |
|---|---|---|
| **Court** | **County** ___Cobb___ | **Date Filed** ___12-13-2016___ |
| ☑ Superior | | MM-DD-YYYY |
| ☐ State | **Docket #** _____ | |

**Plaintiff(s)**

__MiMedx Group, Inc.__
Last    First    Middle I. Suffix Prefix    Maiden

_____
Last    First    Middle I. Suffix Prefix    Maiden

_____
Last    First    Middle I. Suffix Prefix    Maiden

_____
Last    First    Middle I. Suffix Prefix    Maiden

**Defendant(s)**

__Tornquist, Luke__
Last    First    Middle I. Suffix Prefix    Maiden

_____
Last    First    Middle I. Suffix Prefix    Maiden

_____
Last    First    Middle I. Suffix Prefix    Maiden

_____
Last    First    Middle I. Suffix Prefix    Maiden

**No. of Plaintiffs** __1__

**No. of Defendants** __1__

**Plaintiff/Petitioner's Attorney**   ☐ Pro Se

__Wargo, Joseph__
Last            First            Middle I.    Suffix

**Bar #** __738764__

**Related Case**

Case # _____

Parties _____

Assigned Judge _____

---

**Check Primary Type** (Check only **ONE**)

☐ Contract/Account

☐ Wills/Estate

☐ Real Property

☐ Dispossessory/Distress

☐ Personal Property

☐ Equity

☐ Habeas Corpus

☐ Appeals, Reviews

☐ Post Judgment Garnishment, Attachment, or Other Relief

☐ Non-Domestic Contempt

☑ Tort (If tort, fill in right column)

☐ Other General Civil Specify _____

_____

---

**If Tort is Case Type:**
(Check no more than **TWO**)

☐ Auto Accident

☐ Premises Liability

☐ Medical Malpractice

☐ Other Professional Negligence

☐ Product Liability

☑ Other Specify ___Other___

__Breach of Contract & Duty of Loyalty__

**Are Punitive Damages Pleaded?** ☑ Yes  ☐ No

---

☑ I hereby certify that the documents in this filing (including attachments and exhibits) satisfy the requirements for redaction of personal or confidential information in O.C.G.A. 9-11-7.1

2016-0175058-CV
**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**16109795**

Reuben M. Green - 51
**DEC 13, 2016 04:24 PM**

*Rebecca Keaton*
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

DISCLOSURE STATEMENT
CLERK OF SUPERIOR COURT

CASE NUMBER   (Assigned by Clerk)

# MIMEDX GROUP, INC.
Plaintiff

Vs.

# LUKE TORNQUIST
Defendant

## TYPE OF ACTION

- ◯ 1. Divorce without Agreement Attached
- ◯ 2. Divorce with Agreement Attached
- ◯ 3. Domestic Relations
- ◯ 4. Damages Arising out of Contract
- ◉ 5. Damages Arising out of Tort
- ◯ 6. Condemnation
- ◯ 7. Equity
- ◯ 8. Zoning – County Ordinance Violations (i.e., Injunctive Relief-Zoning)
- ◯ 9. Zoning Appeals (denovo)
- ◯ 10. Appeal, Including denovo appeal – excluding Zoning
- ◯ 11. URESA
- ◯ 12. Name Change
- ◯ 13. Other
- ◯ 14. Recusal
- ◯ 15. Adoption

## PREVIOUS RELATED CASES

Does this case involve substantially the same parties, or substantially the same subject matter, or substantially the same factual issues, as any other case filed in this court (Whether pending simultaneously or not)?

- ◉ NO
- ◯ YES – If yes, please fill out the following:
  1. Case #

  2. Parties

  3. Assigned Judge

  4. Is this case still pending?   ◯ Yes   ◯ No

  5. Brief description of similarities:

/S/ Joseph D. Wargo
Attorney or Party Filing Suit

2017-0003098-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**16109795**

JAN 09, 2017 05:58 PM

*Rebecca Keaton*

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

## IN THE SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

MIMEDX GROUP, INC.,                    )
                                       )
          Plaintiff,                   )
                                       )
v.                                     )          CIVIL ACTION FILE NO.
                                       )          16-109795
LUKE TORNQUIST,                        )
                                       )
          Defendant.                   )

### NOTICE OF APPEARANCE

Under Uniform Superior Court Rule 4.2, Shanon J. McGinnis of the law firm Wargo & French,

LLP, located at 999 Peachtree Street, NE, 26th Floor, Atlanta, Georgia 30309, hereby notifies the

Clerk of Court and the parties in this matter of her appearance as counsel for Plaintiff MiMedx

Group, Inc. in the above-referenced litigation.  Ms. McGinnis's appearance as counsel is in

addition to, not substitution for, Mr. Joseph D. Wargo's prior appearance.

*(Signature on next page.)*

1

Respectfully submitted, this 9th day of January 2017.

**WARGO & FRENCH, LLP**
*Counsel for Plaintiff MiMedx Group, Inc.*


*/s/ Shanon J. McGinnis*
Joseph D. Wargo
Georgia Bar No. 738764
E-mail: jwargo@wargofrench.com
Shanon J. McGinnis
Georgia Bar No. 387598
E-mail: smcginnis@wargofrench.com
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1501

**IN THE SUPERIOR COURT OF COBB COUNTY**
**STATE OF GEORGIA**

MIMEDX GROUP, INC.,               )
                                  )
                Plaintiff,           )
                                  )
v.                                )
                                  )        CIVIL ACTION FILE NO.
                                  )        16-109795
LUKE TORNQUIST,                   )
                                  )
                Defendant.          )

      I hereby certify that on this day, I served the foregoing **NOTICE OF APPEARANCE** by

U.S. Mail, postage pre-paid to the following:

Luke Tornquist
1818 Goodrich Avenue
St. Paul, MN 55105

      This 9th day of January 2017.

                                      */s/ Shanon J. McGinnis*_____
                                        Shanon J. McGinnis
                                        Georgia Bar No. 387598

IN THE SUPERIOR COURT FOR COBB COUNTY
STATE OF GEORGIA

MIMEDX GROUP, INC.,                    §
                                       §
        Plaintiff,                     §        CIVIL ACTION FILE
                                       §
v.                                     §        NO. 2016-0175057
                                       §
LUKE TORNQUIST,                        §
                                       §
        Defendant                      §

## NOTICE OF FILING AFFIDAVITS AND SUPPORTING EVIDENCE

Plaintiff MiMedx Group, Inc. ("MiMedx") hereby gives notice of filing and serving of the following affidavits and supporting evidence:

- Affidavit of Kevin Lilly of MiMedx Group, Inc., dated January 20, 2017, attached hereto as Exhibit "A";

- Affidavit of Lee Ann Lawson of MiMedx Group, Inc., dated January 10, 2017, attached hereto as Exhibit "B";

- Affidavit of Kirk Alexander of Academy Medical, LLC, dated January 13, 2017, attached hereto as Exhibit "C"; and

- Academy Medical, LLC records, attached hereto as Composite Exhibit "D".

The foregoing Affidavits and supporting evidence are to be considered by this Court in support of Plaintiff's Petition for Temporary Restraining Order and Interlocutory Injunction, and in support of any future motions or trial in this action.

Respectfully submitted, this 20th day of January, 2017.

                            WARGO & FRENCH, LLP

                            /s/ Joseph D. Wargo
                            Joseph D. Wargo
                            Georgia Bar No. 738764

E-mail: jwargo@wargofrench.com
Shanon J. McGinnis
Georgia Bar No. 387598
E-mail: smcginnis@wargofrench.com
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1506

*Counsel for Plaintiff*
*MiMedx Group, Inc.*

IN THE SUPERIOR COURT FOR COBB COUNTY
STATE OF GEORGIA

MIMEDX GROUP, INC.,                §
                                   §
        Plaintiff,                 §        CIVIL ACTION FILE
                                   §
        v.                         §        NO. 2016-0175057
                                   §
LUKE TORNQUIST,                    §
                                   §
        Defendant                  §

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I served the foregoing **NOTICE OF FILING AFFIDAVITS AND SUPPORTING EVIDENCE** by U.S. Mail, postage pre-paid to Defendant addressed as follows:

Luke Tornquist
1818 Goodrich Avenue
St. Paul, MN 55105

I hereby further certify that on this day, I provided a courtesy copy of the foregoing **NOTICE OF FILING AFFIDAVITS AND SUPPORTING EVIDENCE** by U.S. Mail, postage pre-paid, addressed as follows:

David Allen Roberts, Esq.
Hall, Arbery, Gilligan, Roberts & Shanlever LLP
3340 Peachtree Road NE – Suite 1900
Atlanta, GA 30326-1082

Respectfully submitted, this 20th day of January, 2017.

**WARGO & FRENCH, LLP**
*/s/ Joseph D. Wargo*
Joseph D. Wargo
Georgia Bar No. 738764

# EXHIBIT A

### AFFIDAVIT OF KEVIN LILLY

STATE OF GEORGIA

COUNTY OF COBB

Before me, this day personally appeared Kevin Lilly, who, upon first being duly sworn, states as follows:

1.    I am an adult over the age of eighteen (18), and I am suffering under no disability that would prevent me from giving this Affidavit.  I have personal knowledge of the facts contained herein.  I would provide competent testimony to the matters stated in this affidavit if called upon to do so.

2.    I have been employed by MiMedx Group, Inc. ("MiMedx") since July 2015, most recently as Senior Vice President, Wound Care.  My job responsibilities as the Senior Vice President, Wound Care of MiMedx include direct management of the Area Vice Presidents as well as executing all sales management activities to attain the revenue each quarter.  My responsibilities also include establishing and maintaining the people, process and technologies to consistently and predictably attain our revenue commitments.

3.    MiMedx is a leading regenerative medicine company utilizing human amniotic tissue and patent-protected processes to develop and market advanced products and therapies to various healthcare sectors.  MiMedx's products are used in multiple therapeutic areas, including, but not limited to, ophthalmology, spine, chronic wounds, dental, orthopedic surgery, sports medicine and urology.

4.    MiMedx sells its medical products in Florida, Georgia, and throughout the United States in a highly competitive segment of the health care industry.  MiMedx competitors include Amnio Technology, LLC; Muscularskeletal Transplant Foundation; Advanced Biologics; Aziyo

1

Biologics, Inc.; and Lattice Biologics. MiMedx's clients include Veterans' Affairs hospitals ("VA Hospitals") in many states.

5.    MiMedx uses its trade secret and other confidential information to conduct its business.  Among the most sensitive of MiMedx's business information is detailed customer contact information, data concerning its sales to its customers and marketing information which is relied upon by its salespeople to promote the sale of MiMedx's products.

6.    In the ordinary course of MiMedx's business, MiMedx maintains records of its sales of its products to its customers and marketing information used by its salespeople.  These MiMedx business records include: (1) sales information on salesforce.com, which identifies the person(s) who act as the contact for the customer, the specific tissue product sold under each purchase order, the doctors for whom each tissue was ordered, the account history (from which usage reports may be derived), and other sales related information (the "Salesforce Database"); (2) excel spreadsheets which detail the tissue products by stock keeping unit ("SKU") numbers and quantity for each MiMedx customer and doctor using the same (the "Excel Sales Spreadsheets"); and (3) a repository of marketing and sales materials generated by MiMedx to assist its salespersons in their marketing and sale of MiMedx products, which includes detailed comparisons of the efficacy and other qualities of MiMedx's medical products as compared with directly competitive and comparable products of other manufacturers (the depository is referred to as "Box").  Information contained in the Salesforce Database, Excel Sales Spreadsheets and Box (collectively, the "Sales Trade Secrets") is gathered and inputted by MiMedx in the ordinary course of its business by its authorized personnel who have access to this sales and marketing information in the ordinary and normal course of performing their job functions.  MiMedx maintains and uses the Sales Trade Secrets in the regular and ordinary course of its business.

2

7.      MiMedx is the administrator of the Salesforce Database.  MiMedx sets access control lists for the Salesforce Database, which determines which of its employees have access to what information, based on their job responsibilities (including sales territory) and seniority level.  Access to the Salesforce Database is only permitted by use of a user name, which MiMedx administers, and the user's password.  The information in the MiMedx Salesforce Database is confidential and proprietary to MiMedx, and is available to MiMedx employees on a need-to-know basis as determined by John Boney, MiMedx's Business Analytics Manager who manages the Salesforce Database.  The information on the MiMedx Salesforce Database is not available to MiMedx's competitors, and is not available to the public.

8.      The information contained in the MiMedx Excel Sales Spreadsheets is maintained on MiMedx's computer servers located in Marietta, Georgia.  MiMedx limits access to this information based on the sales employee's territory.  Access to MiMedx's Excel Sales Spreadsheets is only permitted by use of a user name, which MiMedx administers, and the user's password.  The information in the MiMedx Excel Sales Spreadsheets is confidential and proprietary to MiMedx and is available to MiMedx employees on a need-to-know basis as determined by Travis Tucker, MiMedx's Vice President of Informatics, who manages the Excel Sales Spreadsheets.  The information on the MiMedx Excel Sales Spreadsheets is not available to MiMedx's competitors, and is not available to the public.

9.      The information contained in Box is maintained on MiMedx's computer servers located in Marietta, Georgia.  Access to the documents contained in the Box is only permitted by use of a user name, which MiMedx administers, and the user's password.  The information in Box is confidential and proprietary, and is made available to MiMedx's salespeople to assist them in procuring sales of MiMedx product, including by providing information which can be

used to help persuade a customer to purchase a MiMedx product rather than a product of MiMedx's customers. The information in the MiMedx Box is not available to MiMedx's competitors, and is not available to the public.

10.     Jess Kruchoski ("Kruchoski") was until recently a Regional Sales Director of the North Central Region for MiMedx, a position he assumed in or about October, 2013. MiMedx's North Central Region covers the States of Iowa, Minnesota, Nebraska, North Dakota, South Dakota and Wisconsin. As a result of his position with MiMedx, Kruchoski had access to MiMedx's confidential Sales Trade Secrets for the entirety of the North Central Region during his employment. Prior to and as a condition of his employment with MiMedx, Kruchoski executed (among other contracts) a Non-Competition Agreement and a Confidentiality and Non-Solicitation Agreement.

11.     As a result of Kruchoski's position as MiMedx's Regional Sales Director of the North Central Region, Kruchoski had access to MiMedx's Sales Trade Secrets for that Region. Kruchoski thus had detailed confidential information concerning MiMedx's sales throughout the North Central Region, including detailed tissue product information (by SKU number) purchased for use by particular doctors and medical groups.

12.     Luke Tornquist ("Tornquist") was until recently an Account Executive for MiMedx, a position he assumed in or about September, 2013. Tornquist was responsible for MiMedx's sales in Minnesota, including without limitation to the Minneapolis VAMC and the St. Cloud VAMC. During Tornquist's employment with MiMedx, Kruchoski was Tornquist's direct supervisor. Prior to and as a condition of his employment with MiMedx, Tornquist executed (among other contracts) a Non-Competition Agreement and a Confidentiality and Non-Solicitation Agreement.

4

13.     As a result of Tornquist' position as MiMedx's Account Executive for Minnesota, Tornquist had access to MiMedx's Sales Trade Secrets for Minnesota.  Tornquist thus had detailed confidential information concerning MiMedx's sales throughout Minnesota, including detailed tissue product information (by SKU number) purchased for use by particular doctors and medical groups.

14.     During 2015-2016, Avi Carter ("Carter") was employed by MiMedx as an Account Executive.  Carter was responsible for MiMedx's sales in Utah and Montana, including without limitation to the Salt Lake City VAMC and the Ft. Harrison VAMC.

15.     During 2015- June, 2016, Matt Bloemer ("Bloemer") was employed by MiMedx as an Account Executive.  Bloemer was responsible for MiMedx's sales in Ohio, including without limitation to the Dayton VAMC.

16.     During 2015-2016, Mike Wilson ("Wilson") was employed by MiMedx as an Account Executive.  Wilson was responsible for MiMedx's sales in Wisconsin.

17.     During 2015-2016, Cara Margolis n/k/a Gargan ("Margolis") was employed by MiMedx as an Account Executive.  Margolis was responsible for MiMedx's sales in Michigan.

18.     During 2015-2016, Vance Nardin ("Nardin") was employed by MiMedx as an Account Executive.  Nardin was responsible for MiMedx's sales in Michigan.

19.     I understand that Academy Medical, LLC ("Academy Medical") has produced records showing that Kruchoski and Tornquist were involved in sales of other companies' products to the following, all of whom are customers of MiMedx:

    Dayton, OH VMAC
    Ft. Harrison, MT VMAC
    Iowa City, IA VMAC
    Lexington, KY VMAC
    Lexington, KY CBOC
    Minneapolis, MN VMAC

St. Cloud, MN VMAC
Sioux Falls, SD VMAC
Salt Lake City, UT VMAC
West Palm Beach, FL VAMC.

20.     For example, I understand that Academy Medical's records show that Kruchoski and Tornquist were involved in the sale of PalinGen Flow to the Minneapolis Veterans' Affairs Hospital in February and April, 2016.  The Academy Medical documents I have reviewed in this regard are referred to in the Affidavit of Kirk Alexander and marked with document control numbers ACADEMY_006372 (at lines 1660 and 1661, which show Kruchoski as the sales representative for these transactions) and certain emails marked with document control numbers ACADEMY_005788-ACADEMY_005796,   and   ACADEMY_002138   (which   show   that Tornquist was Kruchoski's sales representative in Minnesota).

21.     The Minneapolis Veterans' Affairs Hospital is a customer of MiMedx, located within the North Central Region (Minnesota) for which Kruchoski and Tornquist were responsible – both having personal contact with the Minneapolis Veterans' Affairs Hospital within the past two years – and for which they had confidential MiMedx Sales Trade Secrets. PalinGen Flow is sold by Amnio Technology, LLC, a competitor of MiMedx, and is competitive with various MiMedx tissue products sold under the brand name "OrthoFlo," "EpiFix Micronized," and "AmnioFix Injectable."

22.     At the time of the February 2016 sale and the April 2016 sale of PalinGen Flow to the Minneapolis Veterans' Affairs Hospital, Kruchoski and Tornquist had confidential MiMedx Sales Trade Secrets that would materially assist Kruchoski and Tornquist in making those sales. In this regard, Kruchoski and Tornquist were aware of the quantities of the specific MiMedx tissues (identified by particular SKU numbers for MiMedx products which are competitive with

PalinGen Flow) sold to the Minneapolis Veterans' Affairs Hospital for 2015 and early 2016, and as a result knew the type of competitive PalinGen Flow product to sell to that MiMedx customer.

23.     Academy Medical's business records also show it sold TranZgraft Acellular Dermis ("TranZgraft") to the West Palm Beach Veterans' Affairs Hospital on July 31, 2015. The Academy Medical business records show that the sales representative for this transaction were Lex Harris and Bill Wagner (see ACADEMY_006367 (line 1162) and ACADEMY_006376 (line 1970). The West Palm Beach Veterans' Affairs Hospital is a customer of MiMedx. TranZgraft is sold by Aziyo Biologics, Inc., a competitor of MiMedx, and is competitive with various MiMedx tissue products, including those sold under the brand names "AmnioFix" and "EpiFix."

24.     Bill Wagner ("Wagner") is currently the Regional Sales Director for Florida (effective January 1, 2016). He was previously the Area Director for Federal Sales responsible for the States of Alabama, Florida, Georgia, Louisiana, Mississippi and South Carolina (after being promoted from a sales representative position on July 1, 2015). In the Area Director of Federal Sales role, Wagner had access to MiMedx Sales Trade Secrets that would materially assist in making sales of TranZgraft to the West Palm Beach Veterans' Affairs Hospital. In this regard, Wager was aware of the quantities of the specific MiMedx tissues (identified by particular SKU numbers for MiMedx products which are competitive with TranZgraft) sold to the West Palm Beach Veterans' Affairs Hospital in 2014 and the first six months of 2015, and as a result knew the type of competitive TranZgraft product to sell to that MiMedx customer.

25.     Academy Medical's business records also show that it sold DBM Putty to the Salt Lake City Veteran's Affairs Hospital on January 21, 2016. The Academy Medical business

records show that the sales representatives for this transaction were Harris and Kruchoski (see ACADEMY_006360 (line 588), ACADEMY_006372 (line 1657). DBM Putty is competitive with product sold by Stability Biologics (a company acquired by MiMedx earlier in January, 2016) called "H-Genin DBM Putty." The Salt Lake City VA Hospital is a customer of MiMedx.

26.     MiMedx's business is driven in large part by the personal trust and relationships its sales representatives have with doctors and hospitals, and the ability of its sales representatives to provide guidance for doctors' medical product choices. Through investment of significant time and resources, MiMedx creates and fosters their sales representatives' ability to develop personal relationships with and provide guidance for medical product choices by its customers.    For example, Box is particularly designed to promote MiMedx's sales representatives' ability to pitch MiMedx's medical products as superior to those of its competitors for particular types of wound treatments.

27.     In this regard, MiMedx's customers have various options for patient wound treatments.  As a result of MiMedx's efforts, its sales representatives are enabled to more effectively direct MiMedx's customers to use MiMedx medical products for wound treatments, especially through the use of information concerning these product choices on Box.

28.     Consequently, MiMedx employees who use Sales Trade Secrets to sell competitors' products to MiMedx's customers are trading on MiMedx' good will which MiMedx paid for and facilitated.  Indeed, someone armed with MiMedx's Sales Trade Secrets which, as explained above, have detailed information concerning customer tissue purchases and competitive alternatives, would know which MiMedx customers to target with particular products sold by MiMedx's competitors.  Use of MiMedx's confidential Sales Trade Secrets by MiMedx employees to sell medical products of other companies is thus especially damaging to

MiMedx's relationships with its customers, as absent such solicitation, MiMedx tends to do repeat business with its customers.

**FURTHER AFFIANT SAYETH NOT** this 20th day of January, 2017.

KEVIN LILLY
Senior Vice President, Wound Care
MiMedx Group, Inc.

Sworn to and subscribed before me this 20 day of January, 2017, by Kevin Lilly , who is ✓ personally known to me, or ___ produced the following type of identification _____.

Notary Public
My commission expires: January 13, 2018

SUSAN PALERMO
NOTARY
EXPIRES
GEORGIA
JAN. 13, 2018
PUBLIC
COBB COUNTY

9

# EXHIBIT B

## AFFIDAVIT OF LEE ANN LAWSON

STATE OF GEORGIA

COUNTY OF COBB

Before me, this day personally appeared Lee Ann Lawson ("Affiant") who, upon first being duly sworn, states as follows:

1.     I am over the age of eighteen (18), and I am suffering under no disability that would prevent me from giving this Affidavit. I have personal knowledge of the facts contained herein. I would provide competent testimony to the matters stated in this Affidavit if called upon to do so.

2.     I have been employed by MiMedx Group, Inc. ("MiMedx") since June 2012, most recently as Vice President, Human Resources.

3.     Reid Harris ("Harris") was employed by MiMedx from May 2012 until June 2014 as a National Sales Director. Harris was a consultant for MiMedx from June 2014 until February 2016. MiMedx terminated Harris when it learned Harris was working for MTF, a competitor of MiMedx. Attached hereto as Exhibit 1 is a true and correct copy of MiMedx's letter terminating MiMedx's consulting agreement with Harris.

4.     Jess Kruchoski ("Kruchoski") was employed by MiMedx from July 2012 until December 2016. Kruchoski was an Account Executive for MiMedx in Wisconsin and Minnesota from July 2012 until October 2013. From October 2013 until December 2016, Kruchoski was a Regional Sales Director for MiMedx's North Central Region, which covers Iowa, Minnesota, Nebraska, North Dakota, South Dakota and Wisconsin.

5.      Luke Tornquist ("Tornquist") was employed by MiMedx from September 2013 until December 2016 as an Account Executive for MiMedx in Minnesota.  Kruchoski was Tornquist's direct supervisor.

6.      In the ordinary course of its business and due to the highly-competitive nature of MiMedx's business, MiMedx requires as a condition to employment that its employees execute a non-competition agreement and a confidentiality/non-solicitation agreement.  At the time a new employee is hired, these agreements are created and executed by MiMedx personnel with knowledge of the agreements and with a business duty to create such agreements.  It is MiMedx's regular practice to make these agreements and they are kept in the course of MiMedx's regularly conducted business.

7.      Attached hereto as Exhibit 2 are true and correct copies of the Non-Competition Agreement and the Confidentiality/Non-Solicitation Agreement between Harris and MiMedx.

8.      Attached hereto as Exhibit 3 are true and correct copies of the Non-Competition Agreement and the Confidentiality/Non-Solicitation Agreement between Kruchoski and MiMedx.

9.      Attached hereto as Exhibit 4 are true and correct copies of the Non-Competition Agreement and the Confidentiality/Non-Solicitation Agreement between Tornquist and MiMedx.

10.     During 2015-2016, Avi Carter, Matt Bloemer, Mike Wilson, Cara Margolis (n/k/a Gargan), and Vance Nardin, were all employees of MiMedx.  Each entered into non-competition agreements and confidentiality/non-solicitation agreements at the inception of their employment with MiMedx that contained identical or substantially similar terms as those entered into by Harris, Kruchoski and Tornquist.

[SIGNATURE ON NEXT PAGE]

**FURTHER AFFIANT SAYETH NOT** this \_\_\_ day of January, 2017.

_(signature)_

Lee Ann Lawson
Vice President, Human Resources
MiMedx Group, Inc.

Sworn to and subscribed before me this _10th_ day
of _JAN_ , 2017, by Lee Ann Lawson,
who is _✓_ personally known to me
or \_\_\_ produced the following type of identification:

_____

_Marianne M. Barbour_
Notary Public
My commission expires: _5/27/2018_

```
MARIANNE M. BARBOUR
    NOTARY PUBLIC
     Fulton County
    State of Georgia
My Comm. Expires May 27, 2018
```

# EXHIBIT 1



February 24, 2016

Reid A. Harris
12844 River Dance Drive
Raleigh, NC 27613

Dear Lex:

It has come to our attention that you have become employed by the Musculoskeletal Transplant Foundation (MTF). MiMedx has serious concerns about your ability to continue to serve as a consultant pursuant to that certain consulting agreement entered into between you and MiMedx Group, Inc. with an original effective date of June 28, 2014 (the "Consulting Agreement"). Specifically, the Consulting Agreement holds that you will keep confidential all MiMedx Confidential Information, and that you will not provide consulting services to any other company whose business is directly competitive with the business of MiMedx. MTF is a seller of allograft tissues, including allografts that MiMedx alleges in active litigation infringe on our patents. We therefore consider MTF to be a direct competitor.

We are disappointed that you chose not to notify MiMedx of this development, which we believe clearly violates the spirit of the obligation not to provide services to direct competitors of MiMedx while you are being compensated by MiMedx under the Consulting Agreement.

Accordingly, pursuant to Section 3 of the Consulting Agreement, you are hereby given notice of termination of the Consulting Agreement, effective February 26, 2016. I remind you of your continuing obligations under Sections 5, 6, and 7 of the Consulting Agreement, which require you to (1) immediately return to MiMedx all documents related to MiMedx that were received or created by you during the term of the Consulting Agreement, and (2) maintain the confidentiality of all Confidential Information of MiMedx for a period of two (2) years after the termination thereof. You may direct all Confidential Information being returned to my attention.

MiMedx reserves all rights available to it under the Consulting Agreement and pursuant to applicable law.

Sincerely,

Alexandra O. Haden
General Counsel & Secretary

Cc:     Pete Petit
        Bill Taylor
        Thornton Kuntz
        Christopher Cashman
        Mike Carlton

Regenerative Biomaterials

Innovations in Regenerative Biomaterials

# EXHIBIT 2

*MiMedx Copy*

# Non-Competition Agreement

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Reid A. Harris, Jr. ("Employee"). In consideration of the employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

## 1. Non-Competition

(a) The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, manufacturer and marketer of A) collagen based biomaterials or products and durable hydrogel biomaterials or products, B) bioimplants manufactured from human amniotic membrane or C) amnion based products (the "Business"). Employee is responsible for managing and supporting the Company's Sales & Marketing for the Business throughout the United States. The Employee agrees that, due to Employee's position, Employee's engaging in any business which is competitive with the Business will cause the Company great and irreparable harm.

(b) The Employee agrees that Employee's work for the Company will bring Employee into close contact with many of the Company's customers, trade secrets and confidential and proprietary information. The Employee further agrees that the covenants in subsection 1(d) of this Agreement are reasonable and necessary to protect the Company's legitimate business interests in its customer relationships, trade secrets and proprietary and confidential information. The Employee agrees that the Employee would inevitably disclose the Company's confidential information and trade secrets if he were to violate subsection 1(d).

(c) The Employee agrees that while employed by the Company, Employee will faithfully devote Employee's best efforts to advance the interests of the Company and will not directly or indirectly, on Employee's own behalf or another's behalf, engage in any manner in any business of the type described in subsection 1(a) other than as an employee of the Company.

(d) The Employee agrees that, for one (1) year after the cessation of employment with the Company, the Employee will not, directly or indirectly, perform the same or substantially the same job duties described in subsection 1(a) on behalf of any business that competes with the Business of the Company. Subsection 1(d) is limited to the 48 contiguous states of the United States.

## 2. Severability

If any part or provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, such determination shall not affect the validity of any other part or provision of this Agreement, but such other parts or provisions shall remain in full force and effect. Each provision, paragraph, and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. If a court concludes that any provision, paragraph or subparagraph of this Agreement is overbroad or unenforceable for any reason, the court may modify that provision, paragraph or subparagraph to the minimum extent necessary and then enforce it as modified. The covenants in this Agreement are independent of any other rights or obligations between the parties, and any dispute between the parties as to any such right or obligations shall not delay, preclude or otherwise limit the enforcement of any rights or obligations in this Agreement.

## 3. Successors

This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and the Employee, Employee's heirs, executors and administrators.

## 4. Injunctive Relief

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the courts enjoining said breach or threatened breach. The Employee further acknowledges that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

Employee Initial

5. Waiver of Breach

The Company's waiver of a breach of any provision of this Agreement by the Employee does not waive any subsequent breach by the Employee, nor does the Company's failure to take action against any other employee for similar breaches operate as a waiver by the Company of a breach.

6. Entire Agreement and Modification

This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein and may not be modified, changed or altered by any promise or statement by the Company other than in writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other all prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

7. Choice of Law and Forum Selection

All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida without reference to principles of conflict of laws. Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in the State of Florida, and the Employee and the Company hereby submit to personal jurisdiction in the State of Florida and to venue in such courts. In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

8. Future Employment

For so long as the restricted periods in the covenants in this Agreement remain in effect, Employee shall provide any employers or prospective employers with a copy of this Agreement. For so long as the restricted periods in the covenants in this Agreement remain in effect, the Employee also expressly consents to the Company providing a copy of this Agreement to any of the Employee's future employers.

The parties hereto have duly executed this Agreement on the date identified below.

**Employee has carefully read and understands the provisions of this Agreement and has had the opportunity to seek independent legal advice prior to signing this Agreement. Nothing contained in this Agreement creates a contractual right to continued employment for a definite term, and either Party may terminate the Employee's employment with the Company with or without cause at any time and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.**

Executed this ___24TH___ day of ___MAY___ , 20 _12_ .
      (day)          (month)      (year)

_Reid A. Harris, Jr._
REID A. HARRIS JR.
(Print Name)

MiMedx Group, Inc.

By:  Thornton A. Kuntz, Jr.
Vice President, Human Resources and Administration

Page 2 of 2

*MiMedx Copy*

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Reid A. Harris, Jr. ("Employee"). in consideration of the employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1.  Definitions.

    (a)  "Business" means the business of an integrated developer, manufacturer and marketer of A) collagen based biomaterials or products and durable hydrogel biomaterials or products, B) bioimplants manufactured from human amniotic membrane or C) amnion based products.

    (b)  "Customer of Company" means a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others.

    (c)  "Material Contact" as used in Section 5 below means personal contact with a Customer of the Company in an effort to initiate, maintain or further a business relationship between Company and such Customer. "Material Contact" as used in Section 6 below means direct personal contact between Employee and another employee of the Company, its parent or other subsidiary of its parent in the performance of Employee's job duties on behalf of the Company.

    (d)  "Confidential Information" means information about the Company, its parent and the other subsidiaries of its parent and their respective employees, Customers, products, patients and/or business relationships with other parties which is not generally known outside of the applicable entity, which Employee learns of, receives knowledge of or access to, or develops or obtains from examination, testing or analysis, at any time and in any form or media, whether oral, written, graphic, machine readable, sample form draft, or other media, or in information storage and retrieval systems, in connection with Employee's employment with the Company, and which would be useful to competitors of the applicable entity. Confidential Information includes, but is not limited to: (1) business and employment policies, marketing methods and the targets of those methods, bids, proposals, financial data, Customer lists, business plans, promotional materials and pricing; (2) the terms upon which the applicable entity obtains products from its vendors; (3) the nature, origin, composition and development of the Company's products; (4) all data, reports, analyses, notes, interpretations, forecasts, records, documents, agreements and information concerning the applicable entity or other parties which are not generally available to the public, analysis of a possible business relationship or transaction between the applicable entity and other parties, at any time and in any form, whether or not expressly marked as proprietary or confidential, including without limitation business plans; customer lists; financial statements and other financial information of the disclosing party and its customers; suppliers; know-how; strategic or technical data; technology (including without limitation all design, manufacturing and related technology); sales and marketing data; marketing research data; product research and development data; software programs (including source code), designs, developments, data and any components thereof, whether or not copyrightable; intellectual property; pricing information; any oral, written or visual information obtained by meeting representatives or personnel of the other  party or touring its facilities;  all oral or written analyses (including any valuation or proposed price or range of prices for the stock or assets of either party), notes, analyses, compilations, studies, interpretations or other documents and all copies thereof prepared by either party of the affiliated entity's business relationship, which contain, reflect or are based upon, in whole or in part, any of the information which is described in the this clause; and the content and substance of any discussions or negotiations between the affiliated entity and other parties, and the fact that such discussions or negotiations have taken place.: (5) information provided by third parties which the Company has a duty to protect from disclosure; (6) personnel information; (7) information regarding technology used by the applicable entity in the business; and (9) clinical trial data and outcomes

    (e)  "Trade Secrets" means Confidential Information which meets the additional requirements of the Uniform Trade Secrets Act or similar state law, as applicable.

2.  Employment. Employee agrees to faithfully perform the duties assigned to Employee, and will not engage in any other employment or business activity while employed by Company which would interfere with Employee's full-time performance of Employee's duties for Company, or cause a conflict of interest. Employee covenants that Employee is not subject to any agreements with a prior employer restricting Employee's ability to work for Company. Employee further covenants that Employee does not possess any property or Confidential Information belonging to any prior or existing employer for use on behalf of Company. Employee agrees to abide by all of the Company's policies and procedures, which may be amended from time to time.

3.  Duty of Confidentiality. Employee agrees that during employment with the Company and for a period of three (3) years following the end of that employment for any reason, Employee shall hold all Confidential Information in confidence and shall not directly or indirectly divulge or make use of, copy, publish, summarize or remove any Confidential Information or Trade Secrets outside of employment with Company without prior written consent of the Company, except as otherwise required pursuant to valid judicial order, provided Employee shall provide written notice of such order to, and shall use Employee's best efforts to cooperate with, the Company to obtain a protective order or other remedy to ensure that confidential treatment will be afforded such Confidential Information. Employee acknowledges that applicable law may impose longer duties of non-disclosure. Notwithstanding anything herein to the contrary, Employee's obligations regarding the Company's Trade Secrets shall survive the termination of Employee's employment for any reason and shall continue thereafter for the maximum period of time permitted under applicable law. The term "Confidential Information" does not include, however, information which  (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (b) Employee can show was within Employee's possession prior to its being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a

Employee initial

confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (c) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; (d) is independently developed by Employee without the aid, application or use of the Confidential Information; or (e) is explicitly approved for release by written authorization of the Company.

4. <u>Company Property and Information</u>.  The sole and exclusive property and information belonging to the Company includes, without limitation, all papers, records, data, notes, drawings, files, documents, and other materials, including all copies of such materials, relating to the Employee's employment services or the business of the Company that Employee possesses or creates as a result of or during Employee's employment by the Company, whether or not confidential, as well as all Company-issued equipment vehicles, keys, devices, computers, cell phones and hand-held communication devices, pagers, and data and information storage and retrieval devices. Employee agrees to return all of the Company's property and information within three (3) days following the end of Employee's employment with the Company for any reason.  To the extent Employee maintains property and information belonging to Company in electronic form on any computers or other electronic devices owned by Employee, Employee agrees to delete all such information fully and finally within three (3) days following the end of employment with Company for any reason, and, if requested by Company, to confirm the fact of such deletion in writing.

5. <u>Non-Solicitation Covenant</u>.  While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit from any of the Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company any business in competition with the Business of the Company. It is understood by the Employee that (i) the Company has attempted to limit Employee's right to solicit Customers only to the extent necessary to protect the Company from unfair competition during the twelve (12) months following the end of employment, and (ii) the purpose of these covenants and promises is (and that they are necessary) to protect the Company's legitimate business interests, and to protect and retain (and to prevent Employee from unfairly and to the detriment of the Company utilizing or taking advantage of) those substantial contacts and relationships (including those with Customers of the Company) which Employee may establish due to Employee's employment with the Company. Employee represents that Employee's experience and abilities are such that existence or enforcement of these covenants and promises will not prevent Employee from earning or pursuing an adequate livelihood and will not cause an undue burden to Employee or Employee's family.

6. <u>Non-Recruitment of Company Employees</u>.  While employed by the Company, and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of its parent with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company for the purpose of encouraging, enticing, or causing said employee to terminate employment with the Company.

7. <u>Other Employment After Termination</u>.  Employee acknowledges and represents that Employee has substantial experience and knowledge such that Employee can readily obtain subsequent employment which does not violate this Agreement.

8. <u>Choice of Law and Forum Selection</u>.  All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida without reference to principles of conflict of laws.  Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in the State of Florida, and the Employee and the Company hereby submit to personal jurisdiction in the State of Florida and to venue in such courts.  In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

9. <u>Construction of Agreement</u>.  The covenants contained herein shall be presumed to be enforceable, and any reading causing unenforceability shall yield to a construction permitting enforcement. If any single covenant or clause shall be found unenforceable, it shall be severed and the remaining covenants and clauses enforced in accordance with the tenor of the Agreement.  In the event a court should determine not to enforce a covenant as written due to overbreadth, the parties specifically agree that said covenant shall be enforced to the extent reasonable, whether said revisions be in time, territory, or scope of prohibited activities.

10. <u>Successors</u>.  This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and the Employee, Employee's heirs, executors and administrators.

11. <u>Entire Agreement and Modification</u>.  This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein and may not be modified, changed or altered by any promise or statement by the Company other than in writing signed by Employee and an authorized representative of Company.  This Agreement supersedes and entirely replaces any other prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein.  The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

12. <u>Injunctive Relief</u>.  Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the federal or state courts located in the State of Florida enjoining said breach or threatened breach.  The existence of any claim or cause of action by Employee against the Company, including any dispute relating to the termination of this Agreement, shall not constitute a defense to enforcement of the

covenants and promises contained herein by injunction. Employee further acknowledged that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

**Employee has carefully read and understands the provisions of this Agreement, and has had the opportunity to seek independent legal advice prior to signing the Agreement. Nothing contained in this Agreement creates a contractual right to employment for a definite term, and either party may terminate the employment subject to this Agreement with or without cause at any time, and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.**

Executed this _____ day of _____, _____.
              *(day)*                    *(month)*            *(year)*

_____
Reid A. Harris, Jr.

LEX HARRIS
_____
(Print Name)

MiMedx Group, Inc.

By: Thornton A. Kuntz, Jr.
    Vice President, Human Resources and Administration

Employee initial

Page 3 of 3

# EXHIBIT 3

# Non-Competition Agreement

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Jess Kruchoski ("Employee"). In consideration of the employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

## 1. Non-Competition

(a) The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, manufacturer and marketer of A) collagen based biomaterials or products and durable hydrogel biomaterials or products, B) bioimplants manufactured from human amniotic membrane or C) amnion based products (the "Business"). Employee is responsible for managing and supporting the Company's Sales & Marketing for the Business throughout the United States. The Employee agrees that, due to Employee's position, Employee's engaging in any business which is competitive with the Business will cause the Company great and irreparable harm.

(b) The Employee agrees that Employee's work for the Company will bring Employee into close contact with many of the Company's customers, trade secrets and confidential and proprietary information. The Employee further agrees that the covenants in subsection 1(d) of this Agreement are reasonable and necessary to protect the Company's legitimate business interests in its customer relationships, trade secrets and proprietary and confidential information. The Employee agrees that the Employee would inevitably disclose the Company's confidential information and trade secrets if he were to violate subsection 1(d).

(c) The Employee agrees that while employed by the Company, Employee will faithfully devote Employee's best efforts to advance the interests of the Company and will not directly or indirectly, on Employee's own behalf or another's behalf, engage in any manner in any business of the type described in subsection 1(a) other than as an employee of the Company.

(a) The Employee agrees that, for one (1) year after the cessation of employment with the Company, the Employee will not, directly or indirectly, perform the same or substantially the same job duties described in subsection 1(a) on behalf of any business that competes with the Business of the Company. Subsection 1(d) is limited to the 48 contiguous states of the United States.

(b)

## 2. Severability

If any part or provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, such determination shall not affect the validity of any other part or provision of this Agreement, but such other parts or provisions shall remain in full force and effect. Each provision, paragraph, and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. If a court concludes that any provision, paragraph or subparagraph of this Agreement is overbroad or unenforceable for any reason, the court may modify that provision, paragraph or subparagraph to the minimum extent necessary and then enforce it as modified. The covenants in this Agreement are independent of any other rights or obligations between the parties, and any dispute between the parties as to any such right or obligations shall not delay, preclude or otherwise limit the enforcement of any rights or obligations in this Agreement.

## 3. Successors

This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and the Employee, Employee's heirs, executors and administrators.

## 4. Injunctive Relief

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the courts enjoining said breach or threatened breach. The Employee further acknowledges that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

Employee Initial

## 5. Waiver of Breach

The Company's waiver of a breach of any provision of this Agreement by the Employee does not waive any subsequent breach by the Employee, nor does the Company's failure to take action against any other employee for similar breaches operate as a waiver by the Company of a breach.

## 6. Entire Agreement and Modification

This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein and may not be modified, changed or altered by any promise or statement by the Company other than in writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other all prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

## 7. Choice of Law and Forum Selection

All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida without reference to principles of conflict of laws. Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in the State of Florida, and the Employee and the Company hereby submit to personal jurisdiction in the State of Florida and to venue in such courts. In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

## 8. Future Employment

For so long as the restricted periods in the covenants in this Agreement remain in effect, Employee shall provide any employers or prospective employers with a copy of this Agreement. For so long as the restricted periods in the covenants in this Agreement remain in effect, the Employee also expressly consents to the Company providing a copy of this Agreement to any of the Employee's future employers.

The parties hereto have duly executed this Agreement on the date identified below.

**Employee has carefully read and understands the provisions of this Agreement and has had the opportunity to seek independent legal advice prior to signing this Agreement. Nothing contained in this Agreement creates a contractual right to continued employment for a definite term, and either Party may terminate the Employee's employment with the Company with or without cause at any time and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.**

Executed this _____19th_____ day of ___June___ , 20_12_ .
　　　　　　　　(day)　　　　　　　　(month)　　　　　(year)

Jess Kruchoski

Jess E. Kruchoski

(Print Name)

MiMedx Group, Inc.

By: Thornton A. Kuntz, Jr.,
Vice President, Human Resources and Administration

Page 2 of 2

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Jess Kruchoski ("Employee").  In consideration of the employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1.  Definitions.

   (a)  "Business" means the business of an integrated developer, manufacturer and marketer of A) collagen based biomaterials or products and durable hydrogel biomaterials or products, B) bioimplants manufactured from human amniotic membrane or C) amnion based products.

   (b)  "Customer of Company" means a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others.

   (c)  "Material Contact" as used in Section 5 below means personal contact with a Customer of the Company in an effort to initiate, maintain or further a business relationship between Company and such Customer. "Material Contact" as used in Section 6 below means direct personal contact between Employee and another employee of the Company, its parent or other subsidiary of its parent in the performance of Employee's job duties on behalf of the Company.

   (d)  "Confidential Information" means information about the Company, its parent and the other subsidiaries of its parent and their respective employees, Customers, products, patients and/or business relationships with other parties which is not generally known outside of the applicable entity, which Employee learns of, receives knowledge of or access to, or develops or obtains from examination, testing or analysis, at any time and in any form or media, whether oral, written, graphic, machine readable, sample form draft, or other media, or in information storage and retrieval systems, in connection with Employee's employment with the Company, and which would be useful to competitors of the applicable entity. Confidential Information includes, but is not limited to: (1) business and employment policies, marketing methods and the targets of those methods, bids, proposals, financial data, Customer lists, business plans, promotional materials and pricing; (2) the terms upon which the applicable entity obtains products from its vendors; (3) the nature, origin, composition and development of the Company's products; (4) all data, reports, analyses, notes, interpretations, forecasts, records, documents, agreements and information concerning the applicable entity or other parties which are not generally available to the public, analysis of a possible business relationship or transaction between the applicable entity and other parties, at any time and in any form, whether or not expressly marked as proprietary or confidential, including without limitation business plans; customer lists; financial statements and other financial information of the disclosing party and its customers; suppliers; know-how; strategic or technical data; technology (including without limitation all design, manufacturing and related technology); sales and marketing data; marketing research data; product research and development data; software programs (including source code), designs, developments, data and any components thereof, whether or not copyrightable; intellectual property; pricing information; any oral, written or visual information obtained by meeting representatives or personnel of the other party or touring its facilities; all oral or written analyses (including any valuation or proposed price or range of prices for the stock or assets of either party), notes, analyses, compilations, studies, interpretations or other documents and all copies thereof prepared by either party of the affiliated entity's business relationship, which contain, reflect or are based upon, in whole or in part, any of the information which is described in the this clause; and the content and substance of any discussions or negotiations between the affiliated entity and other parties, and the fact that such discussions or negotiations have taken place.: (5) information provided by third parties which the Company has a duty to protect from disclosure; (6) personnel information; (7) information regarding technology used by the applicable entity in the business; and (9) clinical trial data and outcomes

   (e)  "Trade Secrets" means Confidential Information which meets the additional requirements of the Uniform Trade Secrets Act or similar state law, as applicable.

2.  Employment. Employee agrees to faithfully perform the duties assigned to Employee, and will not engage in any other employment or business activity while employed by Company which would interfere with Employee's full-time performance of Employee's duties for Company, or cause a conflict of interest. Employee covenants that Employee is not subject to any agreements with a prior employer restricting Employee's ability to work for Company. Employee further covenants that Employee does not possess any property or Confidential Information belonging to any prior or existing employer for use on behalf of Company. Employee agrees to abide by all of the Company's policies and procedures, which may be amended from time to time.

3.  Duty of Confidentiality. Employee agrees that during employment with the Company and for a period of three (3) years following the end of that employment for any reason, Employee shall hold all Confidential Information in confidence and shall not directly or indirectly divulge or make use of, copy, publish, summarize or remove any Confidential Information or Trade Secrets outside of employment with Company without prior written consent of the Company, except as otherwise required pursuant to valid judicial order, provided Employee shall provide written notice of such order to, and shall use Employee's best efforts to cooperate with, the Company to obtain a protective order or other remedy to ensure that confidential treatment will be afforded such Confidential Information. Employee acknowledges that applicable law may impose longer duties of non-disclosure. Notwithstanding anything herein to the contrary, Employee's obligations regarding the Company's Trade Secrets shall survive the termination of Employee's employment for any reason and shall continue thereafter for the maximum period of time permitted under applicable law. The term "Confidential Information" does not include, however, information which (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (b) Employee can show was within Employee's possession prior to its being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a

_____ Employee initial                                                                                                              Page 1 of 3

confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company; or (c) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; (d) is independently developed by Employee without the aid, application or use of the Confidential Information; or (e) is explicitly approved for release by written authorization of the Company.

4.  **Company Property and Information.** The sole and exclusive property and information belonging to the Company includes, without limitation, all papers, records, data, notes, drawings, files, documents, and other materials, including all copies of such materials, relating to the Employee's employment services or the business of the Company that Employee possesses or creates as a result of or during Employee's employment by the Company, whether or not confidential, as well as all Company-issued equipment vehicles, keys, devices, computers, cell phones and hand-held communication devices, pagers, and data and information storage and retrieval devices. Employee agrees to return all of the Company's property and information within three (3) days following the end of Employee's employment with the Company for any reason. To the extent Employee maintains property and information belonging to Company in electronic form on any computers or other electronic devices owned by Employee, Employee agrees to delete all such information fully and finally within three (3) days following the end of employment with Company for any reason, and, if requested by Company, to confirm the fact of such deletion in writing.

5.  **Non-Solicitation Covenant.** While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit from any of the Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company any business in competition with the Business of the Company. It is understood by the Employee that (i) the Company has attempted to limit Employee's right to solicit Customers only to the extent necessary to protect the Company from unfair competition during the twelve (12) months following the end of employment, and (ii) the purpose of these covenants and promises is (and that they are necessary) to protect the Company's legitimate business interests, and to protect and retain (and to prevent Employee from unfairly and to the detriment of the Company utilizing or taking advantage of) those substantial contacts and relationships (including those with Customers of the Company) which Employee may establish due to Employee's employment with the Company. Employee represents that Employee's experience and abilities are such that existence or enforcement of these covenants and promises will not prevent Employee from earning or pursuing an adequate livelihood and will not cause an undue burden to Employee or Employee's family.

6.  **Non-Recruitment of Company Employees.** While employed by the Company, and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of its parent with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company for the purpose of encouraging, enticing, or causing said employee to terminate employment with the Company.

7.  **Other Employment After Termination.** Employee acknowledges and represents that Employee has substantial experience and knowledge such that Employee can readily obtain subsequent employment which does not violate this Agreement.

8.  **Choice of Law and Forum Selection.** All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida without reference to principles of conflict of laws. Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in the State of Florida, and the Employee and the Company hereby submit to personal jurisdiction in the State of Florida and to venue in such courts. In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

9.  **Construction of Agreement.** The covenants contained herein shall be presumed to be enforceable, and any reading causing unenforceability shall yield to a construction permitting enforcement. If any single covenant or clause shall be found unenforceable, it shall be severed and the remaining covenants and clauses enforced in accordance with the tenor of the Agreement. In the event a court should determine not to enforce a covenant as written due to overbreadth, the parties specifically agree that said covenant shall be enforced to the extent reasonable, whether said revisions be in time, territory, or scope of prohibited activities.

10. **Successors.** This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and the Employee, Employee's heirs, executors and administrators.

11. **Entire Agreement and Modification.** This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein and may not be modified, changed or altered by any promise or statement by the Company other than in writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

12. **Injunctive Relief.** Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the federal or state courts located in the State of Florida enjoining said breach or threatened breach. The existence of any claim or cause of action by Employee against the Company, including any dispute relating to the termination of this Agreement, shall not constitute a defense to enforcement of the

Employee initial

covenants and promises contained herein by injunction. Employee further acknowledged that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

Employee has carefully read and understands the provisions of this Agreement, and has had the opportunity to seek independent legal advice prior to signing the Agreement. Nothing contained in this Agreement creates a contractual right to employment for a definite term, and either party may terminate the employment subject to this Agreement with or without cause at any time, and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this _19th_ day of _June_ , _2012_ .
     *(day)*     *(month)*     *(year)*

_____
Jess Kuchoski

_Jess E. Kruchosk._
(Print Name)

_____ Employee initial


MiMedx Group, Inc.

_____
By:
Thornton A. Kuntz, Jr.,

Vice President, Human Resources and Administration

Page 3 of 3

# EXHIBIT 4

*MiMedx Copy*

# Non-Competition Agreement

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Luke A. Tornquist ("Employee"). In consideration of the employment or continued employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1. Employee Acknowledgments

(a)     The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, manufacturer and/or marketer of (i) collagen based biomaterials and products and durable hydrogel biomaterials and products, (ii) bioimplants processed from human amniotic membrane, and (iii) other amnion- based products (the "Business").

(b)     The restrictive covenant set forth below in Section 2 is essential for the Company to protect its: (i) trade secrets (as defined by the Georgia Trade Secrets Act of 1990); (ii) valuable confidential information; (iii) substantial relationships with specific prospective or existing customers; (iv) customer good will associated with (A) the Business, including, but not limited to, by way of trade name, trademark, service mark, or trade dress, (B) a specific geographic location; or (C) a specific marketing or trade area; or (v) extraordinary or specialized training.

(c)     Employee: (i) by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of Employee's employment with the Company will attain a high level of influence or credibility with the Company's customers, vendors, or other business relationships; or (ii) by reason of working for the Company, will be in possession of selective or specialized skills, learning, or abilities, or customer contacts or customer information, or confidential information.

(d)     In the course of Employee's employment with the Company, Employee has done or will do one or more of the following (i) customarily and regularly solicit for the Company customers or prospective customers; (ii) customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others; (iii) perform the following duties: (A) have a primary duty of managing the Company or of a customarily recognized department or subdivision of the Company; (B) customarily and regularly direct the work of two or more other employees; or (C) have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (iv) perform the duties of a key employee or professional, as such terms are defined under the Georgia Restrictive Covenants Act.

2. Non-Competition. During Employee's employment with the Company and for a period of one (1) year following the termination of Employee's employment for any reason (the "Termination Date"), Employee shall not, within the Territory, either directly or indirectly, provide the same or similar services (or consulting with respect to the same or similar services) as those provided by Employee for or on behalf of the Company within two (2) years prior to the Termination Date, for any individual or entity that provides products or services that are competitive with or the same as or similar to those provided by the Business.  For purposes of this Agreement, "Territory" means the continental United States.

3. Severability. If any part or provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, such determination shall not affect the validity of any other part or provision of this Agreement, but such other parts or provisions shall remain in full force and effect. Each provision, paragraph, and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. If a court concludes that any provision, paragraph or subparagraph of this Agreement is overbroad or unenforceable for any reason, the court may modify that provision, paragraph or subparagraph to the minimum extent necessary and then enforce it as modified. The covenants in this Agreement are independent of any other rights or obligations between the parties, and any dispute between the parties as to any such right or obligations shall not delay, preclude or otherwise limit the enforcement of any rights or obligations in this Agreement.

4. Successors. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and the Employee, Employee's heirs, executors and administrators.

5. Injunctive Relief. The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the courts enjoining said breach or threatened breach. The Employee further acknowledges that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

6. Tolling. In the event the enforceability of any of the terms of this Agreement shall be challenged in a court of competent jurisdiction and Employee is not enjoined from breaching any of the restrictive covenants, then if a court of competent jurisdiction finds that the challenged restrictive covenant(s) is enforceable, the time periods set forth herein shall be deemed tolled upon the filing of the lawsuit challenging the enforceability of this Agreement until the dispute is finally resolved and all periods of appeal have expired.

_____Employee Initial

7.  Reasonableness of Restrictions. Employee warrants that the restraints imposed upon Employee under Section 2 above: (i) are reasonable, (ii) do not and would not impose an undue economic hardship upon Employee, (iii) are necessary for the reasonable and proper protection of the Company and the Business, and (iv) are reasonable in respect to subject matter, length of time and geographic area.

8.  Waiver of Breach. The Company's waiver of a breach of any provision of this Agreement by the Employee does not waive any subsequent breach by the Employee, nor does the Company's failure to take action against any other employee for similar breaches operate as a waiver by the Company of a breach.

9.  Entire Agreement and Modification. This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein and may not be modified, changed or altered by any promise or statement by the Company other than in writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other all prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

10. Governing Law; Jurisdiction; Venue. This Agreement has been entered into under and shall be governed by the laws of the State of Georgia. The parties agree that the state and federal courts located in or covering Cobb County, Georgia shall be the sole and exclusive jurisdiction and venue for all disputes between the parties under this Agreement.  Employee hereby irrevocably consents to the jurisdiction and venue of the state and federal courts located in Cobb County, Georgia for adjudication of all disputes between the parties under this Agreement or otherwise related to the parties' relationship.  Employee hereby waives any objections or defenses to jurisdiction or venue in any such proceeding before such court.

11. Employee's Status. Nothing in this Agreement will be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Company will continue to employ Employee, nor will this Agreement affect in any way the right of the Company to terminate the employment of Employee at any time and for any reason whatsoever. By Employee's execution of this Agreement, Employee acknowledges and agrees that Employee's employment with the Company is "at will".  No change of Employee's duties as an employee of the Company will result in, or be deemed to be, a modification of the terms of this Agreement.

12. Future Employment. For so long as the restricted period in Section 2 of this Agreement remains in effect, Employee shall provide any employers or prospective employers with a copy of this Agreement.  For so long as the restricted periods in the covenants in this Agreement remain in effect, the Employee also expressly consents to the Company providing a copy of this Agreement to any of the Employee's future employers.

The parties hereto have duly executed this Agreement on the date identified below.

**Employee has carefully read and understands the provisions of this Agreement and has had the opportunity to seek independent legal advice prior to signing this Agreement. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.**

Executed this  24  day of  September , 20 13 .
             (day)            (month)              (year)

_____        _____
Luke A. Tornquist                By: Lee Ann Lawson

MiMedx Group, Inc.

Vice President, Human Resources

*MiMedx Copy*

# CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Luke A. Tornquist ("Employee"). In consideration of the employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1. Definitions.
   (a) "Business" means the business of an integrated developer, manufacturer and marketer of A) collagen based biomaterials or products and durable hydrogel biomaterials or products, B) bioimplants manufactured from human amniotic membrane or C) amnion based products.
   (b) "Customer of Company" means a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others.
   (c) "Material Contact" as used in Section 5 below means personal contact with a Customer of the Company in an effort to initiate, maintain or further a business relationship between Company and such Customer. "Material Contact" as used in Section 6 below means direct personal contact between Employee and another employee of the Company, its parent or other subsidiary of its parent in the performance of Employee's job duties on behalf of the Company.
   (d) "Confidential Information" means information about the Company, its parent and the other subsidiaries of its parent and their respective employees, Customers, products, patients and/or business relationships with other parties which is not generally known outside of the applicable entity, which Employee learns of, receives knowledge of or access to, or develops or obtains from examination, testing or analysis, at any time and in any form or media, whether oral, written, graphic, machine readable, sample form draft, or other media, or in information storage and retrieval systems, in connection with Employee's employment with the Company, and which would be useful to competitors of the applicable entity. Confidential Information includes, but is not limited to: (1) business and employment policies, marketing methods and the targets of those methods, bids, proposals, financial data, Customer lists, business plans, promotional materials and pricing; (2) the terms upon which the applicable entity obtains products from its vendors; (3) the nature, origin, composition and development of the Company's products; (4) all data, reports, analyses, notes, interpretations, forecasts, records, documents, agreements and information concerning the applicable entity or other parties which are not generally available to the public, analysis of a possible business relationship or transaction between the applicable entity and other parties, at any time and in any form, whether or not expressly marked as proprietary or confidential, including without limitation business plans; customer lists; financial statements and other financial information of the disclosing party and its customers; suppliers; know-how; strategic or technical data; technology (including without limitation all design, manufacturing and related technology); sales and marketing data; marketing research data; product research and development data; software programs (including source code), designs, developments, data and any components thereof, whether or not copyrightable; intellectual property; pricing information; any oral, written or visual information obtained by meeting representatives or personnel of the other party or touring its facilities; all oral or written analyses (including any valuation or proposed price or range of prices for the stock or assets of either party), notes, analyses, compilations, studies, interpretations or other documents and all copies thereof prepared by either party of the affiliated entity's business relationship, which contain, reflect or are based upon, in whole or in part, any of the information which is described in this clause; and the content and substance of any discussions or negotiations between the affiliated entity and other parties, and the fact that such discussions or negotiations have taken place.: (5) information provided by third parties which the Company has a duty to protect from disclosure; (6) personnel information; (7) information regarding technology used by the applicable entity in the business; and (9) clinical trial data and outcomes
   (e) "Trade Secrets" means Confidential Information which meets the additional requirements of the Uniform Trade Secrets Act or similar state law, as applicable.

2. Employment. Employee agrees to faithfully perform the duties assigned to Employee, and will not engage in any other employment or business activity while employed by Company which would interfere with Employee's full-time performance of Employee's duties for Company, or cause a conflict of interest. Employee covenants that Employee is not subject to any agreements with a prior employer restricting Employee's ability to work for Company. Employee further covenants that Employee does not possess any property or Confidential Information belonging to any prior or existing employer for use on behalf of Company. Employee agrees to abide by all of the Company's policies and procedures, which may be amended from time to time.

3. Duty of Confidentiality. Employee agrees that during employment with the Company and for a period of three (3) years following the end of that employment for any reason, Employee shall hold all Confidential Information in confidence and shall not directly or indirectly divulge or make use of, copy, publish, summarize or remove any Confidential Information or Trade Secrets outside of employment with Company without prior written consent of the Company, except as otherwise required pursuant to valid judicial order, provided Employee shall provide written notice of such order to, and shall use Employee's best efforts to cooperate with, the Company to obtain a protective order or other remedy to ensure that confidential treatment will be afforded such Confidential Information. Employee acknowledges that applicable law may impose longer duties of non-disclosure. Notwithstanding anything herein to the contrary, Employee's obligations regarding the Company's Trade Secrets shall survive the termination of Employee's employment for any reason and shall continue thereafter for the maximum period of time permitted under applicable law. The term "Confidential Information" does not include, however, information which (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by Employee; or (b) Employee can show was within Employee's possession prior to its being furnished by or on behalf of the Company, provided that the information was not provided to Employee in violation of a confidentiality agreement or other contractual, legal or fiduciary obligation of confidentiality owed to the Company;

_____ Employee initial                                                                                                    Page 1 of 3

or (c) was received by Employee from a third party owing no duty to the Company and having the legal right to transmit the same; (d) is independently developed by Employee without the aid, application or use of the Confidential Information; or (e) is explicitly approved for release by written authorization of the Company.

4.  Company Property and Information.  The sole and exclusive property and information belonging to the Company includes, without limitation, all papers, records, data, notes, drawings, files, documents, and other materials, including all copies of such materials, relating to the Employee's employment services or the business of the Company that Employee possesses or creates as a result of or during Employee's employment by the Company, whether or not confidential, as well as all Company-issued equipment vehicles, keys, devices, computers, cell phones and hand-held communication devices, pagers, and data and information storage and retrieval devices. Employee agrees to return all of the Company's property and information within three (3) days following the end of Employee's employment with the Company for any reason.  To the extent Company maintains property and information belonging to Company in electronic form on any computers or other electronic devices owned by Employee, Employee agrees to delete all such information fully and finally within three (3) days following the end of employment with Company for any reason, and, if requested by Company, to confirm the fact of such deletion in writing.

5.  Non-Solicitation Covenant.  While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit from any of the Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company any business in competition with the Business of the Company. It is understood by the Employee that (i) the Company has attempted to limit Employee's right to solicit Customers only to the extent necessary to protect the Company from unfair competition during the twelve (12) months following the end of employment, and (ii) the purpose of these covenants and promises is (and that they are necessary) to protect the Company's legitimate business interests,  and to protect and retain (and to prevent Employee from unfairly and to the detriment of the Company utilizing or taking advantage of) those substantial contacts and relationships (including those with Customers of the Company) which Employee may establish due to Employee's employment with the Company. Employee represents that Employee's experience and abilities are such that existence or enforcement of these covenants and promises will not prevent Employee from earning or pursuing an adequate livelihood and will not cause an undue burden to Employee or Employee's family.

6.  Non-Recruitment of Company Employees.  While employed by the Company, and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of its parent with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company for the purpose of encouraging, enticing, or causing said employee to terminate employment with the Company.

7.  Other Employment After Termination.  Employee acknowledges and represents that Employee has substantial experience and knowledge such that Employee can readily obtain subsequent employment which does not violate this Agreement.

8.  Choice of Law and Forum Selection.  All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without reference to principles of conflict of laws.  Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in or covering Cobb County Georgia, and the Employee and the Company hereby submit to the personal jurisdiction and venue of the state and federal courts located in or covering Cobb County Georgia. In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

9.  Construction of Agreement.  The covenants contained herein shall be presumed to be enforceable, and any reading causing unenforceability shall yield to a construction permitting enforcement. If any single covenant or clause shall be found unenforceable, it shall be severed and the remaining covenants and clauses enforced in accordance with the tenor of the Agreement.  In the event a court should determine not to enforce a covenant as written due to overbreadth, the parties specifically agree that said covenant shall be enforced to the extent reasonable, whether said revisions be in time, territory, or scope of prohibited activities.

10. Successors.  This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and the Employee, Employee's heirs, executors and administrators.

11. Entire Agreement and Modification.  This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein and may not be modified, changed or altered by any promise or statement by the Company other than in writing signed by Employee and an authorized representative of Company.  This Agreement supersedes and entirely replaces any other prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

12. Injunctive Relief.  Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the federal or state courts located in or covering Cobb County Georgia enjoining said breach or threatened breach.  The existence of any claim or cause of action by Employee against the Company, including any dispute relating to the termination of this Agreement, shall not constitute a defense to enforcement of the covenants and promises contained herein

by injunction. Employee further acknowledged that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

Employee has carefully read and understands the provisions of this Agreement, and has had the opportunity to seek independent legal advice prior to signing the Agreement. Nothing contained in this Agreement creates a contractual right to employment for a definite term, and either party may terminate the employment subject to this Agreement with or without cause at any time, and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.

Executed this ___24___ day of ___September___, ___2013___.
        *(day)*           *(month)*       *(year)*

MiMedx Group, Inc.

_____  
Luke A. Tornquist

_____  
By: Lee Ann Lawson  
Vice President, Human Resources

_____ Employee initial                                                     Page 3 of 3

# EXHIBIT C

## AFFIDAVIT OF KIRK ALEXANDER

STATE OF FLORIDA

COUNTY OF PALM BEACH

Before me, this day personally appeared William K. Alexander ("Affiant") who, upon first being duly sworn, states as follows:

1.      I am over the age of eighteen (18), and I am suffering under no disability that would prevent me from giving this Affidavit.  I have personal knowledge of the facts contained herein.  I would provide competent testimony to the matters stated in this declaration if called upon to do so.

2.      I have been employed by Academy Medical, LLC ("Academy") since 2014, as Chief Operating Officer.  My job responsibilities as the COO of Academy include leadership of company back-office operations, call center, information technology, accounting, vendor management, and customer service.

3.      Academy is a distributor in the sale of medical products and devices to various governmental entities, including primarily to various Veterans' Affairs Hospitals throughout the United States.   Academy sells and distributes medical products and devices of various manufacturers, but Academy does not sell or distribute products manufactured by MiMedx Group, Inc.  Academy facilitates the sale of and distributes the medical products of various manufacturers to Veterans' Affairs Hospitals, as Academy has the requisite contracts with the federal government to make such sales.

1

4.      Academy sells and distributes medical products through consultants, independent distributors and sales representatives with whom Academy has contracted.

5.      In the regular and ordinary course of Academy's business, Academy creates and maintains these consultant, independent distribution and sales representative contracts, and other contract-related documents, for the individuals and/or entities who sell medical products for Academy.   These contracts and contract-related documents are created by authorized personnel with personal knowledge and a business duty to do so in the regular and ordinary course of performing their job functions.  Academy maintains and keeps these contracts and contract-related documents in the regular and ordinary course of its business.

6.      Academy has produced to MiMedx true and correct copies of the consultant, independent distribution and sales representative contracts (and contract-related documents) entered into by Academy from Academy's business records for Carolina Ortho-Biologics, LLC ("Ortho-Biologics"), whose managing member is identified as Reid Harris ("Harris"), with 23 Medical, LLC ("23 Medical"), whose managing   member is identified as Jess Kruchoski ("Kruchoski"), with Recon Medical Devices, LLC ("Recon Medical"), whose managing member is identified as Harold Purdy ("Purdy"), with RMW Medical, Inc. ("RMW Medical"), whose agent is identified as Bill Wagner ("Wagner"), and with Ricky Palmer, LLC ("Palmer LLC"), whose managing member is identified as Ricky Palmer ("Palmer").   These documents are kept as "pdf" copies in each representative's respective folder in our company's electronic filing system.  These documents bear document control numbers ACADEMY_000001 – ACADEMY_000156.

7.      In the regular and ordinary course of Academy's business, Academy creates records of sales of medical products made by its independent distributors and the commissions earned in connection with such sales.  This sales and commission data is created contemporaneously when

2

the order is made and input into an electronic records keeping system known as Flightline by authorized personnel with personal knowledge and a business duty to do so in the regular and ordinary course of performing their job functions. Academy creates, maintains and keeps this sales and commission data in the regular and ordinary course of its business in Flightline.

8.      Academy has produced to MiMedx true and correct copies of the sales and commission data created and maintained in Academy's electronic order management system, named Flightline, for Carolina Ortho-Biologics/Harris, 23 Medical/Kruchoski, Recon Medical/Purdy, RMW Medical/Wagner, and Palmer LLC/Palmer and any member of their respective sales teams. Academy produced this sales and commission data in the form of Comma Separated Values (.csv) and Microsoft Excel (.xlsx) files, shared via email transmission from which records may be printed. This sales and commission data bears document control numbers ACADEMY_006354 – ACADEMY_006376. The "firstname" and "lastname" fields identify the consultant(s), independent distributor(s) and sales representative(s) who were responsible for and who received commission for each sale.

9.      Academy regularly communicates internally and with its contractors, independent distributors and sales representatives via email. These email communications are created and received by authorized personnel with personal knowledge and a business duty to do so in the regular and ordinary course of performing their job functions. Academy maintains and keeps these email communications in the regular and ordinary course of its business.

10.     Academy has produced to MiMedx true and correct copies of emails from Academy's business records between Academy and Carolina Ortho-Biologics/Harris, 23 Medical/Kruchoski, Recon Medical/Purdy, RMW Medical/Wagner, and Palmer LLC/Palmer. These emails bear document control numbers ACADEMY_000157 – ACADEMY_006353.

3

**FURTHER AFFIANT SAYETH NOT** this 13th day of January, 2017.

William K. Alexander
COO
Academy Medical, LLC

Sworn to and subscribed before me this 13th day
of January____, 2017, by Kirk Alexander,
who is _x_ personally known to me
or ___ produced the following type of identification:
_____.

Notary Public
My commission expires: 06/16/2017

4

# Signature Certificate

ⓘ Document Reference:   7GRGT7IRK5F5RG6IZU4DFX



RightSignature
Easy Online Document Signing

**Kirk Alexander**
Party ID: TPDPXHIWRLDS5NVY7KPUBX
IP Address: 75.149.251.105
| VERIFIED EMAIL: | kalexander@academymedical.net |



Multi-Factor
Digital Fingerprint Checksum    05a61dc9f66e285a3547382127c1068e5b89a441

**Herdis Spierto**
Party ID: FYB9N6J95KBL4LI4ZYIHKF
IP Address: 75.149.251.105
| VERIFIED EMAIL: | hspierto@academymedical.net |



Multi-Factor
Digital Fingerprint Checksum    fe9dbb3055e439382e01aca6c6c71bf2707838d9

| Timestamp | Audit |
|---|---|
| 2017-01-13 12:43:03 -0800 | All parties have signed document. Signed copies sent to: Mark Thomas, Kirk Alexander, and Herdis Spierto. |
| 2017-01-13 12:43:03 -0800 | Document signed by Kirk Alexander (kalexander@academymedical.net) with drawn signature. - 75.149.251.105 |
| 2017-01-13 12:42:56 -0800 | Document viewed by Kirk Alexander (kalexander@academymedical.net). - 75.149.251.105 |
| 2017-01-13 12:30:28 -0800 | Document signed by Herdis Spierto (hspierto@academymedical.net) with drawn signature. - 75.149.251.105 |
| 2017-01-13 12:29:35 -0800 | Document viewed by Herdis Spierto (hspierto@academymedical.net). - 75.149.251.105 |
| 2017-01-13 12:29:16 -0800 | Document created by Kirk Alexander (kalexander@academymedical.net). - 75.149.251.105 |



This signature page provides a record of the online activity executing this contract.

Page 1 of 1

# EXHIBIT D

| From: | Jess Kruchoski |
|---|---|
| To: | Kirk Alexander |
| Sent: | 2/3/2015 4:32:32 PM |
| Subject: | 23 Medical LLC - Potential influence |
| Attachments: | NW Academy ActiveLocations-2015-01-22.xlsx |

Kirk,

Attached is the modified spreadsheets with accounts within states that folks I work with could and would impact. I have other people within these states but I named one potential distributor that has existing relationships with these government accounts. I will send in the rest of the signed paperwork when I return home at the end of the week and have access to my printer.

Jess

ACADEMY_005788

ACADEMY_005789

| | A | B | C | D |
|---|---|---|---|---|
| 1 | name | shipcity | shipstate | Column1 |
| 17 | Denver Acq & Log Center | Golden | CO | Scott Hanks |
| 23 | Grand Junction, CO VAMC | Grand Junction | CO | Scott Hanks |
| 28 | Evans Army Community Hospital | Fort Carson | CO | Scott Hanks |
| 30 | Denver, CO VAMC | Denver | CO | Scott Hanks |
| 31 | Aurora, CO CBOC | Aurora | CO | Scott Hanks |
| 61 | Fort Collins, CO CBOC | Fort Collins | CO | Scott Hanks |
| 62 | Pueblo, CO CBOC | Pueblo | CO | Scott Hanks |
| 73 | Durango, CO CBOC | Durango | CO | Scott Hanks |
| 74 | Burlington, CO CBOC | Burlington | CO | Scott Hanks |
| 77 | Aurora (Jewell Ave), CO OPC | Aurora | CO | Scott Hanks |
| 78 | Alamosa, CO CBOC | Alamosa | CO | Scott Hanks |
| 79 | Colorado Springs, CO CBOC | Colorado Springs | CO | Scott Hanks |
| 80 | Craig, CO CBOC | Craig | CO | Scott Hanks |
| 81 | Greeley, CO CBOC | Greeley | CO | Scott Hanks |
| 82 | La Junta, CO CBOC | La Junta | CO | Scott Hanks |
| 90 | Lakewood, CO CBOC | Lakewood | CO | Scott Hanks |
| 91 | Lamar, CO CBOC | Lamar | CO | Scott Hanks |
| 98 | Montrose, CO CBOC | Montrose | CO | Scott Hanks |
| 112 | Buckley AFB Medical Group | Buckley AFB | CO | Scott Hanks |
| 119 | Peterson AFB Medical Facility | Peterson AFB | CO | Scott Hanks |
| 125 | USAF Academy Medical Facility | USAF Academy | CO | Scott Hanks |
| 136 | Aurora, CO OPC | Aurora | CO | Scott Hanks |
| 137 | Pueblo, CO OPC | Pueblo | CO | Scott Hanks |
| 140 | Iowa City, IA VAMC | Iowa City | IA | Tracy Lucas |
| 141 | Dubuque, IA CBOC | Dubuque | IA | Tracy Lucas |
| 159 | Des Moines, IA VAMC | Des Moines | IA | Tracy Lucas |
| 160 | Mason City, IA CBOC | Mason City | IA | Tracy Lucas |
| 296 | Waterloo, IA CBOC | Waterloo | IA | Tracy Lucas |
| 298 | Carroll, IA OPC | Carroll | IA | Tracy Lucas |
| 426 | Coralville, IA OPC | Coralville | IA | Tracy Lucas |
| 427 | Bettendorf, IA CBOC | Bettendorf | IA | Tracy Lucas |
| 428 | Cedar Rapids, IA CBOC | Cedar Rapids | IA | Tracy Lucas |
| 441 | Decorah, IA CBOC | Decorah | IA | Tracy Lucas |
| 442 | Fort Dodge, IA CBOC | Fort Dodge | IA | Tracy Lucas |
| 443 | Knoxville, IA CBOC | Knoxville | IA | Tracy Lucas |
| 444 | Marshalltown, IA CBOC | Marshalltown | IA | Tracy Lucas |
| 445 | Ottumwa, IA CBOC | Ottumwa | IA | Tracy Lucas |
| 450 | Shenandoah, IA CBOC | Shenandoah | IA | Tracy Lucas |
| 451 | Sioux City, IA CBOC | Sioux City | IA | Tracy Lucas |
| 454 | Spirit Lake, IA CBOC | Spirit Lake | IA | Tracy Lucas |
| 455 | Ammon, ID CBOC | Ammon | ID | Heather Moller |
| 456 | Pocatello, ID CBOC | Pocatello | ID | Heather Moller |
| 457 | Boise, ID VAMC | Boise | ID | Heather Moller |
| 458 | Mountain Home, ID OPC | Mountain Home | ID | Heather Moller |
| 459 | Salmon, ID OPC | Salmon | ID | Heather Moller |
| 461 | Caldwell, ID CBOC | Caldwell | ID | Heather Moller |
| 510 | Coeur D Alene, ID CBOC | Coeur D Alene, ID | ID | Heather Moller |

ACADEMY_005790

| | A | B | C | D |
|---|---|---|---|---|
| 512 | Grangeville, ID CBOC | Grangeville | ID | Heather Moller |
| 514 | Lewiston, ID CBOC | Lewiston | ID | Heather Moller |
| 522 | Twin Falls, ID CBOC | Twin Falls | ID | Heather Moller |
| 527 | Mountain Home AFB Medical Facility | Mountain Home AFB | ID | Heather Moller |
| 533 | Crown Point, IN CBOC | Crown Point | IN | Tony Thompson |
| 534 | New Albany, IN CBOC | New Albany | IN | Tony Thompson |
| 535 | Scottsburg, IN CBOC | Scottsburg | IN | Tony Thompson |
| 536 | Greendale, IN CBOC | Greendale | IN | Tony Thompson |
| 537 | Richmond, IN CBOC | Richmond | IN | Tony Thompson |
| 538 | Indianapolis, IN VAMC | Indianapolis | IN | Tony Thompson |
| 540 | Marion, IN VAMC | Marion | IN | Tony Thompson |
| 541 | Fort Wayne, IN VAMC | Fort Wayne | IN | Tony Thompson |
| 542 | Indianapolis, IN OPC | Indianapolis | IN | Tony Thompson |
| 543 | Bloomington, IN CBOC | Bloomington | IN | Tony Thompson |
| 544 | Goshen, IN CBOC | Goshen | IN | Tony Thompson |
| 545 | Martinsville, IN CBOC | Martinsville | IN | Tony Thompson |
| 546 | Muncie, IN CBOC | Muncie | IN | Tony Thompson |
| 547 | Peru, IN CBOC | Peru | IN | Tony Thompson |
| 548 | South Bend, IN CBOC | South Bend | IN | Tony Thompson |
| 549 | Terre Haute, IN CBOC | Terre Haute | IN | Tony Thompson |
| 550 | West Lafayette, IN CBOC | West Lafayette | IN | Tony Thompson |
| 551 | Crown Point, IN OPC | Crown Point | IN | Tony Thompson |
| 552 | Evansville, IN OPC | Evansville | IN | Tony Thompson |
| 553 | Vincennes, IN CBOC | Vincennes | IN | Tony Thompson |
| 554 | Lexington, KY VAMC | Lexington | KY | Tony Thompson |
| 555 | Louisville, KY VAMC | Louisville | KY | Tony Thompson |
| 556 | Ireland Army Community Hospital | Fort Knox | KY | Tony Thompson |
| 557 | Somerset, KY CBOC | Somerset | KY | Tony Thompson |
| 558 | Prestonsburg, KY CBOC | Prestonsburg | KY | Tony Thompson |
| 559 | Bellevue, KY CBOC | Bellevue | KY | Tony Thompson |
| 560 | Florence, KY CBOC | Florence | KY | Tony Thompson |
| 561 | Blanchfield Army Community Hospital | Fort Campbell | KY | Tony Thompson |
| 562 | Bowling Green, KY CBOC | Bowling Green | KY | Tony Thompson |
| 563 | Lexington, KY CBOC | Lexington | KY | Tony Thompson |
| 564 | Hopkinsville, KY OPC | Hopkinsville | KY | Tony Thompson |
| 565 | Louisville, KY OPC | Louisville | KY | Tony Thompson |
| 566 | Berea, KY CBOC | Berea | KY | Tony Thompson |
| 567 | Hazard, KY CBOC | Hazard | KY | Tony Thompson |
| 568 | Morehead, KY CBOC | Morehead | KY | Tony Thompson |
| 569 | Carrollton, KY CBOC | Carrollton | KY | Tony Thompson |
| 570 | Louisville, KY CBOC | Louisville | KY | Tony Thompson |
| 571 | Fort Knox, KY CBOC | Fort Knox | KY | Tony Thompson |
| 572 | Clarkson, KY CBOC | Clarkson | KY | Tony Thompson |
| 573 | Hanson, KY CBOC | Hanson | KY | Tony Thompson |
| 574 | Mayfield, KY CBOC | Mayfield | KY | Tony Thompson |
| 575 | Owensboro, KY CBOC | Owensboro | KY | Tony Thompson |
| 576 | Paducah, KY CBOC | Paducah | KY | Tony Thompson |
| 577 | U.S. Army Medical Recruiting Brigade | Fort Knox | KY | Tony Thompson |

ACADEMY_005791

| | A | B | C | D |
|---|---|---|---|---|
| 578 | Louisville (Newburg), KY CBOC | Louisville | KY | Tony Thompson |
| 579 | Louisville (Shively), KY CBOC | Louisville | KY | Tony Thompson |
| 580 | Detroit, MI VAMC | Detroit | MI | Cara Margolis |
| 582 | Ann Arbor, MI VAMC | Ann Arbor | MI | Cara Margolis |
| 583 | Hancock, MI CBOC | Hancock | MI | Cara Margolis |
| 584 | Ironwood, MI CBOC | Ironwood | MI | Cara Margolis |
| 585 | Jackson, MI CBOC | Jackson | MI | Cara Margolis |
| 587 | Kincheloe, MI CBOC | Kincheloe | MI | Cara Margolis |
| 588 | Saginaw, MI VAMC | Saginaw | MI | Cara Margolis |
| 589 | Battle Creek, MI VAMC | Battle Creek | MI | Cara Margolis |
| 590 | Bad Axe, MI CBOC | Bad Axe | MI | Cara Margolis |
| 591 | Benton Harbor, MI CBOC | Benton Harbor | MI | Cara Margolis |
| 592 | Cadillac, MI CBOC | Cadillac | MI | Cara Margolis |
| 593 | Mackinaw City, MI CBOC | Mackinaw City | MI | Cara Margolis |
| 594 | Clare, MI CBOC | Clare | MI | Cara Margolis |
| 596 | Alpena, MI CBOC | Alpena | MI | Cara Margolis |
| 597 | Flint, MI CBOC | Flint | MI | Cara Margolis |
| 598 | Gaylord, MI CBOC | Gaylord | MI | Cara Margolis |
| 599 | Grand Rapids, MI CBOC | Grand Rapids | MI | Cara Margolis |
| 600 | Grayling, MI CBOC | Grayling | MI | Cara Margolis |
| 601 | Michigan Center, MI CBOC | Michigan Center | MI | Cara Margolis |
| 603 | Lansing, MI CBOC | Lansing | MI | Cara Margolis |
| 604 | Norton Shores, MI CBOC | Norton Shores | MI | Cara Margolis |
| 605 | Oscoda, MI CBOC | Oscoda | MI | Cara Margolis |
| 606 | Pontiac, MI CBOC | Pontiac | MI | Cara Margolis |
| 607 | Traverse City, MI CBOC | Traverse City | MI | Cara Margolis |
| 608 | Brockway, MI CBOC | Brockway | MI | Cara Margolis |
| 609 | Iron Mountain, MI VAMC | Iron Mountain | MI | Mike Wilson |
| 611 | Hancock, MI OPC | Hancock | MI | Cara Margolis |
| 612 | Ironwood, MI OPC | Ironwood | MI | Cara Margolis |
| 615 | Manistique, MI OPC | Manistique | MI | Cara Margolis |
| 616 | Marquette, MI OPC | Marquette | MI | Cara Margolis |
| 618 | Menominee, MI OPC | Menominee | MI | Cara Margolis |
| 619 | Sault Sainte Marie, MI OPC | Sault Sainte Marie | MI | Cara Margolis |
| 623 | St. Cloud, MN VAMC | St. Cloud | MN | Luke Tornquist |
| 624 | Brainerd, MN CBOC | Brainerd | MN | Luke Tornquist |
| 625 | Hibbing, MN CBOC | Hibbing | MN | Luke Tornquist |
| 626 | Minneapolis, MN VAMC | Minneapolis | MN | Luke Tornquist |
| 629 | Saint Cloud, MN VAMC | Saint Cloud | MN | Luke Tornquist |
| 631 | Alexandria, MN CBOC | Alexandria | MN | Luke Tornquist |
| 632 | Bemidji, MN CBOC | Bemidji | MN | Luke Tornquist |
| 634 | Fergus Falls, MN CBOC | Fergus Falls | MN | Luke Tornquist |
| 636 | Mankato, MN CBOC | Mankato | MN | Luke Tornquist |
| 637 | Maplewood, MN CBOC | Maplewood | MN | Luke Tornquist |
| 639 | Montevideo, MN CBOC | Montevideo | MN | Luke Tornquist |
| 640 | Ramsey, MN CBOC | Ramsey | MN | Luke Tornquist |
| 641 | Rochester, MN CBOC | Rochester | MN | Luke Tornquist |
| 642 | Saint James, MN CBOC | Saint James | MN | Luke Tornquist |

ACADEMY_005792

| | A | B | C | D |
|---|---|---|---|---|
| 643 | Ely, MN CBOC | Ely | MN | Luke Tornquist |
| 644 | Sidney, MT CBOC | Sidney | MT | Avi Carter |
| 652 | Fort Harrison, MT VAMC | Fort Harrison | MT | Avi Carter |
| 667 | Hamilton, MT OPC | Hamilton | MT | Avi Carter |
| 677 | Havre, MT OPC | Havre | MT | Avi Carter |
| 681 | Plentywood, MT OPC | Plentywood | MT | Avi Carter |
| 682 | Anaconda, MT CBOC | Anaconda | MT | Avi Carter |
| 693 | Billings, MT CBOC | Billings | MT | Avi Carter |
| 752 | Bozeman, MT CBOC | Bozeman | MT | Avi Carter |
| 753 | Cut Bank, MT CBOC | Cut Bank | MT | Avi Carter |
| 754 | Glasgow, MT CBOC | Glasgow | MT | Avi Carter |
| 755 | Glendive, MT CBOC | Glendive | MT | Avi Carter |
| 762 | Great Falls, MT CBOC | Great Falls | MT | Avi Carter |
| 764 | Kalispell, MT CBOC | Kalispell | MT | Avi Carter |
| 765 | Lewistown, MT CBOC | Lewistown | MT | Avi Carter |
| 768 | Miles City, MT VAMC | Miles City | MT | Avi Carter |
| 769 | Missoula, MT CBOC | Missoula | MT | Avi Carter |
| 770 | Libby, MT CBOC | Libby | MT | Avi Carter |
| 771 | Malmstrom AFB Medical Facility | Malmstrom AFB | MT | Avi Carter |
| 778 | Fargo, ND VAMC | Fargo | ND | Luke Tornquist |
| 779 | Grand Forks AFB Medical Facility | Grand Forks AFB | ND | Luke Tornquist |
| 780 | Minot AFB Medical Facility | Minot AFB | ND | Luke Tornquist |
| 781 | Dickinson, ND OPC | Dickinson | ND | Luke Tornquist |
| 786 | Jamestown, ND OPC | Jamestown | ND | Luke Tornquist |
| 787 | Bismarck, ND CBOC | Bismarck | ND | Luke Tornquist |
| 788 | Grafton, ND CBOC | Grafton | ND | Luke Tornquist |
| 789 | Grand Forks, ND CBOC | Grand Forks | ND | Luke Tornquist |
| 790 | Minot, ND CBOC | Minot | ND | Luke Tornquist |
| 841 | Williston, ND CBOC | Williston | ND | Luke Tornquist |
| 871 | Gering, NE CBOC | Gering | NE | Jason Mahnke |
| 872 | Norfolk, NE CBOC | Norfolk | NE | Jason Mahnke |
| 873 | North Platte, NE CBOC | North Platte | NE | Jason Mahnke |
| 874 | Sidney, NE CBOC | Sidney | NE | Jason Mahnke |
| 875 | Ehrling Bergquist Clinic | Offutt AFB | NE | Jason Mahnke |
| 876 | Omaha, NE VAMC | Omaha | NE | Jason Mahnke |
| 877 | Alliance, NE CBOC | Alliance | NE | Jason Mahnke |
| 878 | Bellevue, NE CBOC | Offutt AFB | NE | Jason Mahnke |
| 879 | Gordon, NE CBOC | Gordon | NE | Jason Mahnke |
| 880 | Grand Island, NE VAMC | Grand Island | NE | Jason Mahnke |
| 881 | Holdrege, NE CBOC | Holdrege | NE | Jason Mahnke |
| 882 | Lincoln, NE CBOC | Lincoln | NE | Jason Mahnke |
| 883 | Oneill, NE CBOC | Oneill | NE | Jason Mahnke |
| 884 | Scottsbluff, NE CBOC | Scottsbluff | NE | Jason Mahnke |
| 885 | Cleveland, OH VAMC | Cleveland | OH | Matt Bloemer |
| 886 | Cincinnati, OH VAMC | Cincinnati | OH | Matt Bloemer |
| 887 | Dayton, OH VAMC | Dayton | OH | Matt Bloemer |
| 888 | Wright-Patterson Medical Center | Wright-Patterson AFB | OH | Matt Bloemer |
| 889 | Ashtabula, OH CBOC | Ashtabula | OH | Matt Bloemer |

ACADEMY_005793

| | A | B | C | D |
|---|---|---|---|---|
| 890 | Saint Clairsville, OH CBOC | Saint Clairsville | OH | Matt Bloemer |
| 891 | Columbus, OH VAMC | Columbus | OH | Matt Bloemer |
| 892 | Chillicothe, OH VAMC | Chillicothe | OH | Matt Bloemer |
| 895 | Canton, OH OPC | Canton | OH | Matt Bloemer |
| 896 | Youngstown, OH OPC | Youngstown | OH | Matt Bloemer |
| 897 | Akron, OH CBOC | Akron | OH | Matt Bloemer |
| 898 | Athens, OH CBOC | Athens | OH | Matt Bloemer |
| 899 | Cambridge, OH CBOC | Cambridge | OH | Matt Bloemer |
| 900 | Cincinnati, OH CBOC | Cincinnati | OH | Matt Bloemer |
| 901 | Calcutta, OH CBOC | Calcutta | OH | Matt Bloemer |
| 902 | Georgetown, OH CBOC | Georgetown | OH | Matt Bloemer |
| 903 | Grove City, OH CBOC | Grove City | OH | Matt Bloemer |
| 904 | Hamilton, OH CBOC | Hamilton | OH | Matt Bloemer |
| 905 | Lancaster, OH CBOC | Lancaster | OH | Matt Bloemer |
| 906 | Lima, OH CBOC | Lima | OH | Matt Bloemer |
| 907 | Lorain, OH CBOC | Lorain | OH | Matt Bloemer |
| 908 | Mansfield, OH CBOC | Mansfield | OH | Matt Bloemer |
| 909 | Marietta, OH CBOC | Marietta | OH | Matt Bloemer |
| 910 | Marion, OH CBOC | Marion | OH | Matt Bloemer |
| 911 | McCafferty (Cleveland), OH CBOC | Cleveland | OH | Matt Bloemer |
| 912 | Middletown, OH CBOC | Middletown | OH | Matt Bloemer |
| 913 | New Philadelphia, OH CBOC | New Philadelphia | OH | Matt Bloemer |
| 914 | Newark, OH CBOC | Newark | OH | Matt Bloemer |
| 915 | Painesville, OH CBOC | Painesville | OH | Matt Bloemer |
| 917 | Parma, OH CBOC | Parma | OH | Matt Bloemer |
| 918 | Portsmouth, OH CBOC | Portsmouth | OH | Matt Bloemer |
| 919 | Ravenna, OH CBOC | Ravenna | OH | Matt Bloemer |
| 920 | Sandusky, OH CBOC | Sandusky | OH | Matt Bloemer |
| 921 | Springfield, OH CBOC | Springfield | OH | Matt Bloemer |
| 922 | Warren, OH CBOC | Warren | OH | Matt Bloemer |
| 923 | Zanesville, OH CBOC | Zanesville | OH | Matt Bloemer |
| 925 | Toledo, OH CBOC | Toledo | OH | Matt Bloemer |
| 926 | St. Clairsville, OH CBOC | St. Clairsville | OH | Matt Bloemer |
| 927 | Maple Heights, OH VC | Maple Heights | OH | Matt Bloemer |
| 928 | McCafferty (Cleveland), OH VC | Cleveland | OH | Matt Bloemer |
| 929 | Columbus, OH VC | Columbus | OH | Matt Bloemer |
| 930 | Parma, OH VC | Parma | OH | Matt Bloemer |
| 931 | Stark County, OH VC | Canton | OH | Matt Bloemer |
| 932 | Gallipolis, OH CBOC | Gallipolis | OH | Matt Bloemer |
| 933 | Roseburg, OR VAMC | Roseburg | OR | Mike Freudenthal |
| 934 | Warrenton, OR CBOC | Warrenton | OR | Mike Freudenthal |
| 935 | Portland, OR VAMC | Portland | OR | Mike Freudenthal |
| 936 | Burns, OR OPC | Burns | OR | Mike Freudenthal |
| 937 | Newport, OR OPC | Newport | OR | Mike Freudenthal |
| 939 | The Dalles, OR OPC | The Dalles | OR | Mike Freudenthal |
| 940 | West Linn, OR OPC | West Linn | OR | Mike Freudenthal |
| 942 | Bend, OR CBOC | Bend | OR | Mike Freudenthal |
| 943 | Brookings, OR CBOC | Brookings | OR | Mike Freudenthal |

ACADEMY_005794

| | A | B | C | D |
|---|---|---|---|---|
| 944 | Portland, OR CBOC | Portland | OR | Mike Freudenthal |
| 945 | Eugene, OR CBOC | Eugene | OR | Mike Freudenthal |
| 947 | Hillsboro, OR CBOC | Hillsboro | OR | Mike Freudenthal |
| 948 | Klamath Falls, OR CBOC | Klamath Falls | OR | Mike Freudenthal |
| 949 | La Grande, OR CBOC | La Grande | OR | Mike Freudenthal |
| 950 | North Bend, OR CBOC | North Bend | OR | Mike Freudenthal |
| 951 | Salem, OR CBOC | Salem | OR | Mike Freudenthal |
| 952 | USCG Sector Columbia River Medical Clinic | Warrenton | OR | Mike Freudenthal |
| 953 | Aberdeen, SD CBOC | Aberdeen | SD | Jason Mahnke |
| 954 | Rapid City, SD CBOC | Rapid City | SD | Jason Mahnke |
| 955 | Sioux Falls, SD VAMC | Sioux Falls | SD | Jason Mahnke |
| 956 | Winner, SD CBOC | Winner | SD | Jason Mahnke |
| 957 | Hot Springs, SD VAMC | Hot Springs | SD | Jason Mahnke |
| 958 | Fort Meade, SD VAMC | Fort Meade | SD | Jason Mahnke |
| 1031 | Eagle Butte, SD CBOC | Eagle Butte | SD | Jason Mahnke |
| 1089 | McLaughlin, SD CBOC | McLaughlin | SD | Jason Mahnke |
| 1136 | Mission, SD CBOC | Mission | SD | Jason Mahnke |
| 1137 | Pierre, SD CBOC | Pierre | SD | Jason Mahnke |
| 1138 | Pine Ridge, SD CBOC | Pine Ridge | SD | Jason Mahnke |
| 1141 | Wagner, SD CBOC | Wagner | SD | Jason Mahnke |
| 1145 | Watertown, SD CBOC | Watertown | SD | Jason Mahnke |
| 1146 | Salt Lake City, UT VAMC | Salt Lake City | UT | Avi Carter |
| 1151 | Ogden, UT CBOC | Ogden | UT | Avi Carter |
| 1152 | Orem, UT CBOC | Orem | UT | Avi Carter |
| 1153 | Roosevelt, UT CBOC | Roosevelt | UT | Avi Carter |
| 1155 | St. George, UT CBOC | St. George | UT | Avi Carter |
| 1156 | South Ogden, UT CBOC | South Ogden | UT | Avi Carter |
| 1157 | Price, UT CBOC | Price | UT | Avi Carter |
| 1158 | West Valley City, UT CBOC | West Valley City | UT | Avi Carter |
| 1159 | Hill AFB Medical Facility | Hill AFB | UT | Avi Carter |
| 1160 | Seattle, WA VAMC | Seattle | WA | Mike Freudenthal |
| 1161 | Madigan Army Medical Center | Tacoma | WA | Mike Freudenthal |
| 1162 | Lakewood, WA VAMC | Lakewood | WA | Mike Freudenthal |
| 1163 | Walla Walla, WA VAMC | Walla Walla | WA | Mike Freudenthal |
| 1167 | Vancouver, WA VAMC | Vancouver | WA | Mike Freudenthal |
| 1168 | Spokane, WA VAMC | Spokane | WA | Mike Freudenthal |
| 1169 | Bremerton, WA CBOC | Bremerton | WA | Mike Freudenthal |
| 1170 | Colville, WA CBOC | Colville | WA | Mike Freudenthal |
| 1171 | Mount Vernon, WA CBOC | Mount Vernon | WA | Mike Freudenthal |
| 1172 | Port Angeles, WA CBOC | Port Angeles | WA | Mike Freudenthal |
| 1173 | Richland, WA CBOC | Richland | WA | Mike Freudenthal |
| 1174 | Chehalis, WA CBOC | Chehalis | WA | Mike Freudenthal |
| 1175 | Bellevue, WA CBOC | Bellevue | WA | Mike Freudenthal |
| 1176 | Federal Way, WA CBOC | Federal Way | WA | Mike Freudenthal |
| 1177 | Seattle, WA CBOC | Seattle | WA | Mike Freudenthal |
| 1178 | Wenatchee, WA CBOC | Wenatchee | WA | Mike Freudenthal |
| 1179 | Yakima, WA CBOC | Yakima | WA | Mike Freudenthal |
| 1180 | Fairchild AFB Medical Facility | Fairchild AFB | WA | Mike Freudenthal |

ACADEMY_005795

| | A | B | C | D |
|---|---|---|---|---|
| 1181 | Lewis–McChord Medical Clinic | Joint Base Lewis-McChord | WA | Mike Freudenthal |
| 1182 | Oak Harbor, WA Naval Hospital | Oak Harbor | WA | Mike Freudenthal |
| 1183 | Silverdale, WA Naval Branch Health Clinic | Silverdale | WA | Mike Freudenthal |
| 1184 | Bremerton, WA Naval Hospital | Bremerton | WA | Mike Freudenthal |
| 1185 | Everett, WA Naval Branch Health Clinic | Everett | WA | Mike Freudenthal |
| 1186 | USCG Base Seattle Medical Clinic | Seattle | WA | Mike Freudenthal |
| 1187 | Tacoma, WA ASC | Tacoma | WA | Mike Freudenthal |
| 1188 | Milwaukee, WI VAMC | Milwaukee | WI | Jason Rudroff |
| 1189 | Madison, WI VAMC | Madison | WI | Jason Rudroff |
| 1190 | Tomah, WI VAMC | Tomah | WI | Jason Rudroff |
| 1191 | Appleton, WI OPC | Appleton | WI | Jason Rudroff |
| 1192 | Baraboo, WI OPC | Baraboo | WI | Jason Rudroff |
| 1193 | Beaver Dam, WI OPC | Beaver Dam | WI | Jason Rudroff |
| 1194 | Owen, WI OPC | Owen | WI | Jason Rudroff |
| 1195 | Cleveland, WI OPC | Cleveland | WI | Jason Rudroff |
| 1196 | Green Bay, WI OPC | Green Bay | WI | Jason Rudroff |
| 1197 | Janesville, WI OPC | Janesville | WI | Jason Rudroff |
| 1198 | Kenosha, WI OPC | Kenosha | WI | Jason Rudroff |
| 1199 | Rhinelander, WI OPC | Rhinelander | WI | Jason Rudroff |
| 1200 | La Crosse, WI OPC | La Crosse | WI | Jason Rudroff |
| 1201 | Union Grove, WI OPC | Union Grove | WI | Jason Rudroff |
| 1202 | Wausau, WI OPC | Wausau | WI | Jason Rudroff |
| 1203 | Wisconsin Rapids, WI OPC | Wisconsin Rapids | WI | Jason Rudroff |
| 1204 | Milwaukee, WI OPC | Milwaukee | WI | Jason Rudroff |
| 1205 | La Crosse, WI CBOC | La Crosse | WI | Jason Rudroff |
| 1206 | Appleton, WI CBOC | Appleton | WI | Jason Rudroff |
| 1207 | Beaver Dam, WI CBOC | Beaver Dam | WI | Jason Rudroff |
| 1208 | Janesville, WI CBOC | Janesville | WI | Jason Rudroff |
| 1209 | Loyal, WI CBOC | Loyal | WI | Jason Rudroff |
| 1210 | Wisconsin Rapids, WI CBOC | Wisconsin Rapids | WI | Jason Rudroff |
| 1211 | Chippewa Falls, WI CBOC | Chippewa Falls | WI | Jason Rudroff |
| 1212 | Hayward, WI CBOC | Hayward | WI | Jason Rudroff |
| 1213 | Rice Lake, WI CBOC | Rice Lake | WI | Jason Rudroff |
| 1214 | Superior, WI CBOC | Superior | WI | Jason Rudroff |
| 1215 | Madison, WI CBOC | Madison | WI | Jason Rudroff |
| 1216 | Truax Field ANG Medical Field | Madison | WI | Jason Rudroff |
| 1217 | Cheyenne, WY VAMC | Cheyenne | WY | Avi Carter |
| 1218 | Sheridan, WY VAMC | Sheridan | WY | Avi Carter |
| 1219 | Afton, WY OPC | Afton | WY | Avi Carter |
| 1220 | Evanston, WY OPC | Evanston | WY | Avi Carter |
| 1228 | Laramie, WY OPC | Laramie | WY | Avi Carter |
| 1232 | Rawlins, WY OPC | Rawlins | WY | Avi Carter |
| 1234 | Torrington, WY OPC | Torrington | WY | Avi Carter |
| 1253 | Wheatland, WY OPC | Wheatland | WY | Avi Carter |
| 1254 | Worland, WY OPC | Worland | WY | Avi Carter |
| 1255 | Casper, WY CBOC | Casper | WY | Avi Carter |
| 1256 | Gillette, WY CBOC | Gillette | WY | Avi Carter |
| 1257 | Powell, WY CBOC | Powell | WY | Avi Carter |
| 1260 | Riverton, WY CBOC | Riverton | WY | Avi Carter |

ACADEMY_005796

| | A | B | C | D |
|---|---|---|---|---|
| 1281 | Rock Springs, WY CBOC | Rock Springs | WY | Avi Carter |
| 1282 | F.E. Warren AFB Medical Facility | F.E. Warren AFB | WY | Avi Carter |
| 1288 | Newcastle, WY CBOC | Newcastle | WY | |

| | |
|---|---|
| **From:** | Jess Kruchoski |
| **To:** | Courtney Cooper |
| **Sent:** | 3/16/2015 9:01:45 AM |
| **Subject:** | 23 Medical - territory agents |

Courtney,

I apologize for this taking me a week to get back to you. The representative names that I have in place for the geographies I am covering are as follows:

1. Luke Tornquist - Minnesota/ Iowa/ Dakotas
2. Mike Wilson - Wisconsin
3. Cara Margolis - Michigan (detroit)
4. Vance Nardin - Michigan (west)
5. Matt Bloemer - Ohio
6. Avi Carter - Utah/ Montana
7. Jeff Powers - Arizona/ Nevada (this is a unique carve out that Lex worked out with Dan)
8. Ryan Patterson - St Cloud/ Greater Minnesota
9. Heather Moller - Idaho/ Washington/ Oregon

Let me know if you would need contact information for these folks. I have a few that are ready to make orders and I will have them contact you directly or have their accounts order directly (Minneapolis, Green Bay, Milwaukee, Madison should all be prepared to start ordering once I get Jarvis set up and contracts in place).

Also...Kirk...any update on the Jarvis system? I would really like to start working with that.

Thanks,

Jess

ACADEMY_002138



ACADEMY_006354

REDACTED

ACADEMY_000371

ACADEMY_006372

ACADEMY_006373

ACADEMY_006374



ACADEMY_006375