IN THE SUPERIOR COURT FOR COBB COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| MIMEDX GROUP, INC., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION FILE |
| | § | |
| v. | § | NO. 2016-0175057 |
| | § | |
| LUKE TORNQUIST, | § | |
| | § | |
| Defendant | § | |

## PLAINTIFF'S PETITION FOR TEMPORARY RESTRAINING ORDER AND INTERLOCUTORY INJUNCTION

Plaintiff MiMedx Group, Inc. ("MiMedx") hereby petitions this Honorable Court, pursuant to O.C.G.A. § 9-11-65, for a temporary restraining order and interlocutory injunction enjoining Defendant Luke Tornquist ("Tornquist"), and his agents and those acting in concert with him, from:

(1)     Directly or indirectly soliciting MiMedx's customers that Tornquist has had Material Contact[1] with during the most recent two years of his employment with MiMedx until December 13, 2017 (i.e., a period of one year after Tornquist's separation of employment with MiMedx);

(2)     Directly or indirectly selling medical products to MiMedx's customers that Tornquist has had Material Contact with during the most recent two years of his employment with MiMedx until December 13, 2017;

(3)     Providing any services in furtherance of or in support of the sale of any products of any of MiMedx's competitors, including by and through any third parties, until December 13, 2017;

---

[1] *See infra* note 5.

(4)     Disclosing, transmitting or otherwise utilizing in any manner MiMedx's Sales Trade Secrets or other confidential business information until December 13, 2019 (i.e. a period of three year after Tornquist's separation of employment with MiMedx); and

(5)     Disposing of, damaging, or in any way altering any data of or concerning MiMedx on Tornquist's personal cellular telephones, tablets, laptop computers, desktop computers, and all other electronic and/or computer equipment in their possession, custody or control.

In support of the requested relief, Plaintiff MiMedx states the following:

## I.        INTRODUCTION

MiMedx recently discovered that Tornquist and other then-current MiMedx employees have been selling competitors' products while in the employ of MiMedx in an outlandish scheme to unlawfully compete with MiMedx's business.  These employees have been selling non-MiMedx medical products to MiMedx's customers, including competitors' products that are competitive with MiMedx's products, all while employed by, and receiving a salary and other benefits from, MiMedx.  MiMedx fired Tornquist after discovering his outrageous conduct.

MiMedx has uncovered substantial evidence of Tornquist's involvement in this well-planned and orchestrated scheme, including recently obtained business records of a distributor that he used to make more than 100 confirmed sales of other companies' medical products to MiMedx's customers.  These sales include sales of medical products that are competitive with those sold by MiMedx.  By his wrongful conduct (individually and in concert with others), Tornquist has breached his duty of loyalty to MiMedx, his restrictive covenants with MiMedx (non-competition and confidentiality/non-solicitation contracts) and has misappropriated MiMedx's trade secrets.

MiMedx is suffering great irreparable harm from Tornquist's conduct, resulting in the loss of MiMedx's goodwill with its customers, which it has spent significant time and resources to nurture and develop. A temporary restraining order and an interlocutory injunction are necessary to stop Tornquist's unlawful and injurious conduct. The Court should therefore issue an order restraining Tornquist from further breach of his contractual non-competition and confidentiality/non-solicitation agreements with MiMedx, and from engaging in the misappropriation of MiMedx's trade secrets to compete with MiMedx's business and solicit its customers. In the absence of immediate injunctive relief, Tornquist will continue to engage in his wrongful conduct and cause irreparably injury to MiMedx.

## II.        FACTUAL BACKGROUND

### A. MiMedx is in a Highly Competitive Segment of the Health Care Industry.

MiMedx is a regenerative medicine company utilizing human amniotic tissue and patent-protected processes to develop and market advanced products and therapies to various healthcare sectors. MiMedx's products are used in multiple therapeutic areas, including ophthalmology, spine, chronic wounds, dental, orthopedic surgery, sports medicine and urology. (Affidavit of Kevin Lilly ("Lilly Aff."), filed concurrently herewith, ¶ 3.)

MiMedx sells its medical products in Florida, Georgia, and throughout the United States in a highly competitive business segment of the health care industry. (Lilly Aff., ¶ 4.) MiMedx competitors include: Amnio Technology, LLC; Musculoskeletal Transplant Foundation; Advanced Biologics; Aziyo Biologics, Inc.; and Lattice Biologics. (*Id.*) MiMedx's clients include Veterans' Affairs hospitals ("VA Hospitals") in many states; these VA Hospital clients are particularly relevant to Tornquist's unlawful actions that are the subject of this lawsuit. (*Id.*)

MiMedx's business is driven in large part by the personal trust and relationships its sales representatives have with doctors and hospitals, and the ability of its sales representatives to

3

provide guidance for a doctor's medical product choices. Through investment of significant time and resources, MiMedx creates and fosters their sales representatives' ability to develop personal relationships with and provide guidance for medical product choices by its customers. (Lilly Aff., ¶ 26.)

**B. MiMedx's Business Relies on Trade Secrets and Confidential Business Information, which are Shared with MiMedx's Salesforce.**

MiMedx uses its trade secret and other confidential information to conduct its business. Among the most sensitive of MiMedx's business information is detailed customer contact information, data concerning its sales to its customers and marketing information which is relied upon by its salespeople to promote the sale of MiMedx's products. (Lilly Aff., ¶ 5.) MiMedx maintains detailed, confidential business records containing this information, as follows:

(1) sales information on salesforce.com, which identifies the person(s) who act as the contact for the customer, the specific tissue product sold under each purchase order, the doctors for whom each tissue was ordered, the account history (from which usage reports may be derived), and other sales-related information (the "Salesforce Database");

(2) excel spreadsheets that detail the tissue products by stock keeping unit ("SKU") numbers and quantity for each MiMedx customer and doctor using the same (the "Excel Sales Spreadsheets"); and

(3) a repository of marketing and sales materials generated by MiMedx to assist its salespersons in their marketing and sale of MiMedx products, which includes detailed comparisons of the efficacy and other qualities of MiMedx's medical products as compared with competitive and comparable products of other manufacturers (this repository is referred to as "Box").

(*Id.*, ¶ 6.)[2] The information contained in the Salesforce Database, Excel Sales Spreadsheets and Box components of MiMedx's confidential business records is collectively referred to as the "Sales Trade Secrets."

---

[2] MiMedx will bring to the hearing for *in camera* inspection certain confidential trade secret documents should the Court wish to inspect them.

Given the highly-sensitive and confidential nature of MiMedx's Sales Trade Secrets, MiMedx protects and restricts the availability of it to its own salespeople, including by limiting employee access to information only within the employee's sales territory. (Lilly Aff., ¶¶ 6-9.) These restrictions are as follows:

(1) Salesforce Database: MiMedx sets access control lists for the Salesforce Database, which determines which of its employees have access to what information, based on their job responsibilities (including sales territory) and seniority level. Access to the Salesforce Database is only permitted by use of a user name, which MiMedx administers, and the user's password. The information in the MiMedx Salesforce Database is confidential and proprietary to MiMedx, and is available to MiMedx employees on a need-to-know basis.

(2) Excel Sales Spreadsheets: The information contained in the MiMedx Excel Sales Spreadsheets is maintained on MiMedx's computer servers located in Marietta, Georgia. MiMedx limits access to this information based on the sales employee's territory. Access to MiMedx's Excel Sales Spreadsheets is only permitted by use of a user name, which MiMedx administers, and the user's password. The information in the MiMedx Excel Spreadsheets is confidential and proprietary to MiMedx and is available to MiMedx employees on a need-to-know basis.

(3) Box: The information contained in Box is maintained on MiMedx's computer servers located in Marietta, Georgia. Access to the documents contained in Box is only permitted by use of a user name, which MiMedx administers, and the user's password. The information in Box is confidential and proprietary, and is made available to MiMedx's salespeople to assist them in procuring sales of MiMedx products, including by providing information which can be used to help persuade a customer to purchase a MiMedx product rather than a product of MiMedx's competitors.

(*Id.*)

Given the above protections, none of MiMedx's Sales Trade Secrets are available to the public or to MiMedx's competitors. (Lily Aff., ¶¶ 6-9.) MiMedx thus protects its Sales Trade Secrets to prevent competitors from identifying, targeting, and poaching MiMedx's customers. If this information were made available to competitors or used improperly by MiMedx

employees, it would negatively impact MiMedx's business, especially the goodwill it has forged through expenditure of significant time and resources. (*Id.*, ¶ 28.)

### C. Tornquist Signs Restrictive Covenants as a Condition of His Employment with MiMedx due to the Highly Competitive Market in which MiMedx Participates.

Due to the highly competitive nature of MiMedx's business, MiMedx requires its employees to sign a non-competition agreement and a confidentiality and non-solicitation agreement (the "Restrictive Covenants") as a condition of employment. (Affidavit of Lee Ann Lawson ("Lawson Aff."), filed concurrently herewith, ¶ 6.)   These agreements prohibit employees from solicitation and competition with MiMedx's business and the unauthorized use or disclosure of any customer and business information confidential to MiMedx, including MiMedx's Sales Trade Secrets. (*Id.*)

Tornquist was a MiMedx Account Executive, a position he assumed in September, 2013 and held until December 12, 2016, when his employment with MiMedx was terminated. (Lawson Aff., ¶ 5.)  As an Account Executive, Tornquist was responsible for MiMedx's sales in Minnesota. (*Id.*)  During Tornquist's employment with MiMedx, Jess Kruchoski ("Kruchoski") was his direct supervisor. (*Id.*)  Kruchoski's employment with MiMedx was also recently terminated and he is a defendant in a related action pending in Florida state court (in compliance with forum selection clauses in his Restrictive Covenants). (*Id.* at ¶ 4.)

Prior to and as a condition of his employment with MiMedx, Tornquist and MiMedx executed (among other contracts) a Non-Competition Agreement (the "Tornquist Non-Competition Agreement") and a Confidentiality and Non-Solicitation Agreement (the "Tornquist Confidentiality/Non-Solicitation Agreement") (collectively, the "Tornquist Restrictive Covenants"). (Lawson Aff. at ¶¶ 6, 9, Ex. 4.)

The Tornquist Non-Competition Agreement provides (among other things) that during his employment with MiMedx and for one year thereafter, Tornquist "shall not, within [the continental United States], either directly or indirectly, provide the same or similar services (or consulting with respect to the same or similar services) as those provided by Employee for or on behalf of [MiMedx] within two (2) years prior to the Termination Date, for any individual or entity that provides products or services that are competitive with or the same as or similar to those provided by the Business[3]."  (Lawson Aff., Ex 4.)

The Tornquist Confidentiality/Non-Solicitation Agreement provides that:

(1) during his employment and for three years thereafter, Tornquist "shall hold all Confidential Information in confidence and shall not directly or indirectly divulge or make use of … any Confidential Information or Trade Secrets outside of employment with [MiMedx]";

(2) during his employment and for one year thereafter, Tornquist "will not directly or indirectly solicit or attempt to solicit from any of the Customers[4] with whom Employee had Material Contact[5] during the last two (2) years of Employee's employment with the Company any business in competition with the Business of the Company"; and

---

[3] "Business" is defined in the Non-Competition Agreement as "an integrated developer, manufacturer and/or marketer of (i) collagen based biomaterials and products and durable hydrogel biomaterials and products, (ii) bioimplants processed from human amniotic membrane, and(iii) other amnion-based products."  (Lawson Aff., Ex. 4 (Non-Competition Agreement, § 1(a)).)

[4] "Customer" is defined in the Confidentiality/Non-Solicitation Agreement as "a physician practice, physician, hospital, or any other person and/or entity that utilizes the products of the Company or procures the Company's products for utilization by others."  (Lawson Aff., Ex. 4 (Confidentiality/Non-Solicitation Agreement, § 1(b)).)

[5] "Material Contact" is defined in the Confidentiality/Non-Solicitation Agreement as "personal contact with a Customer of the Company in an effort to initiate, maintain or further a business relationship between Company and such Customer."  (Lawson Aff., Ex. 4 (Confidentiality/Non-Solicitation Agreement, § 1(c)).)  MiMedx will bring to the hearing for *in camera* inspection certain confidential trade secret documents identifying the Customers with whom Kruchoski had Material Contact in 2015 and 2016 should the Court wish to inspect them.

7

(3) during his employment and for one year thereafter, Tornquist "will not directly or indirectly solicit or attempt to solicit any employee of the Company ... with whom Employee had Material Contact during the last two (2) years of Employee's employment with [MiMedx] for the purpose of encouraging, enticing, or causing said employee to terminate employment with [MiMedx]."

(Lawson Aff. ¶ 9, Ex. 4 (Confidentiality/Non-Solicitation Agreement, §§ 3, 5 and 6).)[6]

After Tornquist's execution of his Restrictive Covenants and as a result of his position as a MiMedx Account Executive, MiMedx provided Tornquist with access to MiMedx's Sales Trade Secrets and other confidential business sales information of MiMedx concerning its customers located in Minnesota. (Lilly Aff., ¶ 13.) The Sales Trade Secrets to which Tornquist had access included detailed information of the tissue products (by stock keeping unit ("SKU") number and the quantities purchased) for use by doctors and medical groups in Minnesota. (*Id.*)

### D. MiMedx Discovers that Tornquist Has Been Competing with MiMedx While Employed by MiMedx.

During October and November, 2016, Tornquist and Kruchoski complained to MiMedx, asserting that Tornquist was not paid certain commissions and that MiMedx was engaging in improper financial accounting practices. As a result of these assertions, MiMedx commenced an investigation, which so far has not revealed any evidence supporting the allegations. However, MiMedx did discover a startling and outlandish scheme by Tornquist and Kruchoski (and others) to sell non-MiMedx medical products to MiMedx's customers, including competitors' products that are competitive with MiMedx's products, all while employed by and receiving a salary and

---

[6] Both Tornquist's Non-Competition Agreement and Confidentiality/Non-Solicitation Agreement further expressly provide, to which Tornquist agreed, that a breach thereof would cause MiMedx to "suffer irreparable injury for which there is no adequate remedy at law." (Lawson Aff. ¶ 9, Ex. 4 (Non-Competition Agreement, § 5; Confidentiality/Non-Solicitation Agreement, § 12).)

other benefits from MiMedx. *MiMedx, without even having the benefit of formal discovery yet, has already uncovered that Tornquist, acting as an agent for 23 Medical, LLC (a limited liability company owned and managed by Kruchoski) has made over 100 sales to clients of MiMedx, including products that compete with MiMedx products, all while in the employ of MiMedx.* (*See* Affidavit of Kirk Alexander ("Alexander Aff."), filed concurrently herewith, ¶ 8; ACADEMY_006371-ACADEMY_006375[7]; Lilly Aff., ¶¶ 19-22.)

MiMedx's investigation, which is ongoing, has revealed that Tornquist and Kruchoski began planning their unlawful conduct by no later than February, 2015. At that time, Kruchoski identified Tornquist as one of the sales representatives for his side company, 23 Medical, LLC ("23 Medical"), to Academy Medical, LLC ("Academy"), a distributor of medical products that does not distribute MiMedx products. (Alexander Aff., ¶ 10; ACADEMY_005788-ACADEMY_005796.) Kruchoski confirmed to Academy in early March, 2015, that Tornquist would be the 23 Medical representative responsible for sales in Minnesota. (Alexander Aff., ¶ 10; ACADEMY_002138.)

Beginning in March 2015 and continuing through at least November 2016, Tornquist placed orders for non-MiMedx medical products for the Minneapolis VA Hospital (a MiMedx customer in his territory) though 23 Medical and Academy. (Alexander Aff., ¶¶ 8, 10; ACADEMY_006371-ACADEMY_006375, ACADEMY_002138.) Some of these sales involved product competitive with MiMedx products. (Lilly Aff., ¶¶ 20-22.) During the time he was selling products for 23 Medical and Academy, Tornquist was employed full-time by MiMedx as the Account Executive responsible for sales in Minnesota. (Lawson Aff., ¶ 5.)

---

[7] Relevant documents obtained from Academy and cited herein are also filed concurrently herewith as a composite exhibit.

Specifically, in both February and April 2016, Tornquist and Kruchoski effectuated sales of PalinGen Flow to the Minneapolis Veterans' Affairs Hospital – a MiMedx customer in their territories with which they both had Material Contact in the past two years.  (Alexander Aff. ¶ 8, ACADEMY_006372 (lines 1660 and 1661); Lilly Aff. ¶¶ 19-22.)  PalinGen Flow is sold by Amnio Technology, LLC, a competitor of MiMedx, and is directly competitive with various MiMedx tissue products sold under the brand names "OrthoFlo," EpiFix Micronized," and "AmnioFix Injectible."  (Lilly Aff., ¶ 21.)

### E.  Tornquist Misappropriates MiMedx's Trade Secrets to sell Competitor's Products to MiMedx Customers.

At the time of the February and April 2016 sales of PalinGen Flow to the Minneapolis VA Hospital, Tornquist had confidential MiMedx Sales Trade Secrets that materially assisted him in making those sales.  (Lilly Aff., ¶ 22.)  In this regard, Tornquist was aware of the quantities of the specific MiMedx tissues (identified by SKU numbers) sold to the Minneapolis VA Hospital for 2015 and early 2016, and as a result, knew the precise type of competitive PalinGen Flow product to sell to that particular MiMedx customer.  (*Id.*)  On December 12, 2016, and because of his wholly improper sales of other manufacturers' medical products, including to MiMedx's customers, MiMedx terminated Tornquist's employment for cause.

Tornquist's conduct is outrageously unlawful, constituting a breach of Tornquist's Restrictive Covenants, misappropriation of MiMedx's Trade Secrets, and a breach of Tornquist's duty of loyalty to MiMedx.  By this motion, MiMedx seeks relief from the Court to stop the ongoing irreparable harm Tornquist is causing to MiMedx's business.

### III.     ARGUMENT

**A. Standard for Preliminary Injunctive Relief.**

MiMedx is entitled to preliminary injunctive relief to stop Tornquist from further misappropriating MiMedx's trade secrets and breaching his Restrictive Covenants, among other violations of law alleged in the Complaint. The Georgia Trade Secrets Act of 1990 prohibits the actual or threatened misappropriation of trade secrets by a person who acquires knowledge of the trade secret "under circumstances giving rise to a duty to maintain its secrecy or limit its use." OCGA §§ 10–1–761(2)(B)(ii)(II), 10–1–762. The Act provides for injunctive relief for actual or threatened misappropriation of trade secret information and even calls for affirmative acts to protect a trade secret by court order in appropriate circumstances. O.C.G.A. § 10-1-762.[8]

In granting a preliminary injunction, either by a temporary restraining order or an interlocutory injunction, the trial court has broad discretion, which will not be disturbed on appeal except for a manifest abuse of discretion. *See* O.C.G.A. §§ 9-5-1, *et. seq.*; O.C.G.A. § 9-11-65; *see also Rife v. Corbett*, 264 Ga. 871, 871 (1995) ("A trial court has the discretion to grant [injunctive relief] to preserve the status quo and balance the conveniences of the parties pending final adjudication.").

A temporary restraining order may be granted, even without written or oral notice to the adverse party or his attorney, after a showing that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party can be heard in opposition. O.C.G.A. § 9-11-65; *Ebon Foundation v. Oatman*, 269 Ga. 340, 343 (1998). As required by

---

[8] The Tornquist Restrictive Covenants state that they are "governed by the laws of the State of Georgia." (Lawson Aff., Ex. 9 (Non-Competition Agreement, § 10; Confidentiality/Non-Solicitation Agreement, § 8).) As a result, Georgia law applies to the interpretation and enforcement of these covenants. *Nationwide Logistics, Inc. v. Condor Transp., Inc.*, 270 Ga.App. 277, 280 (2004) ("… in the absence of contrary public policy, our courts normally will enforce a contractual choice of law provision, as the parties by contract may stipulate that the laws of another jurisdiction will govern the transaction").

statute, such orders are temporary in nature and intended to be in force only for limited periods, not to exceed 30 days, to maintain the status quo until such time the adverse party can be heard. O.C.G.A. § 9-11-65.

Like the temporary restraining order but longer in duration, the purpose of an interlocutory injunction is "to maintain the status quo pending a final adjudication on the merits of the case." *Hampton Island Founders v. Liberty Capital,* 283 Ga. 289, 293 (2008). A trial court has broad discretion in deciding whether to grant an interlocutory injunction. *Byelick v. Michel Herbelin USA,* 275 Ga. 505, 506 (2002); OCGA § 9–5–8. In deciding to issue an interlocutory injunction, the court considers whether:

> (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

*SRB Investment Services, LLLP v. Branch Banking and Trust Co.,* 289 Ga. 1, 5 (2011).

### B. A Temporary Restraining Order Should Issue Immediately.

Because MiMedx will suffer immediate and irreparable injury, this Court should immediately enter a temporary restraining order. Tornquist is actively competing against MiMedx and utilizing proprietary MiMedx Sales Trade Secrets to do so. There is a real and present danger that MiMedx's competitive advantage and the value of its Sales Trade Secrets will be unlawfully diminished via Tornquist's use to compete with MiMedx before a hearing is scheduled. An immediate order prohibiting Tornquist from continuing to engage in such conduct

is therefore appropriate. *Pittman v. State*, 288 Ga. 589, 591-92 (2011) (citing *Ebon Foundation*, 269 Ga. At 343).[9]

### C. An Interlocutory Injunction Should Issue.

All the requisite factors are in favor of an interlocutory injunction against Tornquist, and he should be required to show cause as to why an interlocutory injunction should not issue against him following an opportunity for a hearing.

#### 1. MiMedx Has a Substantial Likelihood of Succeeding on the Merits of its Claims.

##### (a) The Evidence Shows that Tornquist has violated the Georgia Trade Secrets Act.

To succeed on a claim for misappropriation of trade secrets under the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. § 10–1–760 *et seq.*, a plaintiff must prove that: (1) it possessed a trade secret; and (2) the opposing party misappropriated the trade secret. *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 685 (11th Cir. 1998).

        i.   **MiMedx' Sales Trade Secrets contain confidential product purchase information and thus constitute "trade secrets" pursuant to the GTSA.**

The GTSA defines trade secrets as confidential, proprietary information such as technical or nontechnical data, formulas, patterns, compilations, programs, devices, methods, techniques, or processes that are not commonly known by the public and that:

> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4).

---

[9] The certification required by O.C.G.A. § 9-11-65(b)(2) for an *ex parte* temporary restraining order is not required because Plaintiff's counsel is serving notice of this filing on Defendant and on counsel for Defendant, despite the fact that counsel for Defendant has not entered an appearance yet.

MiMedx's Sales Trade Secrets constitute "trade secrets" under O.C.G.A. § 10-1-761(4). First, MiMedx's Sales Trade Secrets derive economic value from not being known to MiMedx's competitors.  In this regard, the Sales Trade Secrets contain valuable detailed information about MiMedx's customers' product purchases.  Specifically, the Salesforce Database includes the contact for each customer, the doctors for whom each tissue product was ordered, and the specific tissue products sold under each purchase order.  (Lilly Aff., ¶ 7.)  The Excel Sales Spreadsheets similarly detail tissue products by unique SKU's and quantity sold to each MiMedx customer and doctor using them.  (*Id.*, ¶ 8.)  Additionally, Box contains detailed comparisons of MiMedx products with competitive products to assist salespersons in their marketing and sales of MiMedx products.  (*Id.*, ¶ 9.)  Someone armed with this detailed information concerning customer tissue purchases and competitive alternatives would know which MiMedx customers to target with particular products sold by MiMedx's competitors.  (*Id.*, ¶¶ 26-28.)  Thus, this information would be very valuable to MiMedx's competitors.

Second, MiMedx has taken appropriate precautions to maintain the secrecy of its Sales Trade Secrets.  In this regard, MiMedx restricts access to the Salesforce Database and the Excel Sales Spreadsheets to its sales employees based on their sales territories.  Access to this information is set by MiMedx for each employee and is protected by user and password log-in procedures.  (Lilly Aff., ¶¶ 7-8.)  Box is similarly protected on a secure server by user and password log-in procedures.  (*Id.*, ¶ 9.)  Finally, MiMedx does not permit access to the Sales Trade Secrets unless and until its employees execute Restrictive Covenants, which contractually obligate them to maintain the secrecy of this information and which also prohibit its use except for the benefit of MiMedx. (Lawson Aff., ¶ 6.)

Courts routinely find that confidential information detailing the types and quantities of products purchased by customers, such as MiMedx's Sales Trade Secrets, are "trade secrets" under O.C.G.A. § 10-1-761(4).  *See, e.g., Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc.*, 793 F.Supp.2d 1302, 1313 (N.D. Ga. 2011) (trade secret information included list of doctors and healthcare providers with patient referral preferences, ailments suffered by the patients, and who provided the referrals) (citing *Crews v. Roger Wahl, C.P.A.*, 238 Ga.App. 892 (1999)).

### ii.    Tornquist has misappropriated MiMedx' Sales Trade Secrets.

The GTSA defines "misappropriation" of a trade secret to include disclosure or use of a trade secret without the owner's express or implied consent by a person who acquired it under circumstances giving rise to a duty to maintain its secrecy or limit its use.  O.C.G.A. § 10–1–761(2).  The Act defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means."  O.C.G.A. § 10-1-761(1).

The evidence shows that Tornquist has used improper means, breaching his duties of confidentiality and limited use of MiMedx's Sales Trade Secrets.   Indeed, Tornquist misappropriated MiMedx's Sales Trade Secrets by using them to make sales of competitors' products to MiMedx's customers, such as his sales of PalinGen Flow (a MiMedx competitor's product) to the Minneapolis VA Hospital (a MiMedx customer).  Tornquist has thereby engaged in, and continues to engage in, misappropriation by using MiMedx's Sales Trade Secrets without consent under circumstances where he has a duty to use this information to only procure sales for MiMedx.

### (b) The Evidence Shows that Tornquist is Liable for Breach of His Restrictive Covenants.

#### i. Tornquist's Restrictive Covenants are reasonable in time, area, and scope.

Tornquist's non-competition and non-solicitation obligations continue for one year after the termination of his employment from MiMedx.  (Lawson Aff., Ex. 9 (Non-Competition Agreement, § 2; Confidentiality/Non-Solicitation Agreement, § 5).)  Pursuant to Georgia statute, non-competition and non-solicitation covenants which last for two years after employment separation are reasonable.  O.C.G.A § 13-8-57(b) (For "a restrictive covenant sought to be enforced against a former employee … a court shall presume to be reasonable in time any restraint two years or less in duration").  As Tornquist's non-competition and non-solicitation obligations remain in place for only one year after the termination of his employment, they are eminently reasonable in duration.

Further, the Georgia statutes governing restrictive covenants that protect against the misappropriation of trade secrets do "not limit the period of time for which a party may agree to maintain information as confidential or as a trade secret," which instead is enforceable for "so long as the information or material remains confidential or a trade secret, as applicable." O.C.G.A. § 13-8-53(e).  The restrictive covenant protecting against Tornquist's misuse of any confidential or trade secret information lasts for only three years after the termination of his employment.   (Lawson Aff., Ex. 3 (Confidentiality/Non-Solicitation Agreement, § 3).) Accordingly, Tornquist's restrictive covenant of confidentiality is reasonable.

Tornquist's Confidentiality/Non-Solicitation Agreement is also reasonable in area and scope as it precludes him from soliciting those MiMedx customers with whom he had "Material Contact" during his employment with MiMedx.  (Lawson Aff., Ex. 4 (Confidentiality/Non-Solicitation Agreement, § 5).)  Such covenants are enforceable – even though a geographic

limitation is not expressed – because they are directly tied to the employer's customers for whom the employee was responsible.  O.C.G.A. § 13-8-53(b) (restrictive covenant is enforceable to prevent employee, following termination, "from soliciting, or attempting to solicit … any business from any of such employer's customers … with whom the employee had material contact during his or her employment …. No express reference to geographic area or the types of products or services considered to be competitive shall be required in order for the restraint to be enforceable.").  In any event, since the MiMedx customers Tornquist serviced are in Minnesota, his restrictive covenant already has a geographical limitation as a practical matter.  Accordingly, the covenants in Tornquist's Confidentiality/Non-Solicitation Agreement are reasonable in time, area, and scope.

The Tornquist Non-Competition Agreement is also reasonable as to scope.  The Tornquist Non-Competition Agreement requires that Tornquist "will not, directly or indirectly, perform the same or substantially the same job duties . . . on behalf of any business that competes with the Business of [MiMedx] . . ." (Lawson Aff., Ex. 4 (Non-Competition Agreement, § 2).)  "Enforcement of contracts that restrict competition after the term of employment . . . are permitted against any employee who, in the course of his or her employment, customarily and regularly solicit for the employer customers or prospective customers; or customarily and regularly engage in making sales." O.C.G.A. § 13-8-53(a).[10]

---

[10] MiMedx recognizes that the Court may confine the geographic area of the Tornquist's Non-Competition Agreement to Minnesota, his sales territory for MiMedx, instead of the entire contiguous United States.  (See Lawson Aff. ¶ 5, Ex. 4 (Non-Competition Agreement, § 2).)  Indeed, if the Court determines that such a geographic restriction is required, it should modify the non-competition clause accordingly.  O.C.G.A § 13-8-53(c)(1), § 13-8-54(b); see In re Pervis, 512 B.R. 348, 372 (N.D. Ga. 2014) (Under Georgia's Restrictive Covenant Act, "courts were given the authority to 'blue pencil' or modify restrictive covenants to make them enforceable").

### ii. MiMedx has legitimate business interests in protecting its customer relationships and its Sales Trade Secrets.

To be enforceable, a restrictive covenant must also be reasonably necessary to protect a "legitimate business interest." O.C.G.A. § 13-8-55. O.C.G.A. § 13-8-51 sets forth a non-exhaustive list of "legitimate business interests" supporting restrictive covenants, including: (1) trade secrets, as defined by the GTSA; (2) valuable confidential business or professional information not otherwise qualified as trade secrets; (3) substantial relationships with specific prospective or existing customers; and (4) client goodwill. O.C.G.A. § 13-8-51(9).

### (1) MiMedx has "legitimate business interests" in protecting its substantial relationships with its customers.

"Substantial relationships with specific prospective or existing customers, patients, or clients" is a legitimate business interest expressly identified in O.C.G.A. § 13-8-51(9)(C). Tornquist's Restrictive Covenants contain a non-solicitation clause expressly prohibiting him from "directly or indirectly solicit[ing] or attempt[ing] to solicit" business from "any of the Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment" that is in competition with MiMedx's business. (Lawson Aff., Ex. 4 (Confidentiality/Non-Solicitation Agreement, § 5).) Tornquist is also contractually prohibited from performing the same or similar job duties with any business that competes with MiMedx. (*Id.*, Ex. 4 (Non-Competition Agreement, § 2).)

Tornquist's employment with MiMedx began in September 2013 and ceased in December, 2016. As a MiMedx Account Executive, he was responsible for sales to MiMedx's accounts in Minnesota. (Lawson Aff., ¶ 5.) Thus, Tornquist had contact with and was responsible for MiMedx's customers in Minnesota. (Lilly Aff., ¶ 13.) Consequently, MiMedx has a substantial business interest in protecting its relationships with its customers as well as in

protecting against Tornquist's solicitation of them, which amply justifies Tornquist's Restrictive Covenants.

### (2) MiMedx has a protectable interest in its Sales Trade Secrets.

O.C.G.A. § 13-8-51(9)(A) explicitly identifies trade secrets "as defined by Code Section 10-1-761" as one of the "legitimate business interests" justifying a restrictive covenant.  MiMedx has demonstrated that its Sales Trade Secrets constitute "trade secrets" pursuant to Section 10-1-761.[11]  Indeed, the Sales Trade Secrets information Tornquist misappropriated enabled him to specifically target the sale of a certain competitor's products to a particular MiMedx customer who was likely to purchase them.  (Lilly Aff., ¶¶ 20-22.)  Thus, MiMedx has "legitimate business interests" in its Sales Trade Secrets which justify enforcement of Kruchoski's Restrictive Covenants.

### iii.   Tornquist breached his Restrictive Covenants.

As explained above, Tornquist made more than 100 confirmed sales of other companies' medical products to MiMedx's customers.  A number of these sales involved medical products which are competitive with those sold by MiMedx.  (Alexander Aff., ¶ 8; ACADEMY_006371-ACADEMY_006375; Lilly Aff., ¶¶ 19-22.)  Tornquist's sales of others' medical products to MiMedx's customers constitute breaches of his non-competition and non-solicitation obligations under his Restrictive Covenants.

Tornquist was further obligated by his Confidentiality/Non-Solicitation Agreement not to use MiMedx's Sales Trade Secrets (and other confidential information) "outside of [his] employment with [MiMedx]." (Lawson Aff., Ex. 4 (Confidentiality/Non-Solicitation Agreement, § 3).)  As explained above, Tornquist misappropriated MiMedx's Sales Trade Secrets to effectuate sales of a competitor's products to a MiMedx customer; specifically, the multiple sales

---

[11] See Section III(C)(1)(a)(i), *supra*.

of PalinGen Flow to the Minneapolis VA Hospital.  Tornquist thereby breached his contractual duties of confidentiality.

Accordingly, Tornquist breached his Restrictive Covenants by soliciting MiMedx's existing customers to engage in business competitive with MiMedx, and by disclosing and using MiMedx's Sales Trade Secrets to make these sales.  MiMedx has thus established Tornquist's multiple breaches of his Restrictive Covenants which entitles MiMedx to injunctive relief under O.C.G.A. § § 13-8-55.

### 2. *MiMedx will Continue to Suffer Irreparable Harm if Tornquist is not Enjoined.*

MiMedx has presented evidence that Tornquist is in fact irreparably injuring MiMedx's good will with its customers.  The loss of customer goodwill is an "irreparable" injury.  *Ferrero v. Associated Materials Inc*., 923 F.2d 1441, 1449 (11th Cir. 1991).

In this regard, MiMedx's salespeople have developed (with MiMedx's assistance) relationships with doctors and hospitals, and the concomitant ability to influence their purchases of medical products.  As a result, MiMedx's sales representatives have the ability to influence MiMedx's customers to purchase not only MiMedx's products, but also competitors' products.  Since MiMedx tends to do repeat business with its customers, the sale of competitors' products to MiMedx's customers by MiMedx sales representatives (such as Tornquist) is especially damaging to MiMedx's relationships and good will with its customers.  (Lilly Aff., ¶¶ 26-28.)  And irreparable harm is caused where a former employee solicits sales by misappropriation of his former employer's customer information.  *Amedisys Holding, LLC*, 793 F.Supp.2d at 1313-14 (concluding that employer will suffer irreparable harm if former employee is allowed to solicit patients from the same doctors and facilities that were referenced in misappropriated referral logs).

Indeed, Tornquist confirmed that his breach of his Restrictive Covenants would cause MiMedx to "suffer irreparable injury for which there is no adequate remedy at law." (Lawson Aff., Ex. 4 (Non-Competition Agreement, § 5; Confidentiality/Non-Solicitation Agreement, § 12).) MiMedx has therefore established irreparable harm as a result of Tornquist's wrongful conduct.

### 3. *The Balance of the Harms Favors Issuance of the Requested Injunction.*

The balance of the harms also favors MiMedx. In fact, MiMedx will be irreparably harmed if Tornquist is permitted to continue to utilize MiMedx's Sales Trade Secret information or to continue competing by selling others' products to the MiMedx customers he served. In the absence of the requested injunction, MiMedx will suffer harm in the form of lost sales, lost revenue, loss of good will with its customers, and diminished value of its Sales Trade Secrets. Tornquist, on the other hand, will not suffer any harm from issuance of the requested injunction because all that MiMedx is asking is for Tornquist to abide by the contractual terms to which he previously agreed, which are also consistent with his statutory obligations. Indeed, Tornquist "cannot suffer compensable harm when enjoined from an unlawful activity." *Amedisys Holding, LLC*, 793 F.Supp.2d at 1314.

### 4. *The Issuance of an Injunction Would Serve the Public Interest.*

An injunction prohibiting Tornquist from soliciting business from MiMedx's customers in Minnesota for whom he was responsible will best serve the public interest. There is a strong public policy in favor of promoting fair competition. *See American Bldgs. Co. v. Pascoe Bldg. Systems, Inc.,* 260 Ga. 346, 348-349 (1990) (wrongful means generally involve predatory tactics such as . . . use of confidential information.). Public policy also supports the protection of an employment agreement imposing a duty on an employee to refrain from disclosing or misusing

confidential business information of the employer.  *Durham v. Stand-By Labor of Georgia, Inc.*, 230 Ga. 558, 563 (1973).  Indeed, the Georgia Legislature has expressly found "that reasonable restrictive covenants contained in employment … contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises in Georgia and keeping existing businesses within the state."  O.C.G.A. § 13-8-50.

## IV.   CONCLUSION

For all the foregoing reasons, MiMedx respectfully petitions the Court for a temporary restraining order until a hearing on an interlocutory injunction can be held, and for an interlocutory injunction until MiMedx's right to a permanent injunction is determined, restraining and enjoining Defendant Luke Tornquist, and his agents and all persons acting in concert with him, from:

(1)     Directly or indirectly soliciting MiMedx's customers that Tornquist has had Material Contact with during the most recent two years of his employment with MiMedx until December 13, 2017 (i.e., for a period of one year after Tornquist's separation of employment with MiMedx);

(2)     Directly or indirectly selling medical products to MiMedx's customers that Tornquist has had Material Contact with during the most recent two years of his employment with MiMedx until December 13, 2017;

(3)     Providing any services in furtherance or support of the sale of any products of any of MiMedx's competitors, including by and through any distributors, until December 13, 2017;

(4)     Disclosing, transmitting or otherwise utilizing in any manner MiMedx's Sales Trade Secrets or other confidential business information until December 13, 2019 (i.e., for a

period of three years after Tornquist's separation of employment with MiMedx); and

(5)    Disposing of, damaging, or in any way altering any data of or concerning MiMedx on Defendants' personal cellular telephones, tablets, laptop computers, desktop computers, and all other electronic and/or computer equipment in their possession, custody or control.

Respectfully submitted, this 20th day of January, 2017.

**WARGO & FRENCH, LLP**

/s/ Joseph D. Wargo
Joseph D. Wargo
Georgia Bar No. 738764
E-mail: jwargo@wargofrench.com
Shanon J. McGinnis
Georgia Bar No. 387598
E-mail: smcginnis@wargofrench.com
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1506

*Counsel for Plaintiff*
*MiMedx Group, Inc.*

IN THE SUPERIOR COURT FOR COBB COUNTY
STATE OF GEORGIA

MIMEDX GROUP, INC.,                   §
                                       §
          Plaintiff,                   §          CIVIL ACTION FILE
                                       §
      v.                               §          NO. 2016-0175057
                                       §
LUKE TORNQUIST,                        §
                                       §
          Defendant                    §

### CERTIFICATE OF SERVICE

I hereby certify that on this day, I served the foregoing **PLAINTIFF'S PETITION FOR TEMPORARY RESTRAINING ORDER AND INTERLOCUTORY INJUNCTION** by U.S. Mail, postage pre-paid to Defendant addressed as follows:

Luke Tornquist
1818 Goodrich Avenue
St. Paul, MN 55105

I hereby further certify that on this day, I provided a courtesy copy of the foregoing **PLAINTIFF'S PETITION FOR TEMPORARY RESTRAINING ORDER AND INTERLOCUTORY INJUNCTION** by U.S. Mail, postage pre-paid to the following:

David Allen Roberts, Esq.
Hall, Arbery, Gilligan, Roberts & Shanlever LLP
3340 Peachtree Road NE – Suite 1900
Atlanta, GA 30326-1082

Respectfully submitted, this 20th day of January, 2017.

**WARGO & FRENCH, LLP**
_/s/ Joseph D. Wargo_
Joseph D. Wargo
Georgia Bar No. 738764

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

MIMEDX GROUP, INC.,                    *        CIVIL ACTION FILE NUMBER

            Plaintiff,                    *        16-1-9795-51

Vs.                                    *

LUKE TORNQUIST,                        *

            Defendant.                    *

## SHOW CAUSE AND RULE NISI ORDER

It is hereby ordered that each of the parties be and appear before Presiding Senior Judge James G. Bodiford of the Superior Court of Cobb County on the **9th day of February, 2017, 2:00 p.m. in Courtroom "M", 4th Floor**, Cobb Superior Court South Building, to show cause, if any, why the prayers of the within Defendant's Emergency Motion should not be granted.

The question of whether there is an emergency is reserved for the Senior Judge presiding over this rule nisi.

SO ORDERED this ___30___ day of ___January___, 2017.

_____
ADELE P. GRUBBS
SENIOR JUDGE, STATE OF GEORGIA
PRESIDING IN COBB SUPERIOR COURT
COBB JUDICIAL CIRCUIT

## IN THE SUPERIOR COURT FOR COBB COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| MIMEDX GROUP, INC., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION FILE |
| | § | |
| v. | § | NO. 16109795 |
| | § | |
| LUKE TORNQUIST, | § | |
| | § | |
| Defendant | § | |

### CERTIFICATE OF SERVICE

I hereby certify that on this day, I served the foregoing **SHOW CAUSE AND RULE**

**NISI ORDER** by U.S. Mail, postage pre-paid to Defendant addressed as follows:

Luke Tornquist
1818 Goodrich Avenue
St. Paul, MN 55105

I hereby further certify that on this day, I provided a courtesy copy of the foregoing

**SHOW CAUSE AND RULE NISI ORDER** by hand delivery to the following:

David Allen Roberts, Esq.
Hall, Arbery, Gilligan, Roberts & Shanlever LLP
3340 Peachtree Road NE – Suite 1900
Atlanta, GA 30326-1082

Respectfully submitted, this 31st day of January, 2017.

WARGO & FRENCH, LLP

Shanon J. McGinnis
Georgia Bar No. 887598