IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


MIMEDX GROUP, INC.,              )
                                 )
            PLAINTIFF,           )
                                 )          DOCKET NUMBER
        VS.                      )          1:17-CV-399-LMM
                                 )
LUKE TORNQUIST,                  )          ATLANTA, GEORGIA
                                 )          FEBRUARY 9, 2017
            DEFENDANT.           )
                                 )
                                 )
_____ )



TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LEIGH MARTIN MAY,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:               JOSEPH WARGO & SHANON MCGINNIS
                                 WARGO & FRENCH, LLP
                                 ATLANTA, GEORGIA  30309


FOR THE DEFENDANT:               DAVID ROBERTS, WES MCCART &
                                 ELIZABETH NEWTON
                                 HALL, ARBERY, ET AL.
                                 ATLANTA, GEORGIA  30326




*MECHANICAL STENOGRAPHY OF PROCEEDINGS*
*AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY*

OFFICIAL COURT REPORTER:         MONTRELL VANN, RPR, RMR, RDR, CRR
                                 2160 UNITED STATES COURTHOUSE
                                 75 TED TURNER DRIVE, SOUTHWEST
                                 ATLANTA, GEORGIA  30303
                                 (404)215-1549

I N D E X

                                            PAGE

DEFENDANT'S WITNESS

LUCAS ALAN TORNQUIST

  DIRECT EXAMINATION BY MR. ROBERTS          30
  CROSS-EXAMINATION BY MR. WARGO             49

REPORTER'S CERTIFICATE                      113

1          *(IN ATLANTA, FULTON COUNTY, GEORGIA, FEBRUARY 9, 2017, IN*

2     *OPEN COURT.)*

3          THE COURT:  OKAY.  GOOD MORNING.  YOU MAY BE SEATED.

4     WE ARE HERE THIS MORNING IN CIVIL ACTION 17-CV-399, MIMEDX --

5     AND Y'ALL CAN TELL ME IN A MINUTE IF I PRONOUNCE THAT

6     CORRECTLY -- GROUP, INC. VS. LUKE TORNQUIST.

7          AND IF COUNSEL WOULD INTRODUCE THEMSELVES FOR THE RECORD,

8     PLEASE.

9          MS. MCGINNIS:  YOUR HONOR, SHANON MCGINNIS ON BEHALF

10    OF MIMEDX GROUP, INC., AND MY PARTNER, JOSEPH WARGO.  ALSO WITH

11    ME HERE TODAY IS LEXI HADEN, GENERAL COUNSEL FOR MIMEDX; MARK

12    TRAYNOR (PHONETIC), SENIOR COUNSEL FOR MIMEDX; AND BILL TAYLOR

13    WHO IS THE PRESIDENT AND C.O.O. OF MIMEDX.

14          THE COURT:  OKAY.  THANK YOU.

15          MR. ROBERTS:  GOOD MORNING, YOUR HONOR.  DAVE ROBERTS,

16    HALL, ARBERY, GILLIGAN, ROBERTS & SHANLEVER HERE IN ATLANTA.

17    AND WITH ME TODAY IS WES MCCART AND ELIZABETH NEWTON WHO ARE

18    ATTORNEYS IN MY OFFICE.  AND ALSO MY CLIENT, MR. TORNQUIST,

19    WHO'S DOWN FROM MINNESOTA TODAY.

20          THE COURT:  GREAT.  WELL, GOOD MORNING TO YOU ALL.

21    BEFORE WE GET STARTED ON THE ACTUAL ARGUMENTS FROM THE PARTIES,

22    WHAT I WANTED TO DO IS GO THROUGH WITH YOU AT THE OUTSET SOME OF

23    MY INITIAL THOUGHTS AFTER READING THE BRIEFS AND AFFIDAVITS FROM

24    ALL THE PARTIES SO THAT YOU COULD HAVE A LITTLE BIT MORE

25    INFORMATION ABOUT WHAT I WAS THINKING SO THAT YOU COULD KIND OF

1    ADDRESS SOME OF MY CONCERNS WHILE YOU'RE MAKING YOUR ARGUMENT

2    AND KNOW THE ISSUES THAT I THINK MAY BE THE ONES THAT YOU MAY

3    HAVE SOME MORE PROBLEMS WITH IN TERMS OF MY REVIEW OF WHAT YOU

4    HAVE INITIALLY FILED.  SO IN LOOKING AT ALL THIS INFORMATION,

5    WHAT I SEE IS, FIRST, I'M NOT UNDULY PERSUADED BY THE ARGUMENT

6    OF THE UNCONSTITUTIONALITY OF THE R.C.A.  CERTAINLY THAT'S

7    SOMETHING THAT I WILL LOOK AT, BUT AT AN INITIAL LOOK AT THE

8    ARGUMENTS AND THE CASE LAW, I DO THINK IT'S LIKELY

9    CONSTITUTIONAL.

10       I ALSO THINK THAT I CAN BLUE PENCIL THE EMPLOYMENT

11    CONTRACTS AND I CAN LIKELY BLUE PENCIL IT SUCH THAT I CAN CHANGE

12    THE AREA TO WHICH IT APPLIES TO MINNESOTA.  SO THAT'S SOMETHING

13    THAT AT LEAST INITIALLY I THINK IS CORRECT.  I ALSO, IN TERMS OF

14    REVIEWING THE AFFIDAVIT OF MR. TORNQUIST AND HIS STATEMENTS

15    ABOUT WHAT HE DOES OR DOES NOT INTEND TO DO AND WHAT HE HAS DONE

16    IN THE PAST, I AM MORE INCLINED TO RELY ON THOSE

17    REPRESENTATIONS.  AND IN TERMS OF MY POWER AS A JUDGE, IF

18    SOMEONE FILES AN AFFIDAVIT IN MY COURTROOM UNDER OATH THAT LATER

19    BECOMES UNTRUE, THEN I HAVE A LOT OF TOOLS THAT I CAN USE IN

20    TERMS OF SANCTIONS AND POWERS THAT I HAVE TO MAKE SURE THAT

21    WHATEVER STATEMENTS ARE MADE ARE ACCURATE.  SO IN TERMS OF SOME

22    OF THE ARGUMENTS MADE IN THE PLAINTIFF'S BRIEF THAT I CAN'T

23    TRUST OR RELY ON WHAT MR. TORNQUIST SAID BECAUSE THAT MAY NOT BE

24    RELIABLE, FROM MY STANDPOINT I HAVE A LOT OF POWER AND TOOLS TO

25    DEAL WITH THAT IF FOR SOME REASON THEY DON'T BECOME TRUE.  SO I

1 AM LESS PERSUADED ABOUT SOME OF THE ARGUMENTS ABOUT THE PAST

2 CONDUCT AS A WAY TO SUPPORT A FUTURE INJUNCTION.

3 I THINK THAT FROM MY STANDPOINT THAT THE HARDEST PART OF

4 PLAINTIFF'S ARGUMENT IS IN TERMS OF THE ARGUMENT THAT THERE IS

5 AN IMMINENT AND IRREPARABLE HARM. BECAUSE WHEN I REVIEW

6 MR. TORNQUIST'S AFFIDAVIT, IT APPEARS THAT THE ONLY ISSUE THAT

7 IS IMMINENT IS HIS EMPLOYMENT POTENTIALLY WITH PROTECTIVE

8 TECHNOLOGIES. AND THAT REALLY IS THE GIST OF, AT LEAST IN MY

9 OPINION, WHAT WE NEED TO BE TALKING ABOUT TODAY AND WHETHER THAT

10 EMPLOYMENT RAISES IMMINENT AND IRREPARABLE HARM. AND I DO NOTE

11 THAT I HAVE THE RECENTLY FILED -- I THINK THERE ARE DECLARATIONS

12 OR AFFIDAVITS THAT STATE THAT PREDICTIVE TECHNOLOGIES DOES SELL

13 A COLLAGEN-BASED PRODUCT, AND CERTAINLY EMPLOYMENT WITH THAT

14 ORGANIZATION COULD BE IN VIOLATION OF THESE CONTRACTS. BUT WHAT

15 I DO NOT HAVE A GOOD UNDERSTANDING ABOUT IS EVEN THOUGH THAT

16 PREDICTIVE TECHNOLOGIES SELLS COLLAGEN-BASED PRODUCTS AND DOES

17 HAVE SOME PRODUCTS THAT OPERATE IN THE SAME SPHERE POTENTIALLY

18 AS THE MIMEDX PRODUCTS, I DON'T HAVE AN UNDERSTANDING OF HOW

19 TRUE OF A COMPETITOR THIS IS SUCH THAT IT WOULD BE IRREPARABLE

20 HARM FOR HIM TO BE ALLOWED TO SELL THESE PRODUCTS.

21 SO, YES, IT APPEARS THAT SOMEONE HAS GONE TO THE WEBSITE

22 AND SHOWN THAT, YES, THERE ARE SOME PRODUCTS, YES, THEY CONTAIN

23 COLLAGEN, YES, THEY COULD BE COMPETITORS, BUT TO ME THAT IS NOT

24 THE SAME THING AS MEETING A BURDEN OF IRREPARABLE HARM IF HE'S

25 ALLOWED TO WORK FOR THAT EMPLOYER. SO THAT'S SOMETHING THAT I

1    HAVE A LOT OF CONCERN WITH, IS THAT KIND OF IRREPARABLE HARM

2    PIECE.

3        THE OTHER ISSUE I WANTED TO RAISE IS THAT UNDER RULE 65(C)

4    OF THE FEDERAL RULES, FOR ANYONE TO GET A TEMPORARY RESTRAINING

5    ORDER OR A PRELIMINARY INJUNCTION, THERE IS THE PREREQUISITE OF

6    THE FILING OF A BOND.  AND NOBODY HAS TALKED ABOUT THAT IN ANY

7    WAY OR SHOWN HOW THEY WILL COMPLY WITH THAT, HOW MUCH THEY WOULD

8    POST OR WHAT THEY WANT TO DO IN TERMS OF THAT PARTICULAR

9    PROVISION.  SO THAT IS A REQUIREMENT THAT HAS TO BE MET BEFORE I

10   CAN ISSUE ANY KIND OF T.R.O. OR PRELIMINARY INJUNCTION.  SO AND

11   ALSO I THINK THAT I WANTED TO KIND OF TALK ABOUT BRIEFLY IS THAT

12   WHEN I'M LOOKING AT THE LIKELIHOOD OF SUCCESS ON THE MERITS

13   PRONG WHICH IS AN IMPORTANT PART OF WHAT WE'RE TALKING ABOUT

14   HERE, IS THAT IT IS UNUSUAL WITH THIS BLUE PENCILING TYPE THING

15   THAT WE'RE DEALING WITH IN THAT, YES, I DO KNOW THAT I HAVE THE

16   POWER TO BLUE PENCIL AND THEN ISSUE A T.R.O. OR PRELIMINARY

17   INJUNCTION, BUT THERE ARE A LOT OF ISSUES THAT ARE GOING TO COME

18   UP IN TERMS OF HOW I ULTIMATELY DO BLUE PENCIL THIS AGREEMENT

19   THAT MAY NOT BE LIMITED TO THIS TERRITORIAL RESTRICTION.  SO

20   THERE IS A LITTLE BIT OF A CIRCULAR ISSUE HERE WHERE I'M BEING

21   ASKED TO ENFORCE AN AGREEMENT THAT MAY BE SUBJECT TO CHANGE BY

22   THE COURT WHEN I HAVE NOT YET DETERMINED HOW THIS AGREEMENT MAY

23   HAVE TO BE CHANGED IN TERMS OF KIND OF THIS REASONABLENESS

24   COMPONENT.  AND THERE DO SEEM TO BE SOME FACTUAL ISSUES OUT HERE

25   ON SOME OF THOSE ISSUES, AS WELL AS POTENTIALLY THIS ISSUE OF

WHETHER PREDICTIVE TECHNOLOGIES ACTUALLY IS A TRUE COMPETITOR.

I DID NOTE THAT THEY WERE NOT LISTED AMONG THE COMPETITORS THAT

WERE PRESENTED IN THE INITIAL T.R.O. MOTION.  SO THOSE ARE KIND

OF SOME OF THE THINGS THAT I HAVE IN MY HEAD AS WE START TODAY'S

HEARING, AND I WANTED YOU TO HAVE THE BENEFIT OF THAT SO YOU

MAKE SURE THAT YOU SPEND YOUR TIME IN A WAY THAT ADDRESSES THOSE

CONCERNS THAT I HAVE AT THE OUTSET HERE.

SO WITH THAT AS A BACKGROUND, MS. MCGINNIS, I WILL ALLOW

YOU TO MAKE YOUR ARGUMENT.  AND I DO SAY THAT BECAUSE WE'VE GOT

DUELING MOTIONS FOR T.R.O.'S, I DO THINK TO MOST EXTENT THEY

NATURALLY RESPOND TO EACH OTHER.  SO I DON'T KNOW THAT WE HAVE

TO DO IT, PLAINTIFF'S T.R.O., DEFENDANT RESPONDS, DEFENDANT'S

T.R.O., PLAINTIFF RESPONDS.  I THINK THAT NATURALLY ALL THE

ARGUMENTS ARE KIND OF CONTAINED WITHIN EACH OTHER, BUT IF WE

NEED TO BREAK IT OUT DIFFERENTLY, LET ME KNOW, BUT I'LL FIRST

HEAR FROM MS. MCGINNIS.

MR. WARGO:  YOUR HONOR, MAY I ASK A QUICK QUESTION?

THE COURT:  SURE.

MR. WARGO:  GIVEN HOW YOU'VE DIRECTED THE PARTIES,

OBVIOUSLY MS. MCGINNIS IS GOING TO TAKE THE LEAD, TAKE THE

CHARGE.  ARE YOU GOING TO ALLOW OTHER COUNSEL TO SPEAK AT -- IN

REBUTTAL AND RESPONSE?  IS THAT GOING TO BE APPROPRIATE WITH

YOUR HONOR?

THE COURT:  I THINK THAT THAT WOULD BE FINE FOR OTHER

PEOPLE TO SPEAK.  JUST I KNOW SOMETIMES PEOPLE HAVE THE NEED TO

1    SAY THE SAME THING THAT SOMEONE ELSE SAID, BUT THEY JUST WANT TO

2    THINK THEY DID IT BETTER.  JUST MAKE SURE THAT YOU'RE ADDRESSING

3    DIFFERENT ARGUMENTS AND DIFFERENT PARTS OF THE ARGUMENT RATHER

4    THAN JUST SAYING THE SAME THING FROM A DIFFERENT VOICE.

5            MR. WARGO:  AND I NEVER SAY THAT ABOUT MS. MCGINNIS

6    ANYWAY.  SHE SAYS IT BETTER THAN I DO.

7            THE COURT:  WELL, PEOPLE ALWAYS FEEL LIKE, WELL, THAT

8    SHE WOULD REALLY UNDERSTAND IT.  SO, YEAH, IF YOU KEEP IT TO THE

9    ACTUAL ARGUMENTS THEMSELVES, THAT WOULD BE FINE.

10           MS. MCGINNIS:  THANK YOU, YOUR HONOR.

11           THE COURT:  JUST ONE MINUTE WHILE WE SET UP.

12       OKAY.  YOU MAY PROCEED.

13           MS. MCGINNIS:  THANK YOU, YOUR HONOR.  IF I MAY, YOUR

14   HONOR, I'D ACTUALLY LIKE TO ADDRESS WHAT YOU BELIEVE IS THE --

15   THE HARDEST PART FIRST.  I THINK THAT THAT'S PROBABLY THE BEST

16   PLACE TO START BECAUSE I THINK IN OUR OPINION, IN THE MIMEDX

17   OPINION, THAT THERE ARE DEFINITELY SOME FACTORS THAT I THINK

18   MAKES IT EASIER FOR THE COURT WITH RESPECT TO THE IMMINENT HARM.

19   THE -- MR. TORNQUIST, THE DEFENDANT, AND IN FACT HIS FORMER

20   BOSS, MR. KRUCHOSKI, HAVE BOTH SUBMITTED WITHIN THE PAST 48

21   HOURS DECLARATIONS TO THIS COURT THAT THEY HAVE ADMITTED THAT --

22   IN THOSE DECLARATIONS THAT THEY ADMIT THAT MR. TORNQUIST

23   BREACHED THE RESTRICTIVE COVENANTS PREVIOUSLY.  THE SALE OF

24   PALINGEN IS A COMPETITIVE PRODUCT.  THERE'S NO DISPUTE OF THAT.

25   AND THAT ADMITTED BREACH IS -- FIRST OF ALL, ESTABLISHES THE

1 SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THE VARIOUS

2 CLAIMS.  BUT, MORE IMPORTANTLY, THAT ADMITTED BREACHED PLAYS

3 INTO THE IRREPARABLE HARM.  BECAUSE IN ADDITION TO ADMITTING

4 BREACH ALREADY, THE DEFENDANT HAS SUBMITTED A DECLARATION

5 INDICATING THAT HE PLANS TO OR HE IS AT LEAST EXPLORING AN

6 EMPLOYMENT OPPORTUNITY WITH A COMPANY CALLED PREDICTIVE

7 TECHNOLOGIES.

8     WE HAVE SUBMITTED IN THE AFFIDAVIT OF KEVIN -- OR, EXCUSE

9 ME -- THE DECLARATION OF KEVIN LILLY, AS WELL AS THE DECLARATION

10 OF MIMEDX'S CHIEF SCIENTIFIC OFFICER, MR. KOOB -- I HOPE I'M

11 PRONOUNCING THAT CORRECTLY -- THAT PREDICTIVE TECHNOLOGIES HAS

12 MORE THAN ONE COMPETITIVE PRODUCTS (VERBATIM) WITH MIMEDX AND

13 THEY ARE PRODUCTS THAT IN FACT MR. TORNQUIST HAS SOLD IN THE

14 PAST FOR MIMEDX.  FOR EXAMPLE, EPICORD IS ONE OF THE COMPETITIVE

15 PRODUCTS WITH THE UMBILICAL CORD MATRIX PRODUCTS THAT

16 MR. TORNQUIST HAS INDICATED HE WOULD BE SELLING FOR THIS NEW

17 COMPANY.  MR. TORNQUIST WAS -- RECEIVED TRAINING IN JANUARY OF

18 2016 ON MIMEDX'S COMPETITIVE PRODUCT.  HE HAS ACCESS TO THE

19 TRADE SECRET INFORMATION THAT MR. LILLY HAS INDICATED IN HIS --

20 IN HIS AFFIDAVIT AND IN HIS DECLARATION.

21     WE'VE IDENTIFIED SOME OTHER THINGS THAT THE SALE OF

22 PALINGEN WAS ONE THAT WE KNEW ABOUT, YOU KNOW, AND WE DIDN'T

23 REALIZE UNTIL THE DECLARATION OF -- OF MR. TORNQUIST THAT HE WAS

24 PLANNING ON, YOU KNOW, EXPLORING AN EMPLOYMENT OPPORTUNITY WITH

25 THIS OTHER COMPANY.  AND SO THAT'S WHY, YOU KNOW, ONE OF THE

1 QUESTIONS THAT YOU ASKED WAS THE, YOU KNOW, THIS WASN'T

2 IDENTIFIED AS ONE OF THE ORIGINAL, YOU KNOW, COMPETITIVE

3 COMPANIES, ONE OF THE COMPETITORS OF MIMEDX IN PART BECAUSE WE

4 DIDN'T KNOW THAT HE WAS GOING THERE AND IN PART BECAUSE THIS IS

5 A -- A FLUID BUSINESS. WE IDENTIFIED SOME OF THE, YOU KNOW, THE

6 MORE WELL-KNOWN COMPETITORS, BUT IT DOESN'T NECESSARILY MEAN

7 THAT PREDICTIVE TECHNOLOGIES IS NOT A COMPETITOR. IT JUST MAY

8 NOT HAVE BEEN ONE ON THE, YOU KNOW, THE TOP FIVE. AND SO THE

9 LILLY AFFIDAVIT HAS INDICATED THE TRADE SECRET TYPE OF

10 INFORMATION THAT IS NOT IN DISPUTE THAT MR. TORNQUIST HAS HAD

11 ACCESS TO, PARTICULARLY WITH RESPECT TO EPIFIX -- OR EPICORD.

12 THE -- ALL THE INFORMATION THAT WE TALKED ABOUT ABOUT PALINGEN,

13 SIMILAR TYPE OF INFORMATION ABOUT EPICORD AND THE OTHER

14 COMPETITIVE PRODUCTS ARE INCLUDED IN THE SALESFORCE.COM

15 DATABASES, IN THE EXCEL SPREADSHEETS, IN BOX WHICH IS MARKETING

16 INFORMATION THAT COMPARES THE EFFICACY OF OUR PRODUCT TO OTHER

17 PRODUCTS. HE'S HAD ACCESS TO ALL THAT INFORMATION IN ADDITION

18 TO THE SPECIFIC TRAINING ON MIMEDX'S PRODUCT IN JANUARY OF 2016.

19 AND IN FACT MR. LILLY EVEN TESTIFIES -- I BELIEVE IT'S PARAGRAPH

20 SIX OF HIS DECLARATION, YOUR HONOR -- THAT -- AND LET ME GET THE

21 EXACT PAGE FOR YOU BECAUSE IN FACT I THINK PARAGRAPH SIX --

22           THE COURT:  I THINK EIGHT IS THE ONE THAT TALKS ABOUT

23 THE PRODUCTS.

24           MS. MCGINNIS:  EIGHT IS THE -- YEAH, EIGHT IS THE

25 PRODUCTS, BUT IN PARAGRAPH 12, YOUR HONOR -- AND, AGAIN, YOU

1  KNOW, WE HAVE SOME DOCUMENTS THAT WERE TRADE SECRET DOCUMENTS,

2  SO WE DIDN'T ATTACH THEM.  WE'VE BROUGHT THEM HERE FOR YOUR

3  HONOR IF YOU WOULD LIKE TO DO AN IN-CAMERA INSPECTION OF THEM.

4  BUT PARAGRAPH 12 IDENTIFIES THAT IN 2016, MR. TORNQUIST MADE

5  SALES OF THE MIMEDX PRODUCT THAT IS DIRECTLY COMPETITIVE WITH

6  THE PRODUCT OF PREDICTIVE TECHNOLOGIES THAT HE HAS INDICATED

7  HE'S GOING TO BE SELLING OR THAT HE WOULD BE SELLING.  IN

8  ADDITION -- AND I THINK THAT THE TOTAL AMOUNT OF THAT IS ALMOST

9  $300,000 OF PRODUCT WAS SOLD BY MR. TORNQUIST IN 2016, ALL THE

10 WAY UP UNTIL THE -- THE VERY MONTH BEFORE HIS TERMINATION.  SO

11 ALL THE WAY UP UNTIL NOVEMBER 16TH, HE -- THIS WAS ONE OF THE

12 PRODUCTS THAT HE WAS SELLING ON BEHALF OF MIMEDX IN MINNESOTA

13 WHICH PRESUMABLY IS WHERE HE'S GOING TO BE SELLING THE

14 PREDICTIVE TECHNOLOGY (VERBATIM) PRODUCTS.

15      PARAGRAPH EIGHT OF MR. LILLY'S AFFIDAVIT ALSO IDENTIFIES

16 THAT IT'S JUST NOT THIS ONE PRODUCT OF PREDICTIVE TECHNOLOGY,

17 THERE (VERBATIM) IN FACT ALL FOUR OF PREDICTIVE TECHNOLOGY

18 PRODUCTS, THERE ARE CORRESPONDING COMPETITIVE PRODUCTS OF MIMEDX

19 THAT MR. TORNQUIST SOLD, HAD ACCESS TO OUR TRADE SECRET DATA,

20 AND IN FACT SOLD TO OUR CUSTOMERS IN 2016.  SO WITH RESPECT TO,

21 YOU KNOW, IMMINENT IRREPARABLE INJURY, YOU KNOW, HIS OWN SWORN

22 DECLARATION ESTABLISHES THAT, YOU KNOW, THAT DECLARATION AND THE

23 LILLY DECLARATION, AND IN FACT THE DECLARATION OF MR. KOOB, THE

24 CHIEF SCIENTIFIC OFFICER WHO UNEQUIVOCALLY STATES THAT THIS --

25 ONE OF THE PRODUCTS IS -- IS PURELY A COLLAGEN-BASED PRODUCT --

WHICH IN MR. TORNQUIST'S AFFIDAVIT HE SAYS THAT HE WILL NOT BE

SELLING COLLAGEN-BASED PRODUCT.  WELL, MR. KOOB ESTABLISHES THAT

THAT IN FACT IS A COLLAGEN-BASED PRODUCT.  AND THAT'S UNREFUTED.

AND IN ADDITION, LIKE I SAID, THE LILLY DECLARATION IDENTIFIES

SEVERAL PRODUCTS OF MIMEDX THAT ARE COMPETITIVE WITH EVERY

SINGLE PRODUCT OF PREDICTIVE TECHNOLOGIES.  AND GIVEN THE PRIOR

ACCESS TO THE TRADE SECRET DATA AND THE PRIOR SALES, THE RECENT

SALES BY MR. TORNQUIST, THAT THAT CLEARLY IN OUR OPINION MAKES

IT -- MAKES IT A MUCH EASIER SHOW OF IRREPARABLE INJURY.

THE OTHER THING IS, IS THAT WE'RE -- WE'RE TALKING ABOUT

GOING TO THE EXACT SAME HOSPITALS, THE EXACT SAME DOCTORS TO

SELL THIS COMPETITIVE PRODUCT.  IMAGINE, FOR EXAMPLE, IF

SOMEBODY WALKED IN OFF OF THE STREET AND HAD NO INFORMATION FROM

MIMEDX AS FAR AS THE TYPES OF PRODUCTS THAT ARE SOLD, THE

DOCTORS THAT ARE PURCHASING THEM, THE VOLUMES THAT THEY'RE

PURCHASING THEM, WHEN THEY'RE PURCHASING THEM, WHETHER IT'S A

SPECIFIC SIZE, WHETHER IT'S A SMALL ONE OR A BIG ONE OR WHETHER

IT'S AN INJECTABLE OR NOT AN INJECTABLE, THAT'S THE TYPE OF

INFORMATION THAT MR. TORNQUIST HAS ABOUT MIMEDX PRODUCTS.  AND

IT IS THAT INFORMATION THAT -- THAT COMPETITORS CAN USE TO GAIN

A COMPETITIVE ADVANTAGE, THAT PREDICTIVE TECHNOLOGIES CAN USE TO

GAIN A COMPETITIVE ADVANTAGE.  WHEN MR. TORNQUIST WALKS INTO THE

EXACT SAME DOCTORS AT THE EXACT SAME HOSPITALS AND SELLING A

COMPETITIVE PRODUCT, HE'S ALREADY GENERATED GOODWILL ON MIMEDX'S

DIME, ON MIMEDX'S TIME FOR THE PAST TWO YEARS, AND THEN HE'S

1   GOING TO BE USING THAT FOR A DIRECT COMPETITOR OF MIMEDX.  AND

2   THAT IS -- THAT IS CLEARLY NOT ONLY THREATENED HARM, BUT

3   IMMINENT HARM BECAUSE HE'S LOOKING AT THAT OPPORTUNITY CURRENTLY

4   RIGHT NOW.  AND THAT IS EXACTLY WHAT THE RESTRICTIVE COVENANTS,

5   THE NON-SOLICITATION, THE NON-COMPETITION RESTRICTIVE COVENANTS

6   AND THE CONFIDENTIALITY RESTRICTIVE COVENANTS ARE DESIGNED TO

7   PROTECT AGAINST.  YOU KNOW, MR. TORNQUIST IN EXECUTING THOSE

8   AGREEMENTS AGREED THAT IN THE EVENT OF BREACH, WHICH WE ALREADY

9   HAVE BASED ON HIS ADMISSION OF SALES OF PALINGEN PREVIOUSLY TO

10  OUR CUSTOMERS, TO MIMEDX CUSTOMERS, HE'S ALREADY ADMITTED

11  BREACH.  SO IN THE EVENT OF BREACH OR THREATENED BREACH, WHICH

12  WE HAVE BASED ON HIS ADMISSION OF WHERE HE'S GOING AND OUR

13  UNREFUTED DECLARATIONS THAT THAT IS IN FACT A COMPETITOR AND A

14  DIRECT COMPETITOR, THAT WE HAVE BOTH A PRIOR BREACH AND A

15  THREATENED BREACH.  AND MR. TORNQUIST AGREED IN EXECUTING ALL

16  THREE -- BOTH OF THOSE DOCUMENTS, ALL THREE OF THOSE PROVISIONS,

17  THAT IN THE EVENT OF BREACH OR THREATENED BREACH, THAT THERE IS

18  A CHANCE OF IMMINENT HARM AND INJUNCTION SHALL ISSUE.  THAT IS

19  THE LANGUAGE OF THOSE AGREEMENTS.  SO HE HAS ALREADY CONSENTED

20  TO THE FINDING OF IRREPARABLE HARM.  HE'S SO CONSENTED TO THE

21  FACT THAT AN INJUNCTION SHALL ISSUE.  AND IN FACT THOSE

22  AGREEMENTS EVEN GO SO FAR AS TO SAY THAT HE UNDERSTANDS THAT THE

23  AGREEMENTS ARE REASONABLY AND NARROWLY DRAFTED SO THAT HE WON'T

24  HAVE A PROBLEM GETTING A JOB IN THE FUTURE.  HE JUST CAN'T GET A

25  JOB THAT DEALS WITH A COLLAGEN-BASED OR AN AMNION-BASED PRODUCT,

1   AND THAT IS EXACTLY WHAT HE'S DOING WITH RESPECT TO PREDICTIVE

2   TECHNOLOGIES.

3       I JUST WANT TO TOUCH BRIEFLY ON -- YOU KNOW, ON THE ISSUE

4   OF MODIFICATION AND BLUE PENCILING.  AND I KNOW THAT YOUR HONOR

5   HAD INDICATED THAT THERE MAY BE, YOU KNOW, OTHER MODIFICATIONS.

6   CLEARLY THE GEORGIA RESTRICTIVE COVENANT ACT PROVIDES THAT

7   MODIFICATIONS ARE ALLOWED.  AND MODIFICATION IS DEFINED THERE AS

8   A LIMITATION OF THE COVENANT TO REFLECT THE ACTUAL

9   CIRCUMSTANCES.  SO, YOU KNOW, HERE THE ACTUAL CIRCUMSTANCES ARE

10  THAT MR. TORNQUIST WOUND UP ONLY SELLING MIMEDX PRODUCTS TO

11  MIMEDX CUSTOMERS IN MINNESOTA.  AND SO, THEREFORE, THAT IS

12  ABSOLUTELY A REASONABLE RESTRICTION AND ONE THAT WE'VE, YOU

13  KNOW, OBVIOUSLY CONSENTED TO IN OUR PAPERS.

14      YOU KNOW, WITH RESPECT TO OTHER RESTRICTIONS, I THINK, YOU

15  KNOW, ONE OF THE OTHER ARGUMENTS THAT DEFENDANT MADE WAS THAT,

16  YOU KNOW, THERE WAS SOME CONFUSION ON THEIR PART AS TO THE

17  PRODUCTS THAT MR. TORNQUIST COULD OR COULDN'T SELL IN THE FUTURE

18  WITH RESPECT TO THE NON-COMPETE.  AND I FIND THAT SOMEWHAT

19  INTERESTING BECAUSE MR. TORNQUIST IN HIS OWN AFFIDAVIT OR IN HIS

20  OWN DECLARATION ABOUT THE PRODUCTS THAT HE WAS AND WAS NOT GOING

21  TO BE SELLING FOR PREDICTIVE TECHNOLOGIES USES THE EXACT

22  LANGUAGE OF THE RESTRICTIVE COVENANT WHICH CLEARLY INDICATES

23  THAT HE UNDERSTANDS THE PRODUCTS THAT HE CAN AND CAN'T SELL

24  UNDER THE RESTRICTIVE COVENANT, UNDER THE NON-COMPETE, AND THE

25  CUSTOMERS THAT HE CAN AND HE CAN'T CONTACT WITH RESPECT TO THOSE

COMPETITIVE PRODUCTS UNDER THE NON-SOLICITATION.  SO TO THE

EXTENT THAT THERE WAS SOME, YOU KNOW, CONFUSION OR QUESTION ON

THE COURT'S PART WITH RESPECT TO THE PRODUCTS THAT HE COULD OR

COULD NOT SELL POST -- POST EMPLOYMENT, YOU KNOW, THAT IS --

THAT'S CLEARLY NOT AN ISSUE.  AND THE -- THE ARGUMENT -- THE

LEGAL ARGUMENTS ARE BELIED, I BELIEVE, BY -- YOU KNOW, NOT ONLY

BY MR. TORNQUIST'S DIRECT AFFIDAVIT, BUT ALSO BY THE FACT THAT

THAT IS CLEARLY SPELLED OUT IN THE AGREEMENT.  AND WE'VE NOW

SUPPLIED AFFIDAVITS, DECLARATIONS FROM MR. LILLY AND MR. KOOB

THAT DEFINE THE EXACT COMPETITIVE PRODUCTS FROM PREDICTIVE

TECHNOLOGIES AND HOW THAT MESHES UP WITH THE PRODUCTS OF MIMEDX.

AND I KNOW THAT YOUR HONOR SAID THAT -- THAT -- THAT YOU

WERE -- YOU KNOW, WITH RESPECT TO MR. TORNQUIST'S

REPRESENTATIONS AS TO WHAT HE DID OR DIDN'T DO IN THE PAST --

AND, YOU KNOW, THAT I THINK THE MOST TELLING OF THOSE FROM OUR

PERSPECTIVE IS THE ADMISSION OF THE -- OF THE SALE OF PALINGEN

UNDER BOTH THE -- IN FACT UNDER ALL OF THE RESTRICTIVE

COVENANTS, THAT IN FACT ALONE IS -- CONSTITUTES BREACH.  THE

NON- --

THE COURT:  BUT THAT'S PAST HARM.  I DON'T ENJOIN PAST

HARM.

MS. MCGINNIS:  SURE, SURE.  BUT -- AND I THINK THAT WE

CAN ALL AGREE THAT, YOU KNOW, ONE OF THE KEY PREDICTORS OF

FUTURE BEHAVIOR IS PAST BEHAVIOR.  AND I THINK WHAT'S IMPORTANT

TO LOOK AT IS THAT IN CONNECTION WITH THAT SALE OF PALINGEN,

1    THAT MR. TORNQUIST NEVER SOUGHT APPROVAL FROM MIMEDX TO MAKE

2    THAT SALE, NEVER EVEN BROUGHT IT TO THEIR ATTENTION.  HE DID IT

3    IN SECRET.  YOU KNOW, HE NEVER -- NEVER LET ANYBODY KNOW ABOUT

4    IT.  THERE'S A PROCESS AT MIMEDX FOR, YOU KNOW, IF YOU HAVE A

5    CONFLICT OF INTEREST, THERE'S A PROCESS THAT -- THAT SHOULD BE

6    FOLLOWED.  THAT PROCESS WASN'T FOLLOWED HERE.  IT WAS DONE IN --

7    IT WAS DONE IN SECRET.  IT WAS DONE WITHOUT LETTING ANYBODY KNOW

8    ABOUT IT, WITHOUT SEEKING AUTHORITY.  IT'S SOMETHING THAT -- I

9    THINK THAT IS A STRONG PREDICTOR AS WELL.  AND SO NOW WE HAVE

10   THIS AFFIDAVIT FROM MR. TORNQUIST THAT SAYS THAT HE'S GOING TO

11   PREDICTIVE TECHNOLOGIES.  AND I WAS KIND OF SHOCKED BECAUSE IN

12   THE EXACT SAME DECLARATION HE ADMITS THAT HE SOLD EPICORD, BUT

13   YET SAYS THAT HE WON'T BE SELLING A COMPETITIVE PRODUCT.  BUT

14   MR. TORNQUIST, BASED ON THE TRAINING AND THE TRADE SECRET DATA

15   THAT HE HAD ACCESS TO, HE SHOULD KNOW THAT THAT IS IN FACT A

16   COMPETITIVE PRODUCT, THAT THAT ALONE IS A COMPETITIVE PRODUCT.

17   AND BASED ON HIS TWO YEARS OF EXPERIENCE, YOU KNOW, OR ALMOST

18   TWO-AND-A-HALF YEARS OF EXPERIENCE WITH MIMEDX -- AND, YOU KNOW,

19   I MEAN, HE'S -- HE WILL TELL YOU HIMSELF HE'S ONE OF THE TOP

20   SELLERS.  HE MADE ALMOST A MILLION DOLLARS LAST YEAR SELLING

21   MIMEDX PRODUCTS, THAT HE IS, YOU KNOW, FULLY VERSED IN WHAT

22   MIMEDX PRODUCTS ARE AND THEIR COMPETITORS, AND SO HE, THEREFORE,

23   SHOULD KNOW.  SO NOT ONLY DID HE SELL PALINGEN IN SECRET, BUT

24   NOW HE'S ATTEMPTING TO KIND OF SAY, OH, BUT I -- YOU KNOW, I'M

25   NOT DOING IT AGAIN.  AND THE LAW JUST DOESN'T SUPPORT THAT.

1          THE COURT:  NOW, I HAVE A QUESTION ABOUT THE

2    NON-SOLICITATION AGREEMENT BECAUSE YOU STATED THAT THE

3    AGREEMENTS THAT MR. TORNQUIST SIGNED WERE NARROW SUCH THAT HE'S

4    ONLY PREVENTED FROM WORKING IF HE'S TRYING TO SELL THESE

5    COLLAGEN -- AND I THINK THERE'S SOME SORT OF AMNIO TISSUE

6    PRODUCTS.

7          MS. MCGINNIS:  YES, MA'AM.

8          THE COURT:  AT LEAST MY GLANCING AT THE

9    NON-SOLICITATION ARGUMENT WOULD SUGGEST THAT THAT IS BROADER

10   THAN JUST LIMITING IT TO THOSE TWO TYPES OF PRODUCTS, THAT IF HE

11   WERE TO SELL OTHER PRODUCTS TO HIS FORMER CLIENT, LIKE, THE

12   V.A., THEN HE WOULD POTENTIALLY BE IN BREACH OF THAT

13   NON-SOLICITATION AGREEMENT.  IS THAT YOUR POSITION, OR HOW BROAD

14   ARE YOU READING THAT AGREEMENT?  BECAUSE THAT WAS ONE THAT, AT

15   LEAST AT FIRST GLANCE, APPEARED THAT IT MAY NEED SOME MORE

16   LIMITING SUCH THAT IF HE WERE TO SELL POTENTIALLY GARDEN TOOLS

17   TO THE V.A. OR ANYTHING TO THE V.A., THAT HE COULD POSSIBLY BE

18   IN BREACH WHEN IT WOULDN'T NECESSARILY BE IN DIRECT COMPETITION

19   TO MIMEDX AND ANY OF THE TYPES OF THINGS THAT THEY SOLD.  SO HOW

20   BROADLY ARE Y'ALL READING THIS NON-SOLICITATION CLAUSE?

21         MS. MCGINNIS:  I BELIEVE THAT THE NON-SOLICITATION

22   CLAUSE IS LIMITED TO SOLICITATION OF COMPETITIVE PRODUCTS.  AND

23   I BELIEVE THAT THAT'S CONSISTENT WITH THE GEORGIA RESTRICTIVE

24   COVENANT ACTS (VERBATIM) AS WELL --

25         THE COURT:  SO YOU WOULD READ THE SAME --

1          MS. MCGINNIS:  -- THE DEFINITION OF MATERIAL CONTACT.

2          THE COURT:  SO YOU WOULD READ, YOU WOULD INTERPRET

3   THAT COMPETITIVE PRODUCTS AS YOU HAVE BEEN STATING HERE TODAY,

4   THE COLLAGEN, AND SO THAT WOULD KIND OF BE THE BLUE PENCILING OR

5   AT LEAST THE FURTHER DEFINING OF WHAT THAT RESTRICTIVE PIECE OF

6   THAT NON-SOLICITATION WOULD BE?

7          MS. MCGINNIS:  YEAH.  THE LANGUAGE OF THE

8   NON-SOLICITATION IN FACT THAT I'M LOOKING AT IS TALKING ABOUT

9   HOW MR. TORNQUIST WILL NOT DIRECTLY OR INDIRECTLY SOLICIT OR

10  ATTEMPT TO SOLICIT ANY OF THE CUSTOMERS WITH WHOM HE HAD

11  MATERIAL CONTACT AS DEFINED -- AND THE DEFINITION IS CONSISTENT

12  WITH WHAT'S IN THE GEORGIA RESTRICTIVE COVENANTS ACT -- DURING

13  THE LAST TWO YEARS OF HIS EMPLOYMENT WITH THE COMPANY, ANY

14  BUSINESS IN COMPETITION WITH THE BUSINESS OF THE COMPANY.  SO --

15         THE COURT:  DOES MIMEDX ONLY DO THESE TYPES OF

16  COLLAGEN AND AMNIOTIC TISSUE PRODUCTS, OR DOES IT DO OTHER

17  PRODUCTS AS WELL?

18         MS. MCGINNIS:  WHAT MIMEDX DOES -- AND I MAY NEED A

19  LITTLE BIT OF HELP.  I MAY NEED TO PHONE A FRIEND A LITTLE BIT

20  ON THIS.  BUT MIMEDX SELLS PRODUCTS THAT ARE COLLAGEN AND AMNION

21  BASED, WHICH IS THE -- THE LANGUAGE THAT'S IN THE NON-COMPETE.

22  THEY'RE COLLAGEN AND AMNION-BASED MEDICAL PRODUCTS THAT THEY

23  SELL, YOU KNOW, REALLY THROUGHOUT THE UNITED STATES IN

24  PARTICULAR TO THE V.A. HOSPITALS, BUT THEY'RE REALLY COOL

25  PRODUCTS.  THEY'RE PATENTED PRODUCTS THAT ARE USED IN THE -- IN

1  THE WOUND-HEALING SPACE.  SO --

2          THE COURT:  WELL, I GUESS WHAT I'M INTERESTED IN IS

3  THAT IF WE'RE GOING TO HAVE A NON-SOLICITATION LIMITED TO THE

4  COMPETITIVE PRODUCTS OF MIMEDX AND I DEFINE THAT AS COLLAGEN

5  BASED AND AMNIO TISSUE BASED, IS THAT THE WAY THAT YOUR POSITION

6  IS THAT SHOULD BE INTERPRETED, OR ARE THERE OTHER PRODUCTS THAT

7  MR. TORNQUIST DID NOT DIRECTLY SELL BUT WOULD BE LIMITED FROM

8  SELLING TO POTENTIAL CLIENTS?

9          MS. MCGINNIS:  THERE MAY BE SOME OTHERS.  I'M GOING TO

10  LET MR. -- IF YOU DON'T MIND --

11          THE COURT:  OKAY.

12          MS. MCGINNIS:  -- MR. WARGO COME UP.  BUT ONE THING

13  THAT I DO WANT TO ADDRESS THAT WE INDICATED IN THE LILLY

14  AFFIDAVIT IS WE HAVE -- AND, OF COURSE, THEY'RE TRADE SECRETS,

15  YOU KNOW, PROTECTED, SO WE DIDN'T FILE THEM, BUT WE HAVE THEM

16  WITH US.  WE ACTUALLY HAD SPREADSHEETS THAT IDENTIFY WHAT MIMEDX

17  AT LEAST RIGHT HERE TODAY CURRENTLY BELIEVES ARE COMPETITIVE

18  PRODUCTS, AND THAT MIGHT BE --

19          THE COURT:  THAT'S NOT REALLY WHAT I'M ASKING.

20          MS. MCGINNIS:  OKAY.

21          THE COURT:  I'M ASKING HOW BROAD THE NON-SOLICITATION

22  AGREEMENT IS IN TERMS OF WHAT MR. TORNQUIST WILL BE ALLOWED TO

23  DO IN TERMS OF FUTURE JOBS?  AND WHAT I WANT TO MAKE SURE IS

24  THAT THIS NON-SOLICITATION AGREEMENT IS MIRRORING THE SAME

25  LANGUAGE AS THE REST OF IT BECAUSE IT'S NOT CLEAR TO ME WHEN IT

1 STATES THAT HE CANNOT WORK -- HE CANNOT SOLICIT FORMER CLIENTS

2 IN COMPETITIVE BUSINESSES OF MIMEDX, HOW BROAD THAT IS.  BECAUSE

3 I WOULD THINK THAT IN TERMS OF WHAT WOULD BE REASONABLE IN TERMS

4 OF THE NON-SOLICITATION IS LIMITING THAT MORE TOWARDS THE TYPES

5 OF SALES THAT MR. TORNQUIST DID FOR MIMEDX AND THE TYPE OF WORK

6 HE DID WOULD BE THE SCOPE OF THAT NON-SOLICITATION.  AND IN BLUE

7 PENCILING LIKE YOU MENTIONED, YOU KIND OF LOOK AT KIND OF THE

8 REALITIES OF WHAT'S GOING ON.  AND TO ME WHEN I READ THE

9 NON-SOLICITATION, I'M NOT ENTIRELY SURE HOW BROAD THAT IS.  BUT

10 IF THE POSITION IS THAT IT SHOULD MIRROR THAT COLLAGEN, AMNIO

11 TISSUE LANGUAGE WE'VE BEEN TALKING ABOUT PREVIOUSLY, THAT

12 ANSWERS MY QUESTION.  BUT IF MIMEDX DOES A LOT OF OTHER THINGS

13 SO THAT YOU WOULD BE SEEKING TO PREVENT MR. TORNQUIST FROM DOING

14 KIND OF ALL MEDICAL SALES OR SELLING OTHER TYPES OF PRODUCTS TO

15 THE V.A., THAT WOULD BE OF MORE CONCERN THAN JUST LIMITING HIM

16 TO SELLING THE PRODUCTS THAT WERE DIRECTLY IN COMPETITION TO THE

17 PRODUCTS HE SOLD FOR MIMEDX.  AND THAT CLAUSE IS NOT CLEAR TO

18 ME.

19        MS. MCGINNIS:  RIGHT.  IT -- OUR POSITION IS THAT IT

20 SHOULD BE THE COLLAGEN-BASED BIOMATERIALS AND/OR PRODUCTS,

21 DURABLE HYDROGEL BIOMATERIALS OR PRODUCTS, BIOIMPLANTS

22 MANUFACTURED FROM HUMAN AMNIOTIC MEMBRANE OR AMNION-BASED

23 PRODUCTS THAT MIMEDX SELLS.  SO JUST THOSE -- THOSE TYPES OF

24 PRODUCTS.  AND THAT IS -- AND I'M READING FROM THE

25 CONFIDENTIALITY NON-SOLICITATION LANGUAGE AS TO WHAT THE

BUSINESS OF MIMEDX IS.

        THE COURT:  AND IS THAT WHAT MR. TORNQUIST DID, DID HE SELL ALL OF MIMEDX PRODUCTS OR WAS HE LIMITED TO CERTAIN PRODUCTS?

        MR. WARGO:  JUST POINTS OF FACT, YOUR HONOR, BECAUSE I DIDN'T KNOW THE ANSWER.  I'M GLAD LEXI IS HERE.  YOUR HONOR, I BELIEVE THE LANGUAGE DOES SAY COMPETITIVE PRODUCTS.  AND YOU'RE OBVIOUSLY GIVING US YOUR INDICATION AND YOU THINK THAT MAY BE OVERBROAD.  OBVIOUSLY THIS IS IN THE DISCRETION OF YOUR HONOR, BUT WE BELIEVE COMPETITIVE PRODUCTS IS BROADER THAN JUST THE AMNIOTIC --

        MS. MCGINNIS:  AMNIOTIC.

        MR. WARGO:  THANK YOU -- FLUID AND UMBILICAL CORD PRODUCTS.  IN PARTICULAR, WE HAVE A BONE-AND-SKIN PRODUCT THAT WOULD BE -- COULD -- WE -- THAT WE SELL THAT WHAT WE'RE SEEKING IN THIS ORDER, FROM AN ORDER FROM YOUR HONOR TODAY, IT WOULD INCLUDE THAT.  THIS WOULD BE SELLING INTO THE SAME HOSPITALS, THE SAME DOCTORS, THE SAME HOSPITALS (VERBATIM).  THAT IS A COMPETITIVE PRODUCT BECAUSE WE SELL THAT PRODUCT.  THAT IS OUR POSITION, YOUR HONOR, BECAUSE THE COVENANT CONTEMPLATES OUR PRODUCTS AND PRODUCTS THAT HE CAN'T SELL BEING COMPETITIVE THERETO.  SO THE ONLY ADDITION TO WHAT MS. MCGINNIS SAID WOULD BE BONE-AND-SKIN PRODUCT THAT WE WOULD ASK THAT WE HAVE RELIEF HERE.  AGAIN, WE UNDERSTAND WHAT YOUR HONOR HAS SAID THAT YOU'RE CONCERNED ABOUT THAT.  I WOULD SAY -- I WOULD STATE THEY HAVEN'T

RESPECTFULLY RAISED THIS ARGUMENT.  WE MAY HEAR THAT THEY'RE

GOING TO SAY SO TODAY, BUT THEY HAVE NOT --

       THE COURT:  WITH A T.R.O. THEY TEND TO BE A LITTLE

FLUID BECAUSE PEOPLE DON'T TEND TO HAVE AS MUCH TIME TO RESPOND.

BUT DID MR. TORNQUIST SELL THE BONE-AND-SKIN PRODUCT?

       MR. WARGO:  YOUR HONOR, I DO NOT KNOW.

       THE COURT:  OKAY.

       MR. WARGO:  WE'RE NOT READY TO RESPOND TO THAT.  I'M

SORRY.

       THE COURT:  OKAY.  WELL, HE MAY KNOW TOO.

       MS. MCGINNIS:  YEAH.

       THE COURT:  OKAY.  THANK YOU.  THAT HELPS IN THAT

REGARD.

       MS. MCGINNIS:  I THINK, YOUR HONOR, THAT I HAVE -- AND

PLEASE LET ME KNOW IF YOU HAVE ANY ADDITIONAL QUESTIONS, BUT I

THINK THAT I HAVE ADDRESSED --

       THE COURT:  THE BOND.

       MS. MCGINNIS:  OH, THE BOND.

       THE COURT:  YES.

       MS. MCGINNIS:  YEAH.  I DO KNOW THAT WE'VE LOOKED AT

THE BOND OBVIOUSLY.  WE'RE -- YOU KNOW, THE BOND ISSUE.  YOU

KNOW, TO THE EXTENT THAT THE COURT ORDERS A BOND, YOU KNOW, WE

WOULD BE WILLING TO POST ONE.  HOWEVER, WE BELIEVE THAT IN THIS

PARTICULAR CASE THAT A BOND MAY NOT BE NECESSARY.  YOU KNOW,

THESE ARE THE AGREEMENTS THAT MR. TORNQUIST HAS ALREADY SIGNED,

1  ALREADY AGREED TO, AND HE'S ADMITTED IN THOSE AGREEMENTS.  AND

2  LET ME FIND THE LANGUAGE FOR YOU.  THAT THESE AGREEMENTS WON'T

3  CAUSE HIM HARM IN TRYING TO FIND FUTURE EMPLOYMENT.  SO TO THE

4  EXTENT THAT ANY BOND IS REQUIRED, IT SHOULD BE A MINIMAL BOND.

5  IF YOU GIVE ME JUST ONE SECOND, YOUR HONOR, I WILL FIND THAT

6  EXACT PROVISION FOR YOU.  APPARENTLY I SHOULD HAVE HIGHLIGHTED

7  IT.  IT'S IN THE -- IT'S IN THE NON-SOLICITATION PROVISION, YOUR

8  HONOR, IN PARAGRAPH FIVE.  AT THE VERY BOTTOM IT SAYS, THE

9  EMPLOYEE REPRESENTS THAT EMPLOYEE'S EXPERIENCE AND ABILITIES ARE

10 SUCH THAT THE EXISTENCE AND ENFORCEMENT OF THESE COVENANTS AND

11 PROMISES WILL NOT PREVENT THE EMPLOYEE FROM EARNING OR PURSUING

12 AN ADEQUATE LIVELIHOOD AND WILL NOT CAUSE AN UNDUE BURDEN TO THE

13 EMPLOYEE OR THE EMPLOYEE'S FAMILY BY THE ENFORCEMENT OF THE --

14 OF THE PROVISION.

15         THE COURT:  OKAY.

16         MS. MCGINNIS:  SO.  OKAY.  THANK YOU.  WE WILL RESPOND

17 AS NECESSARY LATER.  THANK YOU, YOUR HONOR.

18         THE COURT:  YOU'RE WELCOME.

19    OKAY.  MR. ROBERTS.

20         MR. ROBERTS:  JUST A COUPLE OF SECONDS, YOUR HONOR.

21         THE COURT:  NO.  THAT'S FINE.  TAKE YOUR TIME.  I'M

22 RAISING A LOT OF ISSUES WITH STUFF.  AND I'M MORE INTERESTED IN

23 GETTING THE INFORMATION THAN ANYTHING, SO TAKING A FEW MINUTES

24 IS NOT A PROBLEM.

25         MR. ROBERTS:  SURE.  MAY I APPROACH, YOUR HONOR?

1          THE COURT:  SURE.

2          MR. ROBERTS:  MAY IT PLEASE THE COURT.  THANK YOUR

3    HONOR.  I WANTED TO THANK THE COURT FOR THE OPPORTUNITY TO

4    APPEAR BEFORE IT TODAY.  WE -- THESE CASES, THESE TYPES OF

5    PROCEEDINGS BY THEIR NATURE ARE ALWAYS VERY TOUGH ON THE

6    ATTORNEYS AND THE LITIGANTS AND THE COURT BECAUSE OF THE SPEED

7    IN WHICH THEY NORMALLY PROCEED.  SO WE'VE DONE OUR BEST, YOUR

8    HONOR, IN THE SHORT TIME FRAME INVOLVED TO TRY TO LAY OUT

9    EVERYTHING WE CAN IN THE MOST EFFICIENT WAY POSSIBLE FOR

10   CONSIDERATION BY THE COURT.  I APPRECIATE THE COURT'S STATEMENTS

11   AT THE BEGINNING ASKING US TO TAKE INTO CONSIDERATION THINGS

12   THAT YOU'VE FOCUSED ON WHICH I WILL ATTEMPT TO DO, YOUR HONOR.

13   HOWEVER, THERE ARE SOME ISSUES THAT I WOULD LIKE TO GET INTO THE

14   RECORD.  AND SO WHAT MY INTENTION WAS TODAY, YOUR HONOR, IS THAT

15   I WOULD TALK ABOUT THE FACTS, THE UNDERLYING FACTS AND

16   CIRCUMSTANCES OF THE CASE, AND THEN TALK ABOUT THE LAW THAT'S

17   APPLICABLE TO THE CASE.  AND THEN I WOULD ASK THE COURT FOR THE

18   OPPORTUNITY TO HAVE THE COURT HEAR FROM MR. TORNQUIST WHO'S HERE

19   TODAY ON SOME OF THESE ISSUES.  I THINK THAT'S VERY IMPORTANT,

20   YOUR HONOR.  AND IF WE ARE HERE INDEED IN THE CONTEXT OF A

21   PRELIMINARY INJUNCTION HEARING, I WOULD RESPECTFULLY SUGGEST TO

22   THE COURT THAT, GIVEN THE WEIGHT AND SERIOUSNESS OF WHAT -- OF

23   THE RELIEF THAT PLAINTIFF IS SEEKING TODAY, HEARING FROM

24   MR. TORNQUIST WOULD BE VERY BENEFICIAL TO THE COURT, ESPECIALLY

25   ON SOME OF THESE MORE TECHNICAL ISSUES REGARDING THE PRODUCTS

THAT HE DID SELL AND THE PRODUCTS THAT HE'S INTENDING TO SELL

AND AS TO ISSUES OF WHAT HE HAS AND HAS NOT DONE IN THE PAST.  I

THINK IT'S VERY IMPORTANT FOR THE COURT TO HEAR FROM HIM.  SO AT

THE CONCLUSION OF MY PRESENTATION I WOULD ASK IF THE COURT WOULD

ALLOW US TO HAVE MR. TORNQUIST TESTIFY AS TO SOME OF THESE

ISSUES.

       THE COURT:  OKAY.  WE'LL SEE WHAT ISSUES WE KIND OF

HAVE LEFT AT THAT POINT.

       MR. ROBERTS:  OKAY.  OKAY.  LET ME START OFF -- LET ME

START OFF WITH SOME OF THE FACTS, YOUR HONOR.  THE -- WHAT I --

WHAT I THINK IS MAYBE A LITTLE BIT OVERLOOKED HERE TODAY AND

CERTAINLY HASN'T BEEN DISCUSSED IS THAT MIMEDX COMES BEFORE THE

COURT TODAY, YOUR HONOR, WITH THE UNCLEANEST OF HANDS.  THIS

COURT IS SITTING IN EQUITY AND MIMEDX COMES BEFORE IT WITH

UNCLEAN HANDS.  AT ITS CORE, THIS CASE IS ABOUT A RETALIATORY

EFFORT BY MIMEDX TO ATTEMPT TO PREVENT MY CLIENT FROM PURSUING

LEGITIMATE WHISTLE-BLOWER CLAIMS THAT HE FIRST INITIATED IN

MINNESOTA, AND THOSE CLAIMS ARE NOW BEFORE THIS COURT.  AND

THOSE CLAIMS RELATE TO UNLAWFUL FINANCIAL PRACTICES THAT MIMEDX

WERE ENGAGED IN.

    I HAVE -- WE SUBMITTED A COPY OF THE MINNESOTA COMPLAINT.

OBVIOUSLY THOSE CLAIMS ARE NOW OUR COUNTERCLAIMS IN THIS COURT,

SO I WON'T SPEND A GREAT DEAL OF THE COURT'S TIME GOING THROUGH

THOSE.  BUT I THINK IT'S IMPORTANT TO NOTE AND AS A MATTER OF

EQUITY AND AS A MATTER OF THE AFFIRMATIVE DEFENSE WE'VE RAISED

1  OF UNCLEAN HANDS FOR THE COURT TO BE MINDFUL THAT, AT LEAST FROM

2  OUR PERSPECTIVE, OUR CLIENT IS NOT THE BAD GUY HERE.  OUR CLIENT

3  BEGAN WORKING FOR MIMEDX AND HE BECAME VERY SUCCESSFUL.  HE DID

4  VERY WELL.  HE SOLD OVER $6.3 MILLION OF PRODUCTS FOR MIMEDX IN

5  2016.  HE RAISED ISSUES OF FINANCIAL ACCOUNTING IRREGULARITY,

6  PARDON ME, WITH THE COMPANY IN 2016 AND WAS RETALIATED AGAINST,

7  NOT PAID COMMISSIONS DUE TO HIM.  AND THEN WHEN THE -- WHEN MY

8  CLIENT ATTEMPTED TO MEDIATE THOSE CLAIMS WITH MIMEDX, HE WAS

9  TERMINATED AT THAT MEDIATION, AND THEN THE VERY NEXT DAY THIS

10  LAWSUIT WAS FILED AGAINST MY CLIENT.

11      SO I JUST THINK IT'S IMPORTANT, YOUR HONOR, THAT WE NOT

12  OVERLOOK THE FACT THAT THERE ARE A LOT OF UNDERLYING

13  CIRCUMSTANCES IN THIS CASE.  I KNOW WE'RE TALKING ABOUT

14  RESTRICTIVE COVENANTS AND I KNOW WE'RE TALKING ABOUT THE

15  ELEMENTS OF ESTABLISHING OR NOT ESTABLISHING INJUNCTIVE RELIEF,

16  BUT I WOULD ENCOURAGE THE COURT AND IMPLORE THE COURT TO TAKE A

17  LOOK AT THE PLEADINGS AND TO TAKE THOSE FACTORS INTO

18  CONSIDERATION IN THE COURT'S DETERMINATION.

19      THE -- AND I WOULD AGAIN SPECIFICALLY REQUEST THE COURT TO

20  HEAR FROM MR. TORNQUIST ON THIS, BUT TO THE BEST OF MY

21  KNOWLEDGE, YOUR HONOR, THE ONLY THING WRONG MY CLIENT HAS EVEN

22  ARGUABLY EVER DONE AS IT RELATES TO HIS EMPLOYMENT WITH MIMEDX

23  WAS AT THE REQUEST OF TWO PHYSICIANS BACK IN THE EARLY PART OF

24  2016 BEFORE ANY OF THIS -- THESE SITUATIONS CAME UP.  AT THE

25  REQUEST OF TWO PHYSICIANS WHO MR. TORNQUIST HAD BEEN SELLING

1   MIMEDX PRODUCTS TO, THESE TWO PHYSICIANS INFORMED

2   MR. TORNQUIST -- AND THIS IS -- THIS IS IN THE AFFIDAVITS, NOT

3   ONLY OF MR. TORNQUIST, BUT ARE ALSO OF MR. KRUCHOSKI.  THESE TWO

4   PHYSICIANS INFORMED MR. TORNQUIST THAT THE EPIFIX MIMEDX -- THE

5   MIMEDX EPIFIX PRODUCT THAT HE WAS SELLING TO THEM WAS NOT

6   WORKING.

7           THE COURT:  NOW, I'LL TELL YOU, MR. ROBERTS, I'M NOT

8   OVERLY PERSUADED BY THE ARGUMENT FROM THE PLAINTIFFS IN TERMS OF

9   THE PAST CONDUCT AND SALES.  I DID READ ALL THAT INFORMATION --

10          MR. ROBERTS:  I UNDERSTAND.

11          THE COURT:  -- IN THE BRIEFS.  AND I THINK, AT THE

12  MINIMUM, THERE IS A QUESTION OF FACT AS TO THAT SCENARIO.  SO

13  I'M NOT GOING TO BE BASING MY OPINION IN TERMS OF THE INJUNCTION

14  ON THAT PARTICULAR SET OF CIRCUMSTANCES.  I'M REALLY MORE

15  INTERESTED IN THE FUTURE AND KIND OF THE TECHNICAL ISSUES ABOUT

16  WHAT HIS NEW JOB WILL ENTAIL, HOW THAT MIGHT COMPETE DIRECTLY

17  WITH WHAT HE DID AT MIMEDX, WHAT PRODUCTS HE WOULD BE SELLING.

18  AND THAT'S REALLY KIND OF THE GIST OF KIND OF WHAT I'M REALLY

19  INTERESTED IN.

20          MR. ROBERTS:  AND I UNDERSTAND, YOUR HONOR.  AND,

21  AGAIN, THAT'S WHY I'M SUGGESTING TO THE COURT AND IMPLORING THE

22  COURT TO HEAR DIRECTLY FROM MR. TORNQUIST WHO IS IN THE BEST

23  POSITION TO TALK ABOUT THOSE ISSUES.  WE GOT THIS AFFIDAVIT --

24          THE COURT:  WELL, DO YOU WANT TO PUT MR. TORNQUIST UP

25  NOW?  I MEAN, THAT MAY --

1          MR. ROBERTS:  I WOULD BE MORE THAN HAPPY TO DO THAT,

2     YOUR HONOR.  THAT WOULD ACTUALLY --

3          THE COURT:  IT SEEMS LIKE IT MAKES MORE SENSE.

4          MR. ROBERTS:  I THINK IT DOES.  I THINK IT DOES, YOUR

5     HONOR, AND THAT WAY I CAN -- THAT WOULD CONCLUDE MY FACTUAL

6     RECITATION, AND THEN I CAN GO INTO THE LAW.

7          THE COURT:  OKAY.  AND I WILL TELL YOU, TOO, LIKE I

8     SAID A MOMENT AGO, I DON'T THINK WE NEED TO SPEND THE TIME

9     TALKING ABOUT THE PAST.  WHAT I REALLY WANT TO TALK ABOUT IS THE

10    FUTURE.  SO I DON'T THINK WE NEED TO GO BACK OVER THE

11    CIRCUMSTANCES IN THE PAST WHEN HE WAS ALLEGED TO HAVE VIOLATED

12    THE NON-COMPETE, BUT I REALLY WANT TO HEAR MORE ABOUT HIS PLANS

13    AND THIS NEW PREDICTIVE TECHNOLOGIES JOB AND EXACTLY HOW THAT

14    MAY OR MAY NOT COMPETE WITH MIMEDX.  BECAUSE IF I WERE TO ISSUE

15    AN INJUNCTION, IT WOULD BE DIRECTED TO HIS FUTURE ACTIVITIES AND

16    WHAT IT IS THAT HE PLANS TO DO, AND THAT WOULD BE THE ISSUE OF

17    IMMINENT HARM.

18          MR. ROBERTS:  RIGHT.

19          THE COURT:  SO LET'S FOCUS ON KIND OF THOSE SPECIFIC

20    AREAS.

21          MR. ROBERTS:  AND I WILL DO SO, YOUR HONOR.  BUT JUST

22    TO CLARIFY, I WOULD ASK THAT THE COURT HEAR BRIEFLY -- AND I

23    WILL BE AS BRIEF AS I CAN -- FROM MR. TORNQUIST ON THE ISSUE

24    REGARDING WHAT LED TO HIS TERMINATION, AND LET ME EXPLAIN TO THE

25    COURT WHY THAT'S IMPORTANT.

1          THE COURT:  WELL, I WILL TELL YOU THAT AT THIS POINT

2     I'M KIND OF INFERRING ALL THE FACTS IN YOUR CLIENT'S FAVOR.

3          MR. ROBERTS:  I UNDERSTAND.

4          THE COURT:  IF YOU DO SOMETHING TO CHANGE MY MIND,

5     THAT MAY HURT YOU.

6          MR. ROBERTS:  THEN I'LL BE QUIET ON THAT, YOUR HONOR.

7          THE COURT:  I'M TELLING YOU AT THIS POINT I'M NOT

8     PUTTING THAT AGAINST YOU AND YOU'RE WANTING TO ARGUE WITH ME

9     ABOUT THAT, WHICH I WILL LET YOU, BUT THAT CAN ONLY GO SOUTH FOR

10    YOU.

11         MR. ROBERTS:  WELL, I KNOW WHEN TO BE QUIET, YOUR

12    HONOR, ON THAT.  SO --

13         THE COURT:  OKAY.

14         MR. ROBERTS:  IF THEN IT PLEASE THE COURT, I WOULD

15    CALL LUKE TORNQUIST.

16         COURTROOM DEPUTY CLERK:  WILL YOU PLEASE RAISE YOUR

17    RIGHT HAND.

18              (WITNESS SWORN.)

19         COURTROOM DEPUTY CLERK:  THANK YOU.  AND YOU MAY BE

20    SEATED.

21         MR. ROBERTS:  AND, YOUR HONOR, BEFORE I START, I DON'T

22    WANT TO GET SIDEWAYS WITH THE COURT.  I DO THINK IT -- YOU WERE

23    TALKING ABOUT PAST THINGS.  I DO THINK IT'S IMPORTANT FOR

24    MR. TORNQUIST TO FULLY EXPLAIN TO THE COURT WHAT HE WAS SELLING

25    FOR MIMEDX.  SO WOULD THE COURT BE OKAY WITH ME GOING INTO THAT?

1          THE COURT:  THAT'S FINE.

2          MR. ROBERTS:  BECAUSE THEN WE NEED TO COMPARE IT TO

3    WHAT HE'S GOING TO BE DOING.

4          THE COURT:  BUT THAT'S WHAT I'M INTERESTED IN.

5          MR. ROBERTS:  YES, MA'AM.

6          THE COURT:  AND I WILL ALLOW COUNSEL FOR PLAINTIFFS TO

7    HAVE AN OPPORTUNITY TO CROSS-EXAMINE HIM AS WELL.

8          MR. ROBERTS:  CERTAINLY.

9          THE COURT:  BECAUSE WHAT I'M REALLY TRYING TO DECIDE

10   IS IF I NEED TO ENTER AN INJUNCTION PREVENTING MR. TORNQUIST

11   FROM DOING THIS PREDICTIVE TECHNOLOGIES JOB.  THAT TO ME IS WHAT

12   WE'RE DEALING WITH HERE TODAY.  THAT'S THE POTENTIAL IMMINENT

13   HARM.  SO THAT'S WHAT I NEED TO UNDERSTAND, IS WHAT THIS NEW JOB

14   IS AND HOW THAT COMPETES WITH HIS OLD JOB

15         MR. ROBERTS:  CERTAINLY.  I UNDERSTAND.

16                       LUCAS ALAN TORNQUIST

17        CALLED AS A WITNESS BY THE DEFENDANT, AFTER HAVING

18        BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

19                       DIRECT EXAMINATION

20   BY MR. ROBERTS:

21   Q.   WOULD YOU PLEASE STATE YOUR NAME FOR THE RECORD.

22   A.   LUCAS ALAN TORNQUIST.

23   Q.   AND, MR. TORNQUIST, WHERE DO YOU LIVE?

24   A.   ST. PAUL, MINNESOTA.

25         MR. ROBERTS:  I'M SORRY.  COULD YOU SPEAK UP JUST A

```
 1   LITTLE BIT?
 2          THE COURT:  ACTUALLY SPEAK INTO THE MICROPHONE BECAUSE
 3   THAT'S FEED FOR ALL THE SPEAKERS HERE.
 4          THE WITNESS:  ST. PAUL, MINNESOTA.
 5   BY MR. ROBERTS:
 6   Q.   OKAY.  AND WERE YOU FORMERLY EMPLOYED BY MIMEDX?
 7   A.   YES.
 8   Q.   IN WHAT CAPACITY?
 9   A.   I WAS AN ACCOUNT EXECUTIVE IN MINNESOTA.
10   Q.   WHEN DID YOU FIRST BECOME EMPLOYED BY MIMEDX?
11   A.   OCTOBER 2013.
12   Q.   AND DURING YOUR EMPLOYMENT WITH MIMEDX DID YOU HAVE A
13   SPECIFIC TERRITORY THAT YOU WORKED IN?
14   A.   AT FIRST I WAS THE ONLY REP IN MINNESOTA, AND BY THE TIME
15   MY EMPLOYMENT ENDED I WAS ONE OF -- I WAS ONE OF FOUR THAT WAS
16   IN MINNESOTA.  SO WE ALL HAD DIFFERENT -- DIFFERENT HOSPITALS
17   AND ACCOUNTS THAT WE WOULD CALL ON.
18   Q.   DID YOU EVER WORK FOR MIMEDX OUTSIDE OF MINNESOTA?
19   A.   NO.
20   Q.   AND DURING THE LAST TWO YEARS OF YOUR EMPLOYMENT DID YOU
21   WORK IN THE ENTIRETY OF THE STATE OF MINNESOTA?
22   A.   NO.
23   Q.   OR JUST PARTICULAR PARTS?
24   A.   JUST PARTICULAR PARTS.
25   Q.   AND WHICH WERE THOSE PARTS?
```

A.   I HAD A COUPLE HOSPITALS IN THE TWIN CITIES.  I HAD A

HOSPITAL IN ROCHESTER DOWN SOUTH ABOUT AN HOUR AND A HALF OF

THERE, AND I PROBABLY HAVE FIVE TO SIX DIFFERENT HOSPITALS AND

CLINICS IN WESTERN MINNESOTA.

Q.   OKAY.  MINNESOTA IS A PRETTY BIG GEOGRAPHIC STATE; IS THAT

FAIR TO SAY?

A.   CORRECT.

Q.   OKAY.  AND WERE THERE LARGE AREAS OF MINNESOTA THAT YOU

NEVER PROVIDED SERVICES TO DURING THE LAST TWO YEARS FOR MIMEDX?

A.   YES.

Q.   OKAY.  WHAT TYPE OF PRODUCTS, MR. TORNQUIST, DID YOU SELL

FOR MIMEDX?

A.   I SOLD A PRODUCT CALLED AMNIOFIX, AND THAT COMES IN A

MEMBRANE FORM AND AN INJECTION FORM, AND THAT IS MADE FROM

PLACENTA.  SO IT'S THE AMNION AND CHORION LAYERS OF PLACENTA.

AND IT'S DEHYDRATED.  SO ON TOP OF THAT I ALSO SOLD AMNIOFIX AND

EPIFIX AS AN INJECTABLE, AND THEY MICRONIZE THAT SAME TISSUE AND

THEN YOU CAN ADD -- IT COMES IN A GLASS VIAL, AND YOU CAN ADD

SALINE TO IT TO MAKE AN INJECTABLE WITH IT.  AND BEGINNING EARLY

OR MID 2016, I SOLD A PRODUCT THAT WAS A DEHYDRATED UMBILICAL

CORD MEMBRANE, AND THOSE ARE THE MAIN PRODUCTS FOR -- THOSE ARE

THE ONLY PRODUCTS OF MIMEDX THAT I EVER SOLD.

Q.   OKAY.  ARE YOU FAMILIAR WITH YOUR -- WHAT WE'VE CALLED YOUR

NON-COMPETE AGREEMENT?

A.   I AM, YES.

1  Q.   AND ARE YOU FAMILIAR WITH THE FACT THAT YOUR NON-COMPETE

2  AGREEMENT LISTS WHAT I THINK ARE THREE DIFFERENT CATEGORIES OF

3  PRODUCTS THAT YOU ARE PURPORTEDLY PRECLUDED FROM SELLING?

4  A.   YES.

5  Q.   OKAY.  SO LET ME ASK YOU THIS.  ON BEHALF OF MIMEDX DID YOU

6  EVER SELL COLLAGEN-BASED BIOMATERIALS AND PRODUCTS?

7  A.   A COLLAGEN-BASED TISSUE, YES.

8  Q.   OKAY.  AND DID YOU EVER SELL DURABLE HYDROGEL BIOMATERIALS

9  AND PRODUCTS?

10 A.   NO.

11 Q.   OKAY.  AND DID YOU SELL BIOIMPLANTS PROCESSED FROM HUMAN

12 AMNIOTIC MEMBRANE?

13 A.   YES.

14 Q.   AND DID YOU SELL OTHER AMNION-BASED PRODUCTS?

15 A.   I GUESS I DON'T KNOW HOW TO ANSWER THAT.  OTHER

16 AMNION-BASED -- I MEAN, IT WAS BASICALLY ALL AMNIOTIC TISSUE.

17 Q.   OKAY.  ALL RIGHT.  AND COULD YOU TELL ME A LITTLE BIT MORE

18 ABOUT WHAT THESE PRODUCTS DO?  WHAT DOES EPIFIX DO?

19 A.   EPIFIX IS USED TO REGENERATE TISSUE, SO A LOT OF TIMES WE

20 USE IT FOR WOUNDS.  YOU COULD PLACE IT IN A WOUND, AND IT WOULD

21 HELP THE WOUND TO REGENERATE ITSELF.  SO IT HAS A LOT OF

22 DIFFERENT GROWTH FACTORS AND COLLAGEN AND THINGS IN IT THAT HELP

23 WOUNDS TO HEAL QUICKLY.

24 Q.   OKAY.  AND WHAT DID -- WHAT DID THE PRODUCT EPICORD THAT

25 YOU SOLD, WHAT DID -- WHAT DOES THAT DO?  HOW ARE -- AND HOW IS

1  THAT DIFFERENT FROM THE EPIFIX?

2  A.   EPICORD IS MADE FROM THE UMBILICAL CORD DEHYDRATED, SO IT

3  HAS A LOT OF THE SAME THINGS THAT EPIFIX HAS IN IT.  IT JUST HAS

4  A COUPLE OF DIFFERENT MAKE-UPS OF DIFFERENT THINGS.  SO IT'S

5  STILL A MEMBRANE.  WE STILL USED IT IN WOUNDS.  SO BASICALLY

6  IT'S USED TO REGENERATE AND HEAL WOUNDS.

7  Q.   OKAY.  AND I BELIEVE THERE WAS ONE MORE PRODUCT THAT YOU

8  INDICATED YOU HAD SOLD.  WHAT WAS THE NAME OF THAT PRODUCT?

9  A.   AMNIOFIX.

10  Q.   OKAY.  AND WHAT DOES AMNIOFIX DO?

11  A.   AMNIOFIX IS THE SAME -- BASICALLY THE SAME MAKE-UP AS

12  EPIFIX, BUT IT HAS -- IT DOES NOT HAVE THE EPITHELIAL LAYER IN

13  IT THAT EPIFIX DOES.  IN BETWEEN AMNION AND CHORION AND THE

14  PLACENTA, THERE'S AN EPITHELIAL LAYER.  AND THEY TAKE THAT LAYER

15  OFF FOR THE AMNIOFIX.  IT'S A VERY SMALL LAYER AND IT'S JUST

16  LIKE YOUR SKIN, IS BASICALLY WHAT THE EPITHELIAL LAYER IS.  AND

17  YOU WOULD USE AMNIOFIX IN SURGERIES TO, LIKE, WRAP TENDONS WITH

18  AND NERVES WITH OR TO RE-USE IN, LIKE, SPINE SURGERIES TO KEEP

19  SCAR TISSUE FROM FORMING, IS WHAT THAT PRODUCT WAS SUPPOSED TO

20  BE USED FOR.

21  Q.   AND SINCE THE -- NOT TO GET INTO ALL THE DETAILS REGARDING

22  THESE TWO SALES THAT WE'VE BEEN TALKING ABOUT, BUT SINCE YOUR

23  DEPARTURE FROM -- YOUR TERMINATION, YOUR INVOLUNTARY TERMINATION

24  FROM MIMEDX, HAVE YOU SOLD ANY TYPE OF COMPETITIVE PRODUCTS ON

25  BEHALF OF ANY PERSON OR ENTITY?

1    A.   NO.

2    Q.   AND EITHER DURING OR SUBSEQUENT TO YOUR INVOLUNTARY

3    TERMINATION FROM MIMEDX HAVE YOU EVER USED OR DISCLOSED ANY TYPE

4    OF MIMEDX CONFIDENTIAL INFORMATION OR TRADE SECRETS?

5    A.   I OPENED UP ONE OR TWO DOCUMENTS ON MY I-BOOKS IN FRONT OF

6    LAWYERS AT THEIR REQUEST, BUT THAT IS ALL.

7            THE COURT:  AND, MR. TORNQUIST, YOU TALKED ABOUT SOME

8    GENERAL CATEGORIES OF PRODUCTS.  WOULD YOU JUST GIVE ME THE

9    ACTUAL NAMES OF ALL THE PRODUCTS YOU SOLD FOR MIMEDX.

10           THE WITNESS:  SURE.  I SOLD THE EPIFIX MEMBRANE; THE

11   EPIFIX MICRONIZED INJECTION, IS WHAT IT'S CALLED; THE AMNIOFIX

12   MEMBRANE; THE AMNIOFIX INJECTION; AND THE EPICORD.

13           THE COURT:  OKAY.  THANK YOU.

14   BY MR. ROBERTS:

15   Q.   ALL RIGHT.  MR. TORNQUIST, WHAT IS YOUR CURRENT EMPLOYMENT

16   SITUATION?

17   A.   I WAS HIRED WITH PREDICTIVE TECHNOLOGIES THIS MONDAY.

18   Q.   OKAY.  AND WHAT WOULD YOU -- WHAT WILL PRESUMABLY -- HAVE

19   YOU MADE ANY SALES FOR PREDICTIVE TECHNOLOGIES?

20   A.   NO.

21   Q.   OKAY.  HAVE YOU SOLICITED ANY OF YOUR FORMER CUSTOMERS WITH

22   WHOM YOU HAD ANY TYPE OF DEALINGS IN THE LAST -- DURING THE LAST

23   YEARS DURING YOUR EMPLOYMENT WITH MIMEDX ON BEHALF OF PREDICTIVE

24   TECHNOLOGIES?

25   A.   NO.

1  Q.   OKAY.  WHAT -- WHAT EXACTLY ARE YOU GOING TO BE DOING FOR

2  PREDICTIVE TECHNOLOGIES?

3  A.   SO WOULD YOU LIKE TO HEAR, LIKE, THEIR PRODUCTS AND MY TAKE

4  ON THAT, OR WHAT MY ROLE WILL BE WITH --

5  Q.   WELL, FIRST OF ALL, WHAT -- YES, GO AHEAD AND DESCRIBE THE

6  PRODUCTS THAT YOU ARE ANTICIPATING TO BE SELLING AND YOUR TAKE,

7  AS YOU SAID.

8  A.   SO PREDICTIVE TECHNOLOGIES IS A -- IT'S A GENETIC COMPANY

9  BASICALLY AS A WHOLE.  SO THEY HAVE THE SECOND LARGEST GENETIC

10 DATABASE IN THE WORLD, THE FIRST LARGEST IN THE COUNTRY.  AND

11 WHAT THE -- WHAT THE COMPANY DOES IS THEY'RE ABLE TO -- THEY

12 HAVE A PREDICTIVE TEST THAT DOCTORS CAN SWAB THEIR PATIENTS'

13 TONGUE WITH AND SEND THAT TEST TO PREDICTIVE TECHNOLOGIES.

14 THEY'RE ABLE TO LOOK UP AND FIND THE GENETIC MARKERS IN THEIR --

15 IN THAT PLASMA IF THEY ARE GOING TO BE PREDISPOSED FOR

16 ENDOMETRIOSIS OR DEGENERATIVE DISC DISEASE, LOTS AND LOTS OF

17 DIFFERENT DISORDERS THAT THEY MIGHT NOT ALREADY HAVE SYMPTOMS

18 FOR YET, SO THEY'RE PREDICTING IN THE FUTURE THAT THEY ARE GOING

19 TO HAVE THESE.  AND PREDICTIVE TECHNOLOGIES GROUP THEN HAS

20 DIFFERENT PRODUCTS TO HELP DIFFERENT THERAPIES TO HELP THE

21 PATIENT NOT DEVELOP THESE DIFFERENT DISEASES OR DISORDERS.  IT'S

22 KIND OF ONE OF A KIND -- THERE'S NOTHING REALLY ELSE OUT THERE

23 LIKE IT.  SO THAT'S WHAT THE BASIS OF THE COMPANY IS.  AND MY

24 TITLE IS DIRECTOR OF BUSINESS FOR WOMEN'S HEALTH.  ON TOP OF

25 THAT, SOME OF THE THERAPIES THAT THEY HAVE FOR, LIKE,

DEGENERATIVE DISC DISEASE IS THESE INJECTABLES THAT THEY HAVE.

SO THE INJECTABLE IS CALLED -- ONE OF THEM IS CALLED

CORECYTE.  IT IS MADE FROM THE WHARTON'S JELLY OF UMBILICAL

CORD, AND IT'S CRYOPRESERVED.  AND IT IS ONLY MESENCHYMAL STEM

CELLS SUSPENDED IN HYALURONIC ACID.  THERE'S NO AMNIOCYTE TISSUE

IN IT.  THERE'S NO COLLAGEN TISSUE IN THAT PRODUCT.  IT IS JUST

WHARTON'S JELLY WHICH IS HIGH IN MESENCHYMAL STEM CELLS.  AND

DOCTORS ARE SEEING GREAT RESULTS WHEN THEY INJECT IT INTO DISCS

THAT DON'T WORK ANYMORE TO REGENERATE THOSE DISCS.  SO WE HAVE

THE TEST TO TELL THE DOCTOR THAT THE PATIENT HAS THIS PROBLEM,

AND WE HAVE A THERAPY TO HELP THE PATIENT THROUGH IT.  THE

POLYCYTE IS ANOTHER INJECTABLE THAT THEY HAVE.  WE DON'T HAVE

ANY MEMBRANES OR ANYTHING ELSE LIKE THAT, AND I DON'T HAVE

ANY -- I'M NOT SELLING ANY AMNIOTIC TISSUE OR AMNIOTIC

INJECTIONS LIKE I WAS.  THE POLYCYTE IS A MULTIPLIED WHARTON'S

JELLY.  AGAIN, IT'S SUSPENDED IN -- THEY'RE PRETTY SIMILAR

PRODUCTS.  ONE HAS GROWTH FACTORS WITH LOW MESENCHYMAL STEM

CELLS, AND THE OTHER ONE HAS MESENCHYMAL STEM CELLS.  SO

THEY'RE -- THEY'RE CRYOPRESERVED.  THEY COME FROZEN.  YOU HAVE

TO KEEP THEM AT A NEGATIVE 180 DEGREES SO THAT THE CELLS ARE

VIAL -- OR VIABLE INSIDE OF IT.  AND THEY'RE USING BOTH OF THESE

PRODUCTS IN A LOT OF DIFFERENT AREAS.  WHEN I WAS WITH MIMEDX WE

WERE -- I WAS SOLELY FOCUSED ON WOUNDS, IS BASICALLY WHAT I WAS

SELLING FOR.  THIS PRODUCT THEY ARE SELLING FOR AESTHETICS IN,

LIKE, DERMATOLOGY WHEN THEY WOULD DO SKIN AND LASER PEELS.  THEY

1   WOULD RUB THE PRODUCT OVER THE FACE, AND THE PATIENTS WOULD HEAL

2   MUCH QUICKER SO THEY COULD GO BACK OUTSIDE AT A QUICKER RATE.

3   THEY USE IT FOR JOINT INJECTIONS BECAUSE IT HAS HYALURONIC ACID

4   IN IT.  THAT ACTS AS THE SAME FLUID THAT'S ACTUALLY INSIDE OF

5   YOUR JOINT.  AND YOU HAVE STEM CELLS TO HELP HEAL THOSE PLACES.

6   THEY USE IT IN SHOULDERS AND PLANTAR FASCIITIS AND A LOT OF

7   DIFFERENT AREAS LIKE THAT.  SO THAT IS KIND OF THE RUN-DOWN.

8   AND IT'S MY UNDERSTANDING THAT NEITHER OF THOSE TWO PRODUCTS ARE

9   COMPETING WITH MY NON -- WITH WHAT MY NON-COMPETE SAID.  AND

10   THOSE ARE THE TWO PRODUCTS ALONG WITH THAT GENETIC TEST THAT I'M

11   GOING TO BE SELLING AND THAT I WOULD LIKE TO SELL.

12         THE COURT:  OKAY.  THE GENETIC TEST TO ME IS IN ONE

13   CATEGORY.

14         THE WITNESS:  RIGHT.

15         THE COURT:  BUT YOUR STATEMENT UNDER OATH HERE TODAY

16   IS THAT THE PRODUCTS THAT YOU WILL SELL AND BE IN CHARGE OF AT

17   PREDICTIVE TECHNOLOGIES CANNOT BE OR WILL NOT BE USED FOR THE

18   SAME THINGS THAT THE PRODUCTS YOU SOLD AT MIMEDX WOULD BE USED

19   FOR?

20         THE WITNESS:  I -- THEY -- THEY COULD BE USED IN AREAS

21   LIKE THAT, BUT THAT'S NOT WHAT THE COMPANY'S MARKETING THEM FOR

22   OR -- OR ANYTHING LIKE THAT.  THEY'RE -- IT'S A MARKETING FOR

23   SPORTS MEDICINE, AESTHETICS, PLASTIC SURGEONS TO USE IN THEIR

24   CLINICS.  IT'S ALL CASH PAID.

25         THE COURT:  SO IT APPEARS THAT WHAT YOU WERE DOING FOR

1    MIMEDX WAS WOUND CARE TYPE WORK, AND THE TYPE OF WORK YOU'LL BE

2    DOING FOR PREDICTIVE TECHNOLOGIES IS NOT WOUND CARE, BUT THERE

3    CERTAINLY IS -- IT COULD BE USED FOR WOUND CARE, BUT THAT'S NOT

4    HOW YOU'LL BE MARKETING?

5            THE WITNESS:  CORRECT.

6            THE COURT:  OKAY.

7    BY MR. ROBERTS:

8    Q.   MR. TORNQUIST, TO BE CLEAR, LET ME ASK YOU TO TURN YOUR

9    ATTENTION TO THE SCREEN HERE.  YOUR NON-COMPETE PREVENTS YOU

10   FROM DOING ANYTHING -- AND WE'LL TALK ABOUT THE TERRITORY AND

11   SUCH IN A MINUTE.  BUT THE PRODUCTS YOU'RE GOING TO BE SELLING

12   FOR YOUR NEW EMPLOYER, DO THEY -- ARE THEY COLLAGEN-BASED

13   BIOMATERIALS AND PRODUCTS?

14   A.   I UNDERSTAND THAT THE CORECYTE, THE MESENCHYMAL STEM CELL

15   ONE, HAS ZERO COLLAGEN IN IT.  THE POLYCYTE, ACCORDING TO

16   DR. KOOB, HAS -- HAS A TRACE AMOUNT OF COLLAGEN.  WHEN IT SAYS

17   COLLAGEN BASED, THAT'S WHERE I -- THAT'S WHAT I -- WHERE I DON'T

18   UNDERSTAND.

19   Q.   OKAY.  WHAT DO YOU MEAN BY THAT?  WELL, FIRST OF ALL, WHAT

20   IS COLLAGEN?

21   A.   COLLAGEN IS SOMETHING THAT IS FOUND IN EVERY SINGLE PART OF

22   A HUMAN BODY.  THERE'S COLLAGEN IN BONE, THERE'S COLLAGEN IN

23   YOUR HAIR, YOUR NOSE, YOUR EARS, YOUR SKIN, YOUR ORGANS, YOUR

24   TOENAILS.  IT'S IN EVERYTHING.  IT'S IN JELLO.  COLLAGEN IS IN

25   EVERYTHING -- NOT EVERYTHING, BUT ANY TYPE OF BIOLOGIC OR

1   SOMETHING FROM YOUR BODY, THERE'S COLLAGEN IN IT.

2   Q.    AND WHAT IS YOUR -- SO ANY -- ANYTHING OF THIS NATURE WOULD

3   NECESSARILY HAVE COLLAGEN IN SOME AMOUNT, ALBEIT A MINUTE

4   AMOUNT?

5   A.    MINUTE.  ABSOLUTELY.

6   Q.    AND WHAT WAS YOUR UNDERSTANDING OF THE TERM "COLLAGEN-BASED

7   BIOMATERIALS?"

8   A.    I UNDERSTOOD THAT AS BEING PRODUCTS THAT -- THAT IS THEIR

9   BASE OF THE PRODUCT, IS COLLAGEN.  THERE'S A WHOLE LINE OF

10  COLLAGEN PRODUCTS THAT ARE OUT THERE, LIKE, OASIS, AND THEY

11  ARE -- THEY'RE LIKE A SCAFFOLD, BUT THEY'RE MADE FROM COLLAGEN.

12  SO ALMOST THEIR WHOLE MAKE-UP IS COLLAGEN.  SO THERE'S A LINE OF

13  PRODUCTS THAT ARE JUST COLLAGEN PRODUCTS.  IF I WASN'T ABLE TO

14  SELL A PRODUCT WITH COLLAGEN IN IT, MY -- I MEAN, EVEN WITH

15  MINUTE AMOUNTS, I WOULD NOT BE ABLE TO SELL VERY MUCH OF

16  ANYTHING, IS WHAT I'M COMING TO UNDERSTAND.

17  Q.    DID ANY OF THE MIMEDX PRODUCTS YOU SOLD, WERE THEY COLLAGEN

18  BASED AS YOU HAVE EXPLAINED THAT TERM?

19  A.    THOSE -- NO, THEY AREN'T ACTUALLY COLLAGEN BASED EITHER.

20  NO, THEY'RE MADE FROM PLACENTA.

21  Q.    ALL RIGHT.  SO ARE ANY OF THE PRODUCTS THAT YOU'RE GOING TO

22  BE SELLING FOR THIS COMPANY DURABLE HYDROGEL BIOMATERIALS AND

23  PRODUCTS?

24  A.    NOT TO MY UNDERSTANDING, NO.

25  Q.    ARE ANY OF THE PRODUCTS YOU'RE GOING TO BE SELLING FOR THIS

1   COMPANY BIOIMPLANTS PROCESSED FOR IMMUNE AND AMNIOTIC MEMBRANE?

2   A.   NO.

3   Q.   AND ARE ANY OF THE PRODUCTS YOU'RE GOING TO BE SELLING FOR

4   THIS COMPANY OTHER AMNION-BASED PRODUCTS?

5   A.   NO.

6           MR. ROBERTS:  OKAY.  LET ME -- MAY I APPROACH, YOUR

7   HONOR?

8           THE COURT:  YES.

9           MR. ROBERTS:  I'M GOING TO TALK TO THE WITNESS ABOUT

10  EXHIBIT C OF THE AFFIDAVIT FILED LAST NIGHT.  DOES THE COURT

11  HAVE COPIES OF THAT?

12          THE COURT:  OKAY.  IT'S ALREADY IN THE RECORD.  THAT'S

13  FINE.

14          MR. ROBERTS:  OKAY.

15  BY MR. ROBERTS:

16  Q.   MR. TORNQUIST, LET ME SHOW YOU --

17          MR. ROBERTS:  I DON'T THINK I NEED TO MARK OR ENTER

18  THIS BECAUSE IT'S PART OF THE RECORD.

19          THE COURT:  IT'S ALL IN THE RECORD.

20          MR. ROBERTS:  OKAY.

21  BY MR. ROBERTS:

22  Q.   THIS IS A DECLARATION OF THOMAS KOOB.  I THINK YOU'VE -- DO

23  YOU KNOW WHO MR. THOMAS KOOB IS?

24  A.   YES.

25  Q.   WHO IS -- WHO IS MR. KOOB OR DR. KOOB?

1    A.    HE'S ONE OF OUR SCIENCE LEADERS AT MIMEDX.

2    Q.    OKAY.  AND LET ME -- LET ME ASK YOU TO TURN YOUR ATTENTION

3    TO PARAGRAPH FIVE OF THIS AFFIDAVIT.  DR. KOOB STATES THAT

4    AMNIOTIC MEMBRANE IS COMPRISED OF TWO LAYERS, BOTH OF WHICH

5    CONTAIN COLLAGEN AS THE MAIN STRUCTURAL ELEMENT.  AMNION

6    CONTAINS A BASEMENT MEMBRANE AS COMPOSED OF TYPE FOUR COLLAGEN

7    AND A COMPACT LAYER THAT CONTAINS FIBRILLAR COLLAGEN, PRIMARILY

8    TYPE ONE COLLAGEN.

9          DO YOU AGREE WITH THAT STATEMENT?

10   A.    SURE, YES.

11   Q.    OKAY.  AND THEN -- BUT THEN HE GOES ON TO SAY, THE CHORION

12   IS COMPRISED PRIMARILY OF FIBRILLAR COLLAGEN WHICH PROVIDES THE

13   MAIN STRUCTURE ARCHITECTURE GIVING (VERBATIM) THE MEMBRANE AND

14   MECHANICAL PROPERTIES.

15         DO YOU ALSO AGREE WITH THAT STATEMENT?

16   A.    YES.

17   Q.    OKAY.  AND IS THERE ANYTHING ELSE IN PARAGRAPH FIVE THAT

18   YOU WOULD TAKE ISSUE WITH?

19   A.    HE SAYS A PRODUCT THAT CONTAINS WHARTON'S JELLY MUST BE A

20   COLLAGEN-BASED PRODUCT.

21   Q.    OKAY.  WHY DO YOU TAKE ISSUE WITH THAT STATEMENT?

22   A.    WELL, FIRST, IT LOOKS LIKE HE'S MAKING AN ASSUMPTION THAT

23   IT MUST BE.  AND, SECONDLY, BECAUSE IT'S -- COLLAGEN IS WHAT

24   MAKES THE MEMBRANE STAY TOGETHER.  SO IT'S -- A MEMBRANE

25   ACTUALLY HAS STRUCTURE.  SO THAT'S -- I'M NOT SELLING ANY KIND

1   OF A MEMBRANE WHAT -- OR I WOULDN'T BE SELLING ANY KIND OF A

2   MEMBRANE THAT NEEDS COLLAGEN TO HOLD IT TOGETHER.  THESE OTHER

3   PRODUCTS ARE FLUID.  IT'S LIKE A -- IT'S -- IT'S JUST SUSPENDED

4   IN A FLUID.  SO THERE'S -- THE AMOUNT OF COLLAGEN IN SOMETHING

5   LIKE THAT IN ONE OF THOSE WOULD BE MINUTE BECAUSE YOU DON'T NEED

6   THE COLLAGEN TO HOLD ANYTHING TOGETHER IN SOMETHING LIKE THAT.

7   Q.   YOU HAD GAVE ME AN ANALOGY EARLIER ABOUT CHICKEN SOUP.

8   WHAT WAS THAT ANALOGY?

9   A.   WELL, I SAID IF THEY'RE SAYING THAT ALL PRODUCTS WITH

10  COLLAGEN ARE COLLAGEN BASED, I MEAN, IF YOU HAVE SOUP, WHAT'S

11  YOUR BASE OF THE SOUP?  I MEAN, IT WOULD BE CHICKEN STOCK,

12  RIGHT, AND THAT WOULD COMPRISE 90 PERCENT OF YOUR SOUP.  WHAT I

13  HAVE ISN'T COMPRISED OF 90 PERCENT OF COLLAGEN OR EVEN CLOSE TO

14  THAT.  IT WOULD -- ONE OF THE PRODUCTS MIGHT BE IN THE SUPER

15  LOW, LIKE, TWO OR THREE PERCENT AT MOST WHICH WOULD BE -- YOUR

16  HAIR IS, LIKE, 40 PERCENT COLLAGEN.  SO...

17  Q.   SO YOU'RE SAYING THAT THESE PRODUCTS WOULD NOT BE

18  COLLAGEN-BASED?

19  A.   YEAH, THAT'S WHAT I HAVE THE ISSUE WITH, IS SAYING THAT

20  ANYTHING THAT IS COLLAGEN BASED.  IF IT'S A COLLAGEN-BASED

21  PRODUCT, IT WOULD BE A PRODUCT MOSTLY MADE UP OF COLLAGEN.

22          MR. ROBERTS:  MAY I APPROACH, YOUR HONOR?

23          THE COURT:  YES.

24  BY MR. ROBERTS:

25  Q.   MR. TORNQUIST, I'M SHOWING YOU WHAT WAS FILED LAST EVENING

1  AS AN AFFIDAVIT OF KEVIN LILLY.  DO YOU KNOW -- DO YOU KNOW WHO

2  MR. LILLY IS?

3  A.   YES, I DO.

4  Q.   OKAY.  I WOULD ASK YOU TO TURN YOUR ATTENTION TO PARAGRAPH

5  FIVE OF THIS AFFIDAVIT WHERE MR. LILLY AVERS THAT ON

6  FEBRUARY 18TH, 2015, YOU SENT AN E-MAIL FROM YOUR MIMEDX E-MAIL

7  ACCOUNT TO YOUR PERSONAL G-MAIL ACCOUNT TITLED, HEALING REVIEW,

8  ATTACHING A SPREADSHEET, HEALING REVIEW.  A TRUE AND CORRECT

9  COPY OF THE E-MAIL IS ATTACHED TO THE AFFIDAVIT.  THE HEALING

10 REVIEW ATTACHED TO THE E-MAIL CONTAINS TRADE SECRET INFORMATION

11 OF MIMEDX'S BUSINESS.

12      DID YOU IN FACT SEND YOURSELF AN E-MAIL ON FEBRUARY 18TH,

13 2015, WITH THIS DOCUMENT, THIS SPREADSHEET ATTACHED?

14 A.   I GUESS SO.

15 Q.   AND WHY DID YOU DO THAT?

16 A.   I DID IT SO I COULD PRINT IT OFF TO SHOW THE DOCTORS HOW

17 WELL THE PRODUCT'S WORKING AT THE V.A.  SO MY -- I -- I RARELY

18 USED MY WORK COMPUTER.  MY HOME COMPUTER IS THE COMPUTER HOOKED

19 UP TO THE PRINTER AT OUR HOUSE.  AND I DON'T HAVE A MIMEDX

20 E-MAIL CONNECTED TO MY HOME COMPUTER, SO I SENT IT TO MY E-MAIL

21 SO I COULD PRINT IT OFF ON MY HOME COMPUTER.

22 Q.   WHEN YOU WORKED FOR MIMEDX DID YOU HAVE AN OFFICE THAT YOU

23 GO TO THAT HAS A COMPUTER AND PRINTER?

24 A.   NO.

25 Q.   WHERE WAS YOUR OFFICE?

1    A.    IT WAS AT MY HOUSE.

2    Q.    OKAY.  AND WERE YOU ABLE TO CONNECT TO THE MIMEDX SERVER

3    FROM YOUR HOME COMPUTER?

4    A.    NO.

5    Q.    DID -- YOU KNOW, WERE THERE OTHER OCCASIONS WHERE YOU

6    E-MAILED YOURSELF DOCUMENTS SO YOU COULD PRINT THEM OUT FOR USE

7    IN THE ORDINARY COURSE OF YOUR BUSINESS?

8    A.    NOT A LOT, BUT SOMETIMES I NEEDED TO QUICK PRINT SOMETHING

9    OUT TO BRING THEM IN TO A DOCTOR, I WOULD HAVE.

10   Q.    DID YOU EVER USE THIS DOCUMENT THAT THEY -- THAT IS BEING

11   REFERRED TO IN ANY COMPETITIVE PURPOSES?

12   A.    NO.  I USED THE PRODUCT -- I USED THIS DOCUMENT TO HELP

13   SELL EPIFIX TO MY DOCTORS AND MAKE THEM FEEL LIKE WHAT THEY WERE

14   DOING WAS THE RIGHT THING AND USING THE RIGHT PRODUCT.

15   Q.    SO YOU ACQUIRED THIS DOCUMENT IN THE ORDINARY COURSE OF THE

16   PERFORMANCE OF YOUR DUTIES FOR MIMEDX; IS THAT CORRECT?

17   A.    I ACTUALLY -- THE DOCTORS AND I PUT THIS TOGETHER.  LIKE,

18   THIS WAS SOMETHING THAT WE DID.  WE LOOKED AT ALL OF OUR

19   PATIENTS AT THE MINNEAPOLIS V.A. AND SAW HOW WELL THEY WERE

20   DOING AND WANTED TO PUT IT ON PAPER SO THAT WE COULD, YOU KNOW,

21   SEE QUANTIFIABLY HOW WELL OTHER PATIENTS WERE DOING, HOW MUCH

22   THEY WERE SPENDING, AND IT WAS GREAT.  SO IT WAS SOMETHING THAT

23   WE USED TO HELP BOOST MIMEDX'S BUSINESS, YES.

24   Q.    SO THIS IS SOMETHING YOU ALREADY HAD IN THE NORMAL COURSE

25   OF YOUR BUSINESS?

1    A.    YES.

2    Q.    OKAY.  LET ME ASK YOU TO TURN YOUR ATTENTION TO PARAGRAPH

3    EIGHT OF THIS AFFIDAVIT.  AND I WOULD ASK YOU, MR. TORNQUIST, IS

4    THERE ANYTHING IN PARAGRAPH EIGHT THAT'S SEVERE TOO THAT YOU

5    WOULD TAKE ISSUE WITH?

6    A.    THERE'S A LOT IN PARAGRAPH EIGHT THAT I WOULD TAKE ISSUE

7    WITH.

8    Q.    COULD YOU INFORM THE COURT?

9    A.    SO WHEN THEY SAY THAT -- WHEN IT STARTS OFF, FOR INSTANCE,

10   PREDICTIVE TECHNOLOGIES' CORECYTE UMBILICAL CORD ALLOGRAFT

11   SUSPENSION COMPETES WITH MIMEDX'S EPIFIX MICRONIZED, AMNIOFIX

12   INJECTABLE, ORTHOFLO, EPICORD AND AMNIOCORD.  I -- I DON'T AGREE

13   WITH THAT STATEMENT WHATSOEVER.

14   Q.    WHY?

15   A.    BECAUSE IT'S A TOTALLY DIFFERENT PRODUCT THAN ANY OF THOSE.

16   THE MAKE-UP OF THE PRODUCT IS DIFFERENT.  WHAT'S ACTUALLY IN THE

17   PRODUCT IS DIFFERENT.

18   Q.    OKAY.  ANYTHING ELSE YOU DISAGREE WITH IN THAT AFFIDAVIT?

19   A.    THE SAME THING FOR POLYCYTE WHERE IT COMPETES WITH MIMEDX'S

20   EPIFIX MICRONIZED, AMNIOFIX INJECTABLE AND ORTHOFLO.  I NEVER

21   DID SELL -- SELL ORTHOFLO.  I REALLY DON'T KNOW MUCH ABOUT THAT

22   PRODUCT WHATSOEVER.  BUT THE SAME THING, IT'S NOT THE SAME

23   PRODUCT.  IT'S NOT MADE UP OF THE SAME THINGS.  IT'S FROM A

24   DIFFERENT -- I GUESS -- IT'S FROM THE UMBILICAL CORD INSTEAD OF

25   THE PLACENTA.

1  Q.   ALL RIGHT.  ANYTHING ELSE IN PARAGRAPH EIGHT?

2  A.   NO.  I MEAN, THE AMNIOCYTE -- AMNIOTIC -- I'M NOT GOING TO

3  BE SELLING ANY OF THE OTHER PRODUCTS.  THOSE WERE THE ONLY TWO

4  PRODUCTS THAT I WOULD -- WAS HOPING THAT I COULD SELL.

5       THE COURT:  MR. TORNQUIST, IN TERMS OF YOUR JOB WITH

6  PREDICTIVE TECHNOLOGIES, DO YOU PLAN TO CALL ON THE SAME

7  CUSTOMERS THAT YOU HAD WHEN YOU WORKED WITH MIMEDX?

8       THE WITNESS:  I WAS HOPING TO, BUT IN A DIFFERENT

9  FORMAT.  I MEAN, SOME OF THEM DO WAY MORE THINGS THAN JUST

10  WOUNDS.

11       THE COURT:  NOW, AND JUST TO MAKE SURE I UNDERSTAND

12  YOUR TESTIMONY, WILL ANY OF THE SALES OF YOUR PRODUCTS FOR

13  PREDICTIVE TECHNOLOGIES PREVENT A SALE OF A MIMEDX PRODUCT?

14       THE WITNESS:  THAT WOULDN'T BE MY GOAL, NO.

15       THE COURT:  OKAY.

16       MR. ROBERTS:  ONE MOMENT, YOUR HONOR.

17  BY MR. ROBERTS:

18  Q.   MR. TORNQUIST, IF YOU WERE NOT ALLOWED TO SELL WHAT YOU'VE

19  CHARACTERIZED AS THESE NON-COMPETITIVE PRODUCTS, DO YOU HAVE ANY

20  OTHER READILY AVAILABLE MEANS OF INCOME, ANOTHER JOB THAT YOU

21  COULD IMMEDIATELY GO TO AND MAKE MONEY?

22  A.   NO, I DON'T.

23  Q.   HOW LONG HAVE YOU BEEN DOING THIS?

24  A.   LOOKING FOR A JOB?

25  Q.   NO.  HOW LONG HAVE YOU BEEN WORKING IN MEDICAL SALES?

1    A.   IN BIOLOGIC SALES AND SALES LIKE THIS, I'VE DONE IT FOR

2   EIGHT YEARS, BASICALLY SINCE I GOT OUT OF COLLEGE.

3         MR. ROBERTS:  ONE MOMENT, YOUR HONOR.  I MAY BE -- I

4   BELIEVE THAT'S ALL THE QUESTIONS I HAVE OF MR. TORNQUIST, YOUR

5   HONOR.

6         THE COURT:  OKAY.  ONE MORE QUESTION.  DO YOU HAVE ANY

7   UNDERSTANDING IF MIMEDX PRODUCTS THAT YOU USED TO SELL ARE

8   F.D.A. CLEARED FOR THE SAME USES THAT YOU WILL BE MARKETING YOUR

9   PREDICTIVE TECHNOLOGIES PRODUCTS?

10        THE WITNESS:  SO THE THING IS WITH -- WITH THAT

11   QUESTION, NEITHER -- NEITHER COMPANY'S PRODUCTS HAVE -- THEY

12   BOTH ARE CALLED A 361 TISSUE.  SO YOU ARE ABLE TO USE -- THERE'S

13   NO F.D.A. INDICATIONS FOR USE.

14        THE COURT:  OKAY.  SO THESE ARE JUST THINGS THAT

15   PEOPLE CHOOSE TO DO AND PAY FOR?

16        THE WITNESS:  BECAUSE THEY CAME FROM THE BODY, YOU CAN

17   USE THEM BASICALLY ANYWHERE THAT YOU WANT.

18        THE COURT:  AND THE V.A. --

19        THE WITNESS:  WITHOUT ANY RESTRICTIONS.

20        THE COURT:  AND THE V.A. WILL REIMBURSE YOU FOR THAT?

21        THE WITNESS:  CORRECT, YEAH.

22        THE COURT:  OKAY.  THANK YOU.

23        THE WITNESS:  YES.

24        MR. ROBERTS:  THANK YOU, YOUR HONOR.  OBVIOUSLY IF

25   OPPOSING COUNSEL HAS ANY QUESTIONS, AND THEN I WOULD LIKE TO

1  CONTINUE TO TALK ABOUT THE LEGAL ISSUES.

2          THE COURT:  WE'LL ALLOW THE CROSS AND THEN WE'LL ALLOW

3  YOU TO GO BACK TO YOUR ARGUMENT.

4          MR. ROBERTS:  YES, MA'AM.

5          THE COURT:  MR. WARGO, YOU MAY PROCEED, BUT LET'S

6  LIMIT THE QUESTIONS OF THIS WITNESS TO THE ISSUES THAT HAVE BEEN

7  BROUGHT UP IN THE DIRECT OR WHICH DIRECTLY RELATE TO KIND OF

8  WHAT WE'VE BEEN TALKING ABOUT HERE.

9          MR. WARGO:  YES, YOUR HONOR.  THANK YOU.  AND I THINK

10  A LOT OF THIS COULD BE DONE JUST THROUGH ARGUMENT.

11          THE COURT:  OKAY.

12          MR. WARGO:  BUT I'M JUST GOING TO ASK A FEW QUESTIONS.

13          THE COURT:  THAT SOUNDS GREAT.

14          MR. WARGO:  OKAY.  THANK YOU.

15                        CROSS-EXAMINATION

16  BY MR. WARGO:

17  Q.   MR. TORNQUIST, AM I PRONOUNCING THAT NAME CORRECTLY?

18  A.   YES.

19  Q.   THANK YOU.  I WANT TO TALK ABOUT YOUR TESTIMONY CONCERNING

20  PREDICTIVE TECHNOLOGIES.  IS IT YOUR TESTIMONY THAT THEY'RE NOT

21  INVOLVED IN WOUND CARE?

22  A.   IT'S MY TESTIMONY THAT THAT'S NOT WHAT THEY'RE MARKETING

23  THEIR PRODUCTS SPECIFICALLY FOR.  THEY'RE MARKETING THEIR

24  PRODUCTS FOR THESE OTHER AREAS THAT I WAS TALKING ABOUT.

25  Q.   OKAY.  SO IF, FOR EXAMPLE, THEIR WEBSITE -- THEIR WEBSITE

1  YOU AGREE WITH ME IS MARKETING; CORRECT?

2  A.   SURE.

3  Q.   SO IF THEIR WEBSITE SAID THAT THEY WERE MARKETING THEIR

4  PRODUCT FOR WOUND CARE, WOULD YOU AGREE WITH ME THAT YOUR

5  TESTIMONY WAS INCORRECT?

6  A.   I GUESS I WOULD HAVE TO SEE WHERE IT SAYS THAT.  IF IT'S --

7  IS IT JUST A SMALL LITTLE DISCLAIMER ON THE BOTTOM, OR IS IT

8  WHAT THE WEBSITE IS BASED ON?

9  Q.   SURE.  AND AS I AGREED WITH THE JUDGE, WE'LL DO A LOT OF

10 THIS IN ARGUMENT, BUT IF CORRECT A SITE (VERBATIM) -- WHICH IS A

11 PREDICTIVE TECHNOLOGIES PRODUCT; CORRECT?

12 A.   RIGHT, CORECYTE.

13 Q.   I'M SORRY.  CORECYTE.  POLYCYTE AND AMNIOCYTE, IF THEIR

14 DESCRIPTIONS OF THOSE PRODUCTS ON THEIR WEBSITE INDICATED THAT

15 THEY WERE INVOLVED -- THAT THEY ASSISTED WITH WOUND AND PAIN

16 MANAGEMENT TREATMENTS, YOU WOULD AGREE WITH ME THAT THAT IS --

17 THOSE PRODUCTS ARE HELPFUL FOR WOUND TREATMENTS, CORRECT, SIR?

18 A.   THEY CAN BE HELPFUL FOR A LOT OF DIFFERENT THINGS, LIKE I

19 SAID, BUT, YEAH, THAT WOULD BE ONE THING THAT I SAID THAT IT

20 COULD POSSIBLY BE HELPFUL FOR.

21 Q.   AND THEY'RE MARKETING IT THAT WAY TOO, SIR, ARE THEY NOT,

22 IF THAT'S CORRECT WHAT I JUST READ?

23 A.   I'VE NOT SEEN IT.

24 Q.   OKAY.  WE'LL SHOW THE COURT.  SIR, YOU UNDERSTAND, GOING

25 BACK TO SOME TESTIMONY THAT YOU PROVIDED HERE FROM -- ON DIRECT,

1  YOU UNDERSTAND MR. KOOB IS A -- THE CHIEF SCIENCE OFFICER FOR

2  MIMEDX; CORRECT?

3  A.  CORRECT.

4  Q.  YOU UNDERSTAND HE HAS A PH.D.?

5  A.  YES.

6  Q.  I'M NOT MEANING THIS TO BE BELITTLING.  I DON'T HAVE A

7  PH.D.  OKAY.  DO YOU HAVE A PH.D., SIR?

8  A.  NO.

9  Q.  WOULD YOU AGREE WITH ME THAT HE WOULD KNOW MORE THAN YOU

10  ABOUT THE MAKE-UP OF WHARTON'S JELLY?

11  A.  I'M -- I'M SURE HE KNOWS A LOT MORE THAN ME ABOUT A LOT OF

12  DIFFERENT THINGS, YES.

13  Q.  INCLUDING WHARTON'S JELLY, SIR?

14  A.  PROBABLY.

15  Q.  OKAY.  LET ME ASK YOU TO LOOK AT PARAGRAPH FIVE OF HIS

16  DECLARATION WHICH IS THE SAME PARAGRAPH YOUR COUNSEL DIRECTED

17  YOU TO.  LET ME KNOW WHEN YOU'RE THERE, PLEASE.  ARE YOU THERE,

18  SIR?

19  A.  YEAH.

20  Q.  THANK YOU.  THE LAST SENTENCE, SIR, SAYS, A PRODUCT THAT

21  CONTAINS WHARTON'S JELLY MUST BE A COLLAGEN-BASED PRODUCT.

22      DO YOU SEE THAT STATEMENT?

23  A.  I DO, YES.

24  Q.  IS THAT TRUE OR FALSE?

25  A.  IT ALL DEPENDS ON WHAT YOU'RE CALLING COLLAGEN BASED, LIKE

1  I WAS SAYING BEFORE, SO I DON'T AGREE WITH IT.  I DON'T AGREE

2  THAT THAT PRODUCT IS -- THAT'S THE BASE OF THE PRODUCT.

3  Q.   OKAY.  SO YOU THINK THAT STATEMENT IS FALSE; IS THAT YOUR

4  TESTIMONY?

5  A.   FOR HOW -- FOR HOW I UNDERSTAND --

6  Q.   ARE YOU UNSURE --

7  A.   I'M UNSURE.  I --

8  Q.   OKAY.

9  A.   YEAH, I WOULD -- I WOULD THINK THAT TESTIMONY IS FALSE.

10 Q.   OKAY.  BUT YOU'D ALSO AGREE WITH ME THAT MR. KOOB KNOWS

11 MORE THAN YOU ABOUT WHAT WHARTON'S JELLY IS COMPRISED OF;

12 CORRECT?

13 A.   YES.

14 Q.   OKAY, SIR.  SIR, DO YOU UNDERSTAND THAT AN UMBILICAL CORD

15 CONTAINS COLLAGEN?

16 A.   YES.

17 Q.   WOULD YOU AGREE WITH ME THAT AN UMBILICAL CORD PRODUCT IS

18 COLLAGEN BASED?

19 A.   I DON'T KNOW WHAT COLLAGEN -- LIKE, AN UMBILICAL CORD,

20 LIKE, THE CORD IN ITSELF IS COLLAGEN BASED, IS THAT WHAT YOU'RE

21 SAYING OR WHAT -- WHAT DO YOU MEAN?

22 Q.   NO, SIR.  WHAT I MEAN IS I'M TRYING TO MAKE SURE THAT WE'RE

23 ALL TALKING ABOUT THE SAME TERMS HERE.

24 A.   OKAY.

25 Q.   WOULD YOU AGREE WITH ME THAT AN UMBILICAL CORD CONTAINS

1  COLLAGEN?

2  A.   YES.

3  Q.   OKAY.  AND DO YOU AGREE WITH ME THAT MIMEDX PRODUCTS

4  HAVE -- ARE COLLAGEN-BASED PRODUCTS, SOME OF THEM?

5  A.   YEAH, SOME OF THEM HAVE COLLAGEN IN IT.  ALL OF THEM HAVE

6  COLLAGEN IN IT.

7  Q.   OKAY.  AND YOU SOLD THOSE PRODUCTS?

8  A.   YES.

9  Q.   DO YOU UNDERSTAND THAT THERE IS COLLAGEN IN PRODUCTS THAT

10  PREDICTIVE TECHNOLOGIES SELLS?

11  A.   YES, THERE'S A SMALL AMOUNT OF COLLAGEN IN SOME OF THEIR

12  PRODUCTS, YES.

13  Q.   AND YOU ALSO UNDERSTAND THAT THEY ARE SELLING THOSE FOR

14  WOUND CARE?

15  A.   NO, THEY ARE NOT SELLING THOSE FOR WOUND CARE.

16  Q.   EVEN THOUGH THEIR WEBSITE SAYS THEY ARE?

17  A.   THE ONLY ACCOUNTS THAT PREDICTIVE TECHNOLOGIES IS SELLING

18  THOSE INTO RIGHT NOW, LIKE I SAID, OR THEY'VE MADE ANY SALES OFF

19  OF ARE AESTHETIC AND SPINE PAIN CLINICS.

20  Q.   AND WHAT EVIDENCE DO YOU HAVE OF THAT, SIR?  SOMEONE ELSE

21  TOLD YOU THAT?

22  A.   YEAH, YEAH, IT'S SOMEONE ELSE TOLD ME THAT.  I DON'T

23  HAVE -- I DON'T HAVE ANY SALES REPORTS OR ANYTHING.  I JUST

24  STARTED.  I DON'T KNOW.

25  Q.   IS THAT PERSON IN COURT HERE TODAY?

1  A.   NO.

2  Q.   OKAY.  TAKE A LOOK, PLEASE, AT PARAGRAPH EIGHT OF THE

3  AFFIDAVIT THAT WAS PROVIDED TO YOU BY YOUR COUNSEL OF MR. LILLY.

4  PLEASE LET ME KNOW WHEN YOU ARE THERE.

5  A.   YEAH.

6  Q.   OKAY.  I WANT TO MAKE SURE I UNDERSTAND YOUR TESTIMONY.  IS

7  YOUR TESTIMONY THAT MR. LILLY'S AFFIDAVIT IS WRONG OR IS -- LET

8  ME FINISH MY QUESTION, PLEASE.

9  A.   SURE.

10  Q.   OR IS YOUR TESTIMONY THAT YOU DON'T KNOW WHETHER

11  MR. LILLY'S TESTIMONY IS WRONG?

12  A.   MY TESTIMONY IS THAT --

13       THE COURT:  WHICH PART OF THE AFFIDAVIT ARE WE TALKING

14  ABOUT?

15       MR. WARGO:  I'M SORRY.  PARAGRAPH EIGHT.

16       THE COURT:  OKAY.

17       MR. WARGO:  YOUR HONOR, THAT'S THE PARAGRAPH THAT

18  DIRECTLY BRINGS THEIR --

19       THE COURT:  RIGHT.  I THINK YOU JUST SAID THE

20  AFFIDAVIT, SO I WANTED TO MAKE SURE THAT I WAS AT THE RIGHT

21  PART.

22       MR. WARGO:  I SHOULD HAVE SAID DECLARATION.

23  BY MR. WARGO:

24  Q.   SIR, DO YOU UNDERSTAND MY QUESTION?

25  A.   CAN YOU REPEAT IT?

1  Q.   SURE.  ARE YOU SAYING THAT PARAGRAPH EIGHT -- WHICH IS THE

2  PARAGRAPH THAT CALLS OUT PREDICTIVE TECHNOLOGIES' PRODUCTS AND

3  PUTS THEM RIGHT NEXT TO PRODUCTS THAT YOU SOLD; CORRECT?

4  A.   MM-HUM.

5  Q.   ARE YOU SAYING THAT THAT PARAGRAPH IS WRONG, OR ARE YOU

6  SAYING THAT YOU DON'T KNOW WHETHER IT'S WRONG?

7  A.   NO.  I THINK IT'S WRONG.

8  Q.   OKAY.  AND IS YOUR BASIS FOR SAYING THAT'S WRONG BASED ON

9  YOUR UNDERSTANDING THAT THE PRODUCT IS NOT -- THE PREDICTIVE

10  TECHNOLOGIES PRODUCT IS NOT BEING USED FOR WOUND CARE?

11  A.   NO.  I -- FROM MY UNDERSTANDING -- SAY THE QUESTION AGAIN,

12  PLEASE.

13  Q.   WHAT IS THE BASIS, SIR, OF YOUR BELIEF THAT THE PARAGRAPH

14  EIGHT STATEMENTS ARE WRONG?  WHY ARE YOU SAYING THEY'RE WRONG?

15  A.   WELL, BECAUSE THEY DON'T HAVE THE SAME MAKE-UP IN THEM.

16  THEY'RE DIFFERENT PRODUCTS.  THEY'RE MADE FROM DIFFERENT THINGS.

17  THEY'VE GOT DIFFERENT CELLS.  THE THINGS IN THEM ARE NOT THE

18  SAME PRODUCT AS MIMEDX'S PRODUCTS.

19  Q.   AND IS YOUR QUARREL WITH THE AMOUNT OF COLLAGEN IN THE

20  PRODUCTS?  HOW ARE THEY DIFFERENT, SIR?

21  A.   WELL, I ALREADY DID EXPLAIN THIS EARLIER.  I -- DO YOU WANT

22  ME TO EXPLAIN IT AGAIN?

23  Q.   WHY ARE YOU SAYING THAT THESE PRODUCTS ARE NOT COMPETITIVE,

24  SIR?

25  A.   SURE.  NO PROBLEM.  SO CORECYTE IS MADE FROM THE WHARTON'S

JELLY OF THE UMBILICAL CORD WHERE THEY ARE JUST TAKING

MESENCHYMAL STEM SELLS OUT OF THAT PRODUCT.  IT'S A PRODUCT MADE

WITH JUST MESENCHYMAL STEM CELLS AND HYALURONIC ACID.  THAT IS

CORECYTE.  AND IT'S CRYOPRESERVED AT NEGATIVE 180 DEGREES, AND

THAT'S HOW THAT PRODUCT IS KEPT.  THERE'S --

Q.    ARE YOU FINISHED WITH YOUR TESTIMONY ABOUT CORECYTE?

A.    YES.

Q.    IS THAT A HUNDRED PERCENT OF YOUR ANSWER AS TO WHY CORECYTE

DOESN'T COMPETE WITH MIMEDX (VERBATIM) PRODUCT?

A.    YEAH.

Q.    OKAY, SIR.  LET'S TALK ABOUT OTHER PRODUCTS HERE AND HOW

YOU SAY THEY'RE NOT COMPETITIVE.

A.    SURE.

Q.    TELL ME WHY.

A.    POLYCYTE, LIKE I SAID EARLIER, IS ALSO MADE FROM THE

WHARTON'S JELLY, AND IT'S AN ALLOGRAFT SUSPENSION, SO IT'S --

AGAIN, IT'S IN -- SUSPENDED WITH HYALURONIC ACID.  IT HAS GROWTH

FACTORS, BUT IT'S MADE FROM THE WHARTON'S JELLY OF THE UMBILICAL

CORD AND IT'S FROZEN.  IT'S CRYOPRESERVED.

Q.    AND, AGAIN, SIR, IS THAT A HUNDRED PERCENT OF THE REASON

WHY THAT PRODUCT IN YOUR MIND IS NOT COMPETITIVE WITH THE MIMEDX

PRODUCT?

A.    MIMEDX DOES NOT HAVE AN INJECTABLE PRODUCT, CRYOPRESERVED

PRODUCT THAT HAS THOSE SAME THINGS IN IT, NO.

```
 1   Q.   OKAY, SIR.  SO THE COMPETITIVE PRODUCT LISTED BY MR. LILLY
 2   TO THAT PRODUCT, YOU BELIEVE, IS NOT COMPETITIVE?
 3   A.   CORRECT.
 4   Q.   FOR THE REASONS YOU JUST STATED?
 5   A.   CORRECT.
 6   Q.   OKAY.  WHAT ABOUT THE FINAL PRODUCT, SIR, THAT PREDICTIVE
 7   TECHNOLOGIES HAS?
 8   A.   I'M NOT SELLING EITHER ONE OF THOSE PRODUCTS, SO I DON'T
 9   KNOW.
10   Q.   BUT PREDICTIVE TECHNOLOGIES DOES?
11   A.   YEAH, THAT -- THAT IS -- THOSE ARE THE PRODUCTS THAT THEY
12   HAVE UNDER THEIR UMBRELLA.
13   Q.   SO YOU DON'T HAVE ANY OPINION AS TO WHETHER MR. LILLY'S
14   AFFIDAVIT ON THAT SUBJECT IS CORRECT OR NOT?
15   A.   I HAVE NO OPINION ON THOSE TWO, NO.
16   Q.   DO YOU UNDERSTAND THAT AMNIOTIC FLUID -- I'M SORRY.  DO YOU
17   UNDERSTAND THAT AN UMBILICAL CORD DOES CONTAIN COLLAGEN?
18   A.   ALMOST EVERYTHING CONTAINS COLLAGEN IN THE HUMAN BODY, YES.
19   Q.   PLEASE ANSWER MY QUESTION.
20   A.   YES.
21            MR. ROBERTS:  I OBJECT, YOUR HONOR.  I THINK HE DID
22   ANSWER.
23            THE COURT:  YEAH, WE'VE GONE THROUGH THIS LINE OF
24   QUESTIONING BEFORE.
25            MR. WARGO:  YES.
```

1  BY MR. WARGO:

2  Q.   OKAY.  LAST QUESTION, SIR.  YOU UNDERSTAND THAT THIS IS A

3  COVENANT NOT TO COMPETE THAT WE ARE SEEKING TO ENFORCE THAT

4  WOULD BE FOR A YEAR FROM YOUR TERMINATION?

5  A.   YES.

6  Q.   SO WE'RE LOOKING AT ANOTHER TEN MONTHS OR SO; CORRECT?

7  A.   YES.

8  Q.   OKAY.  AND YOU WERE ASKED BY YOUR COUNSEL WHAT ARE YOU

9  GOING TO DO IN THE NEXT FEW MONTHS IF YOU CAN'T WORK AT

10 PREDICTIVE TECHNOLOGIES.  DO YOU REMEMBER THAT?

11 A.   YES.

12 Q.   OKAY.  YOU AGREE WITH ME, SIR, THAT LAST YEAR AT MIMEDX YOU

13 MADE $931,000?

14        MR. ROBERTS:  YOUR HONOR, I'M GOING TO OBJECT TO THE

15 RELEVANCY OF THIS INQUIRY.  I MEAN, WHAT HE MADE AT MIMEDX, I

16 DON'T QUITE UNDERSTAND THE RELEVANCE.  HE EITHER SHOULD BE

17 ALLOWED TO WORK OR SHOULD NOT BE ALLOWED TO WORK.

18        THE COURT:  WELL, IN TERMS OF WHAT I'M INTERESTED IN,

19 THE AMOUNT OF MONEY HE MAKES IS RELEVANT TO ME ON THE AMOUNT OF

20 BOND THAT IF I DO ISSUE AN INJUNCTION, WOULD BE THE POTENTIAL

21 DAMAGES.  SO I'LL ALLOW THE QUESTION.

22        THE WITNESS:  WHAT WAS THE QUESTION AGAIN?

23 BY MR. WARGO:

24 Q.   DO YOU AGREE WITH ME THAT YOU MADE APPROXIMATELY $931,000

25 LAST YEAR AS AN EMPLOYEE AT MIMEDX?

A.   YES.

MR. WARGO:  OKAY.  YOUR HONOR, MAY I HAVE ONE MOMENT?

THE COURT:  SURE.

MR. WARGO:  YOUR HONOR, JUST ARGUMENT, BUT NOTHING FURTHER WITH THIS WITNESS.

THE COURT:  OKAY.  YOU CAN RETURN TO YOUR SEAT.  THANK YOU.

AND, MR. ROBERTS, YOU CAN CONTINUE YOUR ARGUMENT.

MR. ROBERTS:  YES, MA'AM.

THE COURT:  WHY DON'T WE DO THIS.  WHY DON'T WE TAKE FIVE MINUTES SINCE WE'VE BEEN GOING ABOUT AN HOUR AND A HALF. I'M NOT SURE IF ANYONE NEEDS A BREAK OR NOT, BUT WE'LL JUST TAKE FIVE MINUTES SO Y'ALL CAN HAVE A QUICK BREAK, AND THEN WE'LL COME BACK.  LET'S JUST FOR CLARITY, AT THE CLOCK BACK THERE, AT 11:05, SO A LITTLE LONGER THAN FIVE MINUTES.  SO LET'S JUST TAKE A SHORT RECESS.

(RECESS TAKEN.)

THE COURT:  OKAY.  MR. ROBERTS, YOU CAN PROCEED.

MR. ROBERTS:  MAY IT PLEASE THE COURT.  THANK YOU, YOUR HONOR.  YOUR HONOR, I WANT TO BRIEFLY TOUCH ON -- WE'VE TALKED A LITTLE BIT ABOUT THE -- BRIEFLY WE'VE TALKED A LITTLE BIT ABOUT THE PROVISIONS THAT ARE AT ISSUE, BUT I WANT TO JUST HIGHLIGHT A COUPLE -- I'M GOING TO BE ABLE TO MOVE A LOT QUICKER THAN I THOUGHT.  I WANT TO NOTE OBVIOUSLY THE TERRITORY IN THE AGREEMENT SAYS THE ENTIRE CONTINENTAL UNITED STATES.  AND I WANT

TO MAKE VERY CLEAR FROM THE OUTSET OF MY LEGAL ARGUMENT HERE

THAT EVERY INDICATION IN THIS CASE IS THAT MIMEDX KNEW THAT

MR. TORNQUIST WAS GOING TO WORK SOLELY IN MINNESOTA.  SO ONE OF

THE THINGS I'M GOING TO TALK ABOUT A LITTLE BIT LATER -- AND

RESPECTFULLY, YOUR HONOR, I'M VERY HOPEFUL THAT I'M GOING TO BE

ABLE TO CONVINCE THE COURT THAT YOU SIMPLY CANNOT TAKE THAT

UNDER THE NEW LAW AND GO TO MINNESOTA.  I THINK I'M GOING TO BE

ABLE TO CONVINCE YOU OF THAT, AT LEAST I'M GOING TO TRY VERY

HARD, BECAUSE I THINK THAT IS THE LAW, BUT, NONETHELESS, I WANT

TO MAKE -- KIND OF RAISE THIS POINT UP FRONT.  IF COURTS WERE

ABLE TO DO THAT, IF COURTS WERE ABLE TO ALLOW COMPANIES TO DRAFT

COVENANTS LIKE THIS, HERE'S WHAT'S GOING TO HAPPEN.  SO

EVERYBODY IN THE STATE OF GEORGIA IS GOING TO GET A NON-COMPETE

WITH A NATIONAL TERRITORY EVEN IF THEY WORK IN FULTON COUNTY

WITH THE UNDERSTANDING THAT, WE CAN GO TO COURT, WE CAN MAKE

THAT EMPLOYEE PAY TENS OF THOUSANDS OF DOLLARS TO LITIGATE THIS,

AND THEN WE HAVE A DECISION FOR THE NORTHERN DISTRICT OF GEORGIA

WHERE THEY'RE JUST GOING TO CUT IT DOWN TO THE AREA WE WORK.

THAT, I THINK, YOUR HONOR, IS EXTREMELY PROBLEMATIC AND I THINK

IT'S -- IT'S NOT IN COMPORT WITH THE LAW OR THE RULES OF

REASONABLENESS THAT I'M GOING TO GET INTO.  BUT I JUST WANTED TO

KIND OF RAISE THAT ISSUE UP FRONT.  AND WE'VE ALREADY TALKED

ABOUT AND I THINK WE HAVE A CONSENSUS THAT THE NON-COMPETE IS

INDEED LIMITED TO THESE THREE -- I GUESS THERE'S ACTUALLY FOUR

TYPES OF PRODUCTS.  AND WE'VE SPECIFICALLY TALKED ABOUT WHAT I

THINK IS BECOMING A CENTRAL ISSUE IN THIS CASE IS THIS TERM

"COLLAGEN-BASED."  I THINK IF -- WHAT -- WHAT MR. WARGO WAS

TRYING TO SUGGEST IN HIS EXAMINATION OF MY CLIENT IS THAT

COLLAGEN BASED REALLY CAN MEAN IT HAS ANY AMOUNT OF COLLAGEN IN

IT SIMPLY BECAUSE AN AFFIDAVIT THAT WAS SUBMITTED LAST NIGHT

SAYS SO.  WE ALL KNOW THAT LAWYERS DRAFT AFFIDAVITS.  SO ONE OF

THE IMPORTANT THINGS I ALSO WANT TO POINT OUT AT THE OUTSET IS

THAT I THINK THAT INJUNCTIVE RELIEF IS OBVIOUSLY AN

EXTRAORDINARY REMEDY.  AND THIS CASE, IN ORDER FOR THEM TO PROVE

A LIKELIHOOD OF SUCCESS ON THE MERITS AS TO THIS COLLAGEN-BASED

ISSUE, MAY ACTUALLY REQUIRE SOME EXPERT TESTIMONY.

        SO WITH THAT, YOUR HONOR, LET ME PROCEED, TALK VERY BRIEFLY

ABOUT THE OTHER PROVISION THAT I THINK'S VERY IMPORTANT IN THE

NON-COMPETE AGREEMENT.  AND THIS IS A --

        WES, CAN YOU -- CAN I SLIDE THIS?

                THE COURT:  YES.

                COURTROOM DEPUTY CLERK:  I'LL DO IT.

                MR. ROBERTS:  SORRY.  OH, I SEE.

                THE COURT:  IT'S ON THE COMPUTER SCREEN THAT WAY, SO

IT'S NOT THE PROJECTOR.

                MR. ROBERTS:  WELL, WHILE MR. MCCART IS WORKING ON

THAT, HERE'S --

                THE COURT:  I THINK I CAN READ THE GIST OF IT.

                MR. ROBERTS:  SO WORDS IN A CONTRACT, YOUR HONOR, THEY

CAN'T BE IGNORED.  AND WHAT THIS CONTRACT SAYS IS THAT THIS

AGREEMENT REPRESENTS THE ENTIRE UNDERSTANDING OF THE EMPLOYEE

AND THE COMPANY ON THE MATTERS ADDRESSED HEREIN AND MAY NOT BE

MODIFIED OTHER THAN IN WRITING SIGNED BY THE EMPLOYER.  NOW, I'M

SURE MR. WARGO IS GOING TO SAY, WELL, YOUR HONOR, THOSE TYPES OF

PROVISIONS ARE INCLUDED IN EVERY AGREEMENT, BUT IT IS THE PLAIN

LANGUAGE OF THE AGREEMENT.  AND I DON'T THINK THAT PROVISION CAN

BE IGNORED.  BUT THEN LET ME TALK ABOUT THE NON-SOLICITATION

AGREEMENT.  OBVIOUSLY THE NON-SOLICITATION AGREEMENT --

          GO TO THE NEXT SLIDE.  DID YOU GO TO THE NEXT SLIDE?

          MR. MCCART:  YES.

          MR. ROBERTS:  I'M SORRY, YOUR HONOR.

          THE COURT:  THAT'S ALL RIGHT.  I'VE GOT A COPY OF ALL

THIS STUFF HERE, SO JUST GO AHEAD.

          MR. ROBERTS:  SO THE NON-SOLICITATION AGREEMENT,

OBVIOUSLY WHAT WE'RE CONTENDING IS THAT THERE IS AN END TERM

NON-COMPETE PROVISION IN THERE.  AND AN END TERM NON-COMPETE

PROVISION IS A NON-COMPETE THAT APPLIES ONLY DURING THE TERM OF

THE EMPLOYMENT.  OKAY.  THERE'S ALSO A CUSTOMER NON-SOLICITATION

PROVISION, A NON-RECRUITMENT PROVISION, AND A SIMILAR ENTIRE

COVENANT PROVISION.  NOW, ANOTHER ISSUE THAT I WANT TO POINT OUT

TO THE COURT, YOUR HONOR, IS -- AND I'VE -- THIS IS ALL I DO.

I'VE BEEN DOING IT A LONG TIME.  AND I RARELY, IF EVER, SEE

AGREEMENTS THAT ARE DRAFTED LIKE THAT.  NORMALLY THE COVENANTS,

WHEN YOU HAVE COVENANTS, THEY ARE ALL CONTAINED WITHIN ONE

AGREEMENT.  HERE YOU HAVE SIMILAR -- SIMILAR COVENANTS AND

SIMILAR RESTRICTIONS.  YOU'VE GOT NON-COMPETES TYPE OF

AGREEMENTS IN BOTH AGREEMENTS, BUT THESE WERE EXECUTED IN

SEPARATE DOCUMENTS.  AND I'M GOING TO TALK ABOUT A CASE IN A

MINUTE THAT'S FROM THIS COURT THAT SPECIFICALLY HELD THAT, YOU

KNOW, WHEN YOU HAVE A SITUATION LIKE THAT AND THEN YOU HAVE

MERGER CLAUSES SUCH AS THIS WHERE IT SAYS, THIS AGREEMENT

SUPERCEDES AND ENTIRELY REPLACES ALL OF THE PRIOR DISCUSSIONS,

AGREEMENTS, AND UNDERSTANDINGS OF THE PARTY, ORAL OR IN WRITING,

WITH RESPECT TO THE SUBJECT MATTER ADDRESSED IN (VERBATIM),

THAT'S A PROBLEM I THINK THAT NEEDS TO AT LEAST BE CONSIDERED BY

THE COURT BECAUSE OBVIOUSLY MR. TORNQUIST COULD NOT HAVE

EXECUTED BOTH AGREEMENTS SIMULTANEOUSLY.  IN OTHER WORDS, HE

EXECUTED ONE AGREEMENT AFTER THE OTHER.  AND I THINK DISCOVERY

WILL NEED TO KIND OF PLAY THAT OUT AS TO SEE WHICH ONE.  BUT

IT'S OUR CONTENTION THAT WHATEVER AGREEMENT HE EXECUTED

SUBSEQUENT SUPERSEDED THE FIRST AGREEMENT BECAUSE THEY DEAL WITH

THE SAME SUBJECT MATTER.  ALTHOUGH THERE ARE SOME DIFFERENT

COVENANTS IN THOSE AGREEMENTS, THERE ARE ALSO SIMILAR COVENANTS

WITHIN THE AGREEMENT.  AND I'LL -- THERE'S A CASE CITED IN OUR

BRIEF DEALING DIRECTLY WITH THAT ISSUE, YOUR HONOR.  NOW, HERE'S

HOW I WOULD LIKE TO LAY OUT OUR ARGUMENT, AND UNDERSTANDING SOME

OF THE COMMENTS THAT THE COURT MADE EARLIER.  BUT, YOU KNOW,

OBVIOUSLY FIRST, YOUR HONOR, WE CONTEND THAT THE -- THE

COVENANTS AND THE AGREEMENT SHOULD BE GOVERNED UNDER THE COMMON

LAW IN LIGHT OF THE FACT THAT THE RESTRICTIVE COVENANT ACT IS

1   UNCONSTITUTIONAL.  I CERTAINLY HEARD THE COURT EARLIER.  I FEEL

2   IT NECESSARY TO BRIEFLY TOUCH ON THAT AT LEAST TO PRESERVE THAT

3   ISSUE IN THE RECORD.  AND HOPEFULLY I CAN KIND OF MAKE SOME

4   HEADWAY WITH YOUR HONOR ON THAT BECAUSE I THINK THAT'S A VERY

5   IMPORTANT ISSUE.  AND THEN THE SECOND ARGUMENT IS THAT IF --

6   UNDER THE COMMON LAW I DON'T THINK THERE'S GOING TO BE MUCH

7   DISPUTE FROM MR. WARGO ON THIS, THAT IF THESE AGREEMENTS WERE

8   INTERPRETED UNDER THE COMMON LAW, THEY WOULD CLEARLY BE

9   UNENFORCEABLE.  I DON'T THINK THAT'S MUCH IN DISPUTE.  BUT THE

10  THIRD ISSUE, YOUR HONOR, IS, YOU KNOW, EVEN -- EVEN ASSUMING THE

11  R.C.A.'S ULTIMATELY HELD CONSTITUTIONAL, THERE ARE -- UNDER THE

12  NEW STATUTE -- AND -- AND AS YOUR HONOR PROBABLY WELL KNOWS, WE

13  HAVE THREE DECISIONS.  THIS LAW HAS BEEN IN EFFECT SINCE MAY

14  11TH, 2011.  WE HAVE THREE DECISIONS -- AND, AGAIN, THIS IS ALL

15  I DO -- WE HAVE THREE DECISIONS ON THIS LAW.  SO SOME OF THESE

16  ISSUES HAVE YET TO BE DECIDED, HAVE YET TO PLAY OUT, BUT IT IS

17  CLEAR THAT THERE IS PLAIN LANGUAGE IN THE STATUTE THAT SETS

18  FORTH PLEADING REQUIREMENTS THAT WE CONTEND HAVE NOT BEEN MADE

19  IN THIS CASE.  BASICALLY UNDER 13-8-55 YOU HAVE TO MAKE A PRIMA

20  FACIE SHOWING OF THE ENFORCEABILITY OF THE COVENANTS UNDER

21  13-8-53, WHICH CLEARLY ON THE FACE OF THE COMPLAINT THE

22  PLAINTIFFS HAVE NOT DONE THAT HERE.  AND, MORE IMPORTANTLY, YOUR

23  HONOR, THEY CAN'T MAKE A PRIMA FACIE SHOWING BECAUSE THEY FREELY

24  ADMIT, AND THEY'VE DONE SO -- THE COVENANT -- THE NON-COMPETE

25  AGREEMENT EVEN UNDER THE R.C.A. IS UNENFORCEABLE AS WRITTEN.

1   AND YOUR HONOR ALLUDED TO THAT EARLIER WHICH I -- IF I

2   UNDERSTAND THE COURT CORRECTLY, WHOLEHEARTEDLY AGREE IS A BIG

3   ISSUE WITH ESTABLISHING A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON

4   THE MERITS.  IF THEY COME INTO THIS COURT ADMITTING THAT THE

5   NON-COMPETE AGREEMENT IS INVALID UNDER THE R.C.A., THAT'S A

6   PROBLEM WITH RESPECT TO INJUNCTIVE RELIEF AND THAT'S A PROBLEM

7   WITH RESPECT TO THE PLEADING REQUIREMENTS.

8       THEN THE FOURTH ISSUE WE'RE GOING TO TALK ABOUT, YOUR

9   HONOR, IS EVEN IF THE R.C.A. IS ULTIMATELY HELD CONSTITUTIONAL,

10  THE NON-COMPETE PROVISION IS UNENFORCEABLE.  I'M GOING TO SHARE

11  SOME CASES WITH YOUR HONOR THAT, AGAIN, I REALLY BELIEVE THAT IF

12  THE COURT LOOKS AT THIS, THE COURT -- TO THE EXTENT THE COURT IS

13  LEANING TO BE ABLE TO SIMPLY ADD -- TO REWRITE THE AGREEMENT TO

14  ADD THE STATE OF MINNESOTA, I THINK I'M GOING TO MAKE A VERY

15  COMPELLING CASE TO YOUR HONOR CITING CASES NOT ONLY FROM

16  GEORGIA, BUT FROM OTHER BLUE-PENCIL STATES THAT -- IN HIGH

17  COURTS IN THOSE STATES SUCH AS THE SUPREME COURT OF NORTH

18  CAROLINA THAT -- THAT HAS HAD THIS LAW FOR A LONG TIME.  YOU

19  CAN'T DO THAT.  YOU CAN'T DO THAT.

20      THE ONE CASE I'M GOING TO TALK ABOUT THE COVENANT AT ISSUE

21  WAS FOR THE ENTIRETY OF THE STATES OF SOUTH CAROLINA AND NORTH

22  CAROLINA -- NORTH CAROLINA.  AND UNDER NORTH CAROLINA LAW,

23  THEY'RE A BLUE-PENCIL STATE JUST LIKE GEORGIA IS.  THEY ARE NOT

24  A JUDICIAL MODIFICATION STATE, AND JUDGE THRASH MADE THAT

25  ABSOLUTELY CLEAR IN HIS RECENT LIFEBRITE OPINION THAT GEORGIA IS

1  NOT A JUDICIAL MODIFICATION STATE --

2          THE COURT:  NOW, I TAKE THAT CASE DIFFERENTLY THAN YOU

3  DO.  AND WHEN I READ THAT CASE, I READ IT SIMILAR TO PLAINTIFF'S

4  COUNSEL THAT SAYS THAT IF YOU DON'T HAVE A PROVISION AT ALL

5  WITHIN THE AGREEMENT, THEN YOU CAN'T BLUE PENCIL IT.  BUT IF YOU

6  DO HAVE THE PROVISION, THEN IT'S UP FOR BLUE PENCILING.  AND IN

7  THAT ONE THERE WASN'T ANY STATEMENT ABOUT A RESTRICTION AS TO AN

8  AREA.

9          MR. ROBERTS:  OKAY.

10          THE COURT:  SO I DON'T READ THAT CASE THE SAME WAY.

11          MR. ROBERTS:  WELL, IF -- IF -- A COUPLE OF THINGS ON

12  THAT, YOUR HONOR.  THERE IS A GINORMOUS (PHONETIC) DIFFERENCE.

13  AND WHAT JUDGE THRASH TALKED ABOUT IN THAT OPINION WAS THAT HE

14  COULD CHANGE -- YOU COULD CHANGE SOMETHING FROM 75 TO 50 MILES.

15  THAT WAS THE EXACT QUOTE THAT HE USED.  BUT HE ALSO SAID THAT,

16  YOU KNOW, IF -- HE DID NOT -- HE DID NOT SAY THAT IF THERE WAS A

17  PROVISION THAT WAS SO BROAD THAT THE COURT COULD NARROW IT

18  DOWN -- IN OTHER WORDS, THE ENTIRE CONTINENTAL UNITED STATES,

19  THAT IT COULD NARROW IT DOWN TO MINNESOTA.  HE WAS SPEAKING IN

20  TERMS OF 75 MILES TO 50 MILES.  NOW, I THINK THAT JUDGE THRASH

21  WAS A LITTLE OFF ON THAT ASPECT OF THE OPINION BECAUSE I'M GOING

22  TO -- I'M GOING TO GO INTO THE STATUTE --

23          THE COURT:  WELL, LET'S GO INTO IT.  YOU KEEP TELLING

24  ME WHAT WE'RE GOING TO TALK ABOUT.  LET'S GET INTO IT.  WE'RE

25  SPENDING A LOT OF TIME ON INTRODUCTION.  LET'S JUST TALK ABOUT

1  IT.

2       MR. ROBERTS:  ALL RIGHT, YOUR HONOR, VERY GOOD.  LET'S

3  TALK ABOUT THE MODIFICATION ISSUE.

4       THE COURT:  AND I WILL SAY, TOO, THAT IN THESE

5  AGREEMENTS THEMSELVES YOU TALK ABOUT THAT THERE ARE THE MERGER

6  CLAUSES AND THINGS, BUT THERE'S ALSO A PARAGRAPH IN THE DOCUMENT

7  THAT -- PARAGRAPH NINE THAT SAYS THAT IN THE EVENT A COURT

8  SHOULD DETERMINE NOT TO ENFORCE A COVENANT AS WRITTEN DUE TO

9  OVERBREADTH, THE PARTIES SPECIFICALLY AGREE THAT SAID COVENANT

10  SHALL BE ENFORCED TO THE EXTENT REASONABLE WHETHER SAID

11  REVISIONS BE IN TIME, TERRITORY, OR SCOPE OF PROHIBITED

12  ACTIVITY.  SO THAT IS IN THE CONTRACT.

13       MR. ROBERTS:  THEN YOU HAVE -- THEN YOU HAVE -- YOU

14  HAVE AMBIGUOUS PROVISIONS IN THE CONTRACT.  AND I THINK WE ALL

15  KNOW WHAT HAPPENS IN THAT SITUATION.  IF YOU HAVE ONE PROVISION

16  THAT SAYS THAT THE AGREEMENT CANNOT BE MODIFIED EXCEPT BY

17  EXPRESSED WRITTEN CONSENT OF THE PARTY, AND THEN YOU HAVE

18  ANOTHER PROVISION THAT SAYS IT CAN'T BE MODIFIED, THERE'S A

19  PATENT AMBIGUITY THERE.  AND UNDER THE HERTZ CASE THAT'S CITED

20  IN OUR BRIEF, ANY AMBIGUITY SUCH AS THAT IS CONSTRUED AGAINST

21  THE DRAFTER.  AND I DON'T KNOW HOW THEY GET AROUND WITH THAT.  I

22  MEAN, IT'S A TECHNICAL ARGUMENT, I WILL -- I WILL FREELY ADMIT,

23  BUT THAT IS TO A LARGE EXTENT WHAT THESE CASES ARE OFTEN DECIDED

24  ON, IS TECHNICAL ISSUES.

25       THE COURT:  WELL, I'M NOT THE PARTIES, SO I'M SEPARATE

1  FROM THE PARTIES.

2        MR. ROBERTS:  RIGHT.  BUT WHAT MY -- WHAT I'M SAYING,

3  YOUR HONOR, IS IF THERE'S ONE PROVISION THAT SAYS, WE AGREE THAT

4  THE COURT CAN DO X, Y, Z, OKAY, BUT THERE'S ANOTHER PROVISION

5  THAT SAYS THAT NOBODY -- IT DOESN'T MENTION ANYBODY, BUT NOBODY

6  COULD DO ANYTHING TO CHANGE THIS AGREEMENT UNLESS THERE'S

7  WRITTEN CONSENT, THOSE ARE -- THOSE ARE CONFLICTING.  I MEAN,

8  THOSE ARE AT ODDS WITH ONE ANOTHER.  AND I WOULD SUGGEST, YOUR

9  HONOR, THAT THE LAW IS PRETTY CLEAR THAT WHEN THERE IS THAT TYPE

10  OF AMBIGUITY OR CONFLICTING PROVISIONS WITHIN AN AGREEMENT,

11  THERE -- THAT AMBIGUITY IS CONSTRUED AGAINST THE DRAFTER.  SO

12  THAT'S -- THAT'S OUR ARGUMENT THERE.  BUT, AGAIN, IT'S A

13  TECHNICAL ONE, I UNDERSTAND, BUT THESE CASES HAVE BEEN DECIDED

14  ON TECHNICAL ISSUES FOR HUNDREDS OF YEARS.  SO THAT -- I JUST

15  WANTED TO POINT THAT OUT TO THE COURT.

16        THE COURT:  OKAY.

17        MR. ROBERTS:  LET ME GET INTO THE -- THIS MODIFICATION

18  ISSUE.  AND LET ME JUMP AHEAD AND FIND MY -- YEAH, I GOT TO FIND

19  MY NOTES.  OKAY.  SO, YOUR HONOR, UNDER 13-8-51, AND THIS IS IN

20  THE DEFINITIONS IN THE STATUTE, THE -- THE LAW SAYS THAT THE

21  COURT'S BLUE-PENCIL POWERS ARE LIMITED TO SEVERING OR REMOVING

22  UNENFORCEABLE PROVISIONS AND THEN ENFORCING THE COVENANT TO THE

23  EXTENT THAT THE PROVISIONS ARE REASONABLE.

24   LET ME -- THAT'S KIND OF A SUMMATION OF THE STATUTE, YOUR

25  HONOR.  LET ME READ TO YOU THE EXACT LANGUAGE.  SO THE EXACT

1   LANGUAGE -- THIS IS IMPORTANT.  OKAY.  MODIFICATION.  THIS IS

2   UNDER -- THIS IS UNDER 13-8-51-11.  MODIFICATION MEANS THE

3   LIMITATION OF A RESTRICTIVE COVENANT TO RENDER IT REASONABLE IN

4   LIGHT OF THE CIRCUMSTANCES IN WHICH IT WAS MADE.  SUCH TERMS

5   SHALL INCLUDE.  OKAY.  THAT'S WHAT IT SAYS, SUCH TERMS SHALL

6   INCLUDE.  IT DOESN'T SAY SUCH TERMS SHALL INCLUDE, BUT NOT BE

7   LIMITED TO.  AND LET ME PROVIDE SOME AUTHORITY TO THE COURT ON

8   THAT ISSUE.  IF I MAY APPROACH, YOUR HONOR?

9          THE COURT:  SURE.

10         MR. ROBERTS:  THIS WAS ONE OF THE ARGUMENTS THAT WAS

11  RAISED IN A REPLY BRIEF LAST NIGHT.  AND BASICALLY WHAT THEY'RE

12  SAYING IS THAT -- OBVIOUSLY OUR ARGUMENT IS THAT, UNDER THE

13  TWO-PRONG APPROACH, THAT THE PROCESS IS YOU SEVER IT AND THEN --

14  IN OTHER WORDS, WHAT THE BLUE -- THE BLUE PENCIL DOES, AS JUDGE

15  THRASH SAID, IT MARKS.  IT DOESN'T WRITE.  SO BLUE PENCIL, YOU

16  SEVER AND THEN YOU ENFORCE WHAT'S REMAINING IF IT IS

17  ENFORCEABLE.  WHAT THEY'RE ARGUING IS THAT THE TERM INCLUDING --

18  INCLUDE, SO THEY'RE SAYING THAT MODIFICATION MEANS THE

19  LIMITATION OF RESTRICTIVE COVENANT TO READ -- TO RENDER IT

20  REASONABLE IN LIGHT OF THE CIRCUMSTANCES WHICH WAS MADE SUCH

21  TERMS SHALL INCLUDE.

22     WELL, IN AT LEAST NINE OR TEN OTHER PARTS OF THIS STATUTE,

23  THE -- THEY USE THE WORD "INCLUDE" WITHOUT LIMITATION OR INCLUDE

24  BUT NOT LIMITING TO.  OKAY.  SO UNDER THE DECISION IN BERRYHILL

25  VS. COMMUNITY SUPPORT AND SOLUTIONS, WHICH I'LL PROVIDE A COPY

1  TO COUNSEL AND TO THE COURT, IF I MAY APPROACH?

2          THE COURT:  MM-HUM.

3          MR. ROBERTS:  THIS IS DIRECTLY ON POINT AND VERY

4  IMPORTANT.  SO ON THE FOURTH PAGE OF THIS WESTLAW, THE BOTTOM

5  RIGHT-HAND CORNER OF THE FOURTH PAGE, IT TALKS ABOUT IN THIS --

6  AND THE UNITED STATES SUPREME COURT DECIDED THE COURT RECOGNIZED

7  THAT THE TERM "INCLUDES" MAY SOMETIMES BE TAKEN AS SYNONYMOUS

8  WITH MEANS.  THE SUPREME COURT HAS ALSO POINTED OUT THAT WE MAY

9  HAVE A SENSE OF ADDITION AND ALSO BUT (VERBATIM) MAY MERELY

10 SPECIFICALLY PARTICULARLY DEAL WITH THAT BELONGS IN THE

11 GEANCE (PHONETIC).  AND ON THE OTHER SIDE OF THE PAGE IN THE

12 HIGHLIGHTED SECTION THE -- THIS IS THE GEORGIA SUPREME COURT

13 SAYS THAT, THEREFORE, IT IS CLEARLY REASONABLE THAT THE WORD

14 "INCLUDES" AS MEANING IS EQUIVALENT TO AND TO CONCLUDE THAT THE

15 SPECIFIC PHRASES IN SUBSECTION C ARE THE ENTIRE DEFINITION.  ON

16 THE VERY NEXT PAGE THE COURT SAYS, THE LEGISLATURE -- HAD THE

17 LEGISLATURE INTENDED THE WORD "INCLUDES" AS A BROAD TERM OF

18 ILLUSTRATION AS OPPOSED TO A NARROWING TERM, THEN THEY WOULD NOT

19 HAVE USED THE TERM "INCLUDING" BUT NOT LIMITED TO IN OTHER PARTS

20 OF THE STATUTE.

21     SO WHAT BERRYHILL BASICALLY SAYS, IS THAT WHEN YOU HAVE A

22 SITUATION LIKE THIS IN 13-8-51 AND IT'S -- AND IT -- AND IT SAYS

23 THE MODIFICATION INCLUDES SEVERING, TAKING THE PENCIL, MARKING

24 THROUGH THE UNENFORCEABLE TERMS, IN THIS CASE, THE ENTIRE UNITED

25 STATES, AND THEN ENFORCING THE PROVISION TO THE EXTENT IT

         REMAINS ENFORCEABLE, THAT'S ALL THERE IS.  AND THAT'S EXACTLY

         WHAT BERRYHILL STANDS FOR.  BECAUSE IN OTHER PARTS OF THE

         STATUTE, JUST LIKE IN OTHER PARTS OF THE STATUTE IN BERRYHILL,

         THE TERM "INCLUDING" WITHOUT LIMITATION OR INCLUDING BUT NOT

         LIMITED TO IS USED THROUGHOUT THE STATUTE.  SO -- AND, THEN,

         YOUR HONOR, YOU ACTUALLY CITED BERRYHILL IN A DECISION BASICALLY

         FOR THIS PROPOSITION.  IF I MAY APPROACH?

                    THE COURT:  YES.

                    MR. ROBERTS:  THIS WAS YOUR HONOR'S DECISION IN

         HOLCOMBE VS. DIRECTV.  AND ON PAGE SIX OF THIS OPINION ON THE

         LEFT-HAND COLUMN YOUR HONOR SAYS THAT -- YOUR HONOR HELD THAT

         EVEN IF THE COURT FOUND THAT THE G.P.U.U.C. (VERBATIM) WAS

         AMBIGUOUS, IN PARI MATERIA WOULD STILL NOT APPLY BECAUSE THE

         G.P.U.C. AND THE T.C.P.A. BOTH USE DISTINCT LANGUAGE.  DIFFERENT

         WORDS USED IN THE SAME OR SIMILAR STATUTE ARE ASSIGNED DIFFERENT

         MEANINGS WHENEVER POSSIBLE.

         SO, IN OTHER WORDS, THE TERM "INCLUDE" VERSUS, AS THEY

         DISCUSSED IN BERRY -- BERRYHILL, INCLUDING BUT NOT LIMITED TO OR

         INCLUDING WITHOUT LIMITATION, THEY HAVE TO BE PRESCRIBED

         DIFFERENT MEANINGS BY THE COURT.  AND THE COURT FOR THAT

         PROPOSITION CITED TO BERRYHILL IN YOUR OPINION.  SO WE'RE

         TALKING SPECIFICALLY ABOUT THE COURT'S ABILITY NOW TO MODIFY

         RESTRICTIVE COVENANTS.  AND I WOULD ALSO SUGGEST TO THE COURT,

         YOUR HONOR, THAT THIS IS SOMETHING THAT'S BEEN AROUND A LONG

         TIME.  THERE ARE NUMEROUS DIFFERENT APPROACHES THAT THE COURTS

1   USE IN TERMS OF MODIFYING SOMETHING THAT'S UNENFORCEABLE.  AND,

2   AGAIN, LET'S REMEMBER WHAT WE'RE TALKING ABOUT.  THEY HAVE COME

3   TO COURT ADMITTING THAT THE NON-COMPETE IS OVERLY BROAD.  SO

4   SEVERAL DIFFERENT APPROACHES.  STATES LIKE FLORIDA AND TEXAS ARE

5   MANDATORY REFORMATION STATES, IN OTHER WORDS, THAT IF YOU HAVE

6   AN UNENFORCEABLE PROVISION, THE COURTS IN THOSE STATES MUST

7   REFORM THE AGREEMENT.

8       OKAY.  THERE -- THE NEXT LEVEL DOWN IS JUDICIAL

9   MODIFICATION STATES.  AND THOSE ARE STATES WHERE THE COURT IS

10  EMPOWERED TO MAKE -- THROUGH COMMON LAW OR STATUTE, TO REWRITE

11  THE AGREEMENTS OF THE PARTY TO MAKE THEM REASONABLE.  GEORGIA

12  FORMERLY FELL WITHIN THE LOWER RUNG OF THAT WHICH IS CALLED

13  RED-PENCIL STATES, AND RED-PENCIL STATES WOULD -- THEY STILL

14  EXIST.  SOUTH CAROLINA IS A RED-PENCIL STATE.  ARKANSAS IS A

15  RED-PENCIL STATE.  VIRGINIA IS A RED-PENCIL STATE.  AND UNDER

16  THE RED-PENCIL THEORY, IF THERE IS A PROBLEM WITH THE COVENANT,

17  THE COURT DOES NOT HAVE ANY ABILITY TO MODIFY THAT COVENANT.

18  THAT'S WHAT WE USED TO BE, AND THAT WAS REALLY ONE OF THE MAIN

19  POINTS WITH THE R.C.A.  BUT UNDER THE R.C.A., WHAT WE HAVE NOW,

20  WE ARE A STRICT BLUE-PENCIL STATE.  AND I'VE GOT A LOT OF

21  INFORMATION IN OUR BRIEFS ON THAT.  AND WHAT THAT MEANS, YOUR

22  HONOR, IS THAT UNDER THE STRICT BLUE-PENCIL THEORY OF

23  SEVERABILITY, THE COURT CAN MARK, BUT IT CAN'T WRITE.  THAT'S

24  WHAT THE HAMERICK CASE SAYS AND THAT IS WHAT HAS ALWAYS BEEN THE

25  THEORY BEHIND MODIFICATION OF THESE STATUTES.

1    SO IN KIND OF SUMMATION OF THAT ISSUE, YOUR HONOR -- AND

2  I'VE GOT A COUPLE MORE CASES I WANT TO SHARE -- THERE IS --

3  THERE IS NOTHING IN THE STATUTE -- AND REMEMBER IN JUDGE

4  THRASH'S OPINION HE DID SAY STATUTES THAT ARE IN DEROGATION OF

5  THE COMMON LAW HAVE TO BE CONSTRUED STRICTLY.  SO THERE IS

6  NOTHING IN THIS STATUTE THAT GIVES THIS COURT THE ABILITY TO

7  TAKE A PROVISION THAT'S AS BROAD AS THE CONTINENTAL UNITED

8  STATES AND THEN MARK THROUGH THAT AND THEN COME BACK IN AND

9  WRITE IN THE WORD "MINNESOTA" SIMPLY BECAUSE MY CLIENT WORKED IN

10  PART OF THAT.  THAT'S -- THAT'S NOT WHAT I WOULD RESPECTFULLY

11  SUGGEST THAT THE COURT IS EMPOWERED TO DO UNDER THE STATUTE.

12    A COUPLE OF CASES ON THAT ISSUE, YOUR HONOR.  I MENTION THE

13  NORTH CAROLINA CASE.  AND LET ME FIND THAT AND POINT THAT OUT TO

14  YOU.  OKAY.  THIS IS UNDER TAB 30 OF THE MATERIALS.  AND THIS IS

15  BEVERAGE SYSTEMS OF THE CAROLINAS VS. ASSOCIATED BEVERAGE

16  REPAIR, LLC, SUPREME COURT OF NORTH CAROLINA CASE, CAME OUT

17  FAIRLY RECENTLY IN MARCH, AND IT REALLY MADE A LOT OF HEADLINES.

18  SO I WOULD ASK THE COURT TO TAKE ITS ATTENTION TO PARAGRAPH --

19  OR PAGE NINE OF THE OPINION.  AND, AGAIN, I DON'T THINK ANYBODY

20  WOULD ARGUE THAT THE STATE OF NORTH CAROLINA, ITS BLUE-PENCIL

21  LAWS ARE ANY DIFFERENT THAN OURS.  WE'RE A BLUE PENCIL -- IF THE

22  R.C.A. IS CONSTITUTIONAL, WE ARE A BLUE-PENCIL STATE AND THE

23  NORTH CAROLINA IS A BLUE-PENCIL STATE.

24    THE COURT:  DO YOU HAVE THAT STATUTE IN FRONT OF YOU?

25  DO YOU HAVE 13-8-5?  DO YOU HAVE THAT IN FRONT OF YOU, THE

1   STATUTE, THE GEORGIA STATUTE?

2           MR. ROBERTS:  YES, MA'AM.

3           THE COURT:  YES.  LOOK AT SECTION 11(B) OF THAT

4   STATUTE.

5           MR. ROBERTS:  OKAY.  ONE SECOND.  AND WHAT?

6           THE COURT:  BECAUSE THAT PORTION SAYS THAT IT SHALL

7   INCLUDE --

8           MR. ROBERTS:  I'M SORRY, YOUR HONOR.  WHAT?

9           THE COURT:  LOOK AT O.C.G.A. 13-8-5-11(B) --

10          LAW CLERK:  51.

11          THE COURT:  EXCUSE ME.  I CAN'T READ YOUR WRITING.

12          LAW CLERK:  13-8-51-11(B)

13          THE COURT:  EXCUSE ME.  51-11(B).

14          MR. ROBERTS:  13-8-51 --

15          THE COURT:  11(B).

16          MR. ROBERTS:  -- 11(B), THE DEFINITION OF

17  MODIFICATION.

18          THE COURT:  RIGHT.  IT STATES IN THERE THAT IT ALSO

19  SHALL INCLUDE ENFORCING THE PROVISIONS OF A RESTRICTED COVENANT

20  TO THE EXTENT THAT THE PROVISIONS ARE REASONABLE.  WHY DOESN'T

21  THAT CUT AGAINST WHAT YOU'RE ARGUING?

22          MR. ROBERTS:  WELL, WHAT I READ THAT TO SAY, YOUR

23  HONOR, IS THAT ONCE YOU SEVER THE UNENFORCEABLE TERM, IN THIS

24  CASE, THE ENTIRE CONTINENTAL UNITED STATES, THEN YOU GO TO THE

25  NEXT STEP.  AND YOU CAN ENFORCE THE PROVISIONS TO THE EXTENT

1  THAT THOSE PROVISIONS ARE REASONABLE, MEANING THAT IF YOU ARE --

2  HERE'S HOW WE -- HERE'S HOW MOST PEOPLE DRAFT COVENANTS UNDER

3  THE LAW.  SO IF WE WANTED TO -- IF WE WANTED -- FIRST OF ALL, WE

4  WOULDN'T DO A NATIONWIDE COVENANT FOR SOMEBODY THAT ONLY WORKS

5  IN MINNESOTA.  BUT LET'S JUST SAY FOR SAKE OF ARGUMENT THAT WE

6  WANTED TO PRECLUDE MR. TORNQUIST FROM WORKING IN 15 COUNTIES IN

7  THE NORTHERN AREA OF MINNESOTA.  SO THE PRUDENT THING FOR A

8  DRAFTER OF A CONTRACT LIKE THIS IN THE FACE OF THIS LANGUAGE IS

9  TO LIST THOSE 15 COUNTIES.

10         THE COURT:  RIGHT.  BUT THAT'S NOT WHAT WE'RE TALKING

11  ABOUT.  WE'RE TALKING ABOUT THIS DOCUMENT AND THIS STATUTE AND

12  THIS PROVISION.  SO LET'S NOT TALK ABOUT THE WAY IT SHOULD BE

13  DRAFTED.

14         MR. ROBERTS:  OKAY.

15         THE COURT:  LET'S TALK ABOUT MORE WHAT WE'RE DOING.

16         MR. ROBERTS:  OKAY.  SO TO DIRECTLY ANSWER YOUR

17  QUESTION, I THINK IT'S PRETTY CLEAR THE LANGUAGE IN SECTION B,

18  ENFORCING THE PROVISIONS OF A RESTRICTED COVENANT TO THE EXTENT

19  THEY ARE REASONABLE, MEANING -- MEANING, TO THE EXTENT THAT

20  THERE REMAINS AN ENFORCEABLE PROVISION.

21         THE COURT:  SO YOU'RE SAYING THAT IF THEY HAD JUST

22  LISTED ALL 50 STATES AND SAID, OKAY, WE WANT TO LIMIT YOUR

23  ABILITY TO WORK IN GEORGIA, TEXAS, CALIFORNIA, BLAH, BLAH, BLAH,

24  THEN THE -- YOU COULD STRIKE ALL THOSE WITH THE BLUE PENCIL

25  EXCEPT FOR MINNESOTA, BUT WHAT YOU CAN'T DO IS SAME THING WITH

1   THE WORD "UNITED STATES" AND SEPARATE THAT OUT?

2          MR. ROBERTS:  I THINK THEORETICALLY THAT'S CORRECT,

3   YOUR HONOR.  AND, YOU KNOW, I'VE ACTUALLY DONE THAT BEFORE, BUT

4   ONLY IN SITUATIONS WHERE THE EMPLOYEE WAS WORKING THROUGHOUT THE

5   COUNTRY.  YOU RUN THE RISK HERE -- THIS IS A VERY DIFFERENT

6   SITUATION.  I MEAN, THEY JUST WILLY-NILLY LABELED THE ENTIRE

7   COUNTRY AND THEN, YOU KNOW, BUT FOR THE LAWSUIT THAT WAS FILED,

8   MY CLIENT WOULD HAVE TO COME INTO THE COURT, AND, AGAIN, SPEND

9   TENS OF THOUSANDS OF DOLLARS TO TRY TO DETERMINE, YOU KNOW, HIS

10  RIGHTS AND RESPONSIBILITIES HERE.  SO TO ANSWER YOUR QUESTION

11  THERE, I DON'T THINK MANY PEOPLE WOULD DO THAT BECAUSE, IN

12  ADDITION TO THESE ISSUES WE'RE DISCUSSING, I THINK IT'S

13  IMPORTANT TO NOTE TO THE COURT THAT YOU DON'T HAVE TO MODIFY

14  ANYTHING.  THE COURT -- THE MODIFICATION PROVISION, WHATEVER IT

15  IS -- AND I RESPECTFULLY, YOUR HONOR, VERY STRONGLY BELIEVE THAT

16  WE'RE RIGHT -- BUT IT'S DISCRETIONARY WITH THE COURT.  SO WHEN A

17  COMPANY COMES IN IN A SITUATION LIKE THIS AND HAS CLEARLY

18  OVERREACHED, THEN THE COURT SHOULD NOT THEN ENFORCE THE

19  CONTRACT.

20      LET ME SHARE A CASE WITH YOU, YOUR HONOR, IF I MAY, EXACTLY

21  ON THAT ISSUE.  AND THIS IS FROM -- THIS IS AN ILLINOIS CASE.

22  AND I'M SHARING THESE OUT-OF-JURISDICTION CASES WITH YOUR HONOR,

23  YOU KNOW, I WOULDN'T NORMALLY DO THAT.  WE DON'T -- WE DON'T

24  HAVE A LOT OF CASE LAW, SO I THINK THESE ARE VERY HELPFUL.

25          THE COURT:  AND JUST TO LET YOU KNOW, TOO, THAT WE

1    DON'T HAVE EIGHT HOURS TO DO THIS, SO MAKE SURE THAT YOU'RE NOT

2    JUST GOING OVER THINGS THAT ARE ALREADY IN YOUR BRIEF AND THAT

3    YOU'RE USING YOUR TIME --

4            MR. ROBERTS:  I UNDERSTAND.  THIS IS NOT IN OUR BRIEF.

5            THE COURT:  OKAY.

6            MR. ROBERTS:  AND IF I MAY APPROACH?

7            THE COURT:  YES.

8            MR. ROBERTS:  SO ILLINOIS IS A LITTLE BIT DIFFERENT

9    THAN GEORGIA IN THAT ILLINOIS IS A JUDICIAL MODIFICATION STATE,

10   MEANING, IN THE STATE OF ILLINOIS THE COURTS ARE NOT LIMITED BY

11   THIS STRICT BLUE-PENCIL POWER.  THE COURTS UNDER CERTAIN

12   CIRCUMSTANCES CAN BASICALLY REWRITE THE AGREEMENTS OF THE

13   PARTIES, BUT THERE'S DISCRETION WITHIN THE COURT TO DO SO.  SO

14   IF THE COURT WOULD TURN ITS ATTENTION TO PAGE 11, AND THIS IS

15   THE -- THEY DISCUSS THE OVERBREADTH IN PAGE 11.  AND WHAT'S VERY

16   IMPORTANT ABOUT THIS OPINION, YOUR HONOR, IS THAT IN THIS CASE

17   IT WAS A NATIONWIDE NON-COMPETE AGREEMENT.  OKAY.  SO THE -- YOU

18   HAD A NATIONWIDE NON-COMPETE AGREEMENT, AND THAT'S SET FORTH ON

19   PAGE 12 AND 13 WHERE IT -- WHERE IT SAYS THAT THE -- THE

20   EMPLOYEE CANNOT PERFORM SERVICES ANYWHERE IN THE UNITED STATES

21   OR ITS TERRITORY.

22       SO HERE'S THE APPROACH -- SAME EXACT SITUATION.  HERE'S THE

23   APPROACH THE ILLINOIS COURT TOOK, AGAIN, ILLINOIS BEING EVEN

24   MORE LIBERAL TOWARD THE ENFORCEMENT OF NON-COMPETES THAN

25   GEORGIA.  SO ON PAGE 20 OF THE OPINION, IT NOTES THAT THE

1  PLAINTIFF IN THAT CASE, IN OTHER WORDS, WHAT WOULD BE MIMEDX,

2  SPECIFICALLY CONTENDED JUST AS THEY ARE DOING HERE, THAT IF THE

3  NON-COMPETE WAS OVERBROAD, THAT THE COURT SHOULD MODIFY THE

4  PROVISION TO SOME LESSER TERRITORY.  AND ON PAGE 21 AND 22, THE

5  ILLINOIS APPELLATE COURT SPECIFICALLY TALKED ABOUT WHY THEY HAD

6  NO INTEREST IN DOING THAT, THAT THE -- AND ON THE BOTTOM OF THE

7  PAGE IT SAYS THAT SIGNIFICANTLY WE'RE NOT DEALING WITH ONE MINOR

8  DEFICIENCY.  IN OTHER WORDS, WE'RE NOT DEALING WITH THE

9  SITUATION THAT JUDGE THRASH TALKED ABOUT IN HIS OPINION WHERE IT

10 WAS 75 MILES AND GOING TO -- GOING TO 50 MILES.  THE COURT SAID

11 WE'RE NOT DEALING WITH A MINOR DEFICIENCY.  WE FIND THE

12 REASONING OF THE COURT AN ITEM IN PARTICULARLY ITEM (VERBATIM)

13 OF A PARTICULAR SITUATION.  AND HE -- THEY GO ON TO SAY THAT

14 ULTIMATELY WE FIND THE DEFICIENCIES HERE TOO GREAT TO PERMIT

15 MODIFICATION.

16         THE COURT:  RIGHT.  AND THAT WAS BECAUSE THERE WERE

17 SEVERAL DIFFERENT DEFICIENCIES IN THE AGREEMENT, NOT JUST THE

18 GEOGRAPHIC ONE.

19         MR. ROBERTS:  WELL, I THINK --

20         THE COURT:  ARE YOU SAYING THAT THERE ARE OTHER

21 DEFICIENCIES IN THIS AGREEMENT OTHER THAN THE TERRITORIAL?  AND

22 THESE AGREEMENTS IN THIS CASE, I KNOW THAT YOU'RE SAYING THAT

23 THE AGREEMENTS ARE OVERBROAD IN TERMS OF THE TERRITORIAL

24 LIMITATION.  ARE THERE OTHER AREAS IN WHICH YOU SAY THIS

25 PARTICULAR SET OF EMPLOYMENT AGREEMENTS IS TOO BROAD, OR IS IT

1  JUST THE TERRITORIAL LIMIT ISSUE?

2        MR. ROBERTS:  WELL, I BELIEVE WE ARGUED THAT -- YEAH,

3  THE COLLAGEN, YOU KNOW, THE DESCRIPTION OF THE RESTRICTIVE

4  BUSINESS GOES INTO AREAS THAT HE DID NOT TAKE PART IN, SO THAT

5  IS OVERBROAD.  BUT THE GLARING OVERBREADTH IS THE -- IS THE

6  GEOGRAPHIC TERRITORY, THAT'S RIGHT, YOUR HONOR.

7        THE COURT:  OKAY.

8        MR. ROBERTS:  SO, ANYWAY, I THINK THIS ILLINOIS

9  POINT -- THIS ILLINOIS CASE IS VERY INSTRUCTIVE TO THE COURT ON

10 THIS ISSUE, THE NORTH CAROLINA CASE, ON THIS ISSUE OF

11 OVERBREADTH.  SO LET ME JUST MAKE SURE I'VE TOUCHED EVERYTHING I

12 WANTED TO ON THAT PARTICULAR ISSUE, YOUR HONOR, SINCE WE'RE

13 JUMPING AROUND.

14   OKAY.  I DID WANT TO DISCUSS ONE OTHER CASE.

15       THE COURT:  AND I'LL TELL YOU, WE'VE GOT ABOUT 15

16 MINUTES OF TIME, SO JUST KIND OF MAKE SURE THAT YOU GET TO THE

17 MOST IMPORTANT PARTS.

18       MR. ROBERTS:  VERY GOOD.  I WANTED TO DISCUSS THE

19 PETOWITZ CASE, YOUR HONOR --

20       THE COURT:  OKAY.

21       MR. ROBERTS:  -- FROM THIS COURT.  AND THAT'S UNDER

22 TAB 27 OF THE MATERIALS.  AND THIS WAS JUDGE VINING.  AND JUST

23 SIMILAR TO WHAT HAPPENED IN THIS CASE IN PETOWITZ -- AND THIS IS

24 THE THIRD CASE THAT I'M AWARE OF.  SO WE'VE GOT -- WE'VE GOT

25 JUDGE STORY'S DECISION SEVERAL YEARS AGO IN NORTH POINT.  WE'VE

1   GOT JUDGE THRASH'S RECENT DECISION IN LIFEBRITE.  AND THEN WE'VE

2   GOT JUDGE VININGS' DECISION IN PETOWITZ.  THOSE ARE THE ONLY

3   THREE DECISIONS, STATE OR FEDERAL, THAT I'M AWARE OF IN TERMS OF

4   THE STATUTE.  BUT PETOWITZ IS VERY IMPORTANT BECAUSE JUDGE

5   VINING (VERBATIM) DENIED THE PLAINTIFF'S REQUEST FOR A

6   PRELIMINARY INJUNCTION BASED ON A NATIONWIDE NON-COMPETE

7   AGREEMENT WHERE THE EMPLOYEE DID NOT WORK IN EVERY STATE.  AND

8   IN THE OPINION ON THE FIRST PAGE OF THE OPINION, AGAIN, THIS IS

9   UNDER TAB 27, THE COURT NOTES THAT THE PROHIBITION WAS WITHIN

10  NORTH AMERICA, AGAIN, A VERY BROAD ONE.  AND THEN ON PAGE FIVE

11  OF THE OPINION ON THE RIGHT-HAND SIDE JUDGE SAID, THE EMPLOYEE'S

12  NON-COMPETE PROVISION PREVENTED HER FROM ENGAGING IN SERVICES

13  SIMILAR TO T.B.G. WITHIN NORTH AMERICA FOR A PERIOD OF 12 MONTHS

14  MUST BE REASONABLE.  THE PLAINTIFF HAS NOT PERSUASIVELY

15  DEMONSTRATED THAT NORTH AMERICAN TERRITORIES ARE REASONABLE

16  GEOGRAPHIC LIMITATION.  AS SUCH, THE COURT CANNOT CONCLUDE THAT

17  THE PLAINTIFFS ARE SUBSTANTIVELY LIKELY TO SUCCEED ON THE

18  MERITS.

19      AND YOUR HONOR RAISED THAT ISSUE, I BELIEVE, WHEN YOU WERE

20  GOING OVER SOME OF THE THINGS THAT YOU WANTED TO TALK ABOUT, THE

21  FACT THAT THEY CAN'T SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS

22  WHEN THEY COME TO THE COURT WITH AN AGREEMENT THAT SAYS THE

23  ENTIRE CONTINENTAL UNITED STATES.

24      ONE OTHER CASE THAT IS NOT IN THE MATERIALS, YOUR HONOR,

25  THAT I WANTED TO NOTE FOR THE COURT, AND UNFORTUNATELY I DON'T

1   HAVE A COPY OF THIS, SO I'LL JUST BRING IT TO THE ATTENTION OF

2   THE COURT --

3          THE COURT:  THAT'S FINE.

4          MR. ROBERTS:  -- THIS IS THE PARAMOUNT TAX ACCOUNTING

5   VS. H&R BLOCK EASTERN ENTERPRISES CASE.  IT'S CITED AT 299

6   GEORGIA APP 596, COURT OF APPEALS FOR 2009.  AND BASICALLY WHAT

7   THAT CASE SAID WAS THAT A NATIONWIDE RESTRICTION IS REALLY NO

8   RESTRICTION AT ALL.  AND I WANT THE COURT TO PLEASE CONSIDER

9   THIS.  SO WHAT THEIR ARGUMENT IS, AS I UNDERSTAND IT, AND AS IT

10  RELATES TO THE LIFEBRITE CASE, THEY'RE SAYING THAT THE LIFEBRITE

11  CASE, THERE WAS A TERRITORY.  AND -- OR, I'M SORRY, THE

12  LIFEBRITE CASE THERE WAS NOT A TERRITORY.  IN THIS CASE THERE

13  WAS A TERRITORY.  WHAT THIS CASE STANDS FOR THE PROPOSITION OF

14  IS THAT A NATIONWIDE RESTRICTION IS REALLY NO TERRITORY AT ALL.

15  SO WHAT IF THEIR AGREEMENT, YOUR HONOR, SAID, YOU CAN'T -- YOU

16  CAN'T COMPETE WITH US ANYWHERE IN THE UNIVERSE, WOULD THEY THEN

17  BE ABLE TO SAY THERE IS A TERRITORY THAT THE COURT CAN MARK

18  DOWN, OR WHAT IF THEY SAID THE GALAXY, OR WHAT IF THEY SAID

19  ANYWHERE IN THE WORLD?  IN OTHER WORDS, YOU SEE THE -- WHAT I'M

20  CONTENDING, YOUR HONOR, IS KIND OF THE SILLINESS OF THAT

21  ARGUMENT.  THIS IS NOT A MINOR DEFICIENCY.  THIS WAS AN INTENDED

22  ACT WHERE -- I MEAN, THESE GUYS DON'T HAVE PEOPLE WORKING ACROSS

23  THE UNITED STATES THAT I KNOW OF.  THEY'RE ASSIGNED TO SPECIFIC

24  TERRITORIES.  I MEAN, THIS GUY WAS THE TOP SALES REP IN THE

25  ENTIRE COUNTRY AND HE WORKED IN A SPECIFIC PART OF ONE STATE.

1 SO HOW CAN THEY LEGITIMATELY ARGUE THAT THERE'S A TERRITORY WHEN

2 THEY HAVE IT FOR THE ENTIRE UNITED STATES?  IT WASN'T THE

3 NORTHEAST OR THIS, YOU KNOW, THREE OR FOUR STATES.  IT'S THE

4 ENTIRE UNITED STATES.

5     SO WHAT THAT CASE SAYS, YOUR HONOR, IS THAT IT'S TANTAMOUNT

6 TO THERE NOT BEING A TERRITORY AT ALL.  AND -- AND, AGAIN, YOUR

7 HONOR, THE COURT HAS DISCRETION IN SITUATIONS LIKE THIS.  AND I

8 AM CONCERNED, YOUR HONOR, THAT IF THE COURT WERE TO FIND THAT IT

9 COULD -- AND TAKING ALL MY MODIFICATION ISSUES INTO ACCOUNT, I'M

10 CONCERNED THAT IF THE COURT WERE TO FIND THAT -- TO BASICALLY

11 LET THEM GET AWAY WITH THIS, THEN WHAT'S EVERYBODY GOING TO DO?

12 THEY'RE GOING TO DRAFT THEIR NON-COMPETE AGREEMENTS FOR THE

13 ENTIRE COUNTRY.  AND SO THAT'S GOING TO PUT AN UNDUE BURDEN ON

14 THE COURT.  THERE'S GOING TO BE PEOPLE THAT -- YOU KNOW, THERE'S

15 GOING TO BE A PLETHORA OF NON-COMPETE LITIGATION BECAUSE PEOPLE

16 ARE GOING TO BELIEVE THAT THEY CAN GET AWAY WITH THE

17 OVERREACHING.  SO I THINK THAT IS AN ISSUE FOR THE COURT THAT I

18 WOULD RESPECTFULLY REQUEST THAT THE COURT CONSIDER.

19         MR. MCCART:  THE GOOD FAITH.

20         MR. ROBERTS:  THE OTHER POINT -- THIS IS VERY

21 IMPORTANT TOO, YOUR HONOR.  THE STATUTE SPECIFICALLY REQUIRES

22 UNDER 13-8-53 THAT THE -- THERE BE A GOOD FAITH ESTIMATE MADE AS

23 TO THE TERRITORY AND THAT ANY GOOD FAITH ESTIMATE, WHICH THAT

24 PRESUMABLY REQUIRES A GOOD FAITH ESTIMATE, OF THE GEOGRAPHIC

25 AREA THAT MAY BE APPLICABLE AT THE TIME OF THE TERMINATION SHALL

1    ALSO SATISFY THE REQUIREMENT EVEN IF SUCH ESTIMATE IS CAPABLE OF

2    INCLUDING OR ULTIMATELY PROVES TO BE EXTRANEOUS.

3        THIS IS NOT A SITUATION WHERE WE'RE TALKING ABOUT AN

4    EXTRANEOUS SITUATION.  THIS IS TALKING ABOUT A SITUATION WHERE

5    48 STATES, WHEN HE WAS ONLY GOING TO BE WORKING IN ONE, THAT'S

6    NOT EXTRANEOUS.  SO, AGAIN, MODIFYING THE NON-COMPETE AS THEY

7    SUGGEST, DOING AWAY WITH THE CONTINENTAL UNITED STATES AND THEN

8    THE COURT REWRITING THE AGREEMENT TO PUT IN THE TERM

9    "MINNESOTA," WHICH I RESPECTFULLY SUGGEST THAT THE COURT NOT --

10   CANNOT DO, THAT WOULD CREATE AN EXCEPTION THAT WOULD SWALLOW THE

11   RULE THAT EMPLOYERS -- THE SPECIFIC RULE THAT REQUIRES EMPLOYERS

12   TO DRAFT REASONABLE COVENANTS.  SO THAT'S GOING TO BE -- THAT'S

13   GOING TO BE THE LAST ISSUE THAT I WANT TO RAISE ON THAT, YOUR

14   HONOR.

15       LET'S GO TO -- LET'S GO TO THE PROOF OF VIOLATIONS.  SO

16   MR. WARGO INCLUDED A TRANSCRIPT IN HIS FILINGS YESTERDAY OF A

17   CASE THAT I WAS ALSO INVOLVED IN IN FRONT OF JUDGE ROSS.  IT WAS

18   IN ACTUALITY A VERY SIMILAR CASE.  AND WE'VE BEEN TALKING ABOUT

19   COVENANTS AND WE'VE BEEN TALKING ABOUT -- WE'VE BEEN TALKING

20   ABOUT PRODUCTS AND THINGS LIKE THAT.  BUT I THINK WHAT WE ALSO

21   NEED TO KEEP IN MIND IS THAT THERE HAS BEEN NO EVIDENCE -- I

22   HAVEN'T HEARD ANY EVIDENCE, I HAVE NOT SEEN ANY EVIDENCE, YOUR

23   HONOR, BEFORE THE COURT DEALING WITH ANY TYPE OF CONFIDENTIAL

24   INFORMATION AND TRADE SECRETS.

25           THE COURT:  WELL, I WILL TELL YOU THAT IN TERMS OF

1    KIND OF HOW I STARTED, WHAT MY ISSUE IS, IS NOT THE TRADE

2    SECRETS AND ALL THAT.

3          MR. ROBERTS:  OKAY.

4          THE COURT:  IT'S REALLY BACK TO WHETHER OR NOT YOUR

5    CLIENT SHOULD BE ALLOWED TO TAKE THIS JOB AND WORK IN THIS AREA.

6    AND THAT'S REALLY WHAT I'M FOCUSED ON BECAUSE I HAVEN'T SEEN THE

7    EVIDENCE OF THE IRREPARABLE HARM BECAUSE OF THE TRADE SECRETS.

8    I THINK THAT IS SOMETHING THAT I FEEL MORE COMFORTABLE ABOUT.

9          MR. ROBERTS:  OKAY.  WELL, THEN LET ME MOVE AWAY FROM

10   THAT, YOUR HONOR.  AND YOU DIDN'T WANT TO TALK ABOUT THE TWO

11   SALES FROM WHERE HE MADE ONLY $581.  I POINTED OUT THAT I THINK

12   MR. TORNQUIST TESTIFIED I THINK THERE IS, AT MINIMUM, A DISPUTED

13   ISSUE OF FACT AS TO WHETHER THESE PRODUCTS ARE GOING TO BE

14   COMPETITIVE IN VIOLATIVE OF THE PRODUCTS -- THE LIMITATIONS THAT

15   ARE SET FORTH IN THE NON-COMPETE AGREEMENT SHOULD THE COURT

16   DETERMINE THAT IT CAN DO SOMETHING WITH THE NON-COMPETE.  AGAIN,

17   WE DON'T THINK THE COURT CAN, BUT --

18         THE COURT:  AND A QUESTION ABOUT THAT, AND MAYBE IT'S

19   MORE OF A QUESTION FOR MR. TORNQUIST, BUT IS THERE -- WHEN WE GO

20   BACK TO THIS COLLAGEN-BASED ISSUE AND WHETHER OR NOT THE

21   AGREEMENT IS TOO BROAD IN TERMS OF THE INCLUSION OF THAT TERM,

22   IS THERE A COLLAGEN -- I KNOW COLLAGEN IS KIND OF, LIKE, IN

23   EVERY LIVING THING.  IS THERE AN EXAMPLE OF A PRODUCT THAT YOU

24   WILL BE SELLING THAT CONTAINS COLLAGEN THAT COULDN'T COMPETE

25   WITH ANY OF THE PRODUCTS THAT THE MIMEDX SOLD THAT'S TOTALLY

OUTSIDE THAT -- I KNOW THAT THERE'S SOME THAT YOU DON'T PLAN ON

MARKETING IN THAT SPACE, BUT IS THERE A COLLAGEN-BASED PRODUCT

THAT DOESN'T AT ALL POTENTIALLY CONFLICT WITH ONE OF THOSE

MIMEDX PRODUCTS?  DOES THAT MAKE SENSE?

MR. TORNQUIST:  YEAH, I GUESS IN A WAY.  THEY ARE

WORKING ON TRYING TO MAKE A -- LIKE, A CREAM OR A GEL THAT THEY

WANT TO COME OUT WITH WHERE IT WOULD HAVE -- AGAIN, IT WOULD BE

FROM THE UMBILICAL CORD, BUT IT'S IN A CREAM AND GEL FORM.  AND

THAT WOULD BE FOR, LIKE, PSORIASIS AND FOR DIFFERENT SKIN

ISSUES, BUT NOT FOR WOUNDS.  SO THAT'S -- I MEAN, IT WOULD BE

WOMEN COULD PUT ON THEIR -- OR MEN COULD PUT ON THEIR FACES, YOU

KNOW, FOR AESTHETIC, THINGS LIKE THAT.  AND THAT WOULDN'T BE A

WOUND CARE PRODUCT WHATSOEVER IN ANY WAY, SHAPE OR FORM.

THE COURT:  OKAY.

THE WITNESS:  THEY JUST DON'T HAVE IT YET.

THE COURT:  OKAY.  THANK YOU.

MR. ROBERTS:  SO, AGAIN, YOUR HONOR, I THINK THAT ALL

THE -- MY CLIENT HAS TESTIFIED THAT HE HASN'T SOLICITED

ANYTHING.  I THINK THERE'S A BIG ISSUE WITH IRREPARABLE HARM.  I

THINK THERE'S A BIG ISSUE WITH THEIR ABILITY TO PROVE A

SUBSTANTIAL LIKELIHOOD.  I THINK THIS IS GOING TO REQUIRE, YOUR

HONOR, SOME EXPERT TESTIMONY.  IT'S NOT LIKE HE'S SELLING CARS

FOR ONE COMPANY AND SELLING CARS FOR ANOTHER.  THESE ARE

DIFFERENT PRODUCTS, AS WE'VE TALKED ABOUT, SO I THINK IT'S VERY

IMPORTANT THAT, YOU KNOW, THAT THERE BE ALLOWED SOME TESTIMONY

1  TO BE PRESENTED IN FRONT OF THE COURT.  IN ADDITION TO ALL THESE

2  OTHER ISSUES THAT I'VE RAISED, WHICH, AGAIN, YOUR HONOR, I

3  THINK -- I THINK IT'S VERY CLEAR AND INSTRUCTIVE FROM THESE

4  CASES THAT THERE'S A BIG PROBLEM NOT ONLY WITH THE LANGUAGE OF

5  THE NON-COMPETE AGREEMENT, BUT WITH THE IMPLICATIONS, ESPECIALLY

6  IN A CASE LIKE THIS, OF LETTING THEM DRAFT A COVENANT LIKE THIS

7  AND THEN NARROWING IT DOWN.

8      SO THE LAST THING I'LL MENTION, YOUR HONOR, JUST KIND OF IN

9  CONSIDERATION OF THE IRREPARABLE HARM AND THE BALANCE OF

10  EQUITIES AND THE PUBLIC POLICY AND THE LIKE, THE MACGINNITIE VS.

11  HOBBS CASE, VERY SEMINOLE DECISIONS.  AND IT TALKS ABOUT THE

12  FACT THAT THE IMPOSITION OF UNENFORCEABLE COVENANTS CAUSES

13  IRREPARABLE HARM IN THE FORM OF LOST OPPORTUNITIES.

14      SO IT -- I WOULD ASK THE COURT TO KIND OF LOOK AT -- LOOK

15  AT NOW OUR CROSS MOTION IN THIS SITUATION.  THE -- I DON'T CARE

16  HOW MUCH MONEY MR. TORNQUIST MADE, BUT IF HE'S GOING TO LOSE

17  OPPORTUNITIES AND CUSTOMERS AND THINGS LIKE THAT, THAT IS AN

18  IRREPARABLE HARM THAT HE WOULD SUFFER IF THIS UNENFORCEABLE

19  NON-COMPETE PROVISION WAS SOMEHOW ENFORCED BY INJUNCTIVE RELIEF

20  AGAINST HIM.

21      THE COURT IN MACGINNITIE, YOU ALSO HAD THAT THE HARM TO

22  EMPLOYEE IN SUCH CIRCUMSTANCES IS FROM LAWFUL COMPETITION WHICH

23  IS PART AND PARCEL OF A -- OF A COMPETITIVE ECONOMY.  LOSS OF

24  BUSINESS DUE TO FREE AND FAIR COMPETITION IS -- NO HARM.  AND

25  THE COURTS -- THIS COURT AND MANY OTHER GEORGIA STATE COURTS

1    HAVE NOT HESITATED IN THE PAST TO GRANT INJUNCTIVE RELIEF TO AN

2    EMPLOYEE TO PREVENT ACTION ESPECIALLY IN LIGHT OF UNENFORCEABLE

3    RESTRICTIVE COVENANTS OF THIS NATURE, YOUR HONOR.  SO JUST IN

4    CONCLUSION OF THAT ARGUMENT, YOUR HONOR, I KNOW YOU WANT TO MOVE

5    ON --

6              THE COURT:  WELL, AND LET ME TELL YOU TOO,

7    MR. ROBERTS, IS THAT I HAVE READ AND WILL READ AND LOOK AT ALL

8    THESE CASES IN THE BRIEFS.  SO SOME OF THIS IS NOT THAT I'M NOT

9    GOING TO LISTEN AND GO BACK OVER IT.  IT'S JUST THAT WHEN I DO

10   THAT, I ALWAYS HAVE MORE QUESTIONS IN CERTAIN AREAS THAN OTHERS.

11   SO IT'S NOT THAT I'M NOT INTERESTED IN HEARING ABOUT THAT.  IT'S

12   JUST CERTAIN AREAS IN THE BRIEFS AND THE LAW, I CAN GO BACK AND

13   READ THAT AND I'M VERY COMFORTABLE.  IT'S JUST THESE FACTUAL

14   ISSUES THAT TO SOME EXTENT WERE MUCH MORE CONFUSING TO ME AND

15   WHAT THESE PRODUCTS DID AND WHAT HE WAS GOING TO DO IN HIS JOB.

16             MR. ROBERTS:  RIGHT.

17             THE COURT:  SO IT'S NOT THAT I'M NOT INTERESTED IN THE

18   ARGUMENTS.  IT'S JUST IN TERMS OF OUR TIME IN THE HEARING, THAT

19   WAS THE STUFF THAT I COULD NOT GET FROM WHAT I HAD IN FRONT OF

20   ME AND I WAS EXTREMELY CONFUSED ABOUT.  SO IT'S MORE JUST TRYING

21   TO FOCUS THE TIME ON THE STUFF THAT I REALLY NEED YOUR HELP

22   ON --

23             MR. ROBERTS:  SURE.

24             THE COURT:  -- AND LESS THAT I'M NOT INTERESTED IN

25   THOSE UNDERLYING ISSUES --

1          MR. ROBERTS:  SURE.

2          THE COURT:  -- BECAUSE I AM.  BUT I CAN GO BACK AND

3    READ ALL THE CASES.

4          MR. ROBERTS:  OKAY.  AND I UNDERSTAND, YOUR HONOR.

5    AND I -- YOU KNOW, I -- I DIDN'T ADDRESS THE CONSTITUTIONAL

6    ARGUMENT.  I THINK WE'VE PROBABLY PRESERVED THAT ISSUE.

7          THE COURT:  AND YOU'VE DONE A LOT IN YOUR BRIEFING IN

8    THAT.

9          MR. ROBERTS:  OKAY.  I KNOW WE DID A LOT ON IT, BUT,

10   AGAIN, I -- I WOULD -- I WOULD RESPECTFULLY REQUEST THE COURT TO

11   REALLY TAKE A LOOK AT THIS -- THIS ISSUE OF OVERBREADTH, THE

12   REQUIREMENTS OF THE STATUTE THAT THERE BE THIS GOOD FAITH

13   ESTIMATE, THE FACT THAT THERE WAS CLEAR OVER-REACHING HERE, THE

14   FACT THAT I AM OBVIOUSLY VERY -- TRYING TO RESPECTFULLY --

15   ADAMANT ABOUT THE FACT THAT THE COURT CAN'T DO WHAT THE COURT

16   SUGGESTED EARLIER IT THOUGHT IT COULD, THAT IS, TAKE THIS

17   TERRITORY AND WHITTLE IT DOWN TO MINNESOTA.  I WOULD ASK THE

18   COURT TO CONSIDER THE IMPLICATIONS OF THAT, WHAT WOULD THAT

19   MEAN, YOU KNOW, WHAT WOULD -- WHAT WOULD BE THE IMPACT OF A

20   DECISION LIKE THIS.  GEORGIA IS -- I MAKE A LIVING -- YOU KNOW,

21   I TELL LAWYERS FROM OTHER STATES THAT THIS IS ALL I DO, IS

22   NON-COMPETE WORK.  AND THEY SAY, WELL, THERE'S ENOUGH, YOU KNOW,

23   CASES LIKE THAT, AND THERE IS.  BUT THIS IS A -- THIS IS A VERY

24   LITIGIOUS STATE AS IT RELATES TO NON-COMPETE AGREEMENTS.  WE'VE

25   GOT PLENTY OF THEM.  AND PUTTING THE BURDEN ON AN EMPLOYEE BY

1  ALLOWING COMPANIES TO COME IN WITH A GUY THAT LIVES IN MINNESOTA

2  AND ALLOWING COMPANIES TO COME IN AND DRAFT AN AGREEMENT UNDER

3  GEORGIA LAW THAT SAYS HE CAN'T WORK IN (VERBATIM) ANYWHERE IN

4  THE COUNTRY AND THEN SUING HIM IN A GEORGIA COURT AND MAKING HIM

5  COME DOWN FROM MINNESOTA WHEN YOU HAVE A NON-COMPETE THAT SAYS

6  THE ENTIRE COUNTRY, AND THEN FORCING HIM TO TRY TO CONVINCE THE

7  COURT THAT THAT'S OVERBROAD, I JUST THINK THAT'S A REAL PROBLEM,

8  YOUR HONOR.  SO THIS COURT HAS WHAT I BELIEVE FIRST AND FOREMOST

9  THE OBLIGATION RESPECTFULLY UNDER THE STATUTE THAT THIS THING

10 CAN'T BE FIXED.  IT JUST --

11         THE COURT:  I GET YOUR POINT.

12         MR. ROBERTS:  AND THEN, SECONDLY, YOUR HONOR, EVEN IF

13 THE COURT BELIEVES THAT IT COULD, I WOULD ASK THE COURT TO

14 EXERCISE ITS DISCRETION NOT TO DO THAT.

15         THE COURT:  OKAY.

16         MR. ROBERTS:  THANK YOU, YOUR HONOR.

17         THE COURT:  THANK YOU.  AND JUST ONE QUESTION BEFORE I

18 INTERRUPT YOU IN YOUR ARGUMENT.  ARE YOU DISAGREEING WITH

19 MR. TORNQUIST IN THAT HE SAID THAT HE ONLY SOLD MIMEDX PRODUCTS

20 THAT HAD TO DO WITH WOUND CARE?

21         MR. WARGO:  WE ARE NOT DISAGREEING WITH THAT.

22         THE COURT:  OKAY.  THANK YOU.

23         MR. WARGO:  THANK YOU, YOUR HONOR.  I WILL NOT ASK FOR

24 EQUAL TIME.

25         THE COURT:  OKAY.  THAT'S FINE.

1          MR. WARGO:  YOUR HONOR, I'LL KEEP IT BRIEF.  I DO WANT

2    TO -- I'M NOT GOING TO TALK ABOUT THE ARGUMENT THAT WE JUST

3    HEARD A LOT ABOUT, ONLY TO PROVIDE AN ADDITIONAL CITE.

4    13-8-54(B) ALSO PROVIDES THE COURT AUTHORITY TO -- EXCUSE ME,

5    YOUR HONOR -- TO MODIFY.  AND I'M NOT GOING TO REALLY TALK MUCH

6    ABOUT THAT.  YOUR HONOR, I THINK THAT YOU'RE ON TO THE RIGHT

7    ANSWER THERE.  AND I'M GOING TO PROCEED WITH WHAT YOU'VE

8    INDICATED IS YOUR CONCERN, THE SCOPE OF RESPECTFULLY ANY

9    INJUNCTION THAT MAY ISSUE.  YOUR HONOR, WE THINK THAT'S AN EASY

10   ANSWER HERE BECAUSE --

11          THE COURT:  AND I WILL TELL YOU THAT I HAVE NOT IN ANY

12   TERMS DETERMINED THAT THERE WILL BE AN INJUNCTION, BUT, YES,

13   THAT'S SOMETHING TO ADDRESS.

14          MR. WARGO:  I UNDERSTAND.  YOU'VE BEEN VERY CLEAR

15   ABOUT THIS -- THAT THAT IS AN ISSUE THAT YOU HAVE --

16          THE COURT:  RIGHT.

17          MR. WARGO:  -- AS OPPOSED TO PERHAPS SOME OF THE OTHER

18   ISSUES THAT HAVE BEEN BRIEFED.  I DIDN'T MEAN IN ANY WAY TO

19   SUGGEST YOU'VE MADE THE DETERMINATION.  YOUR HONOR, THE

20   NON-COMPETITION AGREEMENT SETS FORTH WHAT THE SCOPE HERE WOULD

21   BE.  I'M NOT GOING TO READ IT AGAIN BECAUSE IT'S ALREADY IN THE

22   BRIEFS, BUT IT'S VERY CLEAR WHAT THAT SCOPE IS.  AND WE HAVE

23   PROVIDED SWORN EVIDENCE FROM A PH.D AND ALSO FROM ANOTHER

24   EMPLOYEE OF OURS SWEARING TO YOU THAT PRODUCTS THAT PREDICTIVE

25   TECHNOLOGIES OFFERS FOR SALE ARE COMPETITIVE.  WHAT WE HAVE

1  HEARD IN RESPONSE RESPECTFULLY TO MR. TORNQUIST IS, I'M NOT

2  SURE, I DON'T KNOW, I CAN'T QUARREL WITH MR. KOOB BECAUSE I'M

3  NOT AS ADVANCED IN THE PH.D ANALYSIS AS HE IS.

4      YOUR HONOR, THAT'S NOT EVIDENCE.  WHAT I HOPE I PROVED IN

5  MY CROSS-EXAMINATION WAS THAT WHAT MR. TORNQUIST HAS DONE, HAS

6  TRIED TO MAKE DISTINCTIONS WITH NO DIFFERENCE.  WHEN YOU GO BACK

7  AND LOOK AT HIS TESTIMONY, YOU WILL SEE THAT EVERY SINGLE WAY HE

8  TRIED TO DISTINGUISH THE PRODUCTS HE WANTS TO SELL FROM THE

9  PRODUCTS THAT HE HAS SOLD AND ARE THE SUBJECT TO OUR

10 NON-COMPETITION AGREEMENT, THEY ARE DISTINCTIONS WITH NO

11 DIFFERENCE.

12      THE COURT:  WELL, AND I THINK IT'S NOT ENTIRELY THE

13 ENTIRETY OF HIS TESTIMONY BECAUSE I THINK IF YOU LOOK AT THE

14 NON-SOLICITATION, IT SAYS THAT IT CAN ONLY BE ENFORCED SO AS TO

15 PREVENT UNFAIR COMPETITION.  AND WHAT I HEAR FROM MR. TORNQUIST

16 IS THAT MAYBE HE DOESN'T UNDERSTAND THE ENTIRETY OF THIS PRODUCT

17 LINE IN SOME RESPECTS, BUT HE DOES KNOW WHAT HE WILL DO AND WHAT

18 HE IS GOING TO MARKET, PERSONALLY MARKET THE PRODUCTS FOR.  AND

19 IF HE IS PERSONALLY NOT MARKETING ANY OF THESE PRODUCTS FOR

20 WOUND CARE, THEN WHY IS THERE GOING TO BE UNFAIR COMPETITION IF

21 HE KNOWS WHAT HE IS GOING TO DO?

22      MS. MCGINNIS:  SURE.  THE ANSWER TO THAT IS BECAUSE

23 THE INJUNCTION WE SEEK IS BASED IN THE CONTRACT.  OKAY.  IT'S

24 NOT BASED IN WHAT HE THINKS HE'S GOING TO DO.

25      THE COURT:  RIGHT.  BUT THERE CAN ONLY BE HARM IF HE

1  IS IN FACT GOING TO DO THIS.

2          MR. WARGO:  NO QUESTION, YOUR HONOR, AND THAT'S WHY

3  THE INJUNCTION WE SEEK MERELY SAYS, FOLLOW THE RESTRICTIVE

4  COVENANT.  IF HE GOES OUT AND SELLS TWINKIES, WE DON'T HAVE A

5  PROBLEM WITH THAT.  IF HE SELLS TWINKIES -- THAT'S AN OLD ONE, I

6  GUESS -- TO DOCTORS AT HOSPITALS WHERE HE WAS BEFORE, THAT'S NOT

7  A PROBLEM.  OKAY.  BUT TO THE EXTENT THAT HE SELLS FOR LAY

8  PEOPLE LIKE YOU AND I STUFF AS DESCRIBED IN THE NON-COMPETE,

9  THAT'S A PROBLEM.  YOU'RE NOT GOING TO BE THERE, YOUR HONOR,

10 LOOKING OVER HIS SHOULDER EVERY TIME HE'S SELLING A TWINKIE

11 VERSUS A NON-TWINKIE.  SO MY POINT IS HE HAS NOT MADE ANY KIND

12 OF DISTINCTION BETWEEN WHAT HE'S HOPING TO SELL, AS HE PUT

13 CRYSTAL CLEAR, YOUR HONOR, HIS TESTIMONY -- THE TRANSCRIPT WILL

14 SHOW THIS -- HE IS HOPING TO CALL ON OUR CUSTOMERS.  THAT'S WHAT

15 HE SAID.  HE'S NOT SELLING THEM TWINKIES, YOUR HONOR.  WHAT WE

16 ARE TRYING TO PREVENT, AND WE BELIEVE RESPECTFULLY, YOUR HONOR,

17 WE ARE ENTITLED TO, IS AN INJUNCTION SAYING, YOU CAN'T SELL THE

18 STUFF THAT IS SET FORTH IN THE RESTRICTIVE COVENANT.

19         THE COURT:  BUT I THINK THERE IS A PROBLEM WITH THAT

20 DEFINITION BEING POTENTIALLY -- OR IT'S CERTAINLY NOT PROVED

21 THAT THAT DEFINITION IS NOT OVERLY BROAD BECAUSE IT DOES

22 ENCOMPASS AREAS IN WHICH HE DID NOT ON WORK.  AND I GUESS

23 GETTING BACK TO KIND OF THE POINT, DO YOU HAVE A PROBLEM WITH

24 HIM SELLING THESE COMPETITOR PRODUCTS FOR USES THAT YOUR

25 PRODUCTS JUST DON'T DO?

1        MR. WARGO:  YES, YOUR HONOR.

2        THE COURT:  AND WHY IS THAT GOING TO HARM YOU?

3        MR. WARGO:  YOUR HONOR, IT'S GOING TO HARM US BECAUSE

4   IT'S SET FORTH IN THE AFFIDAVIT OF MR. LILLY.  THESE PRODUCTS

5   ARE DIRECTLY COMPETITIVE WITH OURS.  IT DOESN'T MATTER -- I

6   MEAN, YOU HEARD THE TESTIMONY.  THEY DON'T DO WOUND CARE.  WELL,

7   YOU'LL SEE WHEN YOU GET BACK TO A COMPUTER, THEIR PRODUCT SAYS

8   IT'S -- COULD BE USED FOR WOUND CARE.  AND WHEN PRESSED, THE

9   RESPONSE IS, WELL, MAYBE POSSIBLY.  OKAY.  SO THAT'S WHY YOUR

10  HONOR'S ORDER HAS TO BE CLEAR.  IT HAS TO BE BASED IN THE ONLY

11  THING WE HAVE HERE, WHICH IS THE CONTRACT.  NOW, IF SUBSEQUENT

12  DISCOVERY DETERMINES THAT HE TOOK A RISK AND HE STARTED SELLING

13  PRODUCTS TO CERTAIN OF OUR CUSTOMERS, THEN WE HAVE A PROBLEM

14  WITH THE ORDER.  MY POINT TO YOU IS WE HAVE TO DRAW BRIGHT LINES

15  HERE.  WHERE DO YOU FIND THOSE BRIGHT LINES?  YOU FIND THOSE

16  BRIGHT LINES IN EVIDENCE.  WHAT EVIDENCE DO YOU HAVE BEFORE YOU?

17  THE EVIDENCE YOU HAVE, YOUR HONOR, BEFORE YOU RESPECTFULLY IS

18  THE EVIDENCE OF MR. LILLY WHICH IS UNCONTROVERTED.  HE TRIED TO

19  CONTROVERT MR. LILLY'S EVIDENCE BY SAYING, WELL, IT'S FROZEN,

20  IT'S PACKAGED DIFFERENTLY, IT'S USED WITH WOMEN.  YOUR HONOR,

21  NONE OF THAT IS A DISTINCTION WITH A DIFFERENCE.  THE ONLY THING

22  THAT MATTERS IS WHAT THE COVENANT SAYS.  THE COVENANT SAYS YOU

23  CAN'T DO THIS.

24      NOW, IF HE GOES OFF AND DOES IT, WE'RE BACK HERE AGAIN.

25  BUT WHEN YOU TRY TO DRAW LINES AND DISTINCTIONS THAT EVEN HE

1  COULDN'T TESTIFY TO, THAT'S WHERE YOUR HONOR'S GOING DOWN A

2  SLIPPERY SLOPE.

3      THE COURT:  BUT I THINK IT'S YOU THAT WANTS ME TO

4  REALLY DO THIS.  BECAUSE IF I WERE TO INSIST ON THE LANGUAGE AS

5  WRITTEN IN THE CONTRACT, THEN I THINK YOU LOSE BECAUSE I DO

6  THINK IT IS OVERBROAD AND DOES ENCOMPASS -- I THINK THIS

7  COLLAGEN BASED IS POTENTIALLY A PROBLEM FOR YOU IN THAT I DON'T

8  KNOW THAT YOU REALLY CAN RESTRICT HIM FROM SELLING ANYTHING THAT

9  HAS ANY KIND OF BIOLOGIC COMPONENT, OR DO YOU THINK THAT YOU

10  CAN?

11      MR. WARGO:  WELL, YOUR HONOR, I APPRECIATE WHAT YOU'RE

12  SAYING, BUT LET'S DEAL WITH THE FACTS AT HAND.  THE FACTS AT

13  HAND ARE NOT HYPOTHETICALS.  THEY'RE SET FORTH IN MR. LILLY'S

14  AFFIDAVIT AND THEY ARE UNCONTROVERTED TO THIS MOMENT EVEN AFTER

15  HIS TESTIMONY.  THE ONLY THING YOU HAVE BEFORE YOU AS A MATTER

16  OF EVIDENCE IS THAT THIS PRODUCT OF PREDICTIVE TECHNOLOGIES

17  COMPETES WITH OUR PRODUCT.

18      THE COURT:  BUT BACK TO THE COLLAGEN BASED, IS IT YOUR

19  OPINION, I MEAN, YOUR POSITION THAT HE SHOULD BE PREVENTED FROM

20  SELLING ANYTHING THAT HAS ANY COLLAGEN IN IT?

21      MR. WARGO:  YOUR HONOR, THE ANSWER FOR THAT IS

22  RIGHT -- THE ANSWER TO THAT IS, I WANT TO FOLLOW THE COVENANT.

23      THE COURT:  SO, YES.

24      MR. WARGO:  THE ANSWER IS, YES, BUT YOU KNOW WHAT, YOU

25  DON'T HAVE TO GO THERE.

1          THE COURT:  I KNOW.  BUT IS THAT WHAT YOU'RE ASKING ME

2  TO DO?

3          MR. WARGO:  YES, YOUR HONOR.

4          THE COURT:  ARE YOU SAYING THAT THAT IS THE WAY THIS

5  SHOULD BE READ?

6          MR. WARGO:  OUR ORDER, OUR REQUESTED ORDER IS LIFT THE

7  LANGUAGE FROM HIS CONTRACT THAT HE AGREED TO.  THAT IS THE

8  COVENANT.  NOW, IF YOU WANT TO MAKE THAT MORE NARROW, YOU CAN'T

9  SELL THE PRODUCT THAT'S SOLD BY PREDICTIVE TECHNOLOGIES.  WHY?

10  TO THIS MOMENT, YOUR HONOR, IT IS UNCONTROVERTED THAT THAT

11  PRODUCT COMPETES WITH OUR PRODUCT.  THAT'S WHY HE'S GOING THERE.

12  HE'S NOT GOING TO A JANITORIAL SERVICE.  HE'S GOING TO A COMPANY

13  TO COMPETE AGAINST US, AS HE SAID UNDER OATH, I'M HOPING TO CALL

14  ON THESE DOCTORS WHO I'VE BEEN INTRODUCED TO BY MIMEDX.  AND,

15  YOUR HONOR, ONE OF THE CORE THINGS HERE, AND I'M GOING TO GET TO

16  THAT -- TO A MOMENT, HE CALLS THOSE HIS CUSTOMERS.  THAT'S

17  REALLY THE CORE OF THE PROBLEM HERE.  THEY'RE OUR CUSTOMERS.  SO

18  HE ADMITTED TO YOU, YOUR HONOR, HIS BAD CONDUCT.  YOU WANT

19  IRREPARABLE HARM?  YOU WANT THE BULLDOZER ABOUT TO KNOCK OVER

20  THE TREE?  HE GAVE IT TO US.  HE SAID FROM THE STAND, AND I

21  BELIEVE IT'S A QUOTE, I AM HOPING TO CALL ON MY FORMER, MY

22  FORMER CUSTOMERS.

23          THE COURT:  BUT YOU'VE SAID THAT HE CAN DO THAT AS

24  LONG AS HE DOESN'T SELL THEM A COMPETITOR PRODUCT.

25          MR. WARGO:  THAT'S RIGHT, YOUR HONOR.  WE HAVE A

1  COUPLE OF STEPS HERE.

2          THE COURT:  SO THAT'S NOT A PROBLEM.

3          MR. WARGO:  OH, IT IS A PROBLEM IF THAT'S STEP ONE.

4  STEP TWO, ARE YOU SELLING THEM TWINKIES, OR ARE YOU SELLING THEM

5  STUFF THAT YOU SAID YOU WOULDN'T?  SO WE HAVE -- WE HAVE A

6  COUPLE DIFFERENT STEPS HERE.

7          THE COURT:  RIGHT.  I MEAN, THE FACT THAT HE'S

8  SELLING -- I MEAN, YOU SEEM TO BE SAYING THAT HE CAN'T SELL

9  ANYTHING TO THE V.A.

10          MR. WARGO:  NO, NO, NO.  HE CAN SELL TWINKIES.

11          THE COURT:  RIGHT.

12          MR. WARGO:  AND WHAT WE'VE IDENTIFIED BECAUSE ONLY

13  YESTERDAY WE HEARD ABOUT PREDICTIVE TECHNOLOGIES.  WE'VE

14  IDENTIFIED FROM THEIR WEBSITE PRODUCTS, AND WE HAVE TWO

15  AFFIDAVITS IN LESS THAN 24 HOURS THAT CLEARLY STATE THESE ARE

16  COMPETITIVE PRODUCTS UNDER THE COVENANT HE AGREED TO.

17          THE COURT:  SO I THINK THAT THE RUB WE HAVE IS THAT --

18  I UNDERSTAND YOUR POSITION THAT THEY'RE COMPETITIVE PRODUCTS,

19  AND BUT THEY DON'T HAVE TO BE COMPETITIVE PRODUCTS.  THEY CAN BE

20  USED FOR DIFFERENT THINGS.  AND SO HE HAS PROVIDED TESTIMONY

21  THAT HE WILL NOT BE SELLING THEM FOR THE SAME THINGS THAT HE

22  WORKED WITH HIS -- THAT'S THE POINT THAT I REALLY THINK YOU NEED

23  TO ADDRESS.  BECAUSE THEY ARE COMPETITIVE PRODUCTS, BUT HE IS

24  NOT GOING TO BE SELLING THEM IN THE SAME SPACE, WAS THE

25  TESTIMONY I HEARD HIM SAY.

1          MR. WARGO:  YOUR HONOR, RESPECTFULLY I DID NOT HEAR

2    HIM SAY THAT.

3          THE COURT:  WELL, LET'S GO WITH THE IDEA THAT HE DID

4    SAY THAT.

5          MR. WARGO:  WHAT I DID HEAR IS A DISTINCTION, WAS

6    WOUND CARE.  IN FACT WHEN HE CAME UP HERE AND STATED, I ASSUME

7    STILL UNDER OATH FROM HERE, THAT -- YOU ASKED HIM THE QUESTION,

8    RIGHT, ABOUT WHAT PRODUCTS ARE NOT COLLAGEN PRODUCTS.

9          THE COURT:  RIGHT.  BUT I'M NOT TALKING ABOUT THE

10   COLLAGEN.  I'M TALKING ABOUT THE SPACE.

11         MR. WARGO:  THE USE.

12         THE COURT:  YES.

13         MR. WARGO:  YES, YOUR HONOR.  THE TESTIMONY WILL BE

14   REFLECTED IN THE RECORD.  HE TALKED ABOUT, WELL, WOUND PRODUCTS.

15   HE TALKED ABOUT THAT THEY WERE -- HE WAS GOING TO BE -- HE HAD

16   BEEN SELLING WOUND PRODUCTS, HEALING PRODUCTS, THAT'S WHAT WE

17   SELL, AND THAT THESE PRODUCTS CAN BE USED FOR WOUNDS.

18         THE COURT:  BUT HE WILL NOT BE SELLING THEM FOR THAT

19   PURPOSE.

20         MR. WARGO:  AND ARE YOU GOING TO BE STANDING THERE

21   WHEN HE'S TALKING TO THE SAME DOCTORS WHO ARE OUR CUSTOMERS

22   SELLING ALL OF THAT MATERIAL?  THIS IS WHY IT'S A

23   STRAIGHTFORWARD INJUNCTION.  DON'T SELL STUFF THAT IS

24   COMPETITIVE AS YOU AGREE TO UNDER YOUR COVENANT.  AND WHAT WE

25   HAVE HERE, YOUR HONOR -- LET ME TAKE A STEP BACK HERE.  THIS

1  ISN'T SOAPBOX STUFF.  THIS IS REAL LIFE.  WE REPRESENT A PUBLIC

2  COMPANY WITH THOUSANDS OF SHAREHOLDERS.  I'M GOING TO TAKE ISSUE

3  RESPECTFULLY, YOUR HONOR, WITH SOMETHING YOU SAID EARLIER, THE

4  PAST PALINGEN SALES.  YOUR HONOR, THAT'S A REALLY BIG FACT IN

5  THIS CASE EVEN THOUGH IT'S IN THE PAST.  WE HAVE A GENTLEMAN

6  HERE WHO IS A DEFENDANT WHO YOU ARE TRYING TO LOOK AT, WELL,

7  MAYBE HE'S GOING TO DO THIS, MAYBE HE'S GOING TO DO THAT.  THIS

8  PERSON, WHILE EMPLOYED BY US, WHILE MAKING ADMITTEDLY A

9  SIGNIFICANT SUM OF MONEY, SOLD COMPETITIVE PRODUCT.  HE WAS

10  EMPLOYED BY US.  WE PAID HIM A SALARY.  WE PAID HIM A

11  COMMISSION.  WE TRAINED HIM.  WE INTRODUCED HIM TO OUR

12  CUSTOMERS, OUR CUSTOMERS.

13       YOUR HONOR, IF YOU WORK FOR HERTZ AND SOMEONE CAME TO YOU

14  AND SAID, CAN I GET AN AVIS?  THAT'S WHAT HE DID.  HE SOLD TWO

15  PALINGEN PRODUCTS, GOT PAID FOR THOSE IN COMMISSION WHILE HE WAS

16  WORKING WITH US.  ARE WE NERVOUS THAT HE'S GOING TO CROSS THE

17  LINE?  YES, YOUR HONOR, WE ARE.  WHEN YOU GET PAID BY HERTZ AND

18  YOU SELL AVIS, YOU'D BE FIRED.  AND THAT'S WHAT HE ADMITS HE DID

19  IN AN AFFIDAVIT.

20            THE COURT:  RIGHT.  AND I UNDERSTAND ALL THE ARGUMENTS

21  ON THAT.

22            MR. WARGO:  MY POINT HERE, YOUR HONOR, IRREPARABLE

23  HARM.  WE REPRESENT A PUBLIC COMPANY.  IF YOU START TO PARSE

24  THIS THE WAY YOU'RE SUGGESTING, YOU CAN SAY GOOD-BYE TO HOW WE

25  ENFORCE COVENANTS WITH OUR SALES PEOPLE BECAUSE THEN EVERYONE'S

1    GOING TO BE RUSHING INTO COURT SAYING, I DON'T HAVE TO FOLLOW

2    THE AGREEMENT I SIGNED.  I'M GOING TO FIND A JUDGE WHO'S GOING

3    TO LISTEN TO A SOB STORY THAT'S GOING TO SAY, OH, THESE PRODUCTS

4    ARE A LITTLE DIFFERENT.  THERE'S NO EVIDENCE THEY'RE DIFFERENT

5    AND THE ONLY EVIDENCE WE HAVE IS THEY'RE COMPETITIVE.  BUT I'M

6    GOING TO FIND A JUDGE WHO'S GOING TO TAKE PITY ON ME AND IS

7    GOING TO START TO MAKE DISTINCTIONS THAT WERE NOT RAISED IN

8    THEIR BRIEF.  SO YOU ASKED THE QUESTION, WELL, ISN'T SOME OF

9    THIS OVERBROAD?  IT AIN'T IN THE BRIEF, YOUR HONOR.

10            THE COURT:  WELL, I THINK WE'RE ASKING FOR

11   EXTRAORDINARY RELIEF AT A T.R.O.

12            MR. WARGO:  ABSOLUTELY.

13            THE COURT:  SO THERE IS MORE LEEWAY ABOUT WHAT I ALLOW

14   IN A HEARING GIVEN WHAT IT IS YOU'RE ASKING FOR.

15            MR. WARGO:  NO QUESTION, YOUR HONOR.  I WOULD BE

16   ASKING THE SAME QUESTION AS YOU.  BUT WHEN YOU TURN THAT PAGE,

17   WHEN YOU SCRATCH OFF THE SCRATCH THING AND YOU LOOK AT WHAT THE

18   EVIDENCE IS, THEY DIDN'T PROVIDE YOU ANY.  IT'S JUST, TRUST ME,

19   YOUR HONOR, I'M NOT GOING TO DO WITH THIS CLEARLY COMPETITIVE

20   PRODUCT BASED ON TWO AFFIDAVITS AND ON CROSS NO DISTINCTION.  HE

21   DID NOT UNDERCUT OUR AFFIDAVITS, YOUR HONOR.

22            THE COURT:  OKAY.  I GET YOUR --

23            MR. WARGO:  YOU FOLLOW WHAT I'M SAYING?

24            THE COURT:  YES.  YOU CAN NOT BE SO ANGRY ABOUT IT.

25            MR. WARGO:  WELL, I AM EMOTIONAL ABOUT IT, YOUR HONOR,

BECAUSE WE'RE DEALING WITH HERE -- YOU KNOW, THERE'S A LITTLE

SOAPBOX ON BOTH SIDES HERE.  OKAY.  AND WHAT WE'RE DEALING WITH

HERE IS A COMPANY THAT HAS A LOT OF SALES PEOPLE MAKING A LOT OF

SALES TO OUR CUSTOMERS.  AND IF WE START TO MAKE THESE KIND OF

DISTINCTIONS, WE'RE TOAST.  AND IT IS NOT FAIR TO OUR COMPANY

BECAUSE HE AGREED TO THIS COVENANT AND HE'S PROVIDED YOU NO

EVIDENCE OF RECORD OTHER THAN SPECULATION ABOUT WHAT I THINK MAY

BE PERCENTAGE-WISE COLLAGEN OR NOT.  AND THAT'S WHY WE'RE JUST

ASKING YOU TO ENFORCE WHAT HE AGREED TO AND BASED ON THAT THE

INVESTMENT THAT OUR COMPANY HAS MADE IN TEACHING AND TRAINING

HIM AND WHAT THE SHAREHOLDERS OF OUR COMPANY EXPECT.  THEY

EXPECT US TO PRESERVE OUR CUSTOMER RELATIONSHIPS.  HOW DO WE DO

THAT?  WE STOP PEOPLE FROM GOING TO OUR CURRENT CUSTOMERS AND

HOPING TO SELL TO THEM AGAIN.  THAT -- THIS IS ALL WE HAVE

AVAILABLE TO US, COMING TO YOUR HONOR SAYING, MAKE HIM STOP.  WE

KNOW HE WAS A BAD GUY WHEN HE WORKED FOR US.  WE'VE PROVEN THAT

TO YOU, HERTZ AND AVIS.  WE HAVE IRREPARABLE HARM THAT WE'RE

STARING RIGHT IN THE -- IN OUR EYES -- EYE TO EYE.  HE ALREADY

TOOK THE JOB.

            THE COURT:  OKAY.  LET'S MOVE ON TO YOUR NEXT POINT.

I GET THAT POINT.

            MR. WARGO:  THANK YOU, YOUR HONOR.  SO I DID MAKE THE

POINT THAT THIS IS WHAT -- THE DISTINCTIONS HE TRIED TO MAKE UP

THERE WERE WITHOUT A DIFFERENCE WITH REGARD TO THE ACTUAL

COVENANT AT ISSUE.  AND THAT'S WHY BASED ON THE UNDISPUTED

1   TESTIMONY WE ASK THAT YOU ENFORCE THAT ENTIRELY.

2       YOUR HONOR, THE LAST POINT IS YOU MADE A COMMENT, AND I --

3   MAYBE I MISHEARD IT, SOMETHING ABOUT, YOU KNOW, EVIDENCE OF HARM

4   FROM OUR TRADE SECRET USE.  RESPECTFULLY, YOUR HONOR --

5       THE COURT:  NO.  I'M TALKING ABOUT IRREPARABLE HARM IN

6   THE RECORD FOR AN INJUNCTION.

7       MR. WARGO:  YES, AND WE HAVE THAT.  WE HAVE THAT IN

8   AFFIDAVIT FORM.  IN THE LILLY AFFIDAVIT HE SAYS WITH THAT

9   INFORMATION THAT MR. TORNQUIST HAS, HE CAN USE THAT TRADE SECRET

10  INFORMATION.  AND I WANT TO BE CLEAR THEY'VE NEVER DISPUTED

11  THESE ARE TRADE SECRETS, THAT THEY PROVIDE VALUE TO US, THAT

12  WE'VE PRESERVED THEM CORRECTLY.  SO THAT'S ALL -- WE'VE PROVEN

13  THAT.  OKAY.  SO --

14      THE COURT:  HOW IS HE INTENDING -- I'VE SEEN NOTHING

15  EXCEPT FOR IN TERMS OF HIS USE OF TRADE SECRETS HIM SAYING THAT

16  HE'S NOT GOING TO DO IT.  SO I DON'T SEE THAT THERE'S ANY ISSUE

17  HERE ABOUT HIS INTENT IN THE FUTURE TO USE YOUR COMPANY'S TRADE

18  SECRETS.

19      MR. WARGO:  YES, YOUR HONOR, AND THERE IS THAT IN THE

20  RECORD.  OKAY.  BUT WHAT WE HAVE HERE IS UNDISPUTED.  HE HAS

21  EVIDENCE OF OUR SALES, OF OUR DATA.  HE ALSO KNOWS THE HISTORY

22  FROM RECORDS THAT WE'VE PROVIDED, FROM TRAINING WE'VE PROVIDED,

23  FROM US PUTTING HIM INTO THE POSITION OF SELLING INTO THESE

24  HOSPITALS.  HE KNOWS HOW MUCH PRODUCT THEY WANT, HOW MUCH THEY

25  NEED, HOW MUCH THEY USE.  THESE COME IN SIZES.  THERE'S SMALL,

BIG, LARGE, EXTRA LARGE.  WHAT KIND OF PRODUCT?  IS IT THE

INJECTABLE?  IS IT THE NON-INJECTABLE?

     THE COURT:  BUT HE DOESN'T HAVE ACCESS TO ANYTHING

ANYMORE EXCEPT FOR WHAT'S IN HIS HEAD; CORRECT?

     MR. WARGO:  THAT WHICH IS PROTECTABLE.

     THE COURT:  RIGHT.  BUT I'M --

     MR. WARGO:  AND THE DOCUMENTS.

     THE COURT:  HE DOES NOT HAVE ACCESS, CORRECT, TO ANY

TRADE SECRETS ANY LONGER OTHER THAN WHAT IS IN HIS HEAD?

     MR. WARGO:  NO, YOUR HONOR.  HE HAS MORE.  HE HAS

ACCESS TO -- HE TOLD YOU UNDER OATH THAT HE PULLED UP STUFF --

     THE COURT:  RIGHT, BUT HE SAID HE WOULD GIVE IT BACK

TO YOU IN HIS AFFIDAVIT.

     MR. WARGO:  OKAY.  WELL, YOU ASKED ME A QUESTION,

WHETHER HE HAS IT.

     THE COURT:  RIGHT, RIGHT.

     MR. WARGO:  AND HE DOES.

     THE COURT:  OKAY.  BUT OTHER THAN THE THINGS THAT HE

SAID HE WOULD GIVE BACK TO YOU, WHAT ELSE DOES HE HAVE?

     MR. WARGO:  IS THAT A TRICK QUESTION?

     THE COURT:  I DON'T KNOW.  I MEAN, HE SAID IN HIS

AFFIDAVIT.  I MEAN, HIS AFFIDAVIT SAID THAT HE WILL GIVE BACK.

I MEAN, IT SAID IN HIS AFFIDAVIT THAT HE'S GOING TO EITHER

DESTROY IT OR GIVE IT BACK, WHICHEVER ONE YOU WANT HIM TO DO.

     MR. WARGO:  YOUR HONOR, IF HE GIVES THEM BACK, HE

1   DOESN'T HAVE THEM ANYMORE.  I AGREE WITH THAT.

2            THE COURT:  OKAY.

3            MR. WARGO:  BUT RIGHT NOW HE HAS DOCUMENTS, AND WE

4   HAVE PROVEN OUR --

5            THE COURT:  LET ME ASK THE QUESTION.  DO YOU WANT THEM

6   BACK OR DO YOU WANT THEM DESTROYED?

7            MR. WARGO:  WE WANT THEM BACK.

8            THE COURT:  OKAY.  THAT ANSWERS THAT QUESTION.

9            MR. WARGO:  OKAY.  YOUR HONOR, NOW, GOING TO THE

10  WHAT'S IN HIS HEAD, AND THIS IS THE LAST POINT I'D LIKE TO MAKE,

11  UNLESS YOUR HONOR HAS ANYMORE QUESTIONS FOR ME.  YOUR HONOR, WHY

12  THIS IS IMPORTANT IS IF HE DIDN'T -- ON THE TRADE SECRET ISSUE,

13  HE HAS THINGS IN HIS HEAD THAT WE CAN PROTECT.  AND WHEN HE

14  WALKS INTO A HOSPITAL AND SEES JOHN SMITH WHO WE INTRODUCED HIM

15  TO AND HE KNOWS DR. JOHN SMITH, OR THE ADMINISTRATOR, IN THAT

16  HOSPITAL TRADITIONALLY HAS USED THIS MANY HUNDREDS IN THIS MONTH

17  OF THIS SIZE OF OUR PRODUCT, HE KNOWS WHAT TO SELL THAT DOCTOR.

18  SO WHAT DOES HE HAVE IN HIS HEAD?  INFORMATION.  IT IS TRADE

19  SECRET INFORMATION.  WE'VE PROVEN THAT AND THEY HAVEN'T DISPUTED

20  IT.  THAT MAKES HIM DIFFERENT FROM AN INDIVIDUAL WALKING OFF THE

21  STREET.  AN INDIVIDUAL WALKING OFF THE STREET WITH NO TRADE

22  SECRET INFORMATION DOESN'T KNOW WHO TO TALK TO, WHAT THEIR PAST

23  USE HAS BEEN, HOW BIG THOSE -- THOSE WOUND CARE PATCHES SHOULD

24  BE THAT THEY'VE USED HISTORICALLY, WHAT THEY NEED, WHAT THEIR

25  RATE IS OF CONSUMPTION.  THAT'S IN HIS HEAD.  HE KNOWS WHO TO

1   TALK TO AND HE KNOWS THAT DR. SMITH LOVES TO USE THE BIGGER

2   PACKAGES INSTEAD OF THE SMALLER PATCHES (VERBATIM).  SO HE'S

3   GOING TO GO AND TAKE THAT INFORMATION AND SPEAK TO THAT DOCTOR.

4   THIS IS WHERE THE RUBBER MEETS THE ROAD.  HE'S GOING TO GO TALK

5   TO THAT DOCTOR AND SAY, HEY, I'VE GOT A PRODUCT.  I'M AT

6   PREDICTIVE TECHNOLOGIES NOW, BUT IT CAN BE USED FOR WOUND CARE.

7           THE COURT:  BUT THAT SEEMS TO BE THE OTHER ARGUMENT.

8   IF HE GIVES BACK ALL OF THE TRADE SECRETS, HE GIVES BACK

9   EVERYTHING HE HAS, HE HAS NO ACCESS TO ANYTHING AND HE'S STILL

10  ALLOWED TO CALL ON THE V.A. AND SELL THEM ALL SORTS OF THINGS, I

11  MEAN, YOU CAN'T ERASE INFORMATION THAT'S IN HIS HEAD.  AND IF

12  HE'S SELLING THEM TWINKIES AND HE KNOWS THE GUY LIKES A BIGGER

13  PACK OF TWINKIES, THAT DOESN'T CAUSE YOU ANY UNFAIR COMPETITION

14  IF HE IS NOT SELLING IN YOUR SPACE THE TYPES OF THINGS THAT YOU

15  SELL.  SO THE TRADE SECRETS AS A STAND ALONE DOESN'T MAKE ANY

16  SENSE TO ME UNLESS IT'S REALLY JUST PARCEL OF THE OTHER

17  ARGUMENT.

18          MR. WARGO:  THE -- RESPECTFULLY, YOUR HONOR, THE ERROR

19  IN YOUR ANALYSIS RIGHT THERE IS THAT HE'S NOT SELLING IN THE

20  SAME SPACE.

21          THE COURT:  RIGHT.  BUT YOU SAID THAT SEPARATE AND

22  APART FROM THIS ISSUE THAT HE'S SELLING IN THE SAME SPACE, THAT

23  THERE IS A TRADE SECRET ISSUE THAT IS STILL PENDING.  AND IF HE

24  IS NOT SELLING IN THE SAME SPACE AT ALL, WHAT IS THE TRADE

25  SECRET ISSUE THAT'S STILL PENDING?

1          MR. WARGO:  I AGREE WITH YOU THAT IF HE'S SELLING

2  TWINKIES TO THESE DOCTORS AND HE'S ONLY SELLING TWINKIES, THE

3  TRADE SECRET ISSUE IS NOT IMPACTED.

4          THE COURT:  OKAY.

5          MR. WARGO:  BUT HERE THE UNDISPUTED EVIDENCE, YOUR

6  HONOR, IS THAT HE'S NOT SELLING TWINKIES.

7          THE COURT:  OKAY.  WELL, THAT MAKES SENSE THEN.  BUT I

8  THOUGHT YOU HAD A SEPARATE TRADE SECRETS ARGUMENT, AND I THINK

9  THAT HAS BEEN DEALT WITH IN THE AFFIDAVIT.

10          MR. WARGO:  UNDERSTOOD.  THAT'S WHY I WANTED TO

11  ADDRESS IT.

12          THE COURT:  OKAY.

13          MR. WARGO:  I STILL BELIEVE THAT WE HAVE A TRADE

14  SECRET ISSUE THAT REMAINS ENTIRELY UNREBUTTED BECAUSE THE

15  EVIDENCE OF RECORD THAT IS UNDISPUTED IS THAT THESE ARE

16  COMPETITIVE PRODUCTS AND HE'S HOPING TO GO TO THE SAME DOCTORS

17  AND SELL COMPETITIVE PRODUCT.  THAT'S THE RECORD BEFORE YOU,

18  YOUR HONOR.

19          THE COURT:  OKAY.

20          MR. WARGO:  THANK YOU FOR YOUR TIME, YOUR HONOR.

21          THE COURT:  YOU'RE WELCOME.

22          MR. ROBERTS:  YOUR HONOR, CAN I HAVE 90 SECONDS

23  BECAUSE OF A COUPLE OF ISSUES THAT GOT RAISED?

24          THE COURT:  90 SECONDS.

25          MR. ROBERTS:  PARDON ME.  FIRST OF ALL, YOUR HONOR,

1 TWINKIES HAVE COLLAGEN IN IT.  WE LOOKED IT UP.  TWINKIES HAVE

2 COLLAGEN IN THOSE.  THERE WAS A MISSTATEMENT SO -- SO I GUESS HE

3 CAN'T SELL TWINKIES.  THERE WAS A MISSTATEMENT THAT MR. WARGO

4 SAID THERE WAS NOT ANY -- NO -- NO CONTRIBUTION (VERBATIM) TO

5 THE EVIDENCE REGARDING THE COMPETITION.  I -- I HEARD MY CLIENT

6 SIT UP THERE AND TESTIFY THAT HE WAS STRONGLY CONTENDING THAT

7 THESE PRODUCTS WEREN'T COMPETITIVE, SO I DON'T THINK IN ANY

8 MANNER THAT HE CONCEDED THAT POINT.  AND WHAT WE HAVE HERE, YOUR

9 HONOR, IS AN ELEVENTH-HOUR AFFIDAVIT FROM A DOCTOR THAT'S

10 OBVIOUSLY NOT HERE TODAY THAT SAYS THESE ARE COMPETITIVE

11 PRODUCTS.  SO I THINK THE COURT -- I THINK AT MINIMUM THERE'S A

12 FACTUAL DISPUTE AND AT BEST, YOUR HONOR, THE COURT NEEDS MORE

13 INFORMATION.  THEY CAN'T JUST SUBMIT AN AFFIDAVIT FROM A DOCTOR

14 AND TELL THE COURT TO BELIEVE IT AS GOSPEL.  THAT'S -- THAT'S

15 NOT HOW THESE PROCEEDINGS WORK.

16      IN TERMS OF THE ISSUE OF HIM SENDING THESE DOCTORS

17 SOMEWHERE ELSE, YOU KNOW, HERTZ, I GO TO THE AIRPORT ALL THE

18 TIME AND I ASK HERTZ FOR A PARTICULAR CAR AND THEY SAY THEY

19 DON'T HAVE IT, GO SEE AVIS.  SO I DIDN'T REALLY UNDERSTAND THAT

20 ARGUMENT.  SO THEN IN TERMS OF THE -- ASK WHAT -- TO ENFORCE

21 WITH NO EVIDENCE HE'S GOING TO VIOLATE -- THERE'S JUST DISPUTED

22 FACTS, YOUR HONOR, THAT PERMEATE THIS CASE.  THE -- MR. WARGO --

23 LAST THING.  MR. WARGO BROUGHT UP THIS TRADE SECRET ACT.  I

24 WOULD ENCOURAGE THE COURT TO REVIEW THE PUTTERS (PHONETIC)

25 DECISION.  THERE HAS NOT BEEN A SHRED OF EVIDENCE OF ANY USE OF

1    ANY TRADE SECRETS BY MY CLIENT, AND THAT'S INDICATIVE OF THIS

2    WHOLE CASE.

3        OKAY.  SO WHAT THE PUTTERS CASE SAYS VERY BRIEFLY, YOUR

4    HONOR, HE HAS THIS INFORMATION BY VIRTUE OF WORKING FOR THE

5    EMPLOYER.  HE HAS THIS STUFF THAT YOU JUST TOLD US TO GIVE BACK

6    BY VIRTUE OF WORKING FOR THEM.  THAT'S NOT A TRADE SECRET

7    VIOLATION UNDER THE PUTTERS CASE.  IT'S ONLY A TRADE SECRET

8    VIOLATION IF HE USES THAT INFORMATION.  SO HE'S GOING TO GIVE

9    EVERYTHING HE HAS BACK, BUT THERE IS NO SUBSTANTIAL LIKELIHOOD

10   OF SHOWING -- OF BEING ABLE TO PREVAIL UNDER THE TRADE SECRET

11   VIOLATION BECAUSE THERE'S NOT BEEN ONE SCINTILLA OF EVIDENCE

12   PRESENTED IN COURT TODAY THAT MY CLIENT HAS USED ANYTHING.

13       AND THEN, LASTLY, MR. WARGO SEEMS TO BE GETTING INTO AN

14   INEVITABLE DISCLOSURE ARGUMENT BASICALLY SAYING THAT ALL THESE

15   THINGS HE HAS IN HIS HEAD ARE PROBLEMATIC.  I THINK, AS THE

16   COURT CORRECTLY NOTED, GEORGIA HAS SPECIFICALLY REJECTED THE

17   INEVITABLE DISCLOSURE DOCTRINE AND THE LAW IS BASICALLY THAT

18   WHATEVER YOU HAVE IN YOUR HEAD DOES NOT CONSTITUTE A TRADE

19   SECRET.  SO, AGAIN, YOUR HONOR, I WOULD SUGGEST TO THE COURT

20   THAT THE COURT SHOULD RESPECTFULLY DENY PLAINTIFF'S REQUEST FOR

21   INJUNCTIVE RELIEF.  I THINK THERE'S FACTUAL ISSUES ABOUND IN

22   THIS CASE.  I THINK THE COURT -- I WOULD AGAIN ASK THE COURT TO

23   REALLY, REALLY TAKE A LOOK AT OUR ARGUMENTS ON THE COVENANT AND

24   NOT CREATE A SITUATION WHERE THEY CAN COME TO THE COURT WITH

25   BAD -- WITH UNCLEAN HANDS, NOT ONLY ON THESE -- ALL THE OTHER

1    STUFF INVOLVING THE WHISTLE-BLOWER CASE, BUT UNCLEAN HANDS IN

2    DRAFTING THIS COVENANT SO BROAD AND THEN EXPECT THIS COURT TO

3    SIMPLY WHITTLE IT DOWN TO THE STATE WHERE HE LIVES.  THAT WOULD

4    BE AN EXTREMELY BAD PRECEDENT AND I WOULD JUST ASK THE COURT

5    RESPECTFULLY NOT TO DO THAT.  THANK YOU.

6              THE COURT:  OKAY.

7              MR. WARGO:  YOUR HONOR, I'LL GET FIRED IF I DON'T SAY

8    THIS BECAUSE THE PRESIDENT ASKED ME TO.

9              THE COURT:  JUST SAY IT.

10             MR. WARGO:  I'M JUST GOING TO SAY IT.  WE DON'T HAVE

11   AN AFFIDAVIT, BUT THIS CAME UP IN TODAY'S TESTIMONY.

12   MR. TORNQUIST SAID THAT THEY WERE DOING MORE AESTHETICS WORK

13   INSTEAD OF WHAT WE DO.  WE ACTUALLY DO AESTHETICS TYPE WORK.

14   MR. TORNQUIST DID SELL INJECTIONS THAT WERE FOR AESTHETICS AND

15   PAIN MANAGEMENT, AND THAT IS CONSISTENT WITH WHAT PREDICTIVE

16   TECHNOLOGIES SAYS ON THEIR WEBSITE THEY DO.

17             THE COURT:  THANK YOU.

18             MR. WARGO:  THANK YOU FOR LISTENING TO US, YOUR HONOR.

19             THE COURT:  THANK YOU.  AND I'M NOT GOING TO MAKE A

20   DECISION FROM THE BENCH.  THERE'S A LOT THAT I WANT TO GO BACK

21   AND READ AND CASES I WANT TO LOOK AT AND AFFIDAVITS I WANT TO

22   STUDY CAREFULLY AND A LOT OF INFORMATION THAT I WANT TO GO

23   THROUGH, BUT I UNDERSTAND THAT THERE ARE SOME ISSUES THAT ARE

24   GOING ON RIGHT NOW, SO I WILL BE QUICK IN THAT AND GET YOU AN

25   ORDER.  AND BECAUSE WE HAVE LOTS OF CLIENTS HERE, LET ME SAY AS

1  WELL, IS THAT, AS YOU KNOW, T.R.O.'S AND PRELIMINARY INJUNCTIONS

2  ARE UNUSUAL CREATURES IN THAT THEY HAVE DIFFERENT EVIDENTIARY

3  STANDARDS AND DIFFERENT SNAPSHOTS OF TIME WITH AN INCOMPLETE

4  RECORD JUST BY THE VERY NATURE OF WHAT THEY ARE.  SO I FIND

5  SOMETIMES THAT PEOPLE READ TOO MUCH INTO ONE WAY OR THE OTHER IN

6  WHAT A DECISION IS ON A T.R.O. OR PRELIMINARY INJUNCTION BECAUSE

7  IT IS SUCH AN UNUSUAL CREATURE OF THE LAW.  SO IF YOU WIN OR

8  LOSE DOES NOT MEAN NECESSARILY THAT YOU DO SO AT YOUR PERIL.  I

9  MEAN, THESE THINGS ARE FLUID AND MORE INFORMATION WILL DEVELOP

10  AS THE CASE GOES IN BOTH RESPECTS.  SO FOR THE PERSON THAT MAY

11  POTENTIALLY LOSE THE T.R.O., THAT DOESN'T MEAN THAT YOU MAY NOT

12  POSSIBLY BE ON THE HOOK FOR DAMAGES AND OTHER ISSUES AS IT

13  RELATES TO YOUR CONDUCT GOING FORWARD.

14     SO IT'S KIND OF A STRANGE CREATURE OF THE LAW, AND JUST

15  WANTED TO LET YOU KNOW THAT I'M GOING TO DO WHAT I CAN WITH THE

16  FACTORS THAT I HAVE TO LOOK AT AND WHAT GOES FILLED IN TO ALL

17  THOSE BLANKS AND ISSUE A GOOD DECISION.  BUT I THINK THAT THERE

18  ARE MANY ISSUES ON BOTH SIDES OF THIS CASE THAT WILL BE HOTLY

19  CONTESTED OVER THE NEXT FEW MONTHS POTENTIALLY AS THE CASE MOVES

20  FORWARD.  AND SINCE IT APPEARS THAT I DO HAVE THE ENTIRETY OF

21  THE CASE NOW, THAT WILL BE SOMETHING THAT WE'LL GET INTO IN MORE

22  DETAIL, BUT I WILL TAKE A SERIOUS LOOK AT THESE ISSUES AND GET

23  YOU AN ORDER, AND WE'LL JUST KIND OF GO FROM THERE.  AND I DO

24  SAY THAT I THINK I HAVE EVERYTHING I NEED.  AS YOU KNOW, I ASK

25  QUESTIONS.  THAT'S JUST MY NATURE.  IF I'M GOING THROUGH THIS

1 AND I NEED SOMETHING ELSE FROM YOU, I NEED AN AFFIDAVIT, I NEED

2 SOMETHING TO FILL IN A BLANK, I WILL NOT HESITATE TO E-MAIL YOU

3 AND LET YOU KNOW THAT I'M MISSING A PIECE OF INFORMATION.  BUT

4 THE PURPOSE FOR ME OF A HEARING IS FOR ME TO ASK QUESTIONS.  AND

5 THERE'S A LOT THAT I UNDERSTOOD VERY WELL FROM THE BRIEFS, AND A

6 LOT OF TIMES IT'S NOT THAT I DON'T APPRECIATE THE ARGUMENT.

7 IT'S JUST THAT I REALLY UNDERSTAND THAT FROM WHAT YOU'VE GIVEN

8 ME AND I REALLY WANT TO SPEND THE TIME GOING OVER THE

9 INFORMATION THAT I DO NOT UNDERSTAND.  SO THAT IS SOMETIMES WHY

10 IT MAY SEEM THAT I'M DISMISSIVE OF A CERTAIN ARGUMENT.  IT'S

11 JUST THAT I DON'T NEED TO USE WHAT I THINK OF IS THE VALUABLE

12 TIME THAT I HAVE TO GET THE QUESTIONS THAT I REALLY, REALLY FEEL

13 LIKE ARE MISSING FROM THE WRITTEN DOCUMENTS ANSWER.  SO I WILL

14 GO BACK AND LOOK VERY CAREFULLY AT THE INFORMATION.

15            MR. ROBERTS:  MAY I MAKE ONE MORE INQUIRY, YOUR HONOR?

16 SINCE WE JUST GOT THESE AFFIDAVITS, YOU KNOW, AT 11:00 LAST

17 NIGHT THAT WERE USED TODAY THAT RELATE TO WHAT I HEAR THE COURT

18 IS SAYING IS A CRITICAL ISSUE, IS IN THAT WHAT HE'S GOING TO DO

19 FOR THIS COMPANY VERSUS WHAT HE DID, WOULD THE COURT ALLOW US TO

20 RESPOND TO THOSE AFFIDAVITS?  BECAUSE I THINK THAT'S VERY

21 IMPORTANT.  THEY HAD A DOCTOR SUBMIT AN AFFIDAVIT AT 11:00 LAST

22 NIGHT MAKING ALL THESE ASSERTIONS.  AND WE DID PUT ON

23 MR. TORNQUIST, BUT WE WOULD LIKE THE OPPORTUNITY TO SUBMIT A

24 RESPONSE TO THESE AFFIDAVITS.

25            THE COURT:  IF YOU WANT TO GET -- LET'S PUT IT THIS

1  WAY.  IF EITHER OF YOU WANTS ANYTHING ELSE IN THE RECORD IN

2  TERMS OF AFFIDAVIT OR INFORMATION, I'LL LET YOU HAVE UNTIL 9:00

3  TOMORROW MORNING TO SUBMIT IT ON THE RECORD.  YOU KNOW, I'LL

4  KIND OF LOOK AT IT WITH A GRAIN OF SALT GIVEN THAT THE OTHER

5  SIDE DIDN'T WANT TO RESPOND TO IT, BUT ANYTHING LIKE THAT YOU

6  WANT TO PUT IN THE RECORD, DO IT TODAY OR TONIGHT AND BEFORE

7  TOMORROW MORNING, AND I'LL TAKE A LOOK AT IT.

8          MR. ROBERTS:  FAIR ENOUGH.

9          MR. WARGO:  THANK YOU, YOUR HONOR.  ALONG THOSE LINES

10 WE REPRESENTED TO YOUR HONOR THAT WE WOULD PRESENT TODAY A

11 PROPOSED ORDER.  WE'RE HAPPY TO PROVIDE THAT.  WE HAVE A COPY

12 FOR COUNSEL JUST FOR THE RECORD.

13         THE COURT:  OKAY.  THAT'S FINE.  AND WHY DON'T YOU

14 ALSO E-MAIL A COPY OF IT TO MS. BACHELOR WITHOUT ME EVEN HAVING

15 LOOKING AT IT, BUT THAT'S ALWAYS HELPFUL.

16         MR. ROBERTS:  AND WE WILL -- WE WILL DO -- WE -- I'M

17 SORRY, YOUR HONOR.  WE JUST DIDN'T HAVE TIME.

18         THE COURT:  NO.  THAT'S FINE.

19         MR. ROBERTS:  BUT WE'LL SEND IN A PROPOSED ORDER

20 WITHIN THE NEXT COUPLE OF DAYS, IF THAT'S OKAY.

21         THE COURT:  THAT'S FINE.  AND I WILL SAY, TOO, IN

22 TERMS OF THESE ISSUES, THESE ARE TYPICALLY ISSUES THAT I WON'T

23 SIGN A PROPOSED ORDER, THAT I'LL DO A LENGTHY ORDER ON.  BUT

24 ANYTHING LIKE THAT YOU WANTED TO SUBMIT, CERTAINLY PLEASE FEEL

25 FREE TO DO SO.  SO GOT SOME WORK TO DO, SO I WILL GET ON MY JOB

1  HERE.  AND THANK YOU ALL AND THANK YOU FOR DEALING WITH ALL MY

2  QUESTIONS.  SO, WITH THAT, WE ARE IN RECESS.

3                    (PROCEEDINGS ADJOURNED.)

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

    I, MONTRELL VANN, RPR, RMR, RDR, CRR, OFFICIAL COURT
REPORTER OF THE UNITED STATES DISTRICT COURT, FOR THE NORTHERN
DISTRICT OF GEORGIA, ATLANTA, DO HEREBY CERTIFY THAT THE
FOREGOING 112 PAGES CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS
HAD BEFORE THE SAID COURT, HELD IN THE CITY OF ATLANTA, GEORGIA,
IN THE MATTER THEREIN STATED.

    IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS, THE
27TH DAY OF FEBRUARY 2017.


                        /S/ MONTRELL VANN
                        MONTRELL VANN, RPR, RMR, RDR, CRR
                        OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT