# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

MIMEDX GROUP, INC.,

      Plaintiff/Counterclaim Defendant

v.

LUKE TORNQUIST,

      Defendant/Counterclaim Plaintiff,

v.

PARKER H. PETIT,

      Counterclaim Defendant.

CIVIL ACTION FILE
NO. 1:17-cv-00399-LMM

## DEFENDANT'S VERIFIED ANSWER, AFFIRMATIVE DEFENSES, AND VERIFIED AMENDED COUNTERCLAIMS FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEYS' FEES

COMES NOW Defendant Luke Tornquist ("Mr. Tornquist"), by and through his undersigned counsel, and submits his Verified Answer, Affirmative Defenses, and Verified Amended Counterclaims for Declaratory Judgment, Injunctive Relief, Damages, and Attorneys' Fees in response to Plaintiff MiMedx Group, Inc.'s ("MiMedx") Complaint ("Complaint"), respectfully showing the Court as follows:

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint should be dismissed, in whole or in part, for failure to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrines of waiver and estoppel, unclean hands and/or laches.

### THIRD AFFIRMATIVE DEFENSE

The restrictive covenants upon which Plaintiff's claims are based in part are illegal and unenforceable restraints of trade because Georgia's new Restrictive Covenant Act, O.C.G.A. § 13-8-50 *et seq.* (the "RCA" or the "Act"), is unconstitutional and the covenants are nonetheless unenforceable under the RCA. No modification to the restrictive covenants is permissible by law or by the underlying Non-Competition Agreement and Confidentiality and Non-Solicitation Agreement (collectively, the "Agreements") without Mr. Tornquist's written consent which is specifically denied.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff has failed to mitigate any damages it claims to have suffered.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims for equitable relief may be barred, in whole or in part, to the extent Plaintiff has adequate remedies at law.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because, to the extent that a violation or breach occurred (an allegation that Mr. Tornquist expressly denies), such violation or breach was not willful, knowing, or in reckless disregard of the law.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of the duty of loyalty are barred to the extent that Mr. Tornquist does not owe a duty of loyalty to Plaintiff under Georgia law.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for tortious interference with contractual relations, business relations and/or potential business relations are barred to the extent that Mr. Tornquist is not a stranger to the relationships at issue.

## NINTH AFFIRMATIVE DEFENSE

Any claim for misappropriation of trade secrets by Plaintiff must be denied because Plaintiff cannot establish the existence of any "trade secret" as defined by

O.C.G.A. § 10-1-761(4) and/or cannot establish any "misappropriation" of any purported "trade secret" as required by O.C.G.A. § 10-1-761(2).

TENTH AFFIRMATIVE DEFENSE

To the extent Plaintiff's claim for misappropriation of trade secrets is based in whole or in part on the so called "inevitable disclosure doctrine", such claim is barred by the holding in *Holton v. Physician Oncology Services, LP*, 292 Ga. 864, 870, 742 S.E.2d 702, 706 (2013) ("the inevitable disclosure doctrine is not an independent claim under which a trial court may enjoin an employee from working for an employer or disclosing trade secrets" and declining to address whether the inevitable disclosure doctrine "may be applied to support a claim for the threatened misappropriation of trade secrets").

ELEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiff's claim for misappropriation of trade secrets was brought in bad faith, Defendant is entitled to reasonable attorneys' fees under O.C.G.A. § 10-1-764.

TWELFTH AFFIRMATIVE DEFENSE

To the extent Plaintiff's claims for tortious interference with contractual relations, business relations and/or potential business relations, and unfair

competition are based on Defendant's alleged misappropriation of trade secrets, these claims are preempted by the Georgia Trade Secrets Act, O.C.G.A. § 10-1-767(a).

<u>THIRTEENTH AFFIRMATIVE DEFENSE</u>

Defendant reserves the right to rely upon such other Affirmative Defenses as may be supported by the facts to be determined by full and complete discovery, and to voluntarily withdraw any stated Affirmative Defense.

## **ANSWER**

1. Denied.

2. Admitted only that Mr. Tornquist was employed by MiMedx as a sales representative until his recent separation of employment. Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 2 of the Complaint.

3. Denied.

4. Admitted only that Mr. Tornquist notified MiMedx in November 2016 of his desire to leave MiMedx's employment. Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 4 of the Complaint.

5. Denied.

6. Admitted only that the Complaint purports to assert claims for injunctive relief, compensatory damages, and punitive damages, but specifically

denied that such claims are viable, that Mr. Tornquist has breached any lawful agreement as alleged, and that MiMedx is entitled to any of the relief sought.

7.     Mr. Tornquist is without information or knowledge sufficient to form a belief as to the truth of the allegations stated in Paragraph 7 of the Complaint, which allegations therefore stand denied.

8.     Admitted only that Mr. Tornquist is a natural person residing at the address 1818 Goodrich Avenue, St. Paul, Minnesota 55105 and is a resident of the State of Minnesota.  Responding further, Mr. Tornquist states that the forum selection clauses of the Agreements speak for themselves.  Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 8 of the Complaint.

9.     Mr. Tornquist does not dispute subject matter jurisdiction in Georgia.

10.     Mr. Tornquist does not dispute venue in this court.

11.     Admitted only that MiMedx's corporate headquarters is located in Marietta, Georgia, that MiMedx is a publicly-traded company on the NASDAQ exchange, and that MiMedx sells medical products, including products related to human amniotic tissue, to healthcare providers.  Except as expressly admitted, Mr. Tornquist is without information sufficient to admit or deny the allegations in Paragraph 11 of the Complaint, which allegations therefore stand denied.

12.     Admitted that Mr. Tornquist's first day of employment with MiMedx was on October 7, 2013, and that he was involuntarily terminated from his employment as an Account Executive with MiMedx on December 12, 2016. Mr. Tornquist further admits that he began his employment with MiMedx as the Account Executive for customers located in Minnesota and ended his employment with MiMedx as one of three Account Executives for customers located in Minnesota, and that Jess Kruchoski (Mr. Kruchoski) was his direct supervisor. Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 12 of the Complaint.

13.     Admitted only that Mr. Tornquist infrequently traveled to MiMedx's headquarters located in Marietta, Georgia (including for a training session in or about November 2013, a visit with a Minnesota doctor in late 2014 or early 2015, and a visit with another Minnesota doctor in or around February 2016), that he communicated with MiMedx employees located at MiMedx's headquarters,  that he sold and placed orders for MiMedx's products, and that tissue is processed by MiMedx in Marietta, Georgia. Except as expressly admitted, Mr. Tornquist is without information sufficient to admit or deny the allegations in Paragraph 13 of the Complaint, which allegations therefore stand denied.

14.     Admitted that Mr. Tornquist was required to sign the Agreements on September 24, 2016, prior to his first day of employment with MiMedx and as a specific condition thereof.  Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 14 of the Complaint.

15.     Admitted only that the content of the referenced Agreement speaks for itself.  Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 15 of the Complaint.

16.     Admitted only that the content of the referenced Agreement speaks for itself.  Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 16 of the Complaint.

17.     Admitted only that Mr. Tornquist entered into the Agreement referenced, and that the content of the document speaks for itself.  Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 17 of the Complaint.

18.     Admitted only that the content of the referenced Agreement speaks for itself. Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 18 of the Complaint.

19.     Admitted only that Mr. Tornquist is aware that other MiMedx employees also signed agreements containing restrictive covenants.  Except as

expressly admitted, Mr. Tornquist is without information sufficient to admit or deny the allegations in Paragraph 19 of the Complaint, which allegations therefore stand denied.

20.     Admitted only that Mr. Tornquist had access to the following information during his employment with MiMedx: his daily sales reports; his commission reports; the identities of Group Purchasing Organizations and Veterans Administration hospitals in his territory; and suggested strategies on selling products to doctors; and marketing and promotional materials regarding MiMedx. Mr. Tornquist specifically denies that all such information constitutes trade secrets or confidential business information of MiMedx. Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 20 of the Complaint.

21.     Mr. Tornquist is without information or knowledge sufficient to form a belief as to the truth of the allegations stated in paragraph 23 of the Verified Complaint, which allegations therefore stand denied.

22.     Admitted only that Mr. Tornquist twice sold a product called PalinGen distributed by Academy Medical, LLC to two doctors in the podiatry clinic located at the Minneapolis Veterans Administration Hospital. By way of further response, these February 2016 and April 2016 sales resulted from the doctors' requests for recommendations for products to help patients whose wounds

had been treated with EpiFix (a MiMedx product) for approximately two months but were still not healing. The doctors each used one injection of PalinGen in an unsuccessful attempt to "jump start" their patients' healing before returning to EpiFix. Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 22 of the Complaint.

23. Denied.

24. Denied.

25. Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

26. Paragraph 26 of the Complaint states a legal conclusion to which no response is required. To the extent a response is required, the allegations of Paragraph 26 of the Complaint are denied.

27. Paragraph 27 of the Complaint states a legal conclusion to which no response is required. To the extent a response is required, the allegations of Paragraph 27 of the Complaint are denied.

28. Denied.

29. Admitted only that the Confidentiality and Non-Solicitation Agreement contains a provision related to costs and attorneys' fees. Except as

expressly admitted, Mr. Tornquist denies the allegations in Paragraph 29 of the Complaint.

30.     Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

31.     Paragraph 31 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, the allegations of Paragraph 31 of the Complaint are denied.

32.     Paragraph 32 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, the allegations of Paragraph 32 of the Complaint are denied.

33.     Denied.

34.     Admitted only that Mr. Tornquist was recently involuntarily separated from his employment with MiMedx on or about December 12, 2016.  Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 34 of the Complaint.

35.     Denied.

36.     Denied.

37.     Admitted only that the Confidentiality and Non-Solicitation Agreement contains a provision related to costs and attorneys' fees.  Except as

expressly admitted, Mr. Tornquist denies the allegations in Paragraph 37 of the Complaint.

38. Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

39. Admitted only that Mr. Tornquist signed a Confidentiality and Non-Solicitation Agreement, and that Mr. Tornquist had access to MiMedx confidential and proprietary information during his employment with MiMedx. Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 39 of the Complaint.

40. Paragraph 40 of the Complaint states legal conclusions to which no response is required. To the extent a response is required, the allegations of Paragraph 40 of the Complaint are denied.

41. Admitted only that Mr. Tornquist signed a Confidentiality and Non-Solicitation Agreement. Except as expressly admitted, Mr. Tornquist denies the allegations in Paragraph 41 of the Complaint.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46.     Denied.

47.     Denied.

48.     Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

49.     Admitted only that Mr. Tornquist entered into a Non-Competition Agreement Confidentiality and a Non-Solicitation Agreement with MiMedx. Except as expressly admitted, Mr. Tornquist is without information sufficient to admit or deny the allegations in Paragraph 49 of the Complaint, which allegations therefore stand denied.

50.     Denied.

51.     Denied.

52.     Paragraph 52 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, the allegations of Paragraph 52 of the Complaint are denied.

53.     Denied.

54.     Denied.

55.     Denied.

56.     Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

57.     Paragraph 57 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, the allegations of Paragraph 57 of the Complaint are denied.

58.     Denied.

59.     Denied.

60.     Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

61.     Paragraph 61 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, the allegations of Paragraph 61 of the Complaint are denied.

62.     Denied.

63.     Denied.

64.     Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

69.     Denied.

70.     Denied.

71.     Mr. Tornquist incorporates his answers and defenses to the preceding paragraphs as if fully restated herein.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Except as expressly admitted, Mr. Tornquist denies each and every allegation stated in the Complaint and further denies that MiMedx is entitled to any remedies including those forth in its Prayer for Relief.

## VERIFIED AMENDED COUNTERCLAIMS FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEYS' FEES

COMES NOW Mr. Tornquist, assuming the role of Counter-Plaintiff, and files these Verified Amended Counterclaims for Declaratory Judgment, Injunctive Relief, Damages, and Attorneys' Fees against Counterclaim-Defendants MiMedx Group, Inc. ("MiMedx") and Parker H. Petit ("Petit"), respectfully showing the Court as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.      Mr. Tornquist is a citizen of the state of Minnesota and a former employee of MiMedx.

2.      MiMedx is a Florida corporation that, upon information and belief, maintains its principal place of business at 1775 West Oak Commons Court, Marietta, Georgia 30062.  MiMedx is a publicly traded company principally engaged in the development, manufacture, and sales of regenerative medicine using human amniotic tissue.

3.      Mr. Tornquist and MiMedx, by virtue of filing or responding to the Complaint in this matter and otherwise, are subject to the venue and jurisdiction of this Court, which is proper.

4.      Parker H. Petit is a citizen of the State of Georgia and current employee of MiMedx.

## GENERAL ALLEGATIONS

### Mr. Tornquist's Employment With MiMedx

5.      On September 19, 2016, MiMedx offered Mr. Tornquist employment and required him to execute, as a specific condition of such employment, a "Non-Competition Agreement" (the "Non-Compete Agreement") and a "Confidentiality and Non-Solicitation Agreement (the "Non-Solicitation Agreement") (collectively,

the "Agreements") which contain the restrictive covenants at issue in this matter. The Agreements were drafted exclusively by MiMedx and it is unclear which Agreement was executed first. A true and accurate copy of the Non-Compete Agreement is attached hereto as Exhibit A, and a true and accurate copy of the Non-Solicitation Agreement is attached hereto as Exhibit B.

6.     Mr. Tornquist's first day of employment with MiMedx was on or about October 7, 2013. Throughout his employment, Mr. Tornquist was an Account Executive, first in the company's orthopedics department for three months, followed by approximately three years in the wound care department. Mr. Tornquist's direct supervisor at MiMedx was Jess Kruchoski.

7.     Throughout his employment, Mr. Tornquist sold the following products on behalf of MiMedx: "Epifix" in both injectable and membrane form, "AmnioFix" in both injectable and membrane form, and, beginning in summer 2016, "EpiCord" in membrane form (MiMedx does not sell EpiCord in an injectable form). "EpiFix" is a dehydrated human amnion/chorion membrane tissue graft used in wound healing. "AmnioFix," also used in wound healing and surgical procedures, is based on composite amniotic tissue. "EpiCord" is a dehydrated cellular umbilical cord and amniotic epithelium tissue graft that supports the healing process and provides a connective tissue matrix.

8. When initially hired by MiMedx, Mr. Tornquist was the only Account Executive responsible for sales of AmnioFix throughout the State of Minnesota. By 2016, Mr. Tornquist was one of three Account Executives responsible for sales of EpiFix, AmnioFix, and, as of summer 2016, EpiCord throughout the State of Minnesota.

9. MiMedx intended Mr. Tornquist to work only in the State of Minnesota during his employment. Indeed, at all times during his employment, Mr. Tornquist worked only in the State of Minnesota.

10. Over the course of his tenure at MiMedx, Mr. Tornquist became MiMedx's number one sales representative in the entire country. For the year 2016, Mr. Tornquist sold approximately $6.3 million of MiMedx products, significantly more than any other MiMedx Account Executive.

**The Restrictive Covenants and Other Relevant Terms of the Agreements**

**The Non-Compete Agreement**

11. The Non-Compete Agreement contains in Section 2 a post-term non-compete provision (the "non-compete provision") which states as follows:

> 2. Non-Competition. During Employee's employment with the Company and for a period of one (1) year following the termination of Employee's employment for any reason (the "Termination Date"), Employee shall not, *within the Territory*, either directly or indirectly, provide the same or similar services (or consulting with respect to the same or similar services) as those provided by

Employee for or on behalf of the Company within two (2) years prior to the Termination Date, for any individual or entity that provides products or services that are competitive with or the same as or similar to those provided by the Business. For purposes of this Agreement, *"Territory" means the continental United States*.

(emphasis added).

12.     The Non-Compete Agreement defines "Business" in section 1(a) as follows: "an integrated developer, manufacturer, and/or marketer of (i) collagen based biomaterials or products and durable hydrogel biomaterials and products, (ii) bioimplants manufactured from human amniotic membrane, and (iii) amnion based products (the 'Business')."

13.     The Non-Compete Agreement also contains in Section 9 an "Entire Agreement and Modification" provision stating as follows:

> 9. Entire Agreement and Modification. This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein *and may not be modified*, changed or altered by any promise or statement by the *Company other than in writing signed by Employee* and an authorized representative of Company. *This Agreement supersedes and entirely replaces any other all [sic] prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein.* The waiver by the Company of breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

**The Non-Solicitation Agreement**

14.     The Non-Solicitation Agreement contains in Section 2 an in-term non-compete provision (the "in-term non-compete provision") related to restrictions applicable only during employment) which contains no geographical or scope of restricted activities limitations and states in relevant part:

> "Employee agrees to faithfully perform the duties assigned to Employee, and will not engage in *any other employment or business activity while employed by Company* which would interfere with Employee's full-time performance of Employee's duties for Company, or cause a conflict of interest."

(emphasis added).

15.     The Non-Solicitation Agreement also contains a post-termination customer non-solicitation provision in Section 5 (the "customer non-solicitation provision") which states, in relevant part, as follows:

> 5.  Non-Solicitation Covenant.  While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit from any of the Customers with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company any business in competition with the Business of the Company. . . .

16.     The Non-Solicitation Agreement defines "Business" in section 1(a) as follows:  "an integrated developer, manufacturer, and marketer of (A) collagen based biomaterials or products and durable hydrogel biomaterials and products, (B)

bioimplants manufactured from human amniotic membrane, or (C) amnion based products."

17.      The Non-Solicitation Agreement further contains a post-term "Non-Recruitment of Company Employees" provision (the "non-recruitment provision) in Section 6 which states as follows:

> 6.  Non-Recruitment of Company Employees.  While employed by the Company and for a period of twelve (12) months following the end of employment for any reason, Employee will not directly or indirectly solicit or attempt to solicit any employee of the Company, its parent or other subsidiaries of the parent with whom Employee had Material Contact during the last two (2) years of Employee's employment with the Company for the purpose of encouraging, enticing, or causing said employee to terminate employment with the Company.

18.      The Non-Solicitation Agreement also contains in Section 11 an "Entire Agreement and Modification" provision (with the same language as the same provision in the Non-Compete Agreement") stating as follows:

> 11.   Entire Agreement and Modification.  This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein *and may not be modified*, changed or altered by any promise or statement by the Company *other than in writing signed by Employee* and an authorized representative of Company.  *This Agreement supersedes and entirely replaces any other prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein.*  The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

(emphasis added).

**Applicable Georgia Law/Unconstitutionality of Georgia's New RCA**

19.     The Non-Compete Agreement in Section 10 and the Non-Solicitation Agreement in Section 8 specifically call for the governance and construction of the Agreements under Georgia law.

20.     Georgia common law should be applied to the interpretation of the relevant restrictive covenants in the Agreement because House Bill 30 ("H.B. 30") - Georgia's Restrictive Covenant Act (the "RCA:), O.C.G.A. § 13-8-50 et seq., is violative of Article III, Section VI, Paragraph V(c) the Georgia Constitution and the referendum/enabling amendment ("Amendment One") related thereto was, itself, unconstitutional and its language perpetrated an intentional fraud upon Georgia voters.

21.     Specifically, Amendment One (which appeared on the November 2, 2010 general election ballot, ultimately led to the enactment of the RCA and purportedly provided a constitutional basis therefore), deceptively stated:

> **Shall the Constitution of Georgia be amended so as to make Georgia more economically competitive by authorizing legislation to uphold reasonable competitive agreements?**

22.     It is widely understood and accepted by practitioners and commentators in this area of the law and others that the vast majority of voters, in fact, did not

know what they were actually voting for and the referendum passed.

23.     Importantly, there were numerous prior versions of the enabling referendum which, as shown below, became more and more vague and deceptive with each version evidencing an unconscionable attempt by the General Assembly to deceive the electorate into voting "yes" on Amendment One.  The first version stated:

> **Shall the Constitution of Georgia be amended so as to authorize the General Assembly to provide for contracts that limit during or after the term of employment or of a commercial relationship and to authorize the courts to cure legal defects in such contracts in order to protect legitimate interests and achieve the intent of the parties?[1]**

24.     This first version at least mentioned "employment", but apparently was nevertheless determined to be too descriptive.  As a result, the second version stated:

> **Shall the Constitution of Georgia be amended so as to permit the General Assembly to enact laws that authorize contract provisions restricting or regulating competitive activities and enable courts to ensure the reasonableness of such contracts?[2]**

25.     Not satisfied with the reduction of detail, the third version stated:

---

[1]     *See* H.R. Doc. No. LC 21 0239, 150th Leg., Reg. Sess. (Ga. 2009), available at http://www .legis.ga.gov /Legislation/20092010/87949.pdf.

[2]     *See* H.R. Doc. No. LC 29 4148ERS, 150th Leg., Reg. Sess. (Ga. 20l0), available at http://www.legis.ga.gov/Legislation /20092010/99870.pdf.

**Shall the Constitution of Georgia be amended so as to permit the General Assembly to enact laws that authorize contract provisions regulating competitive activities and to enable courts to ensure the reasonableness of such contracts?[3]**

26.     Again not deceptive enough, the fourth version stated:


**Shall the Constitution of Georgia be amended so as to permit the General Assembly to enact laws that authorize contract provisions regarding competitive agreements to enable courts to uphold the agreements and to enable courts to ensure the reasonableness of such contracts?[4]**

27.     Apparently finding this fourth version still insufficiently deceptive, the General Assembly committees settled upon the following which was approved by a majority of Georgia voters who obviously, from the language below, would have no real idea as to what they were actually voting for:

---

[3]     *See* H.R. Doc. No. LC 29 4174ERS, 150th Leg., Reg. Sess. (Ga. 2010), available at http://www.legis.ga.gov/Legislation/20092010/103086.pdf.

[4]     *See* H.R. Doc. No. LC 29 4349ERS, 150th Leg., Reg. Sess. (Ga. 20 10), available at http://www.legis.ga.gov/Legislation/20092010/104350.pdf.

**Shall the Constitution of Georgia be amended so as to make Georgia more economically competitive by authorizing legislation to uphold reasonable competitive agreements?**[5]

28.     Such language was affirmatively and purposefully misleading to the electorate as to exactly what they were voting for or against and deprived Georgia voters their due process and other rights guaranteed by the Georgia and United States Constitutions.

29.     It is further critically important to note that the RCA's enabling Amendment does not relate to the General Assembly's General Powers. Instead, the enabling Amendment addresses a specific power of the General Assembly that the Georgia Constitution expressly took away (i.e., the ability to legislate in the area of restraints of trade). *See generally*, Ga. Const. Art. III § VI, para. V (identifying the "specific limitations" on the General Assembly's General Powers"); *see also* Ga. Const. Art. III, § VI, para. V(c) (one of the specific limitations is that the General Assembly cannot legislate in the area of restrictive covenants) (amended by Ga. Const. Art. III, § VI, para. V(c)(l)-(3)). Referendum language should be subject to strict review when, as here, the General Assembly is attempting to lift specific limitations on its

---

[5]     *See* H.R. Doc. No. LC 29 4425ERS, 150th Leg., Reg. Sess. (Ga. 2010), available at http:// www.legis.ga.gov /Legislation/20092010/106505.pdf.

powers under the Georgia Constitution through a ballot referendum which clearly was designed to and did deceive the electorate.

30.     This Court possesses and should exercise its power of judicial review provided by the Georgia and United States Constitutions and find the RCA unconstitutional.[6]

31.     Moreover, the enactment of the RCA by and through the purposefully misleading Amendment One has actually discouraged the rise of new competitors within various industries and limited employee freedom and viability thus causing a negative economic impact on the State of Georgia.

32.     The RCA is further unconstitutional, in whole or in part, due to numerous material vague and ambiguous provisions. *See Jekyll Island–State Park Auth. v. Jekyll Island Citizens Assn.,* 266 Ga. 152, 153(2), 464 S.E.2d 808 (1996) ("A statute must be definite and certain to be valid, and when it is so vague and indefinite that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, it violates the first essential of due process of law. To withstand an attack of vagueness or indefiniteness, a civil statute must

---

[6] The Georgia Constitution specifically provides: "Legislative acts in violation of this Constitution or the Constitution of the United States, are void, and the judiciary shall so declare them." Ga. Const. A r t . I, § II, para. V.

provide fair notice to those to whom the statute is directed and its provisions must enable them to determine the legislative intent.") (internal citations and punctuation omitted).

**Unenforceability of the Covenants
under Georgia Common Law**

33.     Because the RCA is unconstitutional, the relevant restrictive covenants contained in the Agreements must be interpreted under Georgia common law and found unenforceable for the myriad of fatal facial deficiencies associated with the covenants.

**Invalidity of the post-term non-compete provision
in the Non-Compete Agreement**

34.     The required geographic "limitation" associated with the post-term non-compete provision in Section 2 of the Non-Compete Agreement is defined as "the continental United States."

35.     Mr. Tornquist only provided services to MiMedx in the State of Minnesota.

36.     Interpreted under Georgia common law, the non-compete provision in Section 2 is facially unenforceable for lack of a reasonable associated territorial limitation and/or the purported preclusion of Mr. Tornquist from working in vast geographic areas where he undisputedly never provided services to MiMedx. *Owens*

*v. RMA Sales, Inc.*, 183 Ga. App. 340, 341, 358 S.E.2d 897 (1987) (restrictions in non-compete agreements "not limited in territorial effect" are unenforceable); *Wiley v. Royal Cup, Inc.*, 258 Ga. 357, 370 S.E.2d 744 (1988) (non-compete covenant can only apply in the geographic areas in which the employee worked for or represented the employer); *Paramount Tax & Accounting, LLC v. H&R Block Eastern Enterprises, Inc.*, 299 Ga. App. 596, 683 S.E.2d 141 (2009) (language in noncompetition covenant unenforceable because it failed to limit prohibited conduct to a specific geographic area and would prevent employee from accepting employment anywhere in the United States); *Firearms Training Sys. v. Sharp*, 213 Ga. App. 566, 567-568, 445 S.E.2d 538 (1994) (worldwide restrictive covenant held facially unenforceable); *Orkin Exterminating Co. v. Walker*, 251 Ga. 536, 538, 307 S.E.2d 914 (1983) (territorial restriction not limited to employee's territory prior to leaving found unenforceable); *Peachtree Fayette Women's Specialists, LLC v. Turner*, 305 Ga.App. 60, 699 S.E.2d 69 (2010) (non-compete covenant found overbroad where it extended to geographical areas where the employee never worked for former employer); *Dent Wizard Intern. Corp. v. Brown,* 272 Ga.App. 553, 612 S.E.2d 873 (2005) (four (4)-county territorial restriction in non-compete clause of the employment contract between the parties was overly broad warranting the grant of an interlocutory injunction enjoining employer from enforcing the

relevant covenants where the undisputed evidence showed that employee had worked in only two or three out of the four (4) Georgia counties comprising the restricted territory).

**The invalidity of the in-term non-compete provision in the Non-Solicitation Agreement renders the customer non-solicitation provision in the Non-Solicitation Agreement unenforceable as well**

37.     The in-term non-compete provision in Section 2 of the Non-Solicitation Agreement is facially unenforceable under Georgia common law because it does not contain a geographical limitation and is not reasonably limited in the scope of the restricted activities.  Georgia law is clear that such in-term covenants are indeed subject to traditional strict scrutiny requirements regarding geography and scope. *Atlanta Bread Co. Intern., Inc. v. Lupton-Smith,* 285 Ga. 587, 679 S.E.2d 722 (2009) (in-term restrictive covenants are subject to strict scrutiny in the same manner as post-term covenants); *Early, et al. v. MiMedx Group, Inc*., 330 Ga.App. 652, 768 S.E.2d 823 (2015) (in-term covenant not to compete containing no limitation at all concerning either scope or territory, fails as a matter of law under any level of scrutiny).

38.     Accordingly, because the in-term non-compete provision is not limited geographically and purportedly precludes Mr. Tornquist from engaging in "**any**

other employment or business activity ," it is facially unenforceable under Georgia common law.

39.     Moreover, the facial invalidity of the in-term non-compete provision in the Non-Solicitation Agreement renders the customer non-solicitation provision in Section 5 of the Non-Solicitation Agreement unenforceable as a matter of Georgia common law.  *Advance Technology Consultants, Inc. v. RoadTrac, LLC*, 250 Ga. App. 317, 320, 551 S.E.2d 735, 737 (2001) ("…Georgia law is clear that if any one of them [customer non-solicitation or non-compete provision] is unenforceable, then they are all unenforceable.").

**Invalidity of the Non-Compete Provision Under the RCA**

40.     Even if the RCA is ultimately held constitutional, the non-compete provision in Section 2 of the Non-Compete Agreement is nonetheless unenforceable under the RCA.

41.     Under the RCA, a reasonable territorial limitation associated with a non-compete agreement is <u>specifically</u> required (O.C.G.A. § 13-8-53(a)), and must constitute a "good faith estimate" of the geographic areas that may be applicable at the time the employee is terminated.  O.C.G.A. §13-8-53(c)(1).  In other words, the geographic areas where the employee worked at the time of termination.  O.C.G.A. §13-8-53(c)(2). The only mechanism under the RCA in which a geographic territory

(such as that in the Non-Compete Agreement) that encompasses <u>all</u> areas in which the employer is doing business is reasonable is under the provisions of §13-8-56(2)[7] (which is inapplicable to the Non-Compete Agreement because the total distance of the entire continental United States is not reasonable and/or there is no list of particular competitors in the Agreement).

42.     Here the geographical territory associated with the non-compete provision in Section 2 of the Non-Compete Agreement is indeed defined to broadly include, **"the continental United States."**  (emphasis added).

43.     Notably, according to MiMedx itself, Mr. Tornquist "was responsible for sales in Minnesota." [Complaint at ¶ 12 [Doc. 1-1], Plaintiff's Petition [Doc. 2] at 6, 8.]  Thus, MiMedx has clearly attempted to overreach as "the continental United States" is really no territory at all and certainly not a "good faith estimate"

---

[7] Under O.C.G.A. §13-8-56(2), "A geographic territory which includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant, is reasonable provided that: (A) The total distance encompassed by the provisions of the covenant also is reasonable; (B) The agreement contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship; or (C) Both subparagraphs (A) and (B) of this paragraph[.]"

as to the areas in which Mr. Tornquist would be providing services to MiMedx at the time of his termination.

44.  Accordingly, because MiMedx cannot rely on the exception provided in O.C.G.A. §13-8-56(2) for the territory to include all areas in which MiMedx does business, the required reasonable geographic limitation and thus the non-compete provision as a whole is overly broad and unenforceable even under the RCA.

45.  Moreover, even if the RCA is ultimately held constitutional and applicable to the Non-Compete Agreement, the non-compete provision in Section 2 must still fail in light of the unreasonable associated territorial restriction which cannot be enforced under any circumstances because this Court's power to "modify" the provision is specifically limited by O.C.G.A. § 13-8-51(11) to: (A) **Severing or removing** that part of a restrictive covenant that would otherwise make the entire restrictive covenant unenforceable; and (B) Enforcing the provisions of a restrictive **covenant to the extent that the provisions are reasonable**. (emphasis added).

46.  While the RCA allows courts to sever overly broad restrictive covenants, it does *not* allow courts to *rewrite* overly broad covenants or to *insert* or *add in* missing language.

47.     Stated differently, the RCA does not permit a court to arbitrarily add or insert a geographic territory where none exists (after severing an entire overly broad geographic restriction as would be necessary here).  Analogous to Georgia court's ability to blue-pencil restrictive covenants under the common law in the context of a sale of a business, "[t]he 'blue pencil' marks, but it does not write. It may limit an area by striking through and removing particular states, counties, etc. thus making it reasonable, but it may not rewrite a contract void for vagueness, making it definite by designating a new, clearly demarcated area." *Hamrick v. Kelley,* 260 Ga. 307, 308, 392 S.E.2d 518 (1990).  Judge Thrash's recent opinion in *LifeBrite Labs., LLC* further clarified this conclusion, applying the Georgia Supreme Court's longstanding position that "[t]he 'blue pencil' marks, but it does not write" to cases decided under the RCA.  *LifeBrite Labs., LLC*, 2016 WL 7840217, at *7 (quoting *Hamrick v. Kelley,* 260 Ga. 307, 308 (1990)).  The decision in *LifeBrite Labs* confirmed that, while courts do have modification powers under the Act, courts may not "rewrite a contract void for vagueness" or "completely reform and rewrite contracts by supplying new and material terms from whole cloth."  *Id*.   Thus, the Court does not have the power to add language to redefine the "Territory" of that covenant to make it reasonable.

48.     Furthermore, Section 9 of the Non-Compete Agreement <u>specifically</u> provides that the Agreement "may not be modified, changed or altered . . . other than in writing signed by Employee and an authorized representative of Company," and Mr. Tornquist will not approve any modifications to the Agreement.  Thus, even if the Court could rewrite the Agreement between the parties and insert some arbitrary and lesser geographic area smaller than the entirety of "the continental United States" (which it clearly cannot under Judge Thrash's recent decision in *LifeBrite* and under the plain language of the RCA itself), no modification of the Agreement can occur without Mr. Tornquist's written consent.  Any ambiguities in the Agreement created in light of this provision must be construed against MiMedx as the drafter of the Non-Compete Agreement.  *Hertz Equip. Rental Corp. v. Evans*, 260 Ga. 532, 532, 397 S.E.2d 692 (1990).

49.     Lastly, because of the clear overreaching attempted by MiMedx with regard to the non-compete provision (a nationwide covenant for an employee who only worked in one state), even if the RCA is ultimately found constitutional and the provision capable of modification (it is not), the Court should exercise its discretion pursuant to O.C.G.A. § 13-8-54(b) and refuse to modify the non-compete provision clearly designed to overreach and preclude Mr. Tornquist from engaging in otherwise lawful competition.

## Invalidity of the Non-Recruitment Provision in the Non-Solicitation Agreement under Common Law and the RCA

50.     Even if ultimately found constitutional, the RCA does not address aspects and requirements of enforceability with regard to non-recruitment, no-hire and/or employee non-solicitation provisions.  As Judge Thrash noted in *LifeBrite Labs., LLC*, "[s]tatutes in derogation of the common law are strictly construed in Georgia. . . . to the extent that statutory text can be reasonably understood to conform to the common law as to depart from it, the courts usually presume that the legislature meant to adhere to the common law."  *LifeBrite Labs., LLC v. Cooksey*, 2016 WL 7840217, at *7.  Therefore, because the RCA does not mention non-recruitment, employee non-solicitation provisions and the like, it does not change Georgia law with respect to the interpretation and enforceability of such provisions which are properly interpreted under Georgia common law.

51.     The prohibition against the recruitment of MiMedx employees in Section 6 of the Non-Solicitation Agreement is rendered unenforceable under Georgia common law due to the invalidity of the aforementioned in-term non-compete covenant in the same Agreement.  *Advance Tech Consultants v. RoadTrac, LLC*, 250 Ga.App. at 318-319; *Global Link Logistics, Inc. v. Briles*, 296 Ga. App. 175, 178, 674 S.E.2d 52 (2009) (striking non-recruitment covenant with non-competition covenant); *Dent Wizard Intern. Corp. v. Brown,* 272 Ga.App. 553, 556,

612 S.E.2d 873 (restrictive covenants, including employee non-solicitation provisions, rise and fall together); *Wolff v. Protégé Sys., Inc.,* Nos. A98A0912, A98A0913, 1998 WL 56457 (Ga. App. Sept. 8, 1998) (striking non-recruitment covenant with non-competition covenant); *American Gen. Life & Acc. Ins. Co. v. Fisher*, 208 Ga. App. 282, 284, 430 S.E.2d 166 (1993) (all restrictive covenants in an agreement fall together); *Amerigas Propane, L.P. v. T-Bo Propane*, 972 F. Supp. 685, 693 (S.D. Ga. 1997) (non-recruitment covenant invalid because non-solicitation covenant invalid).

52.     Moreover, the absence of an associated geographic territory renders the non-recruitment provision in Section 6 unenforceable under both Georgia common law and the RCA. *Capricorn Systems, Inc. v. Pednekar*, 248 Ga. App. 424, 427 546 S.E. 2d 554 (2001) ("…such restrictive covenant had no definite geographic area limitations as to competition, solicitation of clients, *or recruiting of employees, which also renders the covenant unenforceable for being overbroad."*) (emphasis added); *Club Properties, Inc. v. Atlanta Offices-Perimeter, Inc*., 180 Ga. App. 352, 358, 348 S.E. 2d 919 (1986) (employee non-solicitation provisions must contain a reasonable territorial restrictions to be enforceable); *A.L. Williams & Associates v. Stelk, et al*., 960 F.2d 942, 948-949 (11th Cir. 1992) (decision vacated by joint agreement/settlement of the parties); *Becham v. Synthes (U.S.A.)*, 2011 WL

4102816, at 4. (M.D. Ga. September 14, 2011) ("With regard to non-solicitation or non-recruitment of employees, covenants that have no territorial restriction are unenforceable."); *ALW Marketing Corporation v. Duransky, et al.*, 1991 WL 345313 (N.D. Ga.) (non-recruitment covenant in Georgia must contain a territorial restriction to be enforceable).

## Mr. Tornquist Blows the Whistle and is Discharged in Retaliation

## 2014–2016: MiMedx Employs a Fraudulent Revenue Recognition Scheme

53.     Since at least 2014, MiMedx has engaged in a scheme of "channel stuffing," which MiMedx uses to fraudulently recognize revenue in its certified financial statements before the revenue had been realized or realizable and earned.

54.     The channel-stuffing scheme implicates AvKARE, Inc. (AvKARE), a Tennessee company and Federal Supply Schedule ("FSS") contractor, as well as the Department of Veterans Affairs ("VA").   In 2014, MiMedx entered into a distribution agreement with AvKARE, which allowed MiMedx to sell directly to government accounts, including the VA.  Although MiMedx obtained its own FSS contract in 2015, MiMedx and AvKARE extended the distribution agreement through June 30, 2016.

55.     The channel-stuffing scheme is simple: at the direction and pressure of MiMedx's executive officers and senior management, MiMedx sales

representatives order the MiMedx product "EpiFix"[8] for delivery to VA hospitals throughout the country.

56.     Neither AvKARE nor the end customer—the VA—requests the EpiFix orders.

57.     The channel stuffing routinely occurs at the end of each financial quarter.

58.     Under the scheme, MiMedx sends its product directly to VA hospitals, where MiMedx sales representatives are responsible for procuring sales of the products, managing MiMedx product on the shelves, tracking MiMedx inventory on the shelves, and accounting for any lost or damaged product.

59.     At no point in the distribution channel does AvKARE exercise physical control over the product, assume the risks and rewards of ownership, or otherwise play a role in reselling the product to the end customer.

60.     MiMedx then claims these orders as revenue to meet its quarterly forecasts.

61.     The VA hospitals are typically unaware of the channel-stuffing orders, much less the volume of MiMedx's products in their possession.

---

[8]     EpiFix is a dehydrated human amnion/chorion membrane tissue graft composed of a layer of epithelial cells, a basement membrane, and an avascular connective tissue matrix. It is used for acute and chronic wound care.

62.     In the last month of 2015, over $10 million of MiMedx products was sitting on VA hospitals' shelves, which the hospitals had neither bought nor requested.

63.     MiMedx stuffed its channels with the intent of slowly feathering back returns over time, concealing the return of product it had previously recognized as revenue by balancing them against actual revenue in future reporting periods.

64.     In or about December 2015, Mr. Tornquist was personally instructed by Lou Roselli, MiMedx' Senior Director of Operations, to add as much product for consignment as possible to the shelves of the Minneapolis VA hospital.

65.     Near the end of March 2016, Mr. Tornquist was personally instructed by Steve Blocker, the Area Vice President, to, again, put as much consignment product on the Minneapolis VA's shelves as possible, stating "I have a number to hit, you need to help me out," or words to that effect.

**The Application of Accounting Principles to MiMedx's Channel-stuffing Scheme**

66.     The Financial Accounting Standards Board (FASB)—recognized by the Securities and Exchange Commission as the designated accounting standard setter for public companies—promulgates Generally Accepted Accounting Principles (GAAP) on revenue recognition.

67.     Under FASB Accounting Standard No. 48, if an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met:

a. The seller's price to the buyer is substantially fixed or determinable at the date of sale;

b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product;

c. The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage to the product;

d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller;

e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer;

f. The amount of future returns can be reasonably estimated. The following factors may impair the ability to make a reasonable estimate:

i. Susceptibility of product to significant external factors, such as technological obsolescence or changes in demand;

ii. Relatively long periods in which a particular product may be returned;

iii. Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances;

iv. Absence of a large volume of relatively homogeneous transactions;

v. Other factors that preclude a reasonable estimate. Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first.

70. MiMedx's revenue recognition scheme does not meet the conditions for recognizing revenue under GAAP. Even if there is a transaction between AvKARE and MiMedx at the time of shipment, a number of contingencies preclude MiMedx from properly recognizing this revenue at the time of shipment. For instance:

a. *MiMedx maintains liability for lost or damaged products allegedly "sold" to AvKARE and placed on VA hospitals' shelves.* Whether it is a condition of a formal, written agreement, an oral side agreement, or

established practice, MiMedx has agreed to accept liability returns on product placed on the shelves.  In this event, MiMedx must credit AvKARE for returned, lost, or damaged product. There also remains a distinct possibility that the VA (or AvKARE) could send back the unpurchased product sitting on their shelves at any time.

b. *MiMedx has significant obligations for future performance to directly bring about resale of the product by the buyer.* MiMedx sales representatives work on location at VA hospitals throughout the country and market the product. On information and belief, AvKARE plays no role in procuring customer sales of the products it has allegedly purchased from MiMedx.

c. *The amount of future returns cannot be reasonably estimated.* Whether it is a condition of a formal, written agreement, an oral side agreement, or established practice, there are relatively long periods in which EpiFix products may be returned. There is still unpurchased EpiFix product that MiMedx shipped in the first quarter of 2016 that MiMedx recognized as revenue. Even worse, MiMedx was aware at the time of recognizing product sales as revenue that the same EpiFix products

would have to be returned in future quarters because of a lack of demand.

71.     SEC Staff Accounting Bulletin No. 101, 64 Fed. Reg. 68936 (Dec. 3, 1999) (codified at 17 C.F.R. 211), states that transactions within the scope of specific authoritative accounting literature should be applied. Further, the SEC will consider existing accounting standards as well as broad revenue recognition criteria specified in the FASB's conceptual framework that provide basic guidelines for revenue recognition.

72.     Based on FASB guidelines, the SEC has concluded that revenue should not be recognized until it is realized or realizable and earned. Revenue is generally realized or realizable and earned when all of the following criteria are met:

a.  Persuasive evidence of an arrangement exists;

b.  Delivery has occurred or services have been rendered;

c.  The seller's price to the buyer is fixed or determinable; and

d.  Collectability is reasonably assured.

73.     In the context of consignment arrangements, the SEC holds that the presence of conditions set forth in FASB Accounting Standard No. 48 in a transaction precludes revenue recognition even if title to the product has passed to the buyer.

74. Nevertheless, MiMedx publicly recognizes the shipment of this inventory as revenue in its filings with the Securities and Exchange Commission.

75. In its certified filings, MiMedx has failed to adequately disclose its practice of recognizing revenue upon shipment to VA facilities even in the absence of an executed purchase order or payment from a customer. Moreover, MiMedx fails to adequately disclose the contingent nature of these alleged sales.

76. With respect to accelerated, discounted sales that are realized and earned in the reporting quarter, MiMedx has failed to provide any disclosures in financial statements that it accelerated material amounts of sales revenue as a business practice and discuss its financial implications for future periods. Finally, MiMedx has failed to disclose its practice of slowly feathering back returns.

77. The failure to provide these disclosures results in the artificial inflation of MiMedx's revenue for current reporting periods. The implication for future reporting periods is foreseeable: MiMedx cannot recognize revenue from many *actual* government sales—those transactions that occur when the VA actually purchases MiMedx's products—because the company has already declared revenue from those products in previous quarters. Further, if the VA were to return products that it had never ordered, MiMedx would earn nothing from a transaction it has already reported as revenue in its certified filings.

**MiMedx Fails to Pay Mr. Tornquist Earned Commissions**

78.     In August 2016, some of Mr. Tornquist's customers, doctors at the Minneapolis VA Hospital, indicated that they wanted to ship back all the MiMedx EpiFix and AmnioFix product already on the hospital's shelves through the AvKare consignment arrangement.  Mr. Tornquist successfully persuaded the doctors at the hospital to consider a direct buy-out of the consigned product. The $426,651.25 purchase was completed on or about August 31, 2016.

79.     Under the 2nd Addendum to the 2016 Account Executive Would Care Commission Plan, the August 31, 2016 sale to the Minneapolis VA entitled Tornquist to commissions based on revenue maintenance at 12% and commissions based on revenue growth at 9.5%.  The 2nd Addendum is attached hereto as Exhibit C.

80.     In association with the sale, Mr. Tornquist was paid the 12% revenue maintenance commission, but was not paid the 9.5% revenue growth commission.

81.     Upon information and belief, other Account Executives were paid revenue growth commissions earned on similar sales during the same time period.

82.     MiMedx denied, and continues to deny, commissions due and owing Mr. Tornquist from the large-scale VA purchase in the amount of approximately $40,531.87.

**November 2016: Tornquist and Kruchoski Report Legal Violations
and Are Immediately Subjected to Retaliation**

83.     On November 2, 2016, Mr. Tornquist and Mr. Kruchoski submitted a joint report notifying MiMedx upper management and legal counsel to a fraudulent revenue recognition scheme which Mr. Tornquist and Mr. Kruchoski believed was in violation of Sarbanes-Oxley, as well as the failure to pay commissions in violation of state laws.

84.     On November 3, 2016, Mr. Tornquist received a telephone call from Steve Blocker, the Area Vice President and Mr. Kruchoski's direct supervisor. During that call, Mr. Blocker brought up Mr. Tornquist and Mr. Kruchoski's report of Sarbanes-Oxley violations.  Mr. Blocker asked Mr. Tornquist if he really wished to sign onto that portion of the joint report.  Mr. Blocker warned Mr. Tornquist that doing so would "not be good for" him, and reminded Mr. Tornquist that Mr. Tornquist had a wife and children and cautioned him to "think of [his] family."

85.     That same day, Mr. Blocker also called Mr. Kruchoski and said that he and Mr. Tornquist "should think about their families," or words to that effect.

86.     Also on November 3, 2016, Mr. Tornquist received an email from Lexi Haden, MiMedx's chief legal counsel, responding to Mr. Tornquist and Mr. Kruchoski's joint report of November 2, 2016.

87.     On November 4, 2016, Mr. Tornquist and Mr. Kruchoski supplemented their joint report individually to set forth MiMedx's fraudulent revenue recognition scheme in greater detail.

88.     On November 7, 2016, Mr. Tornquist and Mr. Kruchoski, through their Minnesota lawyers, sent another letter to MiMedx providing additional information about the revenue recognition scheme, including the names of MiMedx employees fully invested in the scheme.

89.     Throughout the day of November 8, 2016, one of the management employees named in the November 9th letter attempted to get in contact with Mr. Tornquist multiple times by phone and text message, saying that he needed to talk to Mr. Tornquist.  There was no business or personal need for the employee to need to talk to Mr. Tornquist.

90.     The next day, November 9, 2016, Mr. Tornquist was called by another employee named in the November 9th letter.   Again, there was no business or personal need for the employee to need to talk to Mr. Tornquist.

91.     On November 21, 2016, Ms. Haden interviewed Mr. Tornquist and Mr. Kruchoski at the offices of their Minneapolis lawyers, and both men provided additional information related to MiMedx's revenue recognition scheme.  During the interview, Mr. Tornquist informed Ms. Haden that Mr. Blocker had called him

and cautioned him to "think about your family." and further stated that he feared retaliation for his reporting.

92.     After the interviews,   Ms. Haden agreed that the company would participate in mediation with Mr. Kruchoski and Mr. Tornquist.

93.     On November 29, 2016, Lou Roselli, MiMedx' Senior Director of Operations contacted several of Mr. Tornquist's MiMedx co-employees and asked about alleged misconduct on the part of Mr. Tornquist as well as Mr. Kruchoski.

94.     On December 12, 2016, representatives of MiMedx flew to Minneapolis and participated in a mediation session with Mr. Tornquist and Mr. Kruchoski and their Minnesota lawyers.

95.     However, at the close of the 10-hour mediation on December 12, 2016, MiMedx simultaneously terminated the employments of Mr. Tornquist and Mr. Kruchoski effective immediately.

96.     Just a day or so later, Mr. Tornquist turned his MiMedx-issued phone, laptop, and tablet to his lawyers.

97.     Just one day after the mediation and Mr. Tornquist's involuntary termination on December 12, 2016, MiMedx filed its complaint against him in the Superior Court of Cobb County, Georgia, and also filed claims against Mr. Kruchoski in Florida State court.  The timing of MiMedx's filing clearly indicates

MiMedx's attempt to dissuade Mr. Tornquist from pursuing his claims against MiMedx.

98. On December 15, 2016, Mr. Kruchoski and Mr. Tornquist filed a lawsuit in the District of Minnesota accusing MiMedx of engaging in the fraudulent channel-stuffing scheme described above.

99. As of January 25, 2017, MiMedx had issued three press releases concerning internal upheaval occurring within the company. In each press release, MiMedx addressed Mr. Kruchoski's and Mr. Tornquist's allegations against the Company.

    a. On December 15, 2016, MiMedx issued a press release responding to Mr. Kruchoski and Mr. Tornquist's lawsuit, describing their allegations as "not factual and fallacious."

    b. On December 27, 2016, MiMedx issued another press release regarding the allegations of "two former employees." MiMedx stated that "management believes the claims made in the lawsuit brought by these former employees, including claims made about the Company's sales practices" were "without merit."

    c. On December 30, 2016, MiMedx announced that it had filed lawsuits against two additional employees. The press release stated that MiMedx

had investigated the "allegations made against the Company by Mr. Kruchoski and Mr. Tornquist" and "found no merit to the actions alleged in the lawsuit filed by Messrs. Kruchoski and Tornquist."

100.     On January 25, 2017, MiMedx, through Petit, sent a letter to the Department of Veterans Affairs medical facility in Minneapolis, Minnesota—an entity both Mr. Tornquist and Mr. Kruchoski had engaged in the scope of their profession. The letter accused Mr. Tornquist and Mr. Kruchoski of being among a group of individuals that had "published false [sic] information about MiMedx in an attempt to discredit the positive relationship [the Company has] with the Veterans Administration." This statement is false, defamatory, and retaliatory.

101.     Mr. Tornquist and Mr. Kruchoski were the only individuals named in the letter. The letter stated that "a copy of the press release" issued by MiMedx "detailing this situation" was enclosed. On information and belief, a press release of one of the above-described press releases referring to Mr. Tornquist's and Mr. Kruchoski's allegations of MiMedx's channel-stuffing scheme was enclosed.

102.     A reader by fair implication would understand (1) MiMedx and Petit's statements to be directed at Kruchoski and Tornquist; (2) MiMedx and Petit had stated that Mr. Kruchoski's and Mr. Tornquist's recent channel-stuffing allegations were false; and (3) MiMedx and Petit asserted that Mr. Kruchoski and Mr. Tornquist,

in making the channel-stuffing allegations, held a specific intent to harm MiMedx's "positive relationship" with the VA with a false publication.

103.     On or before March 31, 2017, Petit denied Mr. Tornquist's and Mr. Kruchoski's allegations of securities fraud. Petit accused Mr. Tornquist of "lying, and that's an understatement." This statement is false, defamatory, and retaliatory. This statement was published in an article posted on the websites of Kaiser Health News (ksn.org) and Salon (salon.com).

## COUNT ONE: DECLARATORY JUDGMENT

104.     Mr. Tornquist re-alleges and adopts Paragraphs 1-103 of this Verified Counterclaims as if set forth herein.

105.     Mr. Tornquist desires to engage in duties likely alleged by MiMedx to violate the afore-mentioned covenants of the Agreements.

106.     Mr. Tornquist reasonably believes that the relevant restrictive covenants in the Agreements are unenforceable for the reasons detailed herein, but requests this Court settle and afford him with certainty and declaratory relief in this regard.

107.     Conversely, MiMedx contends, and will undoubtedly continue to contend, that the relevant restrictive covenants are enforceable and binding upon Mr. Tornquist.

108.     A substantial, justiciable and actual controversy exists between Mr. Tornquist and MiMedx concerning the enforceability of the relevant restrictive covenants of the Agreements discussed herein.

109.     Mr. Tornquist is an interested party and is insecure and uncertain as to his legal rights, interests, status and legal relations because of the relevant restrictive covenants in the Agreements.  Absent relief from this Court declaring his rights at law, Mr. Tornquist will be hindered in his ability to earn a living in his chosen field of endeavor.  Mr. Tornquist respectfully requests this Court settle and afford him with certainty and declaratory relief in this regard.

110.     The ends of justice require that the Court should take such requested action for the protection of Mr. Tornquist.

111.     Mr. Tornquist prays that the Court enter a final Declaratory Judgment pursuant to 28 U.S.C. § 2201, *et seq*. that the relevant restrictive covenants of the Agreements are unenforceable against him, both facially and as applied, as a matter of Georgia common law and that the RCA is unconstitutional.

112.     Alternatively, Mr. Tornquist prays that the Court, if its finds the RCA constitutional, nevertheless determine declare that the relevant restrictive covenants of the Agreements are unenforceable and incapable and/or undeserving of modification even under the RCA.

## COUNT TWO: PRELIMINARY AND PERMANENT INJUNCTION

113.     Mr. Tornquist re-alleges and adopts Paragraphs 1-103 of this Verified Counterclaim as if set forth herein.

114.     Mr. Tornquist will be irreparably harmed if MiMedx is allowed to take any further action to enforce the relevant restrictive covenants of the Agreements against him.

115.     Given the unenforceability of the relevant restrictive covenants of the Agreements, the likelihood of irreparable harm that will befall Mr. Tornquist if MiMedx takes any further action to enforce the restrictive covenants against him or otherwise further attempts to prevent him from engaging in his chosen profession far outweighs the potential harm to MiMedx if the Court were to grant the injunctive relief requested herein.

116.     The public interest would not be adversely affected and, in fact, would be upheld if this Court grants the requested injunctive relief in favor of Mr. Tornquist and against MiMedx in that Mr. Tornquist only seeks to prevent MiMedx from doing what it has no legal right to do – take further action to enforce the relevant unenforceable restrictive covenants in the Agreements against him.

117.     Mr. Tornquist is without an adequate remedy at law to prevent further legal and other adverse action against him by MiMedx based on the unenforceable restrictive covenants in the Agreements.

118.     Due to the patent unenforceability of the relevant restrictive covenants in the Agreements, Mr. Tornquist has a substantial likelihood that he will prevail on the merits of his request for declaratory and permanent injunctive relief in this matter.

119.     Mr. Tornquist thus prays for a preliminary and permanent injunction from this Court enjoining MiMedx, and any associated person or entity acting on its behalf, from attempting, in any way, to take any further action to enforce the relevant restrictive covenants of the Agreements or otherwise interfere, by publication or otherwise, with Mr. Tornquist engaging in any act that would violate the relevant unenforceable restrictive covenants of the Agreements.

## COUNT THREE: VIOLATION OF O.C.G.A. § 10-1-702

120.     Mr. Tornquist re-alleges and adopts Paragraphs 1-103 of this Verified Counterclaim as if set forth herein.

121.     While he was employed by MiMedx, Mr. Tornquist made a sale in or about August 2016 in the amount of $426,651.25 for which he has not received the

9.5% commission payment for revenue growth that he earned in or about September 2016 in the amount of approximately $40,531.87.

122.    MiMedx has violated O.C.G.A. § 10-1-702 by refusing to pay Mr. Tornquist earned commissions which are more than thirty (30) days past due and owing to Mr. Tornquist.

123.    Mr. Tornquist has suffered damages as a direct and proximate result of MiMedx's breach in an amount to be proven at trial.

124.    Mr. Tornquist is entitled to exemplary damages and reasonable attorneys' fees under O.C.G.A. § 10-1-702(b).

## COUNT FOUR: BREACH OF CONTRACT

125.    Mr. Tornquist re-alleges and adopts Paragraphs 1-103 of this Verified Counterclaim as if set forth herein.

126.    Mr. Tornquist was contractually entitled to receive commissions based on revenue growth sales by virtue of the 2016 Account Executive Would Care Commission Plan, as revised by the 2nd Addendum dated June 16, 2016 (Ex. C hereto), and course of conduct between Mr. Tornquist and MiMedx.

127.    While he was employed by MiMedx, Mr. Tornquist made a sale in the amount of $426,651.25 for which he has not received the 9.5% commission payment

for revenue growth that he earned and to which he is entitled in the amount of approximately $40,531.87.

128.     MiMedx has materially breached its obligations by refusing to pay Mr. Tornquist all the commissions earned for sales made in 2016.

129.     Mr. Tornquist has suffered damages as a direct and proximate result of MiMedx's breach in an amount to be proven at trial.

## COUNT SIX: RETALIATION IN VIOLATION OF
## THE DODD-FRANK ACT, 15 U.S.C. § 78u-6(h)

130.     Mr. Tornquist re-alleges and adopts Paragraphs 1-103 of this Verified Counterclaim as if set forth herein.

131.     Under the Dodd-Frank Act, no employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done in making disclosures that are protected under the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq.*

132.     MiMedx took adverse action against Mr. Tornquist because of his reports of conduct that would violate Section 906 of the Sarbanes Oxley Act, 18 U.S.C. §1350(c), Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j; and Rule 10b-5 of the Securities Exchange Act, 17 C.F.R. § 240.10b-5.

133.     MiMedx failed to take all reasonable steps to prevent retaliation against Mr. Tornquist from occurring.

134.     MiMedx's retaliatory conduct has adversely affected Mr. Tornquist's status as an employee.

135.     MiMedx's retaliatory conduct might have dissuaded a reasonable person from making or supporting a report.

136.     The unlawful employment practices complained of above were intentional and were performed by MiMedx with malice or reckless indifference to the Dodd-Frank Act.

137.     As a direct and proximate result of MiMedx's illegal conduct, Mr. Tornquist has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

### COUNT SEVEN: UNLAWFUL DISCHARGE IN VIOLATION OF MINNESOTA STATUTES SECTION 181.931 SUBDIVISION 1(1)

138.     Mr. Tornquist re-alleges and adopts Paragraphs 1-103 of these Verified Counterclaims as if set forth herein.

139.     Minnesota Statutes section 181.932 subdivision 1(1) prohibits retaliation against employees for making good-faith reports of violations of law. The

statute prohibits retaliation against an employee because the employee, in good faith, reports a planned, suspected, or actual violation of any federal or state law or common law or rule adopted pursuant to law to an employer.

140. Mr. Tornquist reported what he reasonably and in good faith believed to be a planned, actual, or suspected violations of law, including but not limited to Minn. Stat. 181.101, Chapter 109 of the Wisconsin Statutes, O.C.G.A. §§ 34-7-2 and 10-1-702, Section 906 of the Sarbanes Oxley Act, 18 U.S.C. §1350(c), Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j; and Rule 10b-5 of the Securities Exchange Act, 17 C.F.R. § 240.10b-5.

141. MiMedx took adverse action against Mr. Tornquist because of his reports.

142. MiMedx failed to take all reasonable steps to prevent retaliation against Mr. Tornquist from occurring.

143. MiMedx's retaliatory conduct has adversely affected Mr. Tornquist's status as an employee.

144. MiMedx's retaliatory conduct might have dissuaded a reasonable person from making or supporting a report.

145.     The unlawful employment practices complained of above were intentional and were performed by MiMedx with malice or reckless indifference to Minnesota Statutes section 181.932 subdivision 1(1).

146.     As a direct and proximate result of MiMedx's illegal conduct, Mr. Tornquist has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages in excess of $75,000.00.

## COUNT EIGHT: ATTORNEYS' FEES

147.     Mr. Tornquist re-alleges and adopts Paragraphs 1–103 of these Verified Counterclaims as if set forth herein.

148.     MiMedx knew or should have known prior to filing the Complaint that the relevant restrictive covenants in the Agreements are unenforceable for the reasons set forth herein.

149.     By filing and failing to dismiss its claims in the Complaint based on the unenforceable restrictive covenants in the Agreements, MiMedx has forced Mr. Tornquist to retain and continue to retain the undersigned Firm to respond to the relevant claims of the Complaint and to further seek the declaratory and injunctive

relief requested herein thus incurring significant legal fees and costs in excess of $75,000.00.

150.　　Moreover, MiMedx has unjustifiably refused to pay, despite demand, compensation due and owing to Mr. Tornquist in the form of commissions earned.

151.　　MiMedx has thus acted in bad faith, been stubbornly litigious and caused Mr. Tornquist unnecessary trouble and expense entitling Mr. Tornquist to an award of attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

## COUNT NINE: COMMON LAW DEFAMATION
### (Against MiMedx)

152.　　Mr. Tornquist re-alleges Paragraphs 1–103 of these Verified Counterclaims as if fully set forth herein.

153.　　MiMedx made false and defamatory statements about Mr. Tornquist to others.

154.　　MiMedx made false and defamatory statements about Mr. Tornquist to others in reference to his trade or profession.

155.　　These statements had the tendency and were intended to harm, and continue to harm, Mr. Tornquist's reputation and estimation in the community.

156.　　The recipients of these false statements can reasonably understand that the statements refer to Mr. Tornquist.

157.     MiMedx maliciously intended to injure Mr. Tornquist by its false statements and succeeded in its malicious intent.

158.     As a direct and proximate result of MiMedx's illegal conduct, Mr. Tornquist has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages in excess of $75,000.00.

## COUNT TEN: COMMON LAW DEFAMATION
### (Against Petit)

159.     Mr. Tornquist re-alleges Paragraphs 1–103 of these Verified Counterclaims as if fully set forth herein.

160.     Petit made false and defamatory statements about Mr. Tornquist to others.

161.     Petit made false and defamatory statements about Mr. Tornquist to others in reference to his trade or profession.

162.     These statements had the tendency and were intended to harm, and continue to harm, Mr. Tornquist's reputation and estimation in the community.

163.     The recipients of these false statements can reasonably understand that the statements refer to Mr. Tornquist.

164. Petit maliciously intended to injure Mr. Tornquist by his false statements and succeeded in its malicious intent.

165. As a direct and proximate result of Petit's illegal conduct, Mr. Tornquist has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages in excess of $75,000.00.

**WHEREFORE**, Mr. Tornquist prays as follows:

(a) That a trial by jury on all such triable claims be had;

(b) That the claims in MiMedx's Complaint be all dismissed with prejudice;

(c) That the claims for damages and other relief in MiMedx's Complaint be denied;

(d) That the Court immediately hear his request for preliminary injunctive relief and advance the trial on the merits of this action for declaratory and injunctive relief and consolidate such trial with a preliminary injunction hearing pursuant to Fed. R. Civ. P. 65(a)(2);

(e) That the Court permanently enjoin MiMedx and any associated person or entity acting on its behalf as requested herein;

(f) That the Court declare the RCA unconstitutional;

(g)     That the Court grant Mr. Tornquist's requested declaratory relief;

(h)     That the Court grant judgment in favor of Mr. Tornquist and against MiMedx for all Counterclaims brought by Mr. Tornquist and award all available damages to Mr. Tornquist accordingly.

(i)     That all costs of this action be cast upon MiMedx, including Mr. Tornquist 's attorneys' fees, court costs, and all expenses incurred in this litigation;

(j)     That the Court grant such further and other relief as it deems just and appropriate under the circumstances.

Respectfully submitted this 7th day of April, 2017.

**HALUNEN LAW**

<u>*/s/ Stephen M. Premo*</u>
Clayton D. Halunen (*pro hac vice*)
Minnesota Bar No. 219721
Mack H. Reed *(pro hac vice)*
MN Bar No. 398703
Stephen M. Premo (*pro hac vice*)
Minnesota Bar No. 393346
Christopher J. Moreland *(pro hac vice)*
MN Bar No. 278142
Kaarin S. Nelson Schaffer *(pro hac vice)*
MN Bar No. 386919
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098

Facsimile: (612) 605-4099
halunen@halunenlaw.com
reed@halunenlaw.com
moreland@halunenlaw.com
premo@halunenlaw.com
nelsonschaffer@halunenlaw.com

and

**HALL, ARBERY, GILLIGAN,
ROBERTS & SHANLEVER LLP**

/s/ *Elizabeth M. Newton*
David Allen Roberts
Georgia Bar No. 608444
Wes R. McCart
Georgia Bar No. 122355
Elizabeth M. Newton
Georgia Bar No. 975191
3340 Peachtree Road NE
Suite 1900
Atlanta, GA 30326
(t) 404-442-8776
(f) 404-537-5555
droberts@hagllp.com
wmccart@hagllp.com
enewton@hagllp.com

*Counsel for Defendant/Counterclaim
Plaintiff Luke Tornquist*

# VERIFICATION

PERSONALLY APPEARED before me, the undersigned officer duly authorized to administer oaths, Luke Tornquist, who, upon being duly sworn, deposes and states on oath that the facts and information contained in the foregoing *Defendant's Verified Amended Answer and Affirmative Defenses, and Counterclaims for Declaratory Judgment, Injunctive Relief, Damages and Attorneys' Fees* are true and correct to the best of his knowledge, information, and belief.



_____
Luke Tornquist

Sworn and subscribed before me
This ⁷ᵗʰ day of April, 2017.

_____
Notary Public
My Commission Expires:

ALISON G FROEHLE
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/21

## CERTIFICATE OF SERVICE AND
## COMPLIANCE WITH FONT SIZE AND TYPE

I hereby certify that the foregoing was prepared with Times New Roman font in 14 point size, as approved by the Court in N.D. Ga. Local Rule 5.1(c).

I further certify that on April 7, 2017, I electronically filed the foregoing *Defendant's Verified Answer, Affirmative Defenses, and Verified Amended Counterclaims for Declaratory Judgment, Injunctive Relief, Damages, and Attorneys' Fees* with the Clerk of Court using the CM/ECF system causing a true and correct copy of the same to be served upon opposing counsel:

Joseph D. Wargo
Shanon J. McGinnis
WARGO & FRENCH, LLP
jwargo@wargofrench.com
smcginnis@wargofrench.com

**HALUNEN LAW**

*/s/ Stephen M. Premo*
Stephen M. Premo (*pro hac vice*)